UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| VS. | §    CRIMINAL NO. 4:15-CR-15-2 |
| | § |
| RICHARD ARTHUR EVANS | § |

## MEMORANDUM ON FORFEITURE

**I.**

Before the Court are the government's motion for a preliminary order of forfeiture, together with related exhibits (Dkt. No. 270), and Dr. Evans' response and exhibits (Dkt. No. 265, 275). (*See* Government Ex. Nos.1 - 9; the Dr. Evans' Ex. Nos. 1-15 with subparts, excluding Ex. Nos. 2, 10 and 12). After having considered the motion, response, related briefs and exhibits, together with the oral arguments of counsel concerning the forfeiture issue, the Court determines that the government's motion for forfeiture should be granted in part.

**II.**

From July 12, 2016, to and including July 25, 2016, this Court presided over a criminal jury trial wherein the defendant, Richard A. Evans, M.D. ("Dr. Evans"), was charged with conspiracy to distribute controlled substances and commit mail fraud, in violation of Title 18 U.S.C. § 371, (Count 1); distributing controlled substances, in violation of Title 21 U.S.C. § 841, (Counts 3 - 7); mail fraud, in violation of Title 18 U.S.C. § 1341, (Counts 8 - 15); and money laundering, in violation of Title 18 U.S.C. § 1957, (Counts 20 - 24). Because Dr. Evans was a medical physician and David DeVido[1] was a pharmacist at the time of the criminal acts alleged,

---

[1] David DeVido entered a plea of guilty to Count (1) of a twice Superseded indictment for the offense of possession of a controlled substance in violation of 21 U.S.C. § 843(a)(3). David DeVido was charged in the original indictment with conspiracy, distribution of a controlled substance, mail fraud, health care fraud and criminal forfeiture.

they were both charged in their professional capacities for distributing schedule II controlled substances outside the course of their professional practices and not for a legitimate medical purpose. *See* 21 U.S.C. § 841(a); 18 U.S.C. § 2; 21 C.F.R. § 1306.04(a).  On July 26, 2016, an empaneled jury returned a guilty verdict against Dr. Evans on all counts of the indictment, save those withdrawn by the government.

The matter is now before the Court for forfeiture proceedings. Rule 32.2(b)(1)(A) of the Federal Rules of Criminal Procedure provides that after a guilty verdict on any count in an indictment for which criminal forfeiture is sought, the Court must determine what property is subject to forfeiture. *See* Fed. R. Crim. P. 32.2(b)(1)(A). The Court must also determine whether the government "has established the requisite nexus between the property and the offense." *Id*. With respect to any money judgment that the government seeks, "the Court must determine the amount of money that the defendant will be ordered to pay." *Id*.  "Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under Rule 32.2(b)(4)." Fed. R. Crim. P. 32.2(b)(2)(B).

### III.

The standard for forfeiture determinations is by a preponderance of the evidence.  *See United States v. Gasanova*, 332 F.3d 297, 300 - 01 (5th Cir. 2003) ("conclud[ing] that [a] statutorily-prescribed forfeiture is warranted upon a showing of a preponderance of the evidence") (internal citations omitted).  The Court's determination "may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).  Since forfeiture is a part of the sentencing process, the Federal Rules of Evidence do not apply, and

hearsay is admissible. *See United States v. Capoccia*, 503 F.3d 103, 109 - 110 (2d Cir. 2007) (Fed. R. Crim. P. 32.2(b)(1) allows the court to consider "evidence or information," making it clear that the court may consider hearsay).

In this case, the government seeks both a money judgment in the amount of approximately $2.5 million and seized cash and money orders in the amount of $ 17,234.42 (the government contends that the seized cash and money orders constitute proceeds of the conspiracy and mail fraud scheme for which Dr. Evans was convicted). *See* Dkt. No. 270.

Dr. Evans disputes that the government is entitled to forfeiture of these items in the amounts alleged. First, Evans contends that the government cannot extrapolate from the testimony of Dr. Graves Owen, the government's expert witness, that all the payments made to Dr. Evans by his patients who were prescribed Schedule II controlled substances are forfeitable. This argument is based on the fact that Dr. Owen only reviewed portions of 17 – 18 of the 879 Schedule II patient charts. Dr. Evans maintains that the reviewed charts equate to less than 2% of the 879 Schedule II patients seen by him from January 2010 – December 2012. He also contends that the patient charts reviewed by Dr. Owen as the underlying basis for his expert opinion were pre-selected by the government. He asserts that there is no evidence as to how these files were selected, *i.e*, whether the selection was randomly-made or were "cherry-picked" by the government because it believed the selected files to provide support for its position. Dr. Evans also disputes the government's $2.5 million figure as over-inclusive in that it seeks to have payments forfeited that were made by patients who received non-oxycodone Schedule II substances.

As support for his argument against the government's attempts at extrapolation in this case, Dr. Evans cites to the Seventh Circuit's decision in *United States v. Chube II*, 538 F.3d

693, 702 – 03 (7th Cir. 2008). *See* Dkt. No. 309. In *Chube*, the government charged two doctors, brothers Randy and David, with 33 counts each of conspiracy to distribute oxycodone. The jury, however, convicted Randy of only one count and David of only six counts, rejecting both the conspiracy charges. *Chube*, 538 F.3d at 694. At the sentencing hearing, during which relevant conduct findings were critical and dramatically enhanced each defendant's guidelines range, the district court discussed only 10 of the 98 patient files and essentially declared all of the prescriptions unlawful. *Id.* at 703 – 04.

On appeal, the Seventh Circuit found no explanation as to "why the prescriptions in the 98 files were not merely unnecessary, but indicative of illegal drug pushing," and concluded that "[t]he court's assumption of a lack of legitimate medical purpose for every prescription in 98 files after discussing only 10 files with any specificity was not enough to support its findings." *Id.* at 704. The Seventh Circuit upheld the convictions, but remanded for resentencing, explaining that: "[w]hen the district court revisits relevant conduct on remand, it must explain its findings with respect to each patient and make a reasoned determination whether or not the government has carried its burden of establishing that each prescription was dispensed outside the scope of medical practice and without a legitimate medical purpose." *Chube*, 538 F.3d at 705 – 06.

The Court further noted that in a case where "a defined set of concrete data form[s] the sole basis for determining the quantity of illegally prescribed drugs[, in order] [f]or a prescription to be included in relevant conduct, the court must evaluate the facts surrounding that particular prescription and explain why those facts render it unlawful." *Id.* "Generalizing from 'numerous' files will not suffice." *Id.* It is also important to note, however, that in affirming the physician-defendants' convictions, the *Chube* court did not hold that expert testimony was required to

sustain the conviction, but rather that the court consider whether expert testimony about a civil standard of care might have muddied the question of "legality." *Chube*, 538 F.3d at 698 – 99.

In a brief filed in response to Dr. Evans' contentions on February 8, 2017, the government maintains that Dr. Evans' attempts to relitigate the jury verdict in the forfeiture phase of this case through certain patients should be disregarded. (*See* Dkt. No. 313 at 1). It avers that the law is well-settled that "'[t]he calculation of forfeiture amounts is not an exact science,' and requires estimation."[2] *United States v. Jafari*, No. 15-556-CR, 2016 WL 5340280, at *5 (2d Cir. Sept. 22, 2016) (quoting *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011)). As support for its position that Dr. Evans' arguments should be disregarded, the Government relies on the Sixth Circuit's decision in *United States v. Rodriguez-Iznaga*, 575 F. Appx. 583, 585 (6th Cir. 2014), wherein the Sixth Circuit recognized that estimation or approximation with regard to patient files may be appropriate when calculating quantities, especially where a district court provides an explanation for its decision and does not merely engage in a "rote extrapolation from the few to the many or an unsupported estimation." *Rodriguez-Iznaga*, 575 F. Appx. at 588.

### IV.

In *Rodriguez-Iznaga*, when distinguishing the case before it from the *Chube* case, the Sixth Circuit noted that the lower court in *Rodriguez-Iznaga*, unlike the court in *Chube*, did explain why the prescriptions to the OH-KY-WV residents *were more than merely unnecessary* **and** *were indicative of drug trafficking* by reasoning that no reasonable person in such pain would travel 15-plus hours to Florida, every 30 days, when he or she could get the same medication "down the street" or "across the road." *Rodriguez-Iznaga*, 575 F. Appx. at 585

---

[2] Noteworthy is the fact that each of these cases cited by the government and the defendant involve the question of "relevant" conduct in the sentencing phase of the case.

(emphasis added). The district court further noted that it could not conclude, by a preponderance of the evidence, that such individuals would have traveled to Florida for any other reason than to obtain pills to bring back to Kentucky to distribute. *Id.*

Of important significance, however, is the fact that other courts, when considering the requirement of expert testimony in cases where, as here, the physician-defendant is charged with violating § 841(a)(1), have held that expert testimony is not required, assuming there is other evidence, including lay testimony and the like, that the defendant acted outside of the scope of his or her usual course of professional practice and other than for a legitimate medical purpose.

The Fifth Circuit, for instance in *United States v. Armstrong*, in rejecting a physician-defendant's challenge to his conviction premised on the government's failure to tender expert testimony, has reasoned:

> While expert testimony may be both permissible and useful, a jury can reasonably find that a doctor prescribed controlled substances not in the usual course of professional practice or for other than a legitimate medical purpose from adequate lay witness evidence surrounding the facts and circumstances of the prescriptions.

*United States v. Armstrong*, 550 F.3d 382, 389 (5th Cir. 2008), *overruled on other grounds by United States v. Balleza*, 613 F.3d 432, 433 (5th Cir. 2010); *see also United States v. Word*, 806 F.2d 658, 663 – 64 (6th Cir. 1986) (affirming conviction of physician and finding expert testimony not required given facts of case); *United States v. Smurthwaite*, 590 F.2d 889, 89 (10th Cir. 1979) (finding expert testimony not required to support conviction of physician defendants).

*Armstrong*, nonetheless, is distinguishable from the case at bar in that, in *Armstrong*, the government presented evidence of an extremely high volume of patients, something more akin to 300 patients in a four-to-six-hour period; quick patient visits; long-term rather than short-term treatment plans, which conflicted with the clinic's own medical guidelines concerning chronic pain management; the lack of meaningful physical exams on initial and repeat visits; sham

physical therapy sessions; false documentation; pre-printed medical comments; a cash-only payment policy; and the lack of individualization of prescriptions, which were prepared in advance of the appointment and required only the doctor's signature. *See Armstrong*, 550 F.3d at 389 - 390.

The *Smurthwaite* case is likewise distinguishable in that patient office visits lasted not more than five minutes with little or no physical exams, patients were billed per prescription, and the physician defendant knew or at least harbored some knowledge that the prescription medication was not being used as intended. *See Smurthwaite*, 590 F.2d at 892.

Dr. Evans maintains that the government cannot use Dr. Graves Owen's review of 18 – 20 selected patient charts of the alleged 879 Schedule II patients' charts to conclude that, with regard to the remaining 916 or so patients, the defendant distributed Oxycodone "outside the course of professional practice and not for a legitimate medical purpose" in violation of Title 22, Part 9, Chapter 170, and 21 C.F.R. § 1306.12. Also, Dr. Evans argues there is no evidence concerning how the patient chart process of selection was structured. Therefore, he avers that it violates due process to permit the government to "cherry-pick" files that might favor the government's position and use that evidence as a scientific basis for extrapolation.

V.

Again, this is a forfeiture proceeding, not a sentencing proceeding. When assessing forfeiture, a district court is required to make a *reasonable* estimate of the loss, in light of all of the information available and may "use general points of reference as a starting point for calculating the losses or gains from fraudulent transactions." *Jafari*, 2016 WL 5340280, at *5. Indeed, to this end, any extrapolations made must be reasonably established by a preponderance

of the evidence. *Id.* They must also rest on a finding that the prescription was not issued for a legitimate medical purpose and not in the usual course of the physician's professional practice.

The testimony of Dr. Graves Owen tendered by the government in support of its unlawful distribution claims and for forfeiture does little to distinguish prescriptions that were "medically unnecessary" or "carelessly" issued from those that were, indeed, unlawful and issued without a legitimate medical purpose. This is so because it is undisputed that Dr. Evans treated "real" patients with "real" pain. In fact, Dr. Owen acknowledged on cross-examination that he never found an instance of Dr. Evans prescribing controlled substances where there was not a complaint of pain or of Dr. Evans meeting with someone outside of his practice and just providing them with a prescription without having a medical chart/file on them. (*See* Dkt. No. 309, Ex. C. Trial Tr. at 1188:15 – 23). Additionally, the two patients called by the government during trial, James Bourke and Kimberly Richardson, both testified that they were experiencing real pain and that Dr. Evans helped them. (*See Id.*, Trial Tr. at 797, 815, 848 – 49, 1064 – 65). Dr. Owen did not dispute these facts. As well, there was no jury finding as to the impropriety of issuing prescriptions for any of the other Schedule II controlled substances, namely, methadone, Opana (oxymorphone), and Dilaudid.

In light of the evidence and case law presented, the Court determines that the proposed extrapolation presented by the government is improper. Unlike a determination of "guilty," where the defendant allegedly engaged in dispensing drugs "outside the course of professional practice and not for a legitimate medical purpose," the government does not enjoy a presumption that every prescription issued to the alleged 879 Schedule II patients was outside the course of professional practice and not for a legitimate medical purpose. The Court will explain further.

Oxycodone is a drug that may be legally prescribed or dispensed by a physician where the injuries and/or pain experienced by a patient may not be safely and medically alleviated by surgery or other appropriate methods. The evidence shows that Dr. Evans was, at all relevant times, a physician authorized to treat patients with chronic pain and dispense Oxycodone as well as other Schedule II medications. The evidence also shows that: (a) patients reported chronic pain that was undisputed; (b) any absence of documentation in the patient charts was not required by the Texas Medical Board; (c) Dr. Owen's conclusion, that Dr. Evans failed to maintain proper documentation in "most" of the charts reviewed, was associated only with the charts reviewed; (d) Dr. Owen did not distinguish Dr. Evans' patient charts related to workers' compensation cases from those related to automobile accident chronic pain patient cases (*See Id.*, Trial Tr. at 1197 – 98); (e) Dr. Owen admitted that each patient executed an informed consent document; and finally, (f) Dr. Owen admitted that Dr. Evans complied with the Texas Medical Board's rules in place during the relevant period. (*See Id.*, Trial Tr. at 1235- 37; 1240). Admittedly, Dr. Owen was of the opinion that, even if Dr. Evans met the Texas Medical Board requirements, that the documentation in the file did not establish that a therapeutic benefit was realized. His determination, however, was based on a "lack of proper" documentation, not whether a therapeutic benefit was, in fact, realized.

Therefore, the Court is of the opinion that Dr. Owen's testimony does not establish a basis for extrapolation for the purpose of forfeiture. His review covered less than 2% of the charts/files identified as Oxycodone patients. There is also evidence presented by Dr. Evans that is undisputed as it relates to the unreviewed files. Further, there is no evidence that in the remaining 861 patient charts Dr. Evans' practice and/or conduct was sufficiently identical to that in the files examined such that Dr. Owen's opinion would be the same for each. In fact, there is

evidence that Dr. Evans from time-to-time reduced or changed the prescriptions concerning his patients. As well, he discharged patients that he suspected of abusing the drugs. (*See* Dr. Evans Ex. Nos. 123, 127, 129, 131, 136, 145, 148, 156, 163, 166, 170, 173, 178 and 182).

Simply put, the government cannot rely on a verdict of "guilty" as direct evidence of Dr. Evans' criminal conduct regarding the 861 patient charts that were not reviewed. The Court holds that a reasonable person cannot infer from the review of less than 20 files and a "guilty" verdict that the remaining unreviewed patient charts violated federal law. Dr. Evans was not found to be a "drug dealer" as that term may be used in street parlance. Rather, he was a licensed physician, who has been found guilty of "illegally" dispensing a drug.

## VI.

The Court holds that the government's motion for forfeiture fails, except as to those patient charts/files examined, and for which no expert or lay opinion was offered. Therefore, based on the Court's 2% formula, the Court determines that $ 268,336, representing $50,000 based on 2% of the $2.5 million sought, $17,234 seized at Dr. Evans' office and $201,102 determined to be laundered funds, should be and is hereby FORFEITED.

SIGNED on this 13th day of February, 2017.

_____
Kenneth M. Hoyt
United States District Judge