1   **UNITED STATES DISTRICT COURT**
    **SOUTHERN DISTRICT OF TEXAS**
2   **HOUSTON DIVISION**

3

4   UNITED STATES OF AMERICA      *      4:15-CR-15-S
                                  *      Houston, Texas
5   VS.                          *
                                  *      9:05 a.m.
6   RICHARD ARTHUR EVANS, M.D.    *      July 18, 2016

7
                              **JURY TRIAL**
8
                              **Volume 5**
9
                **BEFORE THE HONORABLE KENNETH M. HOYT**
10                   **UNITED STATES DISTRICT JUDGE**

11
    **APPEARANCES:**
12
    **FOR THE GOVERNMENT:**
13  Cedric Joubert and Quincy Ollison
    OFFICE OF THE U.S. ATTORNEY
14  1000 Louisiana, Suite 2300
    Houston, Texas 77002
15  713.567.9719

16

17  **FOR THE DEFENDANT:**
    Charley Davidson and Erin Kolodny
18  HANZEN & LAPORT
    11767 Katy Freeway, Suite 850
19  Houston, Texas 77079
    713.962.9392
20
    And
21
    Jennifer Bolen
22  J. BOLEN GROUP, LLC
    14875 Buttermilk Rd.
23  Lenoir City, Tennessee 37771
    865.986.1948
24

25

1  Court Reporter:
   Johnny C. Sanchez, RPR, RMR, CRR
2  515 Rusk, #8004
   Houston, Texas 77002
3  713.250.5581

4  Proceedings recorded by mechanical stenography.  Transcript
   produced by computer-assisted transcription.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2    **WITNESS**                                                    **PAGE**

3    KIMBERLY RICHARDSON
         CONTINUED CROSS-EXAMINATION BY MR. DAVIDSON          1057
4        REDIRECT EXAMINATION BY MR. JOUBERT                  1096

5

     GRAVES OWEN
6        DIRECT EXAMINATION BY MR. JOUBERT                    1116
         CROSS-EXAMINATION BY MS. BOLEN                       1185
7        REDIRECT EXAMINATION BY MR. JOUBERT                  1243

8

     DAVID DEVIDO
9        DIRECT EXAMINATION                                   1254

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Government Exhibit 87 admitted                    1268
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    **(The following was held out of the presence of the jury)**

2            THE COURT:  I need to take up a matter with

3    the lawyers before we get started.  So y'all were stuck in

4    traffic holding up the traffic out there.  I don't need to

09:05:50    5    take it up here -- well, yeah, you can come up to the

6    bench.  That might be appropriate.  But I think it will be

7    just as well, if I spoke with you, y'all just come closer

8    so I don't have to speak so loudly.  Where is your witness?

9    Outside?

09:06:03    10            MR. JOUBERT:  She's here, Your Honor.  She just

11    went outside.

12            Judge, if I may anticipate to --

13            THE COURT:  Let me tell you that you don't have

14    to, just in case.  I'm getting ready to discuss and talk

09:06:29    15    about the expert witness report, and what the Court will

16    permit.  Okay?  Or have y'all worked something out?

17            MR. JOUBERT:  Well, I gave them the first 20 or

18    30 pages, Your Honor, yesterday evening, if that's what

19    you're going to get to.

09:06:44    20            THE COURT:  I figure you gave them basically

21    what they need to know that there's a report, but I need to

22    know -- let me ask you, maybe I'll start it this way.  What

23    is the doctor's opinion that you have requested him to

24    give?

09:06:57    25            MR. JOUBERT:  His opinion essentially is that

1 Dr. Evans was not practicing medicine.

2          THE COURT:  I saw a section in there having to

3 do with a pill mill or something like that.

4          MR. JOUBERT:  That was part of the first 32

5 pages.

6          THE COURT:  I understand.  But is that his

7 conclusion, that he was actually operating "a pill mill"?

8          MR. JOUBERT:  I do not think so, Your Honor, I

9 think that's actually to guide me on what to look for in

10 the pill mill.

11          THE COURT:  I see.

12          So the bottom line -- is there a portion of the

13 report that I ought to look to or that would be the

14 summary of whatever his --

15          MR. JOUBERT:  Yes, Your Honor, there is.

16          MS. BOLEN:  Top of Page 49 of that expert

17 report.

18          THE COURT:  49?

19          MS. BOLEN:  Yes, sir.

20          THE COURT:  Okay.  I think that's what was

21 called the summary.  Yeah, that's why I was asking.  I

22 thought that's probably what it was or is.

23          MR. OLLISON:  I got it.

24          THE COURT:  All right.  And is it what would be

25 represented at Page 49, represented on Page 49?

1033

1          MR. JOUBERT:  That is a summary, Your Honor,

2  yes, sir.

3          THE COURT:  Well, I mean is that, that's what

4  he would be speaking about --

09:08:15   5          MR. JOUBERT:  Yes.

6          THE COURT:  -- when you ask you questions.

7  That's basically his opinion?

8          MR. JOUBERT:  Yes, Your Honor.

9          THE COURT:  Okay.  What I see included in this

09:08:22  10  report are treatises, perhaps papers that he's written,

11  papers that other men or people who -- other doctors and

12  scientists who might have treated or written opinions.  I

13  see him giving us kind of a background to what he and his

14  educational experience and knowledge would "rely upon" in

09:08:57  15  making and formulating his opinion -- his educational

16  experience is basically and what's going on and what's

17  being taught out in the marketplace.

18          Then I saw that you did, I gather, a summary or

19  analysis as to each of the 15 or 17?

09:09:15  20          MR. JOUBERT:  That's correct.

21          THE COURT:  About 17 patients, all of whom

22  would not -- you're not presenting evidence on in this

23  case; right?

24          MR. JOUBERT:  Correct, Your Honor.  Just so the

09:09:26  25  Court will know he looked at another one over the weekend.

1          THE COURT:  Okay.  But his analysis of the

2   paperwork associated is without "the benefit of an

3   examination of the individual patients."  Agree?

4          MR. JOUBERT:  That's correct, Your Honor.

09:09:39    5          THE COURT:  All right.  So here's my point,

6   here's the point of my bringing this to your attention.  I

7   will not permit cross-examination regarding whatever he

8   might have looked at in terms of his -- in terms of his

9   educational experience.  If he's qualified to give an

09:09:59   10   opinion and you don't challenge that, have not challenged

11   it, then if he's read treatises or a hundred treatises and

12   whether he's presented them and said these are some papers

13   that speak to these issues, not an area for

14   cross-examination because his opinion -- are you going to

09:10:17   15   be questioning?

16          MS. BOLEN:  Yes, sir.

17          THE COURT:  His opinion is limited to the

18   documents and when I say documents, I mean the medical

19   paperwork that has been presented to him that would be a

09:10:31   20   part, I gather, of Dr. Evans' records and documents.  So

21   that's the basis of his opinion; the fact that he has

22   education and he lies upon other treatises may be relevant

23   only if there are some or a treatise that contradicts what

24   he's saying.  And to that extent he can be impeached on by

09:10:54   25   any -- he can impeach in question, let me say it that way,

1 impeaching questions can be asked concerning other

2 treatises that disagree with him or disagree with his

3 opinion.

4               I will not permit, however, a battle

09:11:08  5 between the lawyer and the witnesses, or lawyers and the

6 witnesses about which of these treatises is right or wrong,

7 or how a particular doctor writes a book and he has not

8 read the book or he has read the book and he is certainly

9 if he has a different opinion, you can ask him if his

09:11:30  10 opinion is different than doctor whomever.  I don't have a

11 problem with impeachment.  I do have a problem, obviously,

12 with the bulk of this because it's really not an opinion

13 regarding the patients, it's really more of his explanation

14 of all of the -- not all, really, it's probably just some

09:11:49  15 of the work that he's looked at to reach his conclusion.

16 Are we on the same page?

17               MR. JOUBERT:  Yes, Your Honor.

18               MS. BOLEN:  Yes, sir.

19               MR. JOUBERT:  If it please the Court, we

09:11:58  20 mentioned Page 49.  I think Page 50 actually has the word

21 "conclusions" on it, of his summary.

22               THE COURT:  Here's where I'm going with this.

23 It should not take you more than an hour to get his opinion

24 into evidence.  It doesn't matter how many books he's read.

09:12:13  25               MR. JOUBERT:  Okay, Your Honor.  I'm glad you

1  brought that up.  I had hoped to go through certain patient

2  files with him.

3              THE COURT:  You're not going to be able to go

4  through patient files.  He is not -- why would you want to

09:12:26    5  go through patients' files?

6              MR. JOUBERT:  Simply --

7              THE COURT:  He has an opinion that's global,

8  that reaches all of this, doesn't he?

9              MR. JOUBERT:  Yes, Your Honor, but I think I

09:12:32   10  have to ask him if he reviewed certain patient files in

11  order to be here today.

12              THE COURT:  Sure.  But you don't have to go

13  into the -- all of that stuff is basically hearsay to him

14  in this case.  What specifically, individually in each of

09:12:48   15  these files and I'm talking about what expert witnesses do.

16  They go look at hundreds, maybe even thousands of pages of

17  documents, but it is not for the lawyers to say well, I

18  want to go through 500 of those pages with you and here are

19  the individual things that we need to go through.  What

09:13:06   20  you're talking about is a -- seems to me, is a series of

21  questions that would be associated with his lack of use of

22  medical skills, his lack of use of doctor skills.  In other

23  words, if you did A, B, C, D, E and F, if that's what's --

24  did you find that in the record?  And if he says no, then

09:13:26   25  would that be appropriate and necessary in order for you to

1 be -- for him to be "seriously or treating these patients"?

2 See?  Because the standard has nothing to do with what is

3 in the file.  It has to do with what's not in the file.

4          MR. JOUBERT:  That's correct, Your Honor.  And

09:13:41    5 that's what he concluded in his summary.

6          THE COURT:  Right.  And so, I don't want to get

7 bogged down in the question of what it is in each of these

8 individual patient files.  The jury has that record more

9 than they need.  They should not really in most instances

09:13:59   10 have these records.  What you're doing is saying that you

11 reviewed these records because that's what you would do.

12 Have you read the files that have been provided to you for

13 these 17 or 18 patients?  I have.  And, Jeff, what is your

14 opinion?  And he'll tell you.  He can do that in five

09:14:13   15 minutes, then if there are some specific things that bear

16 upon his -- the lack of what is the -- whatever the

17 standard is, that you're seeking, if there are things

18 specifically that are missing or absent from the files, and

19 from what he reviewed, that he would expect to see in there

09:14:35   20 in order to treat the patient the way the patient was

21 treated, then that becomes relevant.  Not so much what was

22 in there, like:  We saw him five times; we did this; we did

23 that.  That's so much detail that the jury will get lost,

24 and then the question becomes:  Well, he treated this one

09:14:54   25 differently than he treated the other will one.  So does

1038

1  that mean that maybe this is okay and that's not okay?

2            That's not proper examination, because he

3  is looking at them individually, and he's looking at them

4  globally.  And what I'm saying is that I am not interested

09:15:12  5  in hearing examination or cross-examination questions

6  regarding the  details of each of these files.  I'm not

7  even sure -- let me ask, are these files in evidence?

8            MR. JOUBERT:  Yes, Your Honor -- well --

9            THE COURT:  They're not in evidence.

09:15:32  10            MR. JOUBERT:  I'm sorry.  Some of them, but not

11  all of them.

12            THE COURT:  Well, some portions having to do

13  with history and some of the notes, et cetera.  I'm not

14  sure what all is in there because, let's say a file is a

09:15:44  15  hundred pages of one patient, that -- that hundred pages

16  can't be relevant to whether or not -- I mean, it could be

17  relevant in an overall view, but you cannot get bogged down

18  in the individual questions regarding whether or not there

19  is some piece of paper that should be in there that would

09:16:04  20  make this okay.

21            MR. JOUBERT:  Yes, Your Honor.

22            THE COURT:  Or it's not okay.

23            MR. JOUBERT:  But as the Court has pointed out,

24  of course, we're also interested in what's not in the

09:16:13  25  files.  And in order to establish that, we have to ask

1 questions about with is in the file.  And --

2          THE COURT:  No, you don't.  No, you don't.

3 Because what's not in the file is evidentiary.  It doesn't

4 matter what's in there at that point.

09:16:25  5          MR. JOUBERT:  When you say "evidentiary" --

6          THE COURT:  What's not in the file is the

7 evidence.  What has not been done is the evidence, or what

8 was not being done is the evidence based upon the

9 indictment that you charged.  Not what's in there.  Unless

09:16:40  10 what's in there is convicting, meaning you gave this person

11 50 milligrams of something and that would be illegal.

12          MR. JOUBERT:  But, Your Honor --

13          THE COURT:  That's not what's in the file.

14          MR. JOUBERT:  Respectfully, I just have to ask

09:16:55  15 the question because this kind of hit squarely on some of

16 the points that I planned to cover with the expert.  Do you

17 remember the testimony on Friday concerning Samantha

18 Gardner?

19          THE COURT:  Yes.

09:17:05  20          MR. JOUBERT:  Do you remember the certain pages

21 in the file that talked about her having wounds in her

22 hand, and the fact that a letter was read that her sister

23 called in saying she was injecting oxycodone?

24          THE COURT:  What's that got to do with whether

09:17:18  25 or not he has an opinion about the doctor's practice?

1          MR. JOUBERT:  Well, if it please the Court, I

2     believe that there's a page in the file that talks about

3     that doctor seeing that patient within a day or two.

4          THE COURT:  Yeah, the jurors heard that.

09:17:32    5          MR. JOUBERT:  And also the doctor's notes and

6     conclusion about what he did and the way he handled that

7     matter.

8          THE COURT:  Why would that detail be important?

9          MR. JOUBERT:  Because it's --

09:17:40   10          THE COURT:  What he did?

11          MR. JOUBERT:  Because it goes to show again

12     what he did not do, Judge, as you said.

13          THE COURT:  No, that doesn't show what he did

14     not do.  What that shows is what he did.  It seems to me

09:17:49   15     that if I were a doctor and I wanted to answer the question

16     whether or not I have an opinion about the doctor's

17     treatment, I'd want to ask whether or not if somebody is

18     injecting drugs, whether or not that's a red flag for you.

19     And then how would you handle that red flag in your

09:18:04   20     practice?  And did you see evidence in the file of not --

21     that not happening?  That's the appropriate, that's the

22     approach, because when you reduce it to individualized

23     patient files, that is the details of it, it seems to me

24     what you're doing is you're saying you're going to prove

09:18:22   25     every individual -- you're going to have to prove every

1 individual, what's not handled appropriately by the

2 specifics in the file.  And what your doctor should have

3 done is looked at each of these files and been able to

4 say -- and be able to say I looked at all of these files

09:18:43  5 and none of them are right.

6          MR. JOUBERT:  Well, he'll come close to that,

7 but he will.

8          THE COURT:  Well, if some of them are not right

9 then they should not be a part of the evidence.  I mean, if

09:18:52 10 any of them meet the standards, then we shouldn't be

11 presenting evidence on it.

12          MR. JOUBERT:  No, but I'm trying to agree, with

13 it, Judge, that he did look at the files and he will say

14 where it was not right.

09:19:02 15          THE COURT:  Okay.

16          MR. JOUBERT:  But by way of saying what's not

17 right in order to get there I think I have to ask him

18 sometimes well, what did happen.

19          THE COURT:  I'll be concerned about that only

09:19:11 20 to the extent that it seems to me that when you're

21 presenting expert evidence you're not trying to prove the

22 details behind -- you're trying to disprove or prove the

23 fact that those details are not -- are insufficient.  And

24 certainly I can understand where there may be some specific

09:19:31 25 instance where a question regarding:  What do you do with a

1  patient who is shooting up every day?  But you don't have

2  to associate that with any particular file, necessarily.

3  Because there's a standard of treatment that is associated

4  with the treatment that you should be giving.  What do you

09:19:46  5  do with a patient where something is happening?  There's a

6  standard of care and it doesn't matter whether it's

7  Samantha or Josephine, or whoever it is.  That's my

8  concern.

9                    So you jumped that when I said you should

09:19:59  10  be able to do this in an hour.  So that means that you plan

11  on spending a day with this witness?

12                    MR. JOUBERT:  No, Your Honor.

13                    THE COURT:  How much time do you think you

14  need?  Because I'm going to limit the defense.  I'm not

09:20:09  15  going to just let you-all run over the jury and cross every

16  trail that you think is -- this is not a fact witness, this

17  is an expert witness.  And he is not -- I'm not going to

18  permit him to get lost in the details.

19                    MR. JOUBERT:  Your Honor, and that's my concern

09:20:24  20  too.  I don't plan to get lost in the details.  I thought

21  it might take us about two hours.  I'll cut it down to less

22  than that and try to get right to the point.

23                    THE COURT:  Let me ask opposing counsel.  Why

24  can't you cross-examine him in an hour?  You know what he's

09:20:37  25  going to say.

1        MS. BOLEN:  I think I have had some pretty

2   quick cross-examinations, and I don't have a problem with

3   it.  My concern is that:  One, obviously this is a criminal

4   case --

09:20:47  5        THE COURT:  That's right.

6        MS. BOLEN:  -- and that we need to be very

7   careful about using the standard language because it's not

8   civil, it's not negligence, it's not anything like that.  I

9   am concerned that as -- and I will be happy to provide some

09:21:01  10  cases if the Court wishes.  The issue here is whether or

11  not this doctor, Dr. Evans --

12       THE COURT:  Right.

13       MS. BOLEN:  -- abandoned his role as a medical

14  professional, not whether he did something as good as any

09:21:17  15  of the experts would have done it or anything like that,

16  and so that's one of my concerns is that we are very

17  careful with that language.

18            Number two, I'm a little bit concerned

19  based on the summary information of Dr. Owen's report.

09:21:31  20       THE COURT:  Well, I'm not going to get into the

21  details of that.

22       MS. BOLEN:  I'm just concerned about the issue

23  of intent, as an expert not testifying about a doctor's

24  intent.

09:21:37  25       THE COURT:  None of this report is coming into

1 evidence.

2             MS. BOLEN:  I understand that.  But verbally

3 out of his mouth.

4             THE COURT:  Okay.

09:21:42  5             MS. BOLEN:  This professional, Dr. Owen, has

6 testified before.  I'm very familiar with his testimony.

7             THE COURT:  Okay.

8             MS. BOLEN:  And it tends to get close to

9 speaking to the issue of intent.  There are several bullet

09:21:53  10 points on here where Dr. Owen has bracketed willful

11 blindness, for example, bullet point Number 2 on Page 49.

12             THE COURT:  I see that.

13             MS. BOLEN:  There's a couple of those like

14 that, Your Honor, and I believe the law is that the expert

09:22:06  15 can testify that his opinion, you know, how he arrived at

16 it, but he can't comment on what he thinks the defendant --

17             THE COURT:  Well, let me ask you, are you

18 planning to submit an instruction, are you planning to

19 submit some instruction deliberate ignorance or willful?

09:22:21  20             MR. JOUBERT:  Yes, Your Honor.

21             THE COURT:  So that's an ultimate issue,

22 though, but not the doctor that testified as to what

23 constitutes that by definition.

24             MR. JOUBERT:  I believe that Ms. Bolen

09:22:35  25 accurately stated that what's at issue is the doctor's

1  intent, and we've proved that in a number of ways of which

2  one may be willful blindness.

3           THE COURT:  I understand that, but the doctor

4  that is testifying cannot testify that this was willful

5  blindness.  This was deliberate blindness on the part of

6  Dr. Evans.  He can always testify that he should have

7  known, or because this is the standard or this is -- he

8  ignored this.  I mean, there are words that can be used

9  that leaves a jury to conclude or not that there was

10 "willful blindness" that is, deliberate ignorance on the

11 part of Dr. Evans in his treatment of these patients.  One

12 example may be, for example, with Samantha, you know, when

13 a person sees the needle marks, assuming that that's what

14 they looked like, you could say:  Well, what did that tell

15 you, doctor?  And he can tell you what that means.  And if

16 a doctor ignores that, does that mean the doctor is being

17 negligent or not negligent, that's not the right term.  Is

18 the doctor abandoning his -- the standard of care when he

19 fails or if he did, to do whatever he did, without saying

20 willful blindness.  That's all I'm saying.

21           I'm trying to get my timeframe right.

22 Hour and a half?  Hour and a half and you get an hour?  How

23 long?

24           MS. BOLEN:  I'm sure we can do it.

25           THE COURT:  How long is your witness going to

1 take?

2                    MS. BOLEN:  About an hour, Your Honor.

3                    THE COURT:  Not an hour.  Okay.  Because he

4 is -- his purpose -- or one of them anyway, purpose is to

09:24:06    5 rebut.

6                    MS. BOLEN:  To refute, yes, sir.

7                    THE COURT:  Yeah.

8                    MS. BOLEN:  And to make sure that there's an

9 understanding of the standard, the reference of the

09:24:12   10 standard.  And I believe it's Chapter 170.  As many of the

11 cases refer to in these instances, the Court allows some

12 latitude when you're talking about a state regulatory

13 standard coming in and the expert using that as a measure.

14 And that really is the measure here, not some evidence

09:24:31   15 based medicine or anything like that.  That's more civil.

16 The measure here is did the doctor perform as a doctor, or

17 did he completely take off the coat and run around as a

18 drug dealer.

19                    And so, to that extent, I do think that

09:24:46   20 that would be a relevant standard for some inquiry, and

21 it's more about, you know, you said there was no treatment

22 plan mentioning, you know, the number of dosage units of

23 medication.  He says that in his opinion here, he said it's

24 a violation of the Texas Medical Board rule.  And then our

09:25:01   25 position would be we would want to refute that and perhaps

1 call attention to something.

2              And that's really the way that I see the

3 cross-examination going.  And then a little bit about his

4 own practice, I think, is relevant.

09:25:15    5              THE COURT:  All right.  Okay.

6              MR. JOUBERT:  Your Honor, I'll do my best to

7 keep it down to an hour, hour and a half at most.

8              THE COURT:  Mr. Davis, how much more time do

9 you need with this witness that's on the witness stand?

09:25:27   10              MR. DAVIDSON:  Judge, assuming we don't need to

11 revisit any of the video, not the section that was played,

12 but other aspects of the visit, the office visit in

13 September 2012, I would say maybe an hour.

14              THE COURT:  Why so much time?

09:25:45   15              MR. DAVIDSON:  Because, Judge, I need to go

16 through with her some of the office visit charts that

17 discuss changes in --

18              THE COURT:  Are you talking about her chart?

19              MR. DAVIDSON:  Yes, sir.

09:25:57   20              THE COURT:  Okay.

21              MR. DAVIDSON:  That discussed changes in

22 medication and the reasons for those changes.  Perhaps

23 less, Judge, I'm really frankly --

24              THE COURT:  Well, I made some notes because

09:26:08   25 what I have experienced over the last 30-plus years, with

1048

1 counsel, whether it's the government or the defense, is

2 that we start all over again the next Monday after we spent

3 two and a half, three, four hours with the witness on a

4 Friday.  And I hate to have witness carry over.  I hate

09:26:26   5 that because while there has to be some way to introduce

6 yourself back into the subject matter, it is unnecessary to

7 cover, and will not be permitted to recover -- to cover all

8 of the remember what we talked about on Friday kind of

9 questions.  Let's go back there and restate those answers

09:26:48  10 all over again, that kind of thing.

11            MR. DAVIDSON:  Judge, I'll let the Court know I

12 have no intention of doing that.  I was going to pick up

13 where I was on my cross, had we continued to go on Friday.

14 The only two things I anticipate talking to her about that

09:27:01  15 we addressed at all on Friday is:  One, criminal

16 convictions; and, secondly, I have a single question --

17            THE COURT:  Criminal convictions on her part?

18            MR. DAVIDSON:  Yes, sir.

19            THE COURT:  You've already covered that,

09:27:13  20 haven't you?

21            MR. DAVIDSON:  There have been some convictions

22 brought out, Judge.  I think there may be some additional

23 ones.

24            THE COURT:  I'm not going to let you go back

09:27:19  25 there.  I mean, how many convictions do you need for a

1049

1  person to be impeached?

2          MR. DAVIDSON:  Well, I think, Judge, if a

3  witness is not truthful with the jury regarding their

4  criminal history --

09:27:28  5          THE COURT:  I thought she said this is all I

6  remember.  If you're refreshing her memory, why do you need

7  to refresh her memory about some things that --

8          MR. DAVIDSON:  Because, Judge, just as with

9  Mr. Bourke, he didn't remember any additional convictions

09:27:39  10  until we asked him about certain additional ones, and then

11  he said:  Oh, yes, I forgot about this.

12          So I think those are relevant to show her

13  credibility to the jury.  I think they're going to be a

14  matter of two or three questions, total, in that regard.

09:27:51  15          THE COURT:  So the credibility issue is no

16  longer a credibility issue in terms of impeachment, but a

17  credibility as impeachment as the conviction.  Now you're

18  testing the credibility -- her credibility as to whether or

19  not she actually forgot?

09:28:03  20          MR. DAVIDSON:  I think it relates to both

21  aspects, Judge.

22          THE COURT:  Okay.

23          MR. DAVIDSON:  And the only other issue, Judge,

24  is I have a single question regarding --

09:28:09  25          THE COURT:  You don't have to tell me

1 everything.

2         MR. DAVIDSON:  But it was addressed Friday.

3         THE COURT:  I'm getting time sensitive because

4 we solved one of our juror's problems.  But the other one

09:28:19  5 that had flight out -- that told us that she had plans to

6 be out of here next Tuesday, you know.  That's something

7 that I don't have any control over and neither do you.  And

8 I'm concerned about that, in terms of whether or not we are

9 maximizing and using our time as wisely as we should.  And

09:28:33  10 I'm not accusing you of not doing that.  I'm simply being

11 the administrator here.  I'm the umpire.  I'm going to call

12 the balls and strikes, and we don't have to like it, but

13 I'm going to do my best.

14         MR. DAVIDSON:  Judge, the only other thing, we

09:28:47  15 would, since the Court discussed the length of the trial

16 and timing and things like that, we thought we should let

17 you know that we, the defense, believe that, collectively,

18 our case will probably take between two and three days.  I

19 realize that's somewhat speculative because we don't know

09:29:03  20 how long cross-examination is or how long each witness is

21 going to take.

22         THE COURT:  And you have control over some of

23 that, but I understand that.

24         MR. DAVIDSON:  So we just wanted to put the

09:29:10  25 Court on notice of that.

1                    THE COURT:  How many witnesses are you going to

2 have?

3                    MR. DAVIDSON:  Judge, we will have -- I'm

4 thinking of eight offhand.

09:29:20   5                    THE COURT:  Let me ask you -- and we never

6 did -- probably need to go ahead and talk about it.  We

7 never did talk about "two experts."  One of them is

8 certainly a rebuttal person.  What is the other person?

9                    MS. BOLEN:  The other one, Your Honor,

09:29:33  10 addresses a very specific component of the issues of

11 abandoning a role as a doctor.  And it relates to

12 the risk --

13                    THE COURT:  I'm not going to permit two

14 witnesses to testify regarding the standard of care.

09:29:46  15                    MS. BOLEN:  Well, they're not going to be, in

16 my opinion, testifying about the standard of care.  They're

17 going to be testifying about the indicia of a medical

18 practice and whether there was medical practice going on

19 here, whether it was good, bad or ugly doesn't matter.

09:29:59  20                    THE COURT:  So what are you going to get from

21 the witness that you're going to call to rebut Dr. Owen?

22                    MS. BOLEN:  They both have different roles and

23 some of it relates to the information that Dr. Evans

24 gathered.

09:30:09  25                    THE COURT:  That doesn't tell me anything to

1  say they got different roles.  You can split up the -- what

2  you want into five different areas and say I want to call

3  five witnesses.  I'm trying to find out whether or not this

4  is something that a person can testify to or not.  And if

09:30:23  5  it is not, then the question is why shouldn't I limit very

6  narrowly you putting on two witnesses to say what one could

7  say?

8              MS. BOLEN:  I understand where the Court is

9  coming from.  The first witness, Dr. Bob Twillman is a

09:30:39  10  clinical psychologist.  And his role in pain management

11  practice and his background and expertise relates to risk

12  litigation and the development of risk assessment tools

13  used.

14              THE COURT:  But he is not able to tell us that

09:30:51  15  a doctor has or has not performed his duty appropriately,

16  if he's a psychologist, can he?  Because he's not an MD.

17              MS. BOLEN:  He's a clinical psychologist.

18              THE COURT:  He's not an MD.

19              MS. BOLEN:  No, he's not.  You're right.

09:31:04  20              THE COURT:  So there's not going to be a

21  head-on collision between a clinical psychologist and an

22  MD.

23              MS. BOLEN:  He's a clinical psychologist who

24  runs the pain medicine program.

09:31:10  25              THE COURT:  But he's running it from a clinical

1 psychologist perspective.

2          MS. BOLEN:  Your Honor, in pain medicine,

3 clinical psychologists work side by side with physicians in

4 connection with --

09:31:21  5          THE COURT:  I'm not disputing that.  I'm trying

6 to find out why you're injecting that in the case when that

7 will be not be evidence for the jury.  The clinical

8 psychologist cannot tell the jury, first of all, that a

9 doctor was practicing appropriately.  He can just tell us

09:31:38 10 what he learned by standing next to them, or what he does.

11          MS. BOLEN:  The clinical psychologist and pain

12 medicine is the one that does the risk evaluation of

13 patients.  And in that connection, there is evidence in

14 before the Court, and ultimately before the jury, about

09:31:56 15 Dr. Evans' use of certain tools for that purpose and that's

16 what a clinical psychologist's role is.

17          THE COURT:  Well, it doesn't matter what

18 Dr. Evans does.  The question is whether or not I thought

19 he was going to be testifying in support of Dr. Evans, as

09:32:10 20 opposed to a second attempt at impeachment.

21          MS. BOLEN:  No.

22          THE COURT:  Are those two witnesses going to be

23 attempting to impeach Dr. Evans' testimony?

24          MS. BOLEN:  No, sir.  This particular witness

09:32:21 25 is going to support the indicia of a medical practice based

1  on the risk management component of it, versus the actual

2  picking up and prescribing --

3           THE COURT:  Then I won't hear anything coming

4  from the psychologist about whether or not Dr. Evans has

09:32:34  5  chosen the appropriate standard in all of that.

6           MS. BOLEN:  There will be on that issue.

7           MR. DAVIDSON:  Judge, I believe -- I apologize.

8  You keep saying Dr. Evans, the client.  I think you mean

9  Owens.

09:32:44  10          THE COURT:  Owens.  Dr. Owens.  I apologize.

11          MS. BOLEN:  I'm sorry.  I guess --

12          THE COURT:  So his testimony --

13          MS. BOLEN:  Is very narrow and very limited to

14  risk litigation.

09:32:55  15          THE COURT:  So how long do you think that will

16  take, because apparently this is your witness.

17          MS. BOLEN:  Yes, sir.

18          THE COURT:  Okay.

19          MS. BOLEN:  Not even 30 witness, Your Honor.

09:33:00  20          THE COURT:  This is your witness as well?

21          MS. BOLEN:  Yes.

22          MR. JOUBERT:  Your Honor, we would at this time

23  oppose the testimony of a Ph.D., doctor of philosophy and

24  psychologist for the basis the Court has stated.  It

09:33:13  25  doesn't appear to be appropriate in this case.

1055

1          THE COURT:  Well, it may or may not be, but at

2   this point in time, having not had a chance to look at any

3   opinion that he has prepared and all of that, I'm concerned

4   about him crossing from Ph.D. and the MD area, and I will

09:33:27   5   sustain objections to that kind of crossover because that's

6   not his practice --

7          MS. BOLEN:  I understand.

8          THE COURT:  -- and that's not his profession.

9   But at this point in time, I'll have to reserve all my

09:33:43   10   rulings for the evidence when it's presented.  I think you

11   had something else you wanted to present, and I cut you

12   off.  I'm not sure if that was all or not.

13          MR. JOUBERT:  I think that was on the first

14   issue, Your Honor.

09:33:53   15          THE COURT:  On the first issue.  All right.

16          MR. JOUBERT:  I've forgotten it now.

17          THE COURT:  Who's the next witness after this

18   witness?  Is that going to be the doctor?

19          MR. JOUBERT:  Your Honor, it depends on whether

09:34:02   20   we get any witnesses back from Louisiana.  They had to go

21   home over the weekend.

22          THE COURT:  They're stuck in Baton Rouge?  I'm

23   just kidding.

24          MR. JOUBERT:  You're exactly right, Your Honor.

09:34:10   25   You're exactly right.  If we do not have them, then it will

1    be Dr. Owen.

2               THE COURT:  Okay.  How will you know it, and

3    when will you know?

4               MR. JOUBERT:  I'll know by the break, I expect.

09:34:19    5        THE COURT:  All right.  So if we get started

6    now, it's about 9:30.  If we get started, we should be

7    through with this witness?

8               MR. JOUBERT:  May I have just a minute to go to

9    the men's room, Judge?

09:34:30   10          THE COURT:  Yeah, we're going to do that.  But

11   we will be through with this witness probably 10:30, 11:00,

12   even with your direct examination or redirect?

13              MR. JOUBERT:  Yes, Your Honor.

14              THE COURT:  So you should know by 11:00, is

09:34:37   15   that your best?

16              MR. JOUBERT:  Yes, Your Honor.

17              THE COURT:  All right.  Let's take five minutes

18   and then we'll get started.

19                   **(Recessed at 9:35 a.m.)**

09:42:30   20        **(The following was held before the jury)**

21              THE COURT:  All right.  Good morning, ladies

22   and gentlemen.  How are you doing?

23              JURORS:  Good morning.

24              THE COURT:  Did you have a good weekend?

09:42:35   25        JURORS:  Yes, sir.

*Cross-Richardson/By Mr. Davidson*

1    THE COURT:  That's good news.  All right.  So

2  we're ready to pick up where we stopped on Friday

3  afternoon.  And, Mr. Davidson, you may proceed.

4    MR. DAVIDSON:  Thank you, Judge.

09:42:43    5    **KIMBERLY RICHARDSON**

6    **CONTINUED CROSS-EXAMINATION**

7  BY MR. DAVIDSON:

8  **Q.**    Ms. Richardson, on Friday, you told the jury, in

9  response to Mr. Joubert's questions about your criminal

09:42:54  10  history, you told him about two felony convictions, that

11  you had a felony theft case, out of Chicago, in around

12  2000, and a drug case out of Louisiana more recently after

13  you had completed seeing Dr. Evans.  Do you recall that?

14  **A.**    The drug case that I had in Chicago was a while back.

09:43:14  15  And I served time for that in Chicago.

16  **Q.**    Okay.  I thought you testified that you had a

17  possession with intent?

18  **A.**    That was here in Louisiana or there in Louisiana.

19  **Q.**    That was in 2013 or 2014?

09:43:28  20  **A.**    Yes.

21  **Q.**    And then the drug case you're describing in Chicago

22  was what?

23  **A.**    That was a long time ago.

24  **Q.**    Right.  That's a felony?

09:43:36  25  **A.**    Yes.

1  **Q.**    Okay.  Do you recall any other felony convictions

2  that you had in the Chicago area?

3  **A.**    I was no angel.  I had quite a few.

4  **Q.**    Well, would you tell the jury about those?

09:43:49  5  **A.**    Well, what would you like to know?  I mean...

6  **Q.**    Well, what were you convicted, when were you

7  convicted and what was the sentence imposed?

8  **A.**    I'm not very good with dates, but --

9  **Q.**    That's fine.

09:44:00  10  **A.**    -- my convictions turned out to be shoplifting,

11  mostly.  And there was one possession charge.

12  **Q.**    Is that it, to the best of your recollection?

13  **A.**    Yeah, yes, sir.

14  **Q.**    Do you recall being convicted in Cause

09:44:20  15  Number 95-CF-2106, of the offense of forgery in DuPage, or

16  DuPage County, Illinois, and receiving a sentence of two

17  years in 2010 or 2000 -- I'm sorry.  You were convicted at

18  the same time you were convicted of the felony theft case

19  that you described on Friday?

09:44:40  20  **A.**    I believe -- I know the felony theft, but the forgery

21  I don't recollect.

22  **Q.**    You don't have a recollection of that conviction?

23  **A.**    No.

24  **Q.**    Do you have a recollection of any other misdemeanors

09:44:52  25  involving moral turpitude that you were convicted of in

*Cross-Richardson/By Mr. Davidson*

1  the Chicago area?

2  **A.**   No.

3          MR. JOUBERT:  Your Honor, we object to that

4  language.  It's legal language.

09:45:00  5          THE COURT:  I'm going to sustain it.  She's

6  already testified that she was convicted of some theft

7  charges, shoplifting.  So that would be -- that question

8  would be too general.

9          MR. DAVIDSON:  Okay.

09:45:11  10 BY MR. DAVIDSON:

11 **Q.**   Do you have a recollection on May 22nd, 2001, being

12 convicted of a misdemeanor offense of prostitution in

13 Cause Number 2001-4002-84401, out of Cooke County?

14          MR. JOUBERT:  Objection, Your Honor.  That

09:45:34  15 appears to be remote in time.  It's a misdemeanor offense.

16          MR. DAVIDSON:  Judge, prostitution is a crime

17 of moral turpitude.

18          THE COURT:  Overruled.

19 BY MR. DAVIDSON:

09:45:43  20 **Q.**   Do you have a recollection of that conviction?

21 **A.**   I was not convicted of prostitution, no.

22 **Q.**   Did you -- were you living at that time at 2417 South

23 Third Street, Apartment 107, in Cicero, Illinois?

24 **A.**   Yes, I was.

09:45:59  25 **Q.**   But you were not the same Kimberly Richardson who was

*Cross-Richardson/By Mr. Davidson*

1  convicted of a misdemeanor offense of prostitution in May

2  of 2001, and received a six-month sentence?

3  **A.**   Sir, I admit I am a convicted felon.  I'm no angel,

4  but prostitution was not one thing that I ever did.

09:46:15  5  **Q.**   So that is not you?

6  **A.**   No.

7  **Q.**   One -- just a single question because my notes are a

8  little bit conflicting regarding your testimony Friday

9  about cancer that you previously had?

09:46:30  10  **A.**   Yes, sir.

11  **Q.**   It was my understanding, or my recollection, that you

12  had cancer sometime in the early to mid 2000; is that

13  correct?

14  **A.**   Yes, sir.

09:46:40  15  **Q.**   But that you were in remission as of 2009?

16  **A.**   Yes, sir.

17  **Q.**   And I think you testified you've not had any further

18  issues since then; is that correct?

19  **A.**   No, sir, no issues.

09:46:50  20  **Q.**   Okay.  I'd like to I think we stopped on Friday

21  discussing the first visit you had at Dr. Evans' office on

22  Augusta in December 2010.  And I think we had gotten

23  through the various paperwork that you were involved with

24  Rhoda Mann, the nurse in providing that related to medical

09:47:14  25  background information?

1   **A.**   Yes, sir.

2   **Q.**   Do you recall that?

3   **A.**   Yes, sir.

4   **Q.**   And do you recall that you -- after you finished with

09:47:20   5   Ms. Mann and had provided her all the relevant medical

6   background information, you went downstairs and you did --

7   you received massage therapy from Roland Rittmaster?

8   **A.**   Yes.

9   **Q.**   And you discussed with him what the areas of your

09:47:37   10   injury were and he provided therapy to those areas,

11   correct?

12   **A.**   Yes, sir.

13   **Q.**   And then you went back upstairs where you saw

14   Dr. Evans?

09:47:44   15   **A.**   Yes, sir.

16   **Q.**   And you have a recollection of Dr. Evans when you saw

17   him I think you testified that he did a hands-on

18   examination, that he checked your neck, your back, and he

19   discussed with you the location of pain and the level of

09:47:58   20   pain that you were feeling?

21   **A.**   For the brief time that he was in the office, yes.

22   **Q.**   Okay.  And do you recall that when he was doing that

23   prior to that discussion, he had your chart, your file and

24   he was thumbing through it as he would routinely do during

09:48:13   25   visits?

*Cross-Richardson/By Mr. Davidson*

1  **A.**   Yes, he did.

2  **Q.**   So he would have -- you would have assumed that he

3  would have had the information provided by Ms. Mann, as

4  well as Mr. Rittmaster or anybody else that had seen you

09:48:22  5  that day in the office?

6  **A.**   Yes.

7  **Q.**   And as a result of your meeting with Dr. Evans, do

8  you recall that he prescribed you Roxicodone, 30

9  milligrams, 150 tablets, Lortab and Soma?

09:48:33  10  **A.**   Yes, sir.

11  **Q.**   And you had -- you testified that you had taken each

12  of these previously; correct?

13  **A.**   Yes, sir.

14  **Q.**   And that you therefore understood the risk and

09:48:46  15  benefits of each of those medications?

16  **A.**   I was aware, yes.

17  **Q.**   Okay.  Did those medications -- you had those

18  medications filled?

19  **A.**   Yes.

09:48:56  20  **Q.**   And I think it was your testimony that you had them

21  filled and you took those medications?

22  **A.**   Yes.

23  **Q.**   Even though you said you had been clean for six years

24  and had had prescriptions filled during that six-year

09:49:13  25  period, but you had not taken those medications, did I

1  understand that correctly?

2  **A.**   Yes, it was a second opinion from -- Dr. Evans was my

3  second opinion.

4  **Q.**   And the first opinion being Dr. Summers?

09:49:24  5  **A.**   No, Dr. Spady.

6  **Q.**   Okay.  Malik Spady?

7  **A.**   Malik Spady.

8  **Q.**   And that was what caused you this time to agree to

9  feel it was okay to take those medications?

09:49:36  10  **A.**   Yes, with being a recovering addict, I had my doubts,

11  but...

12  **Q.**   Do you recall -- your next visit, I believe, was in

13  February of 2011.  Do you have a recollection of that?

14  **A.**   Vaguely.

09:49:55  15       MR. DAVIDSON:  May I have just a second, Judge?

16       THE COURT:  Certainly.

17  BY MR. DAVIDSON:

18  **Q.**   This is going to be Chart 17.  And do you have a

19  recollection when you visited Dr. Evans' office on

09:50:25  20  February 16th, 2011 -- this would be your second visit.

21  Do you remember one of the features that Dr. Evans' staff

22  would have you complete or provide information regarding

23  was what they called, rate your pain?

24  **A.**   Uh-huh.

09:50:39  25  **Q.**   And this is a tool that was used by various pain

1  managed doctors that you had been to in the past; correct?

2  **A.**   Yes.

3  **Q.**   And it provided -- it provided your information to

4  the doctor about what your current level of pain was, the

5  first number, what the best it got was, and what the worst

6  it got was?

7  **A.**   Yes, sir.

8  **Q.**   And do you have a recollection that on that second

9  visit what you reported to Dr. Evans' staff was that you

10  were still -- you were still -- it was still hurting?  You

11  were still having problems with your pain?

12  **A.**   Yes, sir.

13  **Q.**   And it was affecting your ability to function and

14  take care of your child?

15  **A.**   To an extent.

16  **Q.**   Okay.  And would you agree that it was as a result of

17  that and this is information that was put in your chart,

18  as a result of that, Dr. Evans increased the prescription

19  of Roxicodone from 150 count to a 180?

20  **A.**   Yes, I was.

21  **Q.**   Okay.  And would it be fair to say that that tweak of

22  the treatment plan that he had implemented back in

23  December of 2010, that seemed to work because the next

24  time you reported to Dr. Evans office, which would be that

25  next month, March 16th, 2011 -- this will be Number 19.

*Cross-Richardson/By Mr. Davidson*

1          You related to the staff that your rate
2     your pain level was down by not a lot, but it was down
3     some, and you also -- if you'll raise it up a little bit
4     higher -- you also related on your rate your activities
09:52:14    5     that you were able to function better in just about every
6     category from what you had been able to function
7     previously?
8     **A.**   Yes, sir.
9     **Q.**   Okay.
09:52:23   10     **A.**   I didn't take the medications as prescribed.  I took
11     them as needed.
12     **Q.**   Okay.  But regardless, the treatment plan that
13     Dr. Evans had put in place, based on the information you
14     provided him, based on your pain level, which is what he's
09:52:40   15     looking for, it was better, everything was going better
16     than it had previously been, according to what you related
17     to the staff and Dr. Evans?
18     **A.**   Of course, yes.
19     **Q.**   Okay.  And do you recall, that as a result of that,
09:52:51   20     Dr. Evans reduced the amount of Roxicodone, 30 milligrams
21     from the 180, that he had moved you up to previously, in
22     February, back down to 150 milligrams?
23     **A.**   I believe it wasn't because of that.  I believe it
24     was because of my --
09:53:06   25     **Q.**   I'm sorry.

*Cross-Richardson/By Mr. Davidson*

1    **A.**   Weight.

2    **Q.**   Okay.  Do you remember that Dr. Evans as a result of

3    the information you provided in March of 2011, reduced the

4    dosage of your -- or the number of your Roxicodone, 30

09:53:25   5    milligrams, down from 180 to 150?

6    **A.**   Yes.

7    **Q.**   Do you recall that the next time you met with

8    Dr. Evans and just to back up a second -- so would it be

9    fair to say, that he felt it necessary, he would reduce

09:53:45   10   the amount of pain medication he was prescribing for you,

11   based on how you related your pain was as you reported it

12   to his staff?

13   **A.**   Yes.

14   **Q.**   Do you recall the next time you saw Dr. Evans was in

09:54:03   15   May, May 18th, 2011.  This will be Number 21.

16                     And do you remember at that visit you

17   indicated to him that you were intending to do some home

18   remodeling or you indicated to his staff?

19   **A.**   I wasn't doing the remolding myself, but, yes.

09:54:24   20   **Q.**   But that you were going to have home remodelling

21   done, and as a result of that, there would be more

22   activity, more physical activity that you might be

23   involved in?

24   **A.**   No, sir, I did no more physical activity than before

09:54:40   25   the remodeling.

*Cross-Richardson/By Mr. Davidson*

1  Q.   All right.  So if the way it was understood by

2  Dr. Evans was that you were going to be involved in more

3  physical activity and, therefore, he increased the amount

4  of your Roxicodone, 30 milligram -- well, let's go to

5  Page 2.

6           Ms. Richardson, if you look at the notes

7  of Brenda Clayton in the middle of the page, it indicates

8  increase Roxicodone due to working on home remodeling.

9  So is it your testimony today that that was not correct,

10 that you were not working on home remodeling?

11 A.   I was working on home remodelling, but I was -- I

12 wasn't the one actually doing the physical labor.  Whether

13 they assumed that I was or not is something I can't say.

14 Q.   Isn't it true that you asked for an increase in the

15 number of pills of Roxicodone, 30 milligrams at that

16 visit, based on that reason?

17 A.   Was not based on that reason, but yes, I did ask for

18 the increase.

19 Q.   Okay.  And so, because isn't it true, that if a

20 person who is suffering from chronic pain, if they undergo

21 or if they are participating in a lot more physical

22 activity, whether it's home remodeling or whether it's

23 more hours at work, whether it's whatever that requires

24 more physical exertion, there is a potential there is

25 going -- they're going to suffer an increase in pain and

*Cross-Richardson/By Mr. Davidson*

1    so a doctor will frequently increase their dosage or their

2    number in order to compensate for that?

3                 MR. JOUBERT:  Objection.  Speculative.

4                 THE COURT:  I'll sustain it.

09:56:34  5  BY MR. DAVIDSON:

6    **Q.**   And would you agree that based upon this increase

7    from 150 milligrams to 170 milligrams -- I'm sorry -- from

8    150 number to 180 number, that, again, it appeared that

9    your treatment plan, the medications being prescribed by

09:56:53 10   Dr. Evans were working, you were reporting positive things

11   when you would go to the office?

12   **A.**   As I said, I didn't take them as prescribed, but as

13   needed, yes.

14   **Q.**   Okay.  But that's what you were relating to his

09:57:05 15   staff?

16   **A.**   Yes.

17   **Q.**   If we'll go to the August 2011, it's going to be

18   Number 22.

19                 And, again, you see the rate your pain that

09:57:30 20   you reported to his staff, those numbers were substantially

21   down from what they had previously been, as to not only

22   what your current level of pain was, but how much better it

23   had been based upon this additional prescription, this

24   additional tweak that Dr. Evans had prescribed; correct?

09:57:48 25   **A.**   Yes.

1    **Q.**   Okay.  And do you recall that, again, because of

2    that, because you are doing better, Dr. Evans based on the

3    number of Roxicodone, 30 milligram he had previously

4    prescribed, he backed off that number and, again, reduced

09:58:05    5    it from 180 count down to 150 count?

6    **A.**   I don't believe that was because of the pain rate.  I

7    believe it was because of my weight.  He was more

8    interested in my weight than he was the rate pain.

9              MR. DAVIDSON:  Judge, I object to speculation

09:58:19    10    and nonresponsiveness on the part of the witness.

11              THE COURT:  Overruled.

12    BY MR. DAVIDSON:

13    **Q.**   Do you recall, Ms. Richardson, that as a result, or

14    that after you related your rate of pain level to his

09:58:31    15    staff, on August 8th, 2011, at that visit, he reduced the

16    number of Roxicodone from 180 down to 150?

17    **A.**   Yes.

18    **Q.**   Do you recall that he also -- do you recall

19    discussing with him that you were feeling depressed or you

09:58:50    20    were suffering from some depression?

21    **A.**   Yes.

22    **Q.**   And as a result of that, he prescribed Celexa.  Do

23    you remember that?

24    **A.**   He actually prescribed Xanax.

09:59:01    25    **Q.**   Okay.  Do you recall that he prescribed Celexa?

1  **A.**   Yes.

2  **Q.**   And Celexa is a non opioid that is antidepressant

3  that deals with people suffering from depression; correct?

4  **A.**   Yes.

09:59:16  5  **Q.**   Do you recall also, during the course of time that

6  you saw Dr. Evans, he was concerned about your blood

7  pressure and he talked with you about your blood pressure?

8  **A.**   I have a history, of high blood pressure, yes.

9  **Q.**   In fact, at that August visit it was 142 over 98.  It

09:59:26  10  was high?

11  **A.**   Yes, sir.

12  **Q.**   That was an issue in his mind?

13  **A.**   Yes, sir.

14  **Q.**   And even though he wasn't your blood pressure doctor,

09:59:38  15  your general practitioner, he discussed that with you and

16  suggested that you talk to your general practitioner about

17  your blood pressure, don't you recall that happening on

18  several visits during the period of time that you saw

19  Dr. Evans?

09:59:47  20  **A.**   No.  I recall Osman or -- I can't pronounce his

21  name -- but I would call him, for me to discuss the matter

22  with him, but I don't remember speaking with Dr. Evans

23  about it, no.

24  **Q.**   Do you recall the issue of your blood pressure and it

10:00:00  25  being too high and your needing to talk to your blood

*Cross-Richardson/By Mr. Davidson*

1  pressure doctor, do you recall that being discussed during

2  a number of your office visits during the time you saw

3  Dr. Evans?

4  **A.**   Not with Dr. Evans, no.

10:00:12  5  **Q.**   Do you recall that being discussed during a number of

6  the visits that you saw in August?

7           THE COURT:  Asked and answered.  Let's move on.

8           THE WITNESS:  Yes.

9  BY MR. DAVIDSON:

10:00:23  10  **Q.**   All right.  I believe the next time that you saw --

11  this was August of 2011, I believe was the last visit we

12  just discussed.

13  **A.**   Yes.

14  **Q.**   And the next visit I think you had with Dr. Evans was

10:00:50  15  in October of 2011, October 4th.  This will be Number 26.

16           THE COURT:  Counsel, we've covered this last

17  week, and if you want to look at what I indicated I'll be

18  happy.  Let's approach the bench, please.

19           **(The following was held at sidebar)**

10:01:22  20           THE COURT:  You have not covered an area that

21  you did not cover last week.  We started, she testified

22  about October, went through that with her, she said she

23  started selling dope at that time.  She said she went to

24  prison, her son was given over, all of that I wrote down

10:01:39  25  because I was concerned, including about the false numbers

1  with the stretching and all of that.  All of that's been

2  covered.  So we're not treading any new ground.

3              MS. BOLEN:  2010.  I'm sorry, go ahead.

4              THE COURT:  October of 2011, is when she

5  started selling, is that the visits that you're talking

6  about now?

7              MR. DAVIDSON:  That is the visit, Judge, and if

8  you recall, Judge, what she testified on direct was that --

9              THE COURT:  No.  I'm not talking about direct,

10  I'm talking about cross-examination.

11              MR. DAVIDSON:  Judge, this what I'm getting

12  into is the basis for the increase and the prescription

13  from 150 to 210.

14              THE COURT:  She testified that the reason it

15  was increased because she and the doctor got into cuss

16  words and he gave her that without any explanation.  What

17  I'm telling you is all that's been testified to.

18              MR. DAVIDSON:  And, Judge, we have not

19  previously used the -- we have not previously used the

20  chart to show that the basis, the answer she gave is

21  contrary to what the chart shows as the basis for the

22  increase.

23              THE COURT:  I don't know what she didn't do,

24  but I know what she did and you cross-examined her at

25  length about selling dope and about how it came about that

*Cross-Richardson/By Mr. Davidson*

1   she got into this -- got him to move it from 150 or 180 up

2   to 210 that's what I'm saying.

3                MR. DAVIDSON:  Judge, I don't believe what I'm

4   going to be asking her it's not going to be a lot of

10:03:06   5   questions.  I don't believe this is something that has

6   been --

7                THE COURT:  A lot has nothing to do with it,

8   Counsel.  It has to do with managing and that's my job and

9   I'm asking you to make sure that you're not really just

10:03:14   10   treading the same ground over and over --

11                MR. DAVIDSON:  Yes, sir, Judge.

12                THE COURT:  -- again.

13                MR. DAVIDSON:  I will, certainly.

14                THE COURT:  All right.  Let's proceed.

10:03:34   15   **(The following was held in the presence of the jury)**

16                MR. DAVIDSON:  May I proceed, Judge?

17                THE COURT:  Proceed.

18   BY MR. DAVIDSON:

19   Q.   If we can go to the October 4th, 2011, chart.  And I

10:03:47   20   believe this is what the jury's been told that you got

21   into an argument with Dr. Evans at that visit regarding

22   you hadn't lost weight.  You told him you wanted your

23   money back if he didn't increase the number of Roxicodone

24   tablets he gave you, and so, he on his own increased it

10:04:05   25   from 150 to 210 and there was no medical reason beyond the

*Cross-Richardson/By Mr. Davidson*

1    argument that you could provide this jury; is that

2    correct?

3    **A.**    Correct.

4    **Q.**    Okay.  Do you recall -- well, first of all, in fact,

10:04:19    5    isn't it true that your weight, you had lost substantial

6    amount of weight from that prior visit?  You had lost --

7    if you go to that second line, 226, down six, you had lost

8    six pounds?

9    **A.**    Yes.

10:04:32    10    **Q.**    Okay.  So your testimony that Dr. Evans was mad at

11    you because you hadn't lost any weight you had in fact

12    lost six pounds?

13    **A.**    Yes, but he was talking about overall weight, not

14    just that one.

10:04:44    15    **Q.**    Do you recall discussing with Dr. Evans and his staff

16    medical issues you were having at that visit?

17    **A.**    I had quite a few, yes.

18    **Q.**    Do you recall discussing with them that you had an

19    outbreak of Lupus?

10:05:00    20    **A.**    Yes.

21    **Q.**    And Lupus, correct me, is a very painful, autoimmune

22    disease; is that correct?

23    **A.**    Yes.

24    **Q.**    And you actually had a doctor to treat your Lupus; is

10:05:08    25    that correct?

*Cross-Richardson/By Mr. Davidson*

1  **A.**   Yes.

2  **Q.**   But that doctor -- you were asking Dr. Evans' help in

3  treating the pain that relates to that Lupus; correct?

4  **A.**   Because of the fact that I was seeing Dr. Evans for

10:05:25  5  pain medication.

6  **Q.**   Exactly?

7  **A.**   I made my other doctors aware of that fact.

8  **Q.**   So you raised to Dr. Evans and his staff the issue of

9  Lupus, that the outbreak of Lupus that you had, and you

10:05:36  10  were requesting assistance with that pain?

11  **A.**   I had requested it before, but, yes.

12  **Q.**   Do you recall also telling Dr. Evans and his staff

13  that you were about to undergo chemotherapy, and as a

14  result of because of the pain associated with chemotherapy

10:05:58  15  treatments, you were requesting assistance in the amount

16  of pain medication for that purpose?

17  **A.**   I believe so.

18  **Q.**   Okay.  All right.  Even though you previously

19  testified that your cancer was in remission as of 2009,

10:06:17  20  and you had not had any further issues, in October of

21  2011, when you see Dr. Evans and his staff, you tell them

22  that you're about to undergo chemotherapy for an extended

23  period of time and so you're asking for assistance with

24  your pain medication to deal with that?

10:06:33  25  **A.**   My oncologist Dr. Wheeler had --

*Cross-Richardson/By Mr. Davidson*

1  Q.   I'm sorry.

2          MR. DAVIDSON:  Judge, I object to the witness

3  not being responsive.

4          MR. JOUBERT:  Your Honor, we object to him

10:06:40  5  cutting off the witness.

6          THE COURT:  Overruled.

7  BY MR. DAVIDSON:

8  Q.   Did you relate to Dr. Evans and his office on the

9  October 2011 visit, that you were about to undergo

10:06:53  10  chemotherapy and were requesting assistance with the pain

11  that was associated with that chemotherapy?

12  A.   Yes, sir.

13  Q.   Go to Page 2.  And, in fact, if you will look in the

14  doctor's notes, MD notes, second line, changes in

10:07:21  15  medications, increase to 210 during chemotherapy.  In

16  fact, isn't that exactly what took place in your

17  conversation with Dr. Evans at that October 2011 visit

18  where you raised the issue of Lupus with his staff, he was

19  aware as a result of that that you were having an outbreak

10:07:43  20  of Lupus, he was aware that you were claiming that you

21  were about to undergo chemotherapy and so, he was going to

22  provide you with pain assistance during that period of

23  time?

24  A.   For the partial time that he was with me, yes.

10:07:55  25  Q.   And, in fact, that's the reason that he increased

1   your medication from 150 to 210, didn't he?

2   **A.**   I don't believe that was the reason, sir, no.

3   **Q.**   In fact, isn't that exactly what the records reflect?

4   **A.**   That's what the record reflects, yes.

10:08:07   5   **Q.**   Even though you testified this morning your cancer

6   was in remission?

7   **A.**   Yes.

8   **Q.**   So your cancer is in remission, but you're telling

9   the jury now that you were still undergoing chemotherapy

10:08:19   10   for cancer?

11   **A.**   That's what I was trying to tell you before I was cut

12   off was that Dr. Wheeler my oncologist had suggested that

13   I take the chemotherapy as a preventative measure.

14   **Q.**   For ten months?

10:08:34   15   **A.**   Yes.

16   **Q.**   Okay.  Had you recently been diagnosed with cancer?

17   **A.**   Not recently, no.

18   **Q.**   Had you ever related to Dr. Evans' office that you

19   had recently been diagnosed with cancer?

10:08:48   20   **A.**   I did not.

21   **Q.**   Did not.  Okay.  Let's go -- go back to Exhibit 13.

22   Do you recall that at your first office visit in December

23   of 2010, one of the documents that you were asked to fill

24   out by Ms. Mann is what's called a history of injury?

10:09:19   25   **A.**   Yes, sir.

1 **Q.**   And that's your handwriting?

2 **A.**   Yes, sir.

3 **Q.**   Okay.  And this was for you to relate to the office

4 medical issues that you were having; correct?

10:09:29  5 **A.**   Yes, sir.

6 **Q.**   Okay.  If you'll look at the bottom, the third line

7 of current complaints, would you read for the jury what

8 the third line says?

9 **A.**   Recently diagnosed with cancer, Lupus.

10:09:46  10 **Q.**   And isn't it fair to say, Ms. Richardson, that during

11 the succeeding visit that you had with Dr. Evans in --

12 beyond the November -- or beyond the October 2011 visit,

13 you continued to complain and relate to them about the

14 issues you were having from Lupus, the pain issues?

10:10:02  15 **A.**   Yes.  And I still have it today.

16 **Q.**   Okay.  And the medication that was prescribed was

17 because of that increase in pain that you were having as a

18 result of the outbreak of Lupus?

19 **A.**   Not just that, not because of the Lupus only.

10:10:20  20 **Q.**   Right.  You're right.  You're also undergoing

21 chemotherapy and you're also under regular pain as a

22 result of the injuries you had sustained.  All of those

23 were the basis for the treatment plan that was in place

24 into 2012; correct?

10:10:33  25 **A.**   For the treatment plan, but I don't believe it was

*Cross-Richardson/By Mr. Davidson*

1   the fact for the increase.

2   **Q.**   Okay.  Contrary to what the records show?

3   **A.**   Yes.

4   **Q.**   Okay.  During the period of time -- during the period

10:10:51   5   of time that you saw Dr. Evans, do you recall that you

6   also, you periodically were asked to take a test called

7   the COMM test, C-O-M-M, which is a test designed to see

8   whether a person who is under opoid treatment plan might

9   be misusing their medication?

10:11:17  10   **A.**   I don't recall that, no.

11   **Q.**   You don't have a recollection that you --

12   **A.**   No.

13   **Q.**   Okay.  Will you go to Number 29.  And you -- you've

14   taken these tests in the past with other pain management

10:11:29  15   doctors, haven't you?  It's a little bubble, you self

16   answer questions and you fill in whether it's never

17   happened, it frequently happens.  You know what I'm

18   talking about?

19   **A.**   Yes.

10:11:38  20   **Q.**   You've taken that before, but it's not your

21   recollection that you've taken those with Dr. Evans?

22   **A.**   No.

23   **Q.**   Okay.  January 17th, 2011, is that your signature?

24   **A.**   Yes.

10:11:50  25   **Q.**   Do you have a recollection of completing that COMM

*Cross-Richardson/By Mr. Davidson*

1   test?

2   **A.**   Yes.

3   **Q.**   If we'll go to Number 30.  Again, that's your

4   writing?

10:12:06   5   **A.**   Yes.

6   **Q.**   Do you have a recollection in August of 2011, taking

7   that COMM test for Dr. Evans' office?

8   **A.**   Yes.

9   **Q.**   And that's a self reporting test so the person who

10:12:20   10   grades that test has to rely on the integrity and honesty

11   of the individual who is completing that test as to what

12   their situation is?

13   **A.**   Yes.

14   **Q.**   If you'll go to March 2012.

10:12:34   15            Again, that was your signature at the top of

16   that page?

17   **A.**   Yes.

18   **Q.**   And you completed that test in March of 2012?

19   **A.**   Yes.

10:12:49   20   **Q.**   And do you see that all of those questions are

21   answered and it's hard to read, but in the never category,

22   the first category all the way to the left?

23   **A.**   Yes.

24   **Q.**   Indicating that you have not been taking medications

10:13:04   25   or handling medications differently than what you

*Cross-Richardson/By Mr. Davidson*

1   prescribed -- what were prescribed or taking more

2   medicine -- medications than were prescribed for you, in

3   other words, were you honest in your answers to those

4   tests when you provided that information to Dr. Evans and

10:13:18   5   his staff?

6   **A.**   As I said, I took the medication, but it was not as

7   prescribed, no.

8   **Q.**   So you were not honest in your answers to the test?

9   **A.**   You could say that, yes.

10:13:34   10   **Q.**   And you understood that Dr. Evans and his staff, when

11   he is preparing a treatment plan for you in trying to see

12   whether you might be misusing or diverting prescription

13   medication that he's given you, part of what he has to do

14   is rely on information that you're providing?

10:13:49   15   **A.**   Well, yes, sir, if he wanted more information he

16   could have gotten a blood test or urine, and he didn't.

17   **Q.**   Do you recall in testifying that in August of 2012,

18   you were approached by postal inspector agents?

19   **A.**   Yes, I was.

10:14:09   20   **Q.**   Okay.  And they interviewed you at sometime, I don't

21   know if it was before or after you made the undercover

22   video for them in September of 2012, they have -- they

23   have interviewed you previously; correct?

24   **A.**   Yes.

10:14:26   25   **Q.**   And do you recall -- and were you truthful with the

*Cross-Richardson/By Mr. Davidson*

1    agents in what you told them?

2    **A.**   I believe so.

3    **Q.**   Okay.  Just like you've continued to be truthful with

4    the agents ever since you first met them?

10:14:36   5    **A.**   Yes.

6    **Q.**   So you have not withheld, you've been honest, you've

7    been forthcoming about all your issues just as you have

8    with this jury?

9    **A.**   Yes.

10:14:45   10    **Q.**   Do you recall being asked by those agents when you

11    were interviewed and was the agent who interviewed you was

12    it a postal inspector, inspector Marian Williams was that

13    the individual?

14    **A.**   I believe so.

10:14:55   15    **Q.**   And do you recall the nature of that interview when

16    she gave you a bunch of written questions and she had you

17    handwrite out your answers.  Do you recall that?

18    **A.**   I'm sorry.  I don't.

19          MR. DAVIDSON:  May I approach the witness,

10:15:54   20    Judge?

21          THE COURT:  Yes, sir.

22          MR. DAVIDSON:  Judge, I just marked as Defense

23    Exhibit 1000, just for identification purposes an interview

24    that Ms. Richardson gave to inspector -- postal inspector

10:16:18   25    Marian Williams.

*Cross-Richardson/By Mr. Davidson*

1  BY MR. DAVIDSON:

2  **Q.**   Would you look at this, Ms. Richardson, and see if

3  recognize it.   It's got some highlighting on it.   It's

4  mine.   It's not yours.   Look at that and see if it's your

5  handwriting.

6  **A.**   Yes.

7  **Q.**   Do you recall that being the interview that you gave

8  Inspector Williams?   It's undated, but at some point

9  around the time of the fall of 2012?

10  **A.**   Yes.

11  **Q.**   And do you recall being asked whether you had ever --

12  being asked whether you sold pills to others?

13  **A.**   Yes.

14  **Q.**   And what answer did you give Inspector Williams?

15  **A.**   I put --

16  **Q.**   I'm sorry?

17  **A.**   I don't know what I put.   I can't see.

18  **Q.**   Does that look like a zero?

19  **A.**   Oh, yes.

20  **Q.**   Okay.   So you told Inspector Williams that you did

21  not sell the pills that you had been prescribed; is that

22  correct?

23  **A.**   Well, yes, I did.   I had fear of being prosecuted for

24  distribution.

25  **Q.**   So the reality is, you were not truthful with

Cross-Richardson/By Mr. Davidson

1   Inspector Williams, notwithstanding your testimony about

2   two minutes ago?

3   **A.**   Not too many people would be, no.

4   **Q.**   So the answer was no, is that correct, you were not

10:17:33   5   truthful?

6   **A.**   Yes.

7   **Q.**   Okay.  And did you -- did she ask you how much you

8   sold the pills for?

9   **A.**   Yes, she did.

10:17:41   10   **Q.**   And what did you tell her?

11   **A.**   Told her I didn't sell them.

12   **Q.**   Okay.  And did she ask you who you sold them to?

13   **A.**   Yes.

14   **Q.**   And who did you tell her?

10:17:51   15   **A.**   Obviously, I would tell her nobody.

16   **Q.**   All right.  So is it fair to say that you lied to

17   Inspector Williams when she interviewed you?

18             THE COURT:  Asked and answered, counsel.  Let's

19   proceed.

10:18:09   20   BY MR. DAVIDSON:

21   **Q.**   On Friday, we saw a small portion of the office visit

22   that you made to Dr. Evans' office in September of 2012,

23   do you recall that?

24   **A.**   Yes.

10:18:31   25   **Q.**   You've seen that entire video; correct?

*Cross-Richardson/By Mr. Davidson*

1  **A.**   Yes, I have.

2  **Q.**   And you've seen that recently?

3  **A.**   Yes, I have.

4  **Q.**   In preparation for your testimony?

10:18:38  5  **A.**   Yes, sir.

6  **Q.**   And is it fair to say, without going through and

7  having the judge want to kill me, by playing that entire

8  video, it's a several hour video; correct?

9  **A.**   Yes, it is.

10:18:52  10  **Q.**   That's how long you were at Dr. Evans' office that

11  day?

12  **A.**   Unfortunately, yes.

13  **Q.**   And that is exactly how most of us feel when we go to

14  the doctor's office.

10:19:04  15  **A.**   Yes.

16  **Q.**   Do you recall when you first got there you checked in

17  with Jason, Jason Campbell and then you sat in the waiting

18  room?

19  **A.**   Yes, I did.

10:19:10  20  **Q.**   There were other patients in the waiting room?

21  **A.**   Yes, there were.

22  **Q.**   Do you recall as the video reflects, that you engaged

23  in conversations about topics of the day?

24  **A.**   Yes.

10:19:19  25  **Q.**   There had been a recent hurricane, a big topic of

*Cross-Richardson/By Mr. Davidson*

1  conversation was the fact that Fed Ex had seized a package

2  or had not delivered a package in Louisiana that had been

3  sent by Briar Grove Pharmacy; correct?

4  **A.**   Correct.

10:19:36  5  **Q.**   And there were several other topics that were

6  discussed with you by other patients that were in the

7  waiting room that morning?

8  **A.**   Yes, sir.

9  **Q.**   Normal conversations?

10:19:43  10  **A.**   Yes.

11  **Q.**   Okay.  Then do you recall being called in and meeting

12  with Osman?

13  **A.**   Yes.

14  **Q.**   And that was routine for the office visits that you

10:19:55  15  had with Dr. Evans?

16  **A.**   Yes.

17  **Q.**   And do you recall that when you met with Osman, y'all

18  discussed what your pain level was?

19  **A.**   Yes.

10:20:04  20  **Q.**   And the rate your pain information, you would provide

21  that information and he would put it in the chart, and

22  that would be the chart that Dr. Evans would review;

23  correct?

24  **A.**   Yes.

10:20:14  25  **Q.**   And there was a discussion about what your pain level

*Cross-Richardson/By Mr. Davidson*

1    was?

2    **A.**    Yes.

3    **Q.**    Do you recall telling Osman that your pain level was

4    about six, that you were getting better?  Would you

5    like --

6    **A.**    I can't recall the particular conversation, but it

7    may have been.

8    **Q.**    Okay.  And do you recall him asking you, is that with

9    medication, and then how about without medication, and do

10   you recall saying, without medication a ten I'm going to

11   the hospital?

12   **A.**    That was a typical visit and that was the

13   conversation.

14   **Q.**    So what you were indicating in your conversation with

15   Osman that's going to get reflected in the file is that

16   without the medication that's being prescribed, you're in

17   excruciating pain; correct?

18   **A.**    Yes.

19   **Q.**    Do you recall him asking you about your daily

20   activities and how you are able to function on a daily

21   basis?

22   **A.**    Yes.

23   **Q.**    And, again, that was routine for the visits?

24   **A.**    Yes, it was.

25   **Q.**    And do you recall telling him that you still are

Cross-Richardson/By Mr. Davidson

1  doing okay in your functioning with the medication that's

2  being prescribed?

3  **A.**   Yes, I did.

4  **Q.**   Okay.  And do you recall there being some other

10:21:12  5  discussion with him, I think y'all talked about whether --

6  you mentioned that you had polyps?  Do you recall

7  discussing polyps with him?

8  **A.**   No, I don't I don't recall that.

9  **Q.**   And the conclusion of him taking your blood pressure

10:21:30  10  and Osman was the one who took your blood pressure,

11  checked your weight and would ask you a preliminary set of

12  medical questions and return to the waiting room?

13  **A.**   Yes.

14  **Q.**   And again, you were in the waiting room for a few

10:21:41  15  more minutes, more conversations with other patients.  And

16  then you were called back into the office to meet with

17  Roland Rittmaster?

18  **A.**   Yes.

19  **Q.**   And do you recall that morning when you met with

10:21:50  20  Roland Rittmaster him also asking you about your pain

21  level?

22  **A.**   Yes.

23  **Q.**   Asking whether it was better, whether it was worse,

24  about the same, and you provided that information and,

10:22:01  25  again, you gave him from your perspective, from a 0 to 10

*Cross-Richardson/By Mr. Davidson*

1   scale, you told him that your pain level was about a six,

2   do you recall that?

3   **A.**   Yes.

4   **Q.**   Do you recall him asking you how your medicines were

10:22:11   5   doing, were they working, did you need more, did you need

6   less, and you responded that they were okay?

7   **A.**   Yes.

8   **Q.**   Do you recall him from the chart, it reflecting

9   information that you had a child you had to take care of,

10:22:29   10   that you were not working outside the home, but you were

11   taking care of your son?  Do you recall there being a

12   discussion about that, whether you could function and do

13   that?

14   **A.**   Yes.

10:22:39   15   **Q.**   And then do you recall him asking you about your pain

16   and where your pain, where you were suffering the most

17   pain.  Do you have a recollection of that conversation?

18   **A.**   Yes, I do.  It was a typical conversation you have.

19   **Q.**   Okay.  And it's the kind of information they would

10:22:54   20   get from a patient at every visit, that they had done with

21   you; correct?

22   **A.**   Not only myself but other patients, yes.

23   **Q.**   Okay.  And do you recall saying my cervical and my

24   lumbar and those are two areas of your spine, cervical is

10:23:07   25   near your neck, lumbar is down lower back?

*Cross-Richardson/By Mr. Davidson*

1  **A.**   Yes.

2  **Q.**   Do you recall telling him that they both hurt.  And

3  he said he pressed you on it, which hurts the most.  And

4  you told him the cervical, your neck hurts the most?

10:23:20  5  **A.**   Yes.

6  **Q.**   And do you recall that when he asked you this he's

7  writing in the chart?  He's writing information down?

8  **A.**   Oh, yes.

9  **Q.**   Okay.  Do you recall talking to him about the

10:23:29  10  cervical pain and saying it's pushing, there's something

11  pushing against the nerve, it's causing my left side to be

12  paralyzed, but I'm not opting for surgery.  Do you

13  remember telling him you're not opting for surgery?

14  **A.**   Yes, until I find out there was -- releasing fluid.

10:23:44  15  **Q.**   Okay.  And you're not opting for surgery, that was

16  something you were very consistent on from the first time

17  you saw Dr. Evans; correct?  You weren't doing surgery

18  again?

19  **A.**   Right, I did not want surgery no.

10:23:57  20  **Q.**   And do you recall discussing with him the tingling

21  that this pain was causing in your hands and feet?

22  **A.**   As it still does, yes.

23  **Q.**   Okay.  And y'all discussed your weight and the fact

24  that you had lost weight?

10:24:09  25  **A.**   Yes.

*Cross-Richardson/By Mr. Davidson*

1  **Q.**  Do you remember saying I love those scales, they're

2  good scales, keeping using those scales?

3  **A.**  I wish I was thin today, yes, or smaller.

4  **Q.**  And then do you recall him doing physical therapy on

10:24:20  5  you, putting you on the table and actually doing massage

6  therapy, hands on, feeling your muscles to see how tight

7  they were?

8  **A.**  Yes, and it did help.

9  **Q.**  And that was something he would do routinely if you

10:24:30  10  would allow physical therapy?

11  **A.**  That was myself or with other patients, yes.

12  **Q.**  Okay.  And then do you have a recollection of going

13  upstairs and meeting with Ms. Mann, Rhoda Mann -- after

14  you finished with Roland Rittmaster?

10:24:49  15  **A.**  I mostly seen Brenda.

16  **Q.**  All right.  Do you recall in terms of the period of

17  time -- again, you've just seen the videos recently, would

18  it surprise you that you spent approximately 18 minutes or

19  so with Roland Rittmaster, that length of time?

10:25:06  20  **A.**  Approximately.

21  **Q.**  Okay.  And getting back with Osman, would it surprise

22  you that the amount of time, according to the clock, would

23  be around the 8 to 10 minutes of time that you spent with

24  involved in his questioning and checking your vitals and

10:25:19  25  all that?

*Cross-Richardson/By Mr. Davidson*

1    **A.**    About that long, yes.

2    **Q.**    Do you recall -- I know you said you normally met

3    with Brenda, did you walk with Rhoda Mann when you went

4    upstairs to see the doctor?

10:25:31    5    **A.**    Yes, I did.

6    **Q.**    And do you have a recollection of telling Ms. Mann

7    that your Lupus was worse?

8    **A.**    Yes, it is.

9    **Q.**    And do you have a recollection, and I'm asking you

10:25:40    10    now to think back to the video that we saw on Friday, do

11    you have a recollection that when Dr. Evans came in, he

12    sat down at the table; right?

13    **A.**    Yes.

14    **Q.**    And he had there available for him, he had this

10:25:53    15    chart, your chart?

16    **A.**    Yes.

17    **Q.**    And he's going through the chart, and one of the

18    things Rhoda tells him on the video is that your Lupus is

19    worse; correct?

10:26:00    20    **A.**    She mentioned it, yes.

21    **Q.**    Okay.  And he's thumbing through the chart, he's got

22    everything that's in there, in the chart, which is going

23    to be from Osman, Roland Rittmaster, a brief from the

24    nurse, and then based upon that, he does not make any

10:26:15    25    change to your prescription to the medication that you are

1    receiving, is that correct?

2    **A.**    No, he didn't make any change.

3    **Q.**    I'm sorry?

4    **A.**    No, he did not make any change.

10:26:23    5    **Q.**    Okay.  And that is after he has had the opportunity

6    to review the chart, which has what the other staff

7    members have already -- the information that's provided in

8    there from the other staff members?

9    **A.**    Yes.

10:26:45    10    **Q.**    Is it fair to say, that every time you went to

11    Dr. Evans' office, you would see multiple members of

12    Dr. Evans' staff, as well as Dr. Evans for some period of

13    time, at each of those visits?

14    **A.**    Yes.

10:27:08    15    **Q.**    Okay.  That at each of those visits, as you've just

16    testified, they would, in addition to checking your

17    vitals, they would ask you about your pain level, where it

18    hurts, how you were functioning, all the sort of things

19    you just testified to, that was a routine visit?

10:27:22    20    **A.**    Of course, yes.

21    **Q.**    Is it fair to also say, that Dr. Evans routinely

22    would tweak or adjust your medication as issues arose?  He

23    would either increase it, he would decrease it, he would

24    add perhaps Celexa or some other type of prescription on

10:27:43    25    an as-needed-basis based upon your complaints?

*Cross-Richardson/By Mr. Davidson*

1  **A.**   Well, I was told that Celexa along with the Motrin

2  that was prescribed for me, was only because they had to

3  have a nonnarcotic with the ones that I was prescribed.

4  **Q.**   So is it fair to say -- so it's your testimony that

10:28:03  5  Dr. Evans had to prescribe a nonopioid?

6  **A.**   That's what I was told, yes.

7  **Q.**   All right.  And that the medications that they

8  prescribed, the Mobic, the Celexa, those are medications

9  designed to Leal with anxiety, depression, different

10:28:21  10  aspects and those are nonopioids; correct?

11  **A.**   Yes.

12  **Q.**   Okay.  Is it fair to say that at times during your

13  visit at Dr. Evans' office, based on the information

14  obtained from you during those visits, he reduced your

10:28:41  15  Roxicodone 30 milligram prescriptions from some number to

16  a lower number?

17           THE COURT:  Counsel, that's been asked and

18  answered.  You've gone through the charts.

19  BY MR. DAVIDSON:

10:28:50  20  **Q.**   Is it also -- now did you also in the summer of 2012,

21  because of the pain levels you were reporting, did he

22  also, Dr. Evans also ask you to start doing peg board

23  treatments?  Do you have a recollection of that?

24  **A.**   Do what?

10:29:11  25  **Q.**   Peg board treatments?  Do you remember those?

*Cross-Richardson/By Mr. Davidson*

1  **A.**    Peg boards?

2  **Q.**    Yes.

3  **A.**    Yes, I was given one.

4  **Q.**    And you understood that the reason for the peg board

10:29:19  5  similar to massage therapy only different, it's an

6  alternate treatment designed to help reduce pain in a

7  patient; correct?

8  **A.**    It may be for other patients.  It didn't work on me.

9  **Q.**    Okay.  And you understand that what it does, is it is

10:29:33  10  literally a peg on a board and you push it against the

11  muscle that is very tight?

12  **A.**    Pressure points.

13  **Q.**    Right.  And the object is to try to loosen that

14  muscle which will cause a reduction of pain which will

10:29:47  15  allow the person to function better?

16  **A.**    Correct, yes.

17  **Q.**    And you did that, you were given the peg board and

18  you were asked to do that regularly outside of the office;

19  correct?

10:29:55  20  **A.**    Yes.

21  **Q.**    And did you do it on a daily basis outside the

22  office?

23  **A.**    For a brief period, yes.

24  **Q.**    How brief?

10:30:02  25  **A.**    Maybe two weeks.

*Direct-Richardson/By Mr. Joubert*

1    **Q.**    And in two weeks, it wasn't fixed so you quit doing

2    it?

3    **A.**    It did not work on me.

4    **Q.**    So in two weeks you had not felt release so you

10:30:13    5    stopped?

6    **A.**    Yes, my son uses the board now as a chair.

7    **Q.**    Did you continue to when Osman and Roland Rittmaster

8    would see you at succeeding office visits, did you

9    continue to tell them that you were doing the therapy

10:30:25    10    outside the office?

11    **A.**    Yes, I told them.

12    **Q.**    Which was not true?

13    **A.**    No.

14    **Q.**    And it's fair to say, that you went to Dr. Evans

10:30:36    15    because you were seeking pain management without surgery;

16    correct?

17    **A.**    Yes.

18            MR. DAVIDSON:  I'll pass the witness, Judge.

19            THE COURT:  Any redirect?

10:31:07    20            MR. JOUBERT:  Yes, Your Honor.

21            THE COURT:  All right.

22                        **REDIRECT EXAMINATION**

23    BY MR. JOUBERT:

24    **Q.**    Good morning, Ms. Richardson.

10:31:18    25    **A.**    Good morning.

1    **Q.**   I want to go over just a few areas with you about

2    questions about Dr. -- I'm sorry -- Mr. Davidson asked you

3    about?

4    **A.**   Yes.

10:31:26   5    **Q.**   His last question was whether you went to see

6    Dr. Evans because you were suffering and you wanted the

7    pain management outside of surgery.  Is that the only

8    reason you saw the doctor?

9    **A.**   No, it wasn't.

10:31:38   10   **Q.**   What other reasons did you see Dr. Evans?

11   **A.**   To obtain medications that I could sell.

12   **Q.**   And why was that?

13   **A.**   Basically the fact that I was paying quite a bit of

14   bills and was broke and needed something other than --

10:31:54   15   **Q.**   Well, that's why you were selling your medication,

16   but I'm asking, why did you go to Dr. Evans to get

17   medication, as opposed to going to some other doctor?

18   **A.**   Oh, I couldn't get the amount that -- any other

19   doctor would not prescribe that amount that Dr. Evans did.

10:32:11   20   **Q.**   Is it your testimony that other doctors in the

21   Louisiana area you were seeing, they would not write the

22   prescription for Roxicodone at the level that Dr. Evans

23   was writing?

24   **A.**   Yes.

10:32:20   25   **Q.**   Let's talk a minute about now the reasons for the

Redirect-Richardson/By Mr. Joubert

1  increase in the Roxicodone and the decrease and then the

2  increase again.  You told us I think on Friday, you

3  started seeing Dr. Evans he was prescribing what dosage

4  units of Roxicodone?  About how many?

10:32:38  5  **A.**  When I started it was 150, then it went to 180.

6  **Q.**  Correct.

7  **A.**  And then back down to 150 up to 210.

8  **Q.**  Now, you told the jury in your mind why the number

9  was reduced from 180 to 150.  I think it was the spring of

10:32:56  10  2011?

11  **A.**  Yes.

12  **Q.**  Can you tell the jury again exactly in your mind why

13  the reduction -- why Dr. Evans reduced the number of

14  Roxicodone pills?

10:33:06  15          MR. DAVIDSON:  Objection, Judge.  Asked and

16  answered.

17          THE COURT:  I'm going to sustain it.

18  BY MR. JOUBERT:

19  **Q.**  Did you discuss -- did you tell us on Friday about an

10:33:17  20  argument or two arguments that you had with the doctor?

21  **A.**  Yes, I did.

22  **Q.**  In your mind, is it because of the arguments that he

23  reduced the medication of roxi?

24  **A.**  Yes.

10:33:25  25          MR. DAVIDSON:  Same objection, Judge.  Asked

Redirect-Richardson/By Mr. Joubert

1    and answered.

2              THE COURT:  Overruled.

3    BY MR. JOUBERT:

4    **Q.**    I'm responding now to questions that Mr. Davidson

10:33:31    5    asked you repeatedly concerning your understanding for why

6    you had a decrease in your medication and then and

7    increase again.  Now, you told the jury about two

8    different arguments you had with the doctor at least one

9    was very --

10:33:45   10    **A.**    The second one was very heated, yes.

11    **Q.**    Very heated, and words were exchanged, profanity?

12    **A.**    Yes, it was.

13    **Q.**    And at that time, you told the doctor if you didn't

14    give you an increase, you were going to take your business

10:33:59   15    elsewhere, wasn't that your testimony?

16    **A.**    Under no certain terms I told him if I couldn't get

17    my increase I wanted my money back.

18    **Q.**    The money meaning what money?

19    **A.**    The money for the visit.

10:34:09   20    **Q.**    Which was how much?

21    **A.**    $240.

22    **Q.**    In fact, you had already paid the $240 when you told

23    the doctor this?

24    **A.**    Yes.

10:34:16   25    **Q.**    So as a result of that, what happened?  Did the

1    doctor increase your medication?

2    **A.**   Yes, he did.

3    **Q.**   In your understanding of the medical charts that Mr.

4    Davidson showed you, did you ever see what the doctor was

10:34:26    5    writing on the charts?

6    **A.**   No, I did not.

7    **Q.**   So you don't know what he wrote as opposed to what

8    your conversation with him was, do you?

9    **A.**   No, I had no idea what he wrote.

10:34:35   10    **Q.**   Have you ever worked in the medical field?

11    **A.**   No, I haven't.

12    **Q.**   Are you -- have any experience on assessing pain or

13    describing on a chart what pain is like, I mean, other

14    than what you did with Dr. Evans?

10:34:53   15    **A.**   No.

16    **Q.**   You may have filled out charts for other doctors;

17    correct?

18    **A.**   I have.

19    **Q.**   What about this peg board Mr. Davidson just asked you

10:35:03   20    about, what was that for?

21    **A.**   I'm sorry?

22    **Q.**   The peg board?

23    **A.**   Paperwork work?

24    **Q.**   Peg board?

10:35:09   25    **A.**   Oh, the peg word it was to basically -- they were

1  little begs on a big board to -- it acted like

2  acupuncture.  It worked on tight spots in the muscles and

3  helped release some of it -- reduce the pain.

4  **Q.**    Did it work for you?

10:35:27  5  **A.**    No, it did not.

6  **Q.**    And, in fact, did you say your son now uses it for a

7  chair?

8  **A.**    He made a chair out of the bottom board.

9  **Q.**    Any other doctors ever give you a peg board as a way

10:35:40  10  of treatment for your pain?

11  **A.**    No.

12  **Q.**    Did Dr. Evans give you a urine test?

13  **A.**    No, never.

14  **Q.**    Never.  In how many years did you see him?

10:35:51  15  **A.**    I believe it was two, close to two and a half years,

16  a urine examination.

17  **Q.**    Did Dr. Evans ever refer you for a current MRI?

18  **A.**    He never suggested that I have one because I always

19  made sure every six months I got one.

10:36:05  20  **Q.**    Oh, you got one from your other doctors?

21  **A.**    Yes, I did.

22  **Q.**    The doctors in Louisiana?

23  **A.**    Yeah, Dr. Spady in particular, she would write every

24  six months for MRI.

10:36:15  25  **Q.**    Did Dr. Evans ever refer you for an X-ray?

Redirect-Richardson/By Mr. Joubert

1    **A.**    No.

2    **Q.**    Did Dr. Evans refer you for therapy, other than what

3    Osman or Roland was giving you?

4    **A.**    No, sir.

10:36:23   5    **Q.**    Do you know anything about Osmon's background?

6    **A.**    Not too much, no.

7    **Q.**    To your knowledge, is he a trained therapist -- a

8    massage therapist?

9    **A.**    I assumed that's what he was.  He worked in the

10:36:35  10    office.

11   **Q.**    You assumed it, but you don't know that, do you?

12   **A.**    No, I don't.

13   **Q.**    To your knowledge, was Osman a trained physical

14   therapist?

10:36:42  15   **A.**    I don't know.

16   **Q.**    What about Roland Rittmaster same questions, do you

17   know whether for a fact, whether Mr. Rittmaster was either

18   a trained therapist, massage therapist or a physical

19   therapist?

10:36:53  20   **A.**    No, I don't.

21   **Q.**    What is your understanding about the training of

22   Rhoda Mann.  What is her background?

23   **A.**    I thought she was -- had been with Dr. Evans for

24   quite awhile and she was a registered RN, worked in the

10:37:06  25   office with Dr. Evans.

1  Q.   Who told you that?

2  A.   Well, she did.

3  Q.   Now, I want you to think about it for a minute.  Do

4  you recall that Ms. Mann told you she was a registered

10:37:15  5  nurse?

6  A.   Yes, I believe it was early on visits.

7  Q.   Well, could it have been she told you she was an LVN?

8  A.   Yes.

9  Q.   Licensed vocational nurse?

10:37:28  10  A.   Yes.

11  Q.   What about Brenda Clayton, did Brenda Clayton or

12  anyone ever tell you about whether Brenda Clayton had any

13  medical certification training?

14  A.   I don't recall, no.

10:37:57  15  Q.   Mr. Davidson showed you a number of the so charts or

16  do you recall those charts that you indicated what mood

17  swings you were in or whether you were having any?

18  A.   Yes.

19  Q.   I'd like to show you one now from Exhibit 50 I think

10:38:11  20  it is.

21       THE COURT:  Is this government's 30?

22       MR. JOUBERT:  Yes, Your Honor.

23  BY MR. JOUBERT:

24  Q.   Can we have --

10:38:58  25       THE COURT:  You want it on a different screen?

Redirect-Richardson/By Mr. Joubert

1  Are you going to show it on the ELMO or on a different

2  screen?

3                    MR. JOUBERT:  Just one second, Your Honor.

4                    Use the ELMO.  Thank you.

10:39:15  5  BY MR. JOUBERT:

6  Q.   All right.  This was your one sheet from your chart,

7  Government's Exhibit 60, our Bates Number 62.  And on this

8  occasion and the date appearance at the bottom it says

9  12-15-10, that would be December 15th, 2010.  A few months

10:39:34 10  after you first started seeing Dr. Evans.  Do you recall

11  this?

12  A.   Yes.

13  Q.   Now, who would you fill this out with?

14                    MR. DAVIDSON:  Excuse me, Judge, I'm going to

10:39:43 15  object as that being a misstatement.  I believe the first

16  office in Augusta was December 10th of 2010.

17                    MR. JOUBERT:  I'm sorry?

18                    MR. DAVIDSON:  December 10, 2010, was the first

19  office visit, I believe.

10:39:54 20                    MR. JOUBERT:  And?

21                    MR. DAVIDSON:  I object to it being a

22  misstatement that she had been seeing him for several

23  months on Augusta.  The first time she saw him in Augusta,

24  was December of 2010.  That's the only point, Judge.  It's

10:40:07 25  not a big deal.

1               THE COURT:  All right.  Then to the extent that

2   it's an error, I think it's a question, so restate the

3   question, please.

4   BY MR. JOUBERT:

10:40:13  5   **Q.**   You started seeing Dr. Evans in 2010, and

6   Mr. Davidson was saying that it was December -- I'm sorry,

7   that it was December, I thought it was earlier.  But at

8   any rate, this document is filled out on December 15th,

9   2010; correct?

10:40:28  10  **A.**   Yes.  Yes.

11  **Q.**   Would you have seen him on December 10th also, five

12  days before?

13  **A.**   I believe so, yes.

14  **Q.**   You would have seen the doctor within five days?

10:40:38  15  Would you have seen him on December 10th and then again on

16  December 15th?

17  **A.**   No, no, no.  I only see him one time a month.

18  **Q.**   Exactly.  Let's look at the first question.  How

19  often do you mood swings?  Do you recall indicating that

10:40:53  20  you have them often?

21  **A.**   Yes.

22  **Q.**   Did anybody ever discuss that with you?

23  **A.**   No.

24  **Q.**   Anybody in Dr. Evans office?

10:41:00  25  **A.**   No.

*Redirect-Richardson/By Mr. Joubert*

1  Q.   Osman, Roland, Rhoda Mann?

2        THE COURT:  Counsel, asked and answered.

3  BY MR. JOUBERT:

4  Q.   What about the next question, how often do you

10:41:10  5  have -- have you felt the need for high dosage of

6  medication to treat your pain?  You indicated sometimes?

7  A.   Yes.

8  Q.   Did anybody ever discuss that with you?

9  A.   No.

10:41:18  10  Q.   Including Dr. Evans?

11  A.   No.

12  Q.   Let's look at Number 5.  How often is there tension

13  in the home?  You indicated often.  Did you ever discuss

14  that with Dr. Evans?

10:41:29  15  A.   I discussed it briefly with Brenda.

16  Q.   With Brenda?

17  A.   Yes.

18  Q.   Not Dr. Evans?

19  A.   No.

10:41:37  20  Q.   How often do you feel bored?  Did you discuss that

21  with anybody?  You indicated often?

22  A.   I never discussed it with anybody, no.

23  Q.   Look at answer to Number 9, how often have you taken

24  more pain medication than you were supposed to?  You

10:41:52  25  indicated seldom?

1  **A.**   Yes.

2  **Q.**   Is that -- was that a truthful answer at the time?

3  **A.**   Yes, it was.

4  **Q.**   Did you ever discuss that with anybody, including

10:42:07  5  Dr. Evans?

6  **A.**   No, not that, no.

7  **Q.**   You've seen the photos of the so-called office notes,

8  I believe, that has the indication of the skeleton on

9  them --

10:42:20  10  **A.**   Yes.

11  **Q.**   -- et cetera, that you would fill out every time you

12  would go in?

13  **A.**   Yes, sir.

14  **Q.**   Who did you discuss those notes with, was it

10:42:32  15  Dr. Evans, or was it with one of the therapists?

16  **A.**   It was one of the therapists.  I mean, after the

17  initial visit with Dr. Evans, the longest you've ever seen

18  him was maybe two minutes, two, three minutes, tops.  And

19  he would write or sign the prescriptions and that would be

10:42:58  20  it.

21  **Q.**   Well, we saw that from the video.  In fact,

22  Mr. Davidson made it a point to ask you how much time you

23  spent with Osman, how much time you spent with Roland

24  Rittmaster.  He asked you how much time you spent on the

10:43:12  25  tape it showed you spent 18 minutes with Rhoda Mann,

1  didn't he?

2  **A.**   He never asked me -- yes, he did, but he never asked

3  me how long I spent with Dr. Evans.

4  **Q.**   Well, you're anticipating my question.  So we saw

10:43:19   5  from the tape that Dr. Evans spent less than two minutes

6  with you when he came to see you, didn't he?

7  **A.**   That was typical, yes.

8  **Q.**   And that's typical of your average office visit?

9  **A.**   Yes, sir.

10:43:31   10  **Q.**   What about the dates with the arguments, how much

11  time did he spend with you?

12  **A.**   Those, probably about five minutes, which is three

13  minutes than he usually spends.

14          MR. JOUBERT:  One second, Your Honor.

10:43:58   15  BY MR. JOUBERT:

16  **Q.**   I'd like to show you now, let's go to Page -- well,

17  I'll use the ELMO again, Bates 53, Bates Number 53 out of

18  your medical chart, which is Government's Exhibit 30.  And

19  this is another one of the SOAPP test.

10:44:24   20          Incidentally, in your observation in

21  filling these out, number one, were they filled out each

22  time you went to see the doctor?

23  **A.**   Yes, you filled them out while you were waiting to

24  see Osman or something like that.

10:44:36   25  **Q.**   Once you would fill them out, who would you discuss

Redirect-Richardson/By Mr. Joubert

1    them with, if anyone?

2    **A.**    Sometimes they would bring it -- Osman would bring it

3    up, that's about it.

4    **Q.**    All right.  Let me -- I'm not sure of the date on

10:44:54   5    this one, but this is from your file, your patient file.

6    **A.**    Uh-huh.

7    **Q.**    Government's Exhibit 30 and Bates Number 0063.

8    Question Number 14, "How often have others told you that

9    you had a bad temper?"  You indicated "seldom"?

10:45:10   10    **A.**    Yes.

11    **Q.**    But, in fact, persons have told you you have a bad

12    temper, or at least sometimes according to your answer;

13    correct?

14    **A.**    Yes.

10:45:19   15    **Q.**    What about question Number 18, "How often in your

16    lifetime have you had legal problems or been arrested?"

17    You indicated "seldom"?

18    **A.**    Yes.

19    **Q.**    Now, was that truthful?

10:45:28   20    **A.**    Yes.

21    **Q.**    Well, we've heard today about your criminal history;

22    correct?

23    **A.**    Yes.

24    **Q.**    But my question was did anyone in Dr. Evans' office

10:45:40   25    ever discuss that with you?

*Redirect-Richardson/By Mr. Joubert*

1    **A.**    No.

2    **Q.**    Did anyone ever discuss with you the fact that you

3    had, in fact, had convictions for possession of narcotics?

4    **A.**    No, they never did.

10:45:49   5    **Q.**    Question 19, "How often have you attended an AA?"  Do

6    you know what that is, "AA"?

7    **A.**    Yes.

8    **Q.**    Alcoholics Anonymous or narcotics anonymous meeting?

9    **A.**    Yes.

10:46:03   10    **Q.**    And you indicated seldom?

11    **A.**    Yes.

12    **Q.**    Now, seldom would indicate that you had sometimes;

13    correct?

14    **A.**    Yes.

10:46:09   15    **Q.**    Even though maybe minimally, you had, in fact,

16    attended one of those meetings?

17    **A.**    I had, yes.

18    **Q.**    Did anyone at Dr. Evans, including Dr. Evans ever

19    discuss that with you?

10:46:15   20    **A.**    Oh, no.

21    **Q.**    Let's go down to question 24, how often have you ever

22    been treated for an alcohol or drug problem?  You

23    indicated seldom.  Did anybody in Dr. Evans' office ever

24    discuss that with you?

10:46:27   25    **A.**    No, never discussed.

1  Q.   What is your opinion of these forms that you were

2  filling out for Dr. Evans?

3                MR. DAVIDSON:  Objection, Judge.  Relevance.

4                THE COURT:  I'm going to sustain it.  It's to

10:46:38  5  the form of the question.

6                THE WITNESS:  In my opinion --

7                THE COURT:  Excuse me.

8                THE WITNESS:  -- it was just the paper.

9  BY MR. JOUBERT:

10:46:44  10  Q.   You can't answer the question.

11  A.   I'm sorry.

12  Q.   Let me ask you, back in 2010, when you started seeing

13  the doctor and you had to actually fill these forms out,

14  what was your impression about why you were filling them

10:46:56  15  out?

16  A.   Supposed to have been to screen for the medication, I

17  mean...

18  Q.   When you say "medication," what kind of medication do

19  you mean?

10:47:05  20  A.   The Roxicodone and Somas, Lortab.

21  Q.   The narcotics?

22  A.   Yes.

23  Q.   Your impression was these tools, these SOAPPs and

24  you've heard the term COMM, the COMM form, your impression

10:47:24  25  was those were to be used as screening for a narcotics use

Redirect-Richardson/By Mr. Joubert

1    or misuse; is that correct?

2    **A.**    Yes.

3    **Q.**    My question is:  Did anyone ever sit down and talk to

4    you about any of these forms that you filled out in

10:47:38  5    Dr. Evans' office?

6    **A.**    Maybe once or twice the whole time I was there.

7    **Q.**    And who would have been, if anyone?

8    **A.**    Osman.

9    **Q.**    Osman only?

10:47:46  10   **A.**    Yes.

11   **Q.**    The massage therapist?

12   **A.**    Yes.  He's the one that read the papers, but it was

13   like once or twice.  Like I said, the whole time I was

14   there.

10:48:17  15                  MR. JOUBERT:  Just one second, Your Honor.

16                      No further questions at this time, Your

17   Honor.

18                  THE COURT:  You may step down, ma'am.  Thank

19   you very much.

10:48:39  20                  THE WITNESS:  Thank you.

21                  MR. JOUBERT:  Your Honor, may she be released

22   to return to Louisiana?

23                  THE COURT:  Any objections to the witness being

24   released?

10:48:50  25                  MR. DAVIDSON:  No, sir, Judge.

1113

```
 1              THE COURT:  All right.  Thank you.  Let's
 2  approach, counsel.
 3              (The following was held at sidebar)
 4              THE COURT:  Any word?
 5              MR. JOUBERT:  I can check real quickly, Judge.
 6              THE COURT:  I just need to know if we need to
 7  go ahead and take a break at this point, but if we do take
 8  a break, you will have a witness at the end of the break.
 9              MR. JOUBERT:  Yes, sir, I think so, Your Honor.
10  I'll go outside to check, but should have at least the
11  expert here at the very least.
12              THE COURT:  Let's do that before we take the
13  break.  Make sure that somebody is here.
14              MR. OLLISON:  I'll go check.
15              THE COURT:  Make sure somebody is here because
16  I don't want to take a break and then we say we've still
17  got to take another 15, 20-minute break.
18              MR. JOUBERT:  We asked the expert to be here in
19  case the other witnesses didn't show up.
20              THE COURT:  He might have been on the same
21  freeway you and Mr. -- what's his name?
22              MR. DAVIDSON:  I don't know what was going on
23  because --
24              THE COURT:  I heard about it.
25              MR. DAVIDSON:  It was crazy, and I didn't see
```

1  accidents.

2             MS. BOLEN:  It was crazy.

3             THE COURT:  Which one were you coming in.

4             MR. DAVIDSON:  I came in on I-10.

10:50:12   5             MR. JOUBERT:  I was on Houston Avenue.

6             MR. DAVIDSON:  And then once you got to

7  downtown it was crazy.

8             THE COURT:  There's disruption on Allen

9  Parkway.

10:50:22   10             MR. OLLISON:  The expert is here in the

11  hallway.

12             THE COURT:  So we can take a break and if you

13  don't have one of the fact witnesses we'll get underway.

14  All right.  Let's take about 30 minutes.

10:50:33   15             MR. JOUBERT:  Thank you, Your Honor.

16             THE COURT:  Well, make it 25.  That will be

17  about 11:15.

18             MR. JOUBERT:  Okay.  Thank you.

19      **(The following was held in the presence of the jury)**

10:50:49   20             THE COURT:  All right, ladies and gentlemen,

21  we're going to take about a 20, 25 minutes until about

22  11:15 and we'll pick up with the next witness.

23                **(Recessed at 10:51 a.m.)**

24         **(The following was held before the jury)**

11:18:40   25             THE COURT:  All right.  Please be seated.  If

1 the witness will come forward at this time, please.

2             MR. JOUBERT:  The United States calls

3 Dr. Graves Owen, Your Honor.

4             THE COURT:  All right.  Stand right there.  Do

11:18:56 5 you solemnly swear that the testimony you are about to give

6 will be the truth, the whole truth and nothing but the

7 truth, so help you God?

8             THE WITNESS:  I do.

9             THE COURT:  Please have a seat and I failed to

11:19:07 10 ask counsel in the session this morning, whether or not

11 there is any objection to the admission of a curriculum

12 vitae of the experts?

13             MS. BOLEN:  No, Your Honor.

14             MR. JOUBERT:  No, Your Honor.  I had not

11:19:22 15 planned to offer it.  Should we offer it or make it part of

16 the record?

17             THE COURT:  Well, it's up to you, but I don't

18 think you need to spend an hour talking about all of his

19 accomplishments.  That's part of the curriculum vitae.

11:19:36 20             MR. JOUBERT:  I may need --

21             THE COURT:  With all due respect to the doctor,

22 go ahead, proceed however you want to do it.

23             MR. JOUBERT:  Thank you, Your Honor.

24                     **GRAVES OWEN,**

25 after having been first cautioned and duly sworn, testified

*Direct-Owen/By Mr. Joubert*

1  as follows:

2                              **DIRECT EXAMINATION**

3  BY MR. JOUBERT:

4     **Q.**   Good morning.

11:19:46   5     **A.**   Good morning.

6     **Q.**   How are you, sir?

7     **A.**   I'm fine, thank you.

8     **Q.**   Would you state your name for the ladies and

9  gentlemen of the jury.

11:19:51   10     **A.**   Graves Owen.

11     **Q.**   Can you spell the last name?

12     **A.**   O-w-e-n.

13     **Q.**   Without telling us your address street, where do you

14  reside generally?

11:20:00   15     **A.**   Round Rock, Texas.

16     **Q.**   And are you a medical doctor by profession and

17  training?

18     **A.**   Yes, sir.

19     **Q.**   I want to talk to you first of all about your

11:20:10   20  background.  Tell the jury where did you go to medical

21  school?

22     **A.**   I went to medical school at the University of Texas

23  Medical School in Houston.

24     **Q.**   And what year did you finish?

11:20:22   25     **A.**   I finished in 1990.

*Direct-Owen/By Mr. Joubert*

1   Q.   Prior to that, where had you graduated undergraduate

2   school?

3   A.   At Southwest Texas State University known as Texas

4   State University or Texas State University.

11:20:37   5   Q.   And what year did you finish that program?

6   A.   1986.

7   Q.   What did you major in?

8   A.   Chemistry.

9   Q.   Now, after you finished medical school, here at the

11:20:52   10   University of Texas Health Science Center in Houston,

11   where did you do your residency?

12   A.   I did my residency in here in Houston at the same

13   facility.

14   Q.   And how long was that program, residency program?

11:21:07   15   A.   One year of an internship in internal medicine and

16   three years in anesthesia residency.

17   Q.   So how do you define your special assessment, is it

18   anesthesia?

19   A.   That was my primary specialty and then I sub

11:21:23   20   specialized in pain management.

21   Q.   What did you subspecialize in pain management?

22   A.   I did a fellowship at the University of Pittsburgh

23   Medical Center from 1994 to 1995.

24   Q.   So that's a three or four-year program?

11:21:49   25   A.   It is a one-year, training from summer to summer.

*Direct-Owen/By Mr. Joubert*

1    Q.    I beg your pardon?  I was misreading.  Thank you.

2                      Now, let's talk a little bit your

3    experience and your background.  When were you licensed to

4    practice medicine?

11:22:05   5    A.    In 1990.

6    Q.    And do you have any board certifications?

7    A.    I'm Board Certified by the American Board of

8    anesthesiology.

9    Q.    Any other certifications?

11:22:23   10    A.    I'm a diplomat at the American Academy of Pain

11    Management.

12    Q.    Tell the jury what that means, a diplomat?

13    A.    It just means that you've past a test regarding the

14    content of pain management.

11:22:37   15    Q.    But it is a licensure or certification?

16    A.    It is a certification, not a licensure.

17    Q.    And what are you -- in practical terms, what are you

18    certified for?

19    A.    To treat acute chronic pain conditions.

11:23:01   20    Q.    Are you also certified for outpatient management of

21    opioid dependency?

22    A.    I was.  I left -- I let the license go a few years

23    after selling my practice.

24    Q.    At one time you were certified?

11:23:19   25    A.    Yes, sir.

*Direct-Owen/By Mr. Joubert*

1    Q.   Now, let's talk about your work experience.  Tell the

2    jury about your experience from -- after you finished the

3    residency program at the University of Pittsburgh in '95.

4    A.   I started my own pain management clinic in Round Rock

11:23:34    5    from 1995 until December of 2011.

6    Q.   And what office was -- what was the title of the

7    office or name of it?

8    A.   It was called the Texas Pain Rehabilitation

9    Institute.

11:23:48    10    Q.   How long did you work there?

11    A.   From 1995, until I sold it in December 2011.

12    Q.   Since December 2011, what employment have you had or

13    even before 2011, in 2008, did you become -- start to do

14    work with a pain management group Paradigm Outcomes?

11:24:13    15    A.   Yes.  I became a medical director part time while I

16    was still practicing, and over time it grew and grew to

17    the point that it became a majority of my day's activity.

18    Q.   All right.  Then in 2011, did you become a member of

19    the advisory board for doctor safeguards?

11:24:38    20    A.   Yes.

21    Q.   I should have asked you this.  Let me go back for a

22    minute.  Just tell the jury that sentence or two what

23    Paradigm Outcome is or organization is.

24    A.   Well, Paradigm has two divisions, one is catastrophic

11:24:54    25    spinal cord and brain injury, and the second division is

1    pain management.  I worked in the pain management

2    division.

3    **Q.**   And what about -- tell the jury what Dr. Safeguard

4    program is -- what kind of program is that?

5    **A.**   Dr. Safeguard is a website that advises physicians

6    and office staffs about common schemes of trying to divert

7    drugs so that it improves the education of these kinds of

8    problems.

9    **Q.**   Is that for profit or nonprofit organization?

10   **A.**   It's a for profit.  My participation is not -- I'm

11   not a paid person.  I'm just an advisor on the board.

12   **Q.**   Okay.  Have you also been a panel member, a medical

13   review panel of the Texas Department of Insurance, a

14   division of Workers' Compensation?

15   **A.**   Yes, sir.

16   **Q.**   And what years have you been a member of that panel?

17   **A.**   I don't remember the year I started, but it's been

18   several years.

19   **Q.**   Have you also worked with the Texas Department of

20   Insurance -- well, division of Workers' Comp as arbiter?

21   **A.**   I've been an arbiter for several years, yes, sir.

22   **Q.**   Tell the jury what that means.  I mispronounced an

23   arbiter is what?

24   **A.**   An arbiter is someone who sits before a physician who

25   is accused of violating the standard of care or doing

*Direct-Owen/By Mr. Joubert*

1    something without medical necessity.  We're a panel of two

2    physicians and an attorney for the division.  And we hear

3    the physician's explanation for his acts, and then we

4    decide if there was a violation or not.  And if there was

11:26:38    5    a violation, we come up with some kind of corrective

6    action that usually involves additional education and

7    possibly a monetary fee.

8    **Q.**    Now, let's talk about your -- you have a number of

9    other -- are you a peer reviewer for pain medicine with

11:27:01   10    the Journal Academy of Pain Science -- Pain Medicine.

11    **A.**    I'm a peer reviewer for the general pain medicine,

12    which is a journal for the American Academy of Pain

13    Medicine.

14    **Q.**    And as to addiction medicine, have you worked from

11:27:20   15    2012 -- I'm sorry -- '11 until about 2013, in a limited

16    capacity -- I'm sorry -- limited to opioid dependency?

17    **A.**    Yes, sir.

18    **Q.**    Explain that just for a second, if you will, for a

19    minute.  Does that include Suboxone treatment?

11:27:39   20    **A.**    It was Suboxone treatment sometimes with

21    psychotherapy and we treated only opioid addiction.  It's

22    all I was treating.

23    **Q.**    Can you tell the jury why psychotherapy would be part

24    of your training or consideration for Suboxone treatment?

11:27:56   25    **A.**    Because the Suboxone can curve the cravings, but they

*Direct-Owen/By Mr. Joubert*

1  need to learn different ways of coping with life and

2  stressors, instead of just taking a pill.  So you're

3  trying to give them a structured foundation that helps

4  them to develop better life skills, so that you don't need

5  medication to be the sole treatment.

6  **Q.**   Have you also worked on the military advisory board

7  for the office of disability at times -- official

8  disability at times?

9  **A.**   I'm one of the -- I'm on the editorial panel for the

10  official disability guides.

11  **Q.**   And have you also done work as an aviation medical

12  examiner examining airline pilots?

13  **A.**   I do airline -- I do medical exams on pilots, but not

14  the airlines.  I do the second and third class, which are

15  commercial and just private general aviation.

16  **Q.**   Not commercial -- I mean, not the airlines?

17  **A.**   Not the first class, which is going to be your United

18  and Southwest pilots.

19  **Q.**   Right.  Have you been an officer or member for the

20  Texas Pain Society?

21  **A.**   Yes.

22  **Q.**   What -- have you held a position with the Texas Pain

23  Society?

24  **A.**   Yes.  Currently I'm immediate past president for the

25  Texas Pain Society.

1    **Q.**    Have you authored publications concerning neuropathic

2    pain and best practices?

3    **A.**    I've lectured and authored many topics in pain

4    management.

11:29:34    5    **Q.**    Have you testified previously in any forum as a

6    expert witness?

7    **A.**    Yes, sir.

8    **Q.**    Let's talk first about jury trials -- I'm sorry --

9    federal trials.  Did you serve as an expert witness in

11:30:01   10    2007, concerning a trial of a Dr. Steven Schneider?

11    **A.**    Yes, sir.

12    **Q.**    Was that in Dallas, in Houston, Texas or where was

13    it?

14    **A.**    Wichita, Kansas.

11:30:14   15    **Q.**    Wichita.  I'm sorry.  Have you also served as an

16    expert witness concerning the trial of an anesthesiologist

17    last year in -- I'm not sure, was that in Fort Worth?

18    **A.**    In Dallas.

19    **Q.**    In Dallas.  And was the doctor's name on or about

11:30:40   20    Ogee Keecoo (phonetic)?

21    **A.**    Ogee Keecoo (phonetic), yes, sir, I think.

22    **Q.**    Do you know how to spell that?

23    **A.**    Not off the top of my head.

24    **Q.**    All right.  Have you also served as either an expert

11:30:59   25    or given testimony before the Texas Medical Board?

*Direct-Owen/By Mr. Joubert*

1    **A.**   Yes, sir.

2    **Q.**   And how many times have you done that, if you recall

3    approximately?

4    **A.**   A few times.  I don't remember exact number.

5    **Q.**   And what about the Texas Board of Nursing, have you

6    given depositions or otherwise offered expert testimony in

7    depositions before the Texas Board of Nursing?

8    **A.**   Yes, sir.

9    **Q.**   Have you also appeared in Texas state administrative

10   hearings on the topic of pain management?

11   **A.**   Yes, sir.

12   **Q.**   Now, I would like to start your testimony, by going

13   over a couple of some terms and then we'll get into

14   substance of your testimony.  First of all, I'd like you

15   to just tell the jury in your own words how you define

16   pain or how would you suggest the definition of pain be

17   defined?

18   **A.**   Well, pain is a physical and emotional sensation, so

19   if I was to take a hammer and whack you in the big toe, we

20   know the toe trauma would cause your toe pain, but I bet

21   you'd have a strong emotional and negative emotional

22   reaction to me whacking your toe with a hammer, so pain of

23   any significance has an emotional quality to it.  So if we

24   put it in context, if you're driving home today and you

25   notice you need gas and you pull in the gas station and

1    you notice the lotto is a hundred million-dollar lotto and

2    you buy your ticket and tonight those balls come off and

3    you got them all, you just one a piece of a hundred

4    million-dollar lotto.  You're pretty excited.  And I come

5    up and I whack you in the toe with a hammer.  You still

6    have toe trauma and toe pain, but I bet you cope with it a

7    whole lot better after winning a hundred million dollars

8    than prior.

9                 So let's flip that around.  You didn't win

10   the money.  You go home and there's a nasty letter from

11   the IRS, you didn't dot your I's, you didn't cross your

12   T's, and you've got a big penalty, plus interest, and you

13   don't have the money.  You're pretty stressed out.  And

14   they're going to seize all your property in a number of

15   weeks because you can't pay it, and I whack you in the toe

16   with a hammer.  It's the same toe trauma, it's the same

17   toe pain, but your ability to cope with it has been

18   adversely affected by this external stressor, which comes

19   to the definition of what is suffering.  Suffering is how

20   one copes with adversity.  So if you have somebody who is

21   reporting very severe pain, but their pathology is not

22   very severe, what they're telling you is not that they're

23   physical pain is severe, but their suffering is severe and

24   you have to identify those elements that is contributing

25   to their suffering and help them.

*Direct-Owen/By Mr. Joubert*

1           So while we call ourselves pain

2  management, we're really suffering management, and when

3  you manage the suffering, medication use goes down, people

4  go back to work and they become much more functional.

11:34:24  5  **Q.**   You anticipated my second question, which was going

6  to be the definition of suffering.

7           Let me ask you if you can also tell the

8  jury what they've heard talk about a diagnostic tool

9  called the SOAPP.  Can you define it for the jury and

11:34:54  10  explain it?

11  **A.**   The SOAPP is a self reporting questionnaire that is

12  predictive of somebody's risk factors to misuse controlled

13  substances in the future.

14  **Q.**   Is it a standard tool of use in the risk -- I'm

11:35:13  15  sorry, managing risk and pain management?

16  **A.**   It's a standard tool to assess risk.  It's not

17  necessarily the only tool you would use to assess risk.

18  **Q.**   Okay.  Along with other tools?

19  **A.**   Yes.

11:35:26  20  **Q.**   In assessing a management -- pain management, is a

21  physical examination important?

22  **A.**   Yes.

23  **Q.**   Can you explain to the jury why?

24  **A.**   Well, you want to take a good history so you can

11:35:41  25  understand the problem, you want to know what treatments

*Direct-Owen/By Mr. Joubert*

1  have been done before, and then you want to do a physical

2  exam to correlate the subjective report of their symptoms

3  with your anatomical or physical findings.

4  **Q.**  All right.  Can you explain to the jury now how you

11:36:01  5  define the term opioids and if you will, distinguish it at

6  the end of your definition from opiates.

7  **A.**  Opioids, o-p-i-o-i-d includes all of the opioid

8  medications that affect the pain receptors in your body

9  called -- there are several different receptors -- and

11:36:31  10  opioids with an A or opioids that come directly from the

11  opium poppy plant, where opioid with an O includes the

12  opioid's with an A that comes from the poppy plant, but in

13  the manmade opioids, the semi-synthetic and synthetic

14  opioids.

11:36:52  15  **Q.**  Can you explain -- will you explain to the jury,

16  please, distinguish just a couple of medicines your basic

17  generic hydrocodone and tell us whether that is an opioid

18  or -- and then also oxycodone?

19  **A.**  Hydrocodone is a semi-synthetic opioid and oxycodone

11:37:13  20  is a synthetic opioid.

21  **Q.**  And when you say semi synthetic, let's start with

22  hydrocodone.  Does that mean it would include both natural

23  and manmade elements in the drug component?

24  **A.**  Yes.  It's not -- it does not occur naturally, a

11:37:35  25  chemist has to take that drug and take a precursor and

*Direct-Owen/By Mr. Joubert*

1    chemically react it to form hydrocodone.

2    **Q.**   And as distinguished from oxycodone, which is --

3    well, you explain it, totally synthetic?

4    **A.**   It's -- a chemist has to make it.  It's a synthetic.

11:37:57  5   **Q.**   Is there a difference essentially in the makeup

6    between hydrocodone and oxycodone?

7    **A.**   Structurally, there's a difference, but the effects

8    upon a human has minor differences.

9    **Q.**   All right.  Now, I'd like to go -- just a couple

11:38:24  10  other things with you.

11                    The jury's already heard some testimony

12   and speak in reference to standard of care.  Can you tell

13   the jury how you define standard of care?

14   **A.**   The standard of care is what a reasonable or prudent

11:38:41  15  physician would do in the same or similar circumstance.

16   And a reasonable prudent physician would look at the

17   evidence base literature as a foundation for how to apply

18   their treatment to somebody.  So as we get smarter and

19   learn more things, we change the standard of care, so it

11:39:03  20  he evolves slowly over time as we get smarter.

21   **Q.**   And can you give the jury maybe just one good example

22   how the standard of care has evolved in the last three

23   years in the 1990s, compared to today?

24   **A.**   Well, the -- so in the '90s, there is no evidence for

11:39:21  25  or against opioids for the treatment of chronic pain.  You

1    could pretty much just pull your opinion out of a hat.

2    But towards the early 2000s, we started developing risk

3    tools to try to figure out who was higher risk to abuse

4    their medication, and towards the mid of 2000, we started

11:39:44    5    getting analysis of the literature on opioids, which

6    basically said we don't have good evidence to treat pain

7    with opioids.  So there is dangerous inherently with

8    opioids and there's other ways of treating pain that are

9    safer.  So we started making sure you exhaust conservative

11:40:09    10    evidence based treatments before you go to high risk

11    nonevidence based treatment.

12    Q.   Can you give the jury an example of how you would

13    exhaust some of the low risk types of treatment?  What are

14    some of the low risk type of treatment?

11:40:30    15    A.   The most evidence based low treatment is some form of

16    exercise to help you with your pain.  Another evidence

17    based low risk treatment is a form of psychotherapy called

18    cognitive behavioral therapy.

19    Q.   And if you can keep that simple, but yet explain it,

11:40:47    20    can you tell us what cognitive behavior therapy is?

21    A.   Cognitive behavioral therapy is a way of relooking.

22    It's called cognitively restructuring the way you look at

23    your life and react to adversity.  It develops -- helps

24    you develop coping strategies and basic life skills.

11:41:09    25    Q.   Now, that sounds similar to a part of a definition

*Direct-Owen/By Mr. Joubert*

1    you gave to pain, that is earlier when you talked about a

2    physical component and emotional component.  Would that be

3    a proper assessment?

4    **A.**   Well, the cognitive behavioral therapy is helping you

11:41:27   5    with the emotional reaction to pain.

6    **Q.**   Okay.  And over time, in the last 20 years or so, has

7    cognitive behavioral therapy become more as you said,

8    earlier, I think, either not popular, but you recognize

9    the importance of it as part of the treatment plan?

11:41:50   10    **A.**   It's been recognized, the evidence for it has only

11    gained in strength over time.

12    **Q.**   Let's -- let me ask you just for one more definition.

13    Can you define for the jury, how you would define the word

14    "addiction"?

11:42:08   15    **A.**   An addiction is a disease that has both environmental

16    and genetic elements to it.  And basically, the disease of

17    addiction would be defined as cravings for the drug,

18    inability to self regulate.  There's a country western

19    song that says, "one's too many and 12 is not enough."

11:42:45   20    Once you start to use your drug you start to escalate the

21    use and can't curb it.

22                          And the third area would be continued use

23    despite self harm.  You keep falling because you're

24    intoxicated, you keep having motor vehicle accidents.  The

11:43:01   25    rest of the definition of addiction has to do with

*Direct-Owen/By Mr. Joubert*

1   tolerance.  And anybody around opioids will get these

2   elements.  So you can't distinguish somebody who is on

3   opioids because they're doing well, versus an addict based

4   on these other criteria.

11:43:13   5            The real ones that are important is the

6   craving, inability to self regulate, and continued use,

7   despite self harm.

8   **Q.**   Okay.  Now, some weeks ago, months ago, did I provide

9   to you a series of medical files to review, which were

11:43:34  10   taken from the office of Dr. Richard Evans?

11  **A.**   Yes, sir.

12  **Q.**   And we're going to talk about those in just a few

13  minutes, but let me go back to a couple more questions.

14  You talked about the conservative treatment, how you would

11:43:59  15   start treating a person with pain or severe pain.  How

16  would you say that those contributors, conservative

17  evidence is exhausted?  In other words, what things would

18  a pain management doctor do in order to exhaust the

19  conservative treatment before you would get into some

11:44:20  20   other treatment?

21  **A.**   Well, the first thing is if I get a new patient is I

22  get all the pertinent previous records.  And I would look

23  to see what treatments have been performed, how well,

24  they've been performed, and then I would look at for

11:44:37  25   consultations and what their opinions were and what

*Direct-Owen/By Mr. Joubert*

1   treatments, what medications have been tried or not tried.

2   And I would do an analysis of all these records to see

3   where the person was.  And I might find that they said --

4   tell me physical therapy didn't work, but they only showed

11:44:53   5   up two times or three times and quit.  And in that case,

6   physical therapy hasn't been exhausted and we need to go

7   back and do the fundamentals.

8   Q.   Okay.  Now, assuming let's say physical therapy has

9   been exhausted.  Would consultation with other specialists

11:45:12   10   be one of the ways in which you would approach treating a

11   person conservatively?

12   A.   Depending on the facts of the history and the

13   physical exam, I might consider cognitive behavorial

14   therapy.  I might send them for an orthopedic cervical

11:45:30   15   consult or a neurological consult.  It would just depend

16   on the situation.

17   Q.   And as far as cognitive behavioral therapy goes,

18   would you -- would it be correct or proper to perhaps

19   refer a patient to a psychologist if necessary?

11:45:47   20   A.   Yes.

21   Q.   Now, let's make clear a definition of a psychologist

22   and a psychiatrist, which may be for our purposes, but to

23   see a psychologist, you would refer a patient in pain for

24   what purpose?

11:46:04   25   A.   Well, a psychologist and psychiatrist both diagnose

1   mental health problems.  But a psychologist only treats

2   with talk therapy and it focuses mainly on copying

3   mechanisms and the way you react to adversity and give you

4   fundamental skills on how to handle stress.  Where a

11:46:24   5   psychiatrist is typically dealing with some kind of

6   chemical imbalance in the brain and is using

7   pharmaceutical agents to treat certain issues and they

8   could be used together.  But as far as pain management

9   psychologist is the typical resource you use.

11:46:42   10   **Q.**   Okay.  So we've talked about obtaining the previous

11   medical records.  Look at the medications they're getting,

12   perhaps use physical therapy, perhaps cognitive behavioral

13   therapy.  Any other things you would look at before you

14   would escalate the treatment from a conservative level to

11:47:00   15   a more intense level?

16   **A.**   Well, I would look at their risk factors for average

17   drug taking behavior.

18   **Q.**   Tell the jury what risk factors are aberrant?

19   **A.**   Besides whatever the SOAPP would tell you about their

11:47:17   20   risk factors.  There are other risk factors that you

21   should consider, age less than 45 years old is a risk

22   factor.  Personal or family history of alcoholism of

23   substance use disorders, of heavy use of nicotine,

24   depression, anxiety, impulse control disorders, like

11:47:42   25   obsessive compulsive disorders, like obsessive compulsive

*Direct-Owen/By Mr. Joubert*

1    disorder, attention deficient disorder, bipolar,

2    schizophrenia or personality disorders.  And then hydro

3    vigilance phase, such as post traumatic stress disorder or

4    some kind of traumatic event in their past.

11:47:56   5    **Q.**   And give the jury some example about how you define

6    family disorders, other than ADHD, ADD.  Would that

7    include things like maybe going through a painful divorce

8    or during emotional period of time?

9    **A.**   Any type of stressor like that could be equated to

11:48:21   10   your being in trouble with the IRS.  Any type of stressor

11   can magnify your perception of pain and disability.

12   **Q.**   And would it be fair to say on and off to compare --

13   well, I want to get to is.  Can you tell the jury either

14   about reaching a -- what do you call it a threshold or a

11:48:46   15   level at which you would compare some of the symptoms,

16   that is, what they were originally, versus what they may

17   be subsequently?

18   **A.**   Well, part of the review of the medical records would

19   be looking at what their baseline function was, what their

11:49:00   20   baseline physical exam were, and then comparing it to

21   where they are now.

22   **Q.**   Baseline is what I was looking for.  Thank you very

23   much.  Now, if controlled substances were previously

24   prescribed for a patient, would that be a consideration

11:49:18   25   that you would make?

*Direct-Owen/By Mr. Joubert*

1   **A.**   Yes.

2   **Q.**   In assessing treatment?

3   **A.**   Yes.

4   **Q.**   How is that important?

11:49:25   5   **A.**   Well, somebody comes in and they're saying -- they

6   tell me that they're on controlled substances.  Well, even

7   more important to get the previous records because I want

8   to one verify that they truly are on those controlled

9   substances, that they prior to becoming, being placed on a

11:49:43   10   controlled substances that they've tried the other options

11   that are safer and evidence based, that I would make sure

12   that they hadn't had any aberrant drug taking behaviors

13   and -- such as early refill request or abnormal urine drug

14   test, and then I would make sure they truly had a

11:50:06   15   therapeutic document in the record.

16   **Q.**   What is a therapeutic benefit?

17   **A.**   Therapeutic benefit means what kind of benefit are

18   you getting from the treatment.  If you have high blood

19   pressure and you come to me and I give you a blood

11:50:24   20   pressure pill and it normalizes your blood pressure where

21   I want that's a therapeutic benefit.  A nontherapeutic

22   benefit would be I haven't improved your blood pressure

23   and we've got to do something different.

24   **Q.**   Would weight be a consideration?

11:50:39   25   **A.**   I don't --

*Direct-Owen/By Mr. Joubert*

1    **Q.**   Fluctuation in weight or change in weight, would that

2    be a consideration for whether or not the person needed

3    having a therapeutic benefit from treatment or not?

4    **A.**   Well, it depends if I was trying to do a weight loss

11:50:58    5    then that would be the goal I would be using for my

6    measure of therapeutic response.  And when you're trying

7    to do pain management what you're looking for is

8    functional improvement.

9    **Q.**   Let me ask you now, you've used a term a couple of

11:51:12   10    times and I didn't get you to explain it earlier, can you

11    explain the term aberrant drug behavior or test and how

12    that's used in evaluating a patient?

13    **A.**   Aberrant behavior is a behavior you don't expect.

14    Aberrant urine drug test would be a urine drug test that

11:51:33   15    does not have the drug that you prescribed in it, or has

16    an illegal drug in it, or has a legal drug, but it wasn't

17    a drug prescribed by you, but it would be all aberrant

18    drug test.  And an aberrant taking behavior would be a

19    drug test that is aberrant, but it could also be reporting

11:51:55   20    lost and stolen meds, asking for early refills, or other

21    kinds of activities, maybe getting drugs from more than

22    one doctor.

23    **Q.**   And would it be correct to say that a physician

24    should look for a self escalation of an aberrant drug

11:52:16   25    behavior?  In other words, if they're maybe running out of

*Direct-Owen/By Mr. Joubert*

1   medication early or going to other sources for medication?

2   **A.**   Yes.  Because addiction, one of the few things that

3   you can help you identify an addiction is their inability

4   to self regulate as we previously talked about.  If they

11:52:37   5   start to self escalate and use more medicines than you're

6   prescribing, that's a warning sign that you may have an

7   addiction developing and you have to do some kind of

8   corrective analysis or correct the situation to try to

9   catch the problem before it gets out of control.

11:52:56   10   **Q.**   Would doctor shopping be considered part of an

11   aberrant drug behavior?

12   **A.**   Yes, sir.

13   **Q.**   And tell the jury what you understand doctor shopping

14   to mean in your field?

11:53:14   15   **A.**   Doctor shopping is when you go to multiple doctors to

16   get some kind of controlled substances and you're not

17   having a con- -- you may go to multiple doctors for these

18   drugs, while you still have an adequate supply of these

19   drugs on hand.

11:53:29   20   **Q.**   Okay.  Let's go now to a couple of other

21   explanations.  Tell the jury what it's like -- well, how

22   would you define the practice of medicine in terms of the

23   way it relates to the medical history?

24   **A.**   Well, we've all been to doctors, I suspect and we

11:53:51   25   know what doctors do if you complain to a new doctor you

*Direct-Owen/By Mr. Joubert*

1    go in, they're going to look at your records as we

2    previous discussed, they're going to ask you some history

3    of what's going on, what's wrong with you, with respect to

4    low back pain, it's either, who, what, when where, why

11:54:08    5    questions, how did you get hurt, when did you get hurt,

6    where does it hurt, does the pain radiate anywhere?  Do

7    you have any numbness or weakness associated with the

8    radiating pain?  Do you have any bowel or bladder

9    problems?  Do you -- what treatments have you had before?

11:54:25    10   How did those treatments help or not help?  Have you had

11   any consultations?  Who did you see?  Those kind of basic

12   questions so that you can understand what's called the

13   history of the present illness.

14   **Q.**   In order to answer those questions, would a physical

11:54:40    15   examination be necessary?

16   **A.**   Well, this would be the subjective part of the exam

17   we're talking about.  The physical exam would come right

18   after that.  So this is the questions you would ask to

19   understand better their disease process and their

11:54:55    20   symptoms.  And then you correspond those symptoms they're

21   telling you about with the medical records you've gotten

22   from previous treatments.  Then you do your physical exam.

23   **Q.**   All right.  Now, with respect to those records of

24   Dr. Evans that you've been able to review and I think I've

11:55:13    25   asked you, you reviewed approximately 17 or 18 records?

*Direct-Owen/By Mr. Joubert*

1  **A.**   Yes, sir.

2  **Q.**   Of his patient charts?

3  **A.**   Yes, sir.

4  **Q.**   What did you find with regard to the documented

11:55:22  5  medical history in those charts?

6  **A.**   There was no adequate medical history documented in

7  the record.

8  **Q.**   Can you tell the jury just a little bit more where

9  you say no adequate medical history, was there any at all?

11:55:34  10  **A.**   There was very superficial history such as low back

11  pain after a car accident three years ago, or something

12  analogous to that.

13  **Q.**   Whereabouts did you make an observation with regard

14  to those files you reviewed regarding urine drug tests,

11:56:01  15  what did you find?

16  **A.**   Out of all of the charts, only one chart had a urine

17  drug test and it was a preliminary test that needed

18  confirmation.

19  **Q.**   Okay.  Can you explain to the jury what do you mean

11:56:15  20  by confirmation for a urine drug test?

21  **A.**   There's two kinds of urine drug test ones kind of

22  like your urine pregnancy screen that you get for home

23  use, and the problem with that test for drugs in pain

24  management is that they have a lot of inaccuracies, a lot

11:56:37  25  of false positives and a lot of false negatives.  And

*Direct-Owen/By Mr. Joubert*

1    you're supposed to send that to a laboratory that does a

2    test using mass spectrometry that's essentially a hundred

3    percent accurate so that you can confirm your results.

4    **Q.**   Let's go back to the example that you gave us.  After

11:57:00   5    you do those diagnostics, which are written out

6    subjectively by the patient and you get to the point that

7    you need to make an examination, a physical examination,

8    does a physical examination proper before you would

9    prescribe narcotic drugs?

11:57:14   10   **A.**   Yes.

11   **Q.**   Why?

12   **A.**   It's part of what we do as physicians practicing

13   medicine, take a history, you review records, you take a

14   history, you do a physical exam, you make the diagnosis,

11:57:27   15   or you order diagnostic testing so that you can make a

16   diagnosis and then you prescribe a treatment.

17   **Q.**   What about with regard to your review of those files

18   of Dr. Evans' patients, or at least their charts, and just

19   to be clear, you did not examine any patients; is that

11:57:47   20   correct?

21   **A.**   Correct.

22   **Q.**   You only reviewed medical charts?

23   **A.**   Yes, sir.

24   **Q.**   With regard to range of motion examinations, what did

11:57:54   25   you find among the records of Dr. Evans?

*Direct-Owen/By Mr. Joubert*

1  **A.**   Only a few charts had range of motion.  The vast

2  majority did not have any range of motion exam.

3  **Q.**   With regard to those few charts you found with a

4  range of motion examination, was there sufficient evidence

5  for you to document the right range of motion in terms of

6  its accuracy?

7  **A.**   Well, it was -- I was a little suspect of the range

8  of motion documentation because it was too precise, it was

9  like 21 degrees or 43 degrees, that's just -- that

10  requires using very accurate instruments to make such

11  numbers, and I just didn't see those -- that documentation

12  being as reliable as I'd like to have seen.

13  **Q.**   Well, did you observe in the medical charts that you

14  reviewed, that a therapist of some type, even a massage

15  therapist, or physical therapy, actually conducted the

16  range of motion test?

17  **A.**   Well, there were some documentation, but under what

18  was called massage therapy, but it wasn't real clear who

19  was doing the range of motion because that documentation

20  was in a different part of the page.

21  **Q.**   Was it clear that as to the range of motion, was

22  there any direct indication that Dr. Evans in fact

23  conducted a range of motion test?

24  **A.**   It was unclear.

25  **Q.**   Now, with regard to a therapist conducting range of

1142

*Direct-Owen/By Mr. Joubert*

1    motion, is a trained massage therapist -- well, let's --

2    let me first ask, is a person who is not totally trained

3    as a massage therapist, would they be either qualified or

4    sufficiently prepared to conduct a range of motion test?

11:59:56   5    **A.**   No, sir.

6    **Q.**   What about a massage therapist, would a typical

7    massage therapist be qualified to conduct a sufficient

8    range of motion test?

9    **A.**   No, sir.

12:00:04   10   **Q.**   What about a physical therapist?

11   **A.**   Yes, sir.

12   **Q.**   And tell the jury the distinction there between the

13   therapist and the training and why a physical therapist

14   would be the only one who would conduct an accurate range

12:00:23   15   of motion test?

16   **A.**   Well, a physical therapist is trained on body

17   mechanics and how to measure range of motion and other

18   therapeutic exercises, so it's within their skill set to

19   know how to make such go arrangements.

12:00:36   20   **Q.**   With regard to your review of Dr. Evans, did you see

21   any indication that a physical therapist conducted a range

22   of motion test?

23   **A.**   I did not.

24   **Q.**   With regard to your view of the files of the medical

12:01:04   25   charts of Dr. Evans, did you make an assessment with

1  regard to the pathology identified and whether that would

2  show pain?

3  A.   Well, there's no diagnostic test that can prove

4  somebody has pain or doesn't have pain, but what I saw in

5  the records were reports of severe pain and pathology that

6  was nonspecific or mild in nature.  So, what I saw was

7  evidence of the patient suffering and having more of an

8  emotional quality to their pain than a physical quality.

9  Q.   Do you recall any files that you may have observed

10  where the description, that is the verbal or written

11  description of the level of pain, may have not been

12  consistent with what was documented in the file?

13  A.   I did see evidence of symptom execration, if that's

14  what you're asking me.

15  Q.   Yes.  We'll get into that.  Can you give the jury

16  some example of that?

17  A.   I saw several times in which a patient reported their

18  worst pain is 10 out of 10, or 10 plus out of ten, and

19  that's just not going to be a reliable number.  What that

20  means is, if you're saying you're pain is 10 out of 10, if

21  I woke up and kick you hard in the shin, you can't hurt

22  anyone.  So that's not a real reflection of their pain.

23  It's a reflection of their suffering.

24  Q.   And to the extent that a patient would report the

25  pain level of 10 out of 10, what would be the -- would

12:01:24

12:01:47

12:02:04

12:02:23

12:02:42

*Direct-Owen/By Mr. Joubert*

1   that dictate more of a necessity for the doctor to conduct

2   a physical exam?

3   **A.**   Yes.  Unfortunately, you have to rely a lot on

4   subjective self report when you treat pain.  So when you

12:02:58   5   see something that is disconnect from what seems to be

6   common sense, you have to put your radar on and dig a

7   little deeper.

8   **Q.**   Did you see any evidence that would support in the

9   medical charts that Dr. Evans would dig deeper, in terms

12:03:17   10   of making physical examinations to either explain, or to

11   support what was being reported by the patient?

12   **A.**   I did not.

13   **Q.**   Did you see any evidence that Dr. Evans made a

14   diagnosis in the records that was consistent with a proper

12:03:36   15   standard of care?

16   **A.**   I did not.

17   **Q.**   Now, in all due candor and fairness to Dr. Evans, I

18   think you told me that some of the tools or some of the

19   ways that you utilized standard of care today, or the way

12:03:56   20   you defined it, may have been different from the period of

21   time of most of the medical records you reviewed, that is

22   just a few years ago, 2011, 2012; correct?

23   **A.**   Yes, sir.

24   **Q.**   So I want to ask the question now, with regard to the

12:04:09   25   standard of care that would have been in place, not today,

1    but in 2011 and '12, did you find evidence that Dr. Evans

2    did or did not follow a proper had standard of care?

3    **A.**   I found evidence he did not follow the standard of

4    care.

12:04:27  5    **Q.**   Can you give the jury some examples of that?

6    **A.**   He didn't get pertinent previous medical records.

7    **Q.**   I'm sorry?

8    **A.**   He didn't get all pertinent previous medical records.

9    **Q.**   Okay.

12:04:38  10   **A.**   There might be an X-ray or an MRI or a pharmacy page,

11   but there wasn't records from the previous -- from the

12   physicians that previously treated the person allegedly

13   with controlled substances.  There was an inadequate

14   history, there was an inadequate physical exam.  The only

12:04:59  15   physical exam I found was occasionally some range of

16   motion.  Neurological exams and other nerve compression

17   exams were not performed.  There was -- the risk

18   assessment tool that was used, the SOAPP was performed,

19   but it wasn't incorporated into the analysis of how you're

12:05:24  20   going to use this information and how it's going to

21   mitigate how you treat the person.  And then there was no

22   reliable and clinical meaningful documentation of a

23   therapeutic benefit.  And if you don't have a therapeutic

24   benefit you're nontherapeutically prescribing.  And if you

12:05:47  25   don't have a therapeutic benefit, you don't have medical

*Direct-Owen/By Mr. Joubert*

1  necessity to keep that treatment.  So the drugs were

2  prescribed without medical necessity.

3          Urine drug testing with the exception of one

4  case was not performed, and that urine drug test when it

12:06:02  5  was performed was aberrant.  It was positive for marijuana,

6  and there was no corrective action taken for that aberrant

7  urine drug test.

8  **Q.**   If a patient told Dr. -- well, if not -- if a patient

9  was using marijuana did not tell the doctor, but stated to

12:06:24  10  the jury that, in fact, he had a drug test in Dr. Evans'

11  office, which is not a -- well, let me rephrase the

12  question.

13          If a patient was using marijuana who saw the

14  doctor and that patient also had a drug test, but the drug

12:06:42  15  test or nothing in the file reflected the use of marijuana,

16  what would that suggest?

17  **A.**   I'm a little confused by your question.  Can you ask

18  me it differently?

19  **Q.**   Yes.  If a patient was using marijuana while seeing

12:06:58  20  the doctor and being prescribed narcotics, and did not

21  indicate it in a subjective test like a SOAPP, but stated

22  he did have a urine drug test with the doctor, is it

23  reasonable that the marijuana would have shown up in the

24  drug test?

12:07:16  25  **A.**   If they're using marijuana, it will show up in the

*Direct-Owen/By Mr. Joubert*

1    drug test.

2    **Q.**    If the patient was using marijuana and has admitted

3    so while seeing the doctor while on narcotics, would that

4    be an indication of an aberrant drug behavior?

12:07:32    5    **A.**    Yes, sir.

6    **Q.**    And what would be the proper course of treatment for

7    a patient under those circumstances?

8    **A.**    Well, in Texas it's illegal to use marijuana, so

9    you'd have to approach the individual and say, this is not

12:07:45    10    an acceptable behavior, that you can either have your

11    drugs, or you're assuming they have a therapeutic benefit,

12    or I can't prescribe to you because I cannot in Texas give

13    you a controlled substances while you're also using

14    illegal drugs.

12:08:03    15    **Q.**    Would it matter if the patient was from Louisiana?

16    **A.**    It would not.

17    **Q.**    You mentioned a minute ago that you saw evidence in

18    these patient charts of Dr. Evans that the SOAPP was

19    performed, and do you recall seeing some instances where

12:08:23    20    another diagnostic tool we've referred to in court as the

21    COMM, or the C-O-M-M test performed?

22    **A.**    Yes, sir.

23    **Q.**    I think you saw no indication that the SOAPP test or

24    diagnostic tool was integrated into the treatment for the

12:08:42    25    patient?  Did I get that correctly?

*Direct-Owen/By Mr. Joubert*

1   **A.**   Yes.  It was scored and the score was put on the

2   document, but there was no analysis of what that means in

3   the context of the patient's history and how you're going

4   to adjust your treatment because of this risk or lack of

5   risk.

6   **Q.**   If a patient indicated on the SOAPP that they had

7   mood swings, but then they were not -- the doctor did not

8   exam her or ask her about that, would that be an

9   indication -- I mean, is that the example of what you were

10  talking about, you found no evidence that the SOAPP was

11  integrated into the treatment?

12  **A.**   In two different ways, yes, the total score wasn't

13  discussed and used in a critical thinking away, and then

14  mood swings could represent somebody who has a bipolar

15  disorder, which is a risk factor for aberrant drug take

16  behavior.  So you want to go further and pursue that and

17  maybe get a psychological evaluation to make sure they

18  don't have a bipolar disorder, or what's causing their

19  mood swing.

20  **Q.**   Do you recall reviewing a file, a patient chart for a

21  Kimberly Richardson?

22  **A.**   Yes, sir.

23  **Q.**   Without showing you the details in the file, if

24  Ms. Richardson scored on her SOAPP test -- I'll call it a

25  test -- the diagnostic tool, that she had seldom but still

*Direct-Owen/By Mr. Joubert*

1  some dependency or craving for drugs, what would that

2  suggest for you?

3  **A.**   Well, craving is one of the signs that you have an

4  addiction that's either developed or it's in the

12:10:14  5  developing process and you want to go and talk to her

6  about it and try to tease out more information.

7  **Q.**   So is that an area that a doctor properly examining

8  patients should get into?

9  **A.**   Yes, sir.

12:10:25  10  **Q.**   Do you recall reviewing the file of a patient by the

11  name of Calvin McDonald?

12  **A.**   Yes, sir.

13  **Q.**   And did you -- you may or may not recall, but if

14  there were indications that Mr. McDonald scored on his

12:10:36  15  SOAPP that he had cravings for drugs, would that be an

16  area that the doctor should get into and examine?

17  **A.**   Yes, sir.

18  **Q.**   Would some of the things that you just mentioned, an

19  inadequate history, inadequate physical exam, inadequate

12:11:05  20  neurological test, you only saw one drug test and the

21  SOAPP was not integrated into the treatment plan for the

22  patient, would that be, in your opinion, considered

23  nontherapeutic prescribing?

24  **A.**   It's not the practice of medicine when you don't act

12:11:24  25  like a physician and practice medicine.  Nontherapeutic

1   prescribing would be whether or not you got a therapeutic

2   benefit.

3   Q.    And I should have made my question a little bit more

4   clearly, assuming that Dr. Evans was prescribing narcotics

12:11:40    5   drugs, Schedule II narcotic drugs, particularly oxycodone

6   and hydrocodone, but nevertheless, he inadequately had a

7   medical history and did not have physical exams or

8   neurological tests, those kinds of things, would that be,

9   in your opinion, would you say that Dr. Evans was

12:12:04    10   nontherapeutic prescribing without a medical necessity?

11   A.    Yes, sir.

12   Q.    Did you find evidence, or did you find a trend

13   whether you could observe in those files you reviewed,

14   that whether Dr. Evans made a proper diagnosis in those

12:12:21    15   cases?

16   A.    I did not see a proper diagnosis.

17   Q.    Without a proper diagnosis and if you write

18   prescriptions for Schedule II narcotics, is that

19   nontherapeutic prescribing without medical necessity?

12:12:36    20   A.    Yes, sir.

21   Q.    Is that prescribing outside the course of

22   professional practice as a doctor and not for a legitimate

23   medical purpose?

24   A.    Yes, sir.

12:12:50    25   Q.    Let's talk a little bit, did you see evidence in the

*Direct-Owen/By Mr. Joubert*

1 files that you reviewed that Dr. Patients -- I'm sorry,

2 that Dr. Evans would start off seeing a patient in his

3 office maybe monthly in the beginning, but there would

4 come a time when he would begin to see them once every

5 three months.  Do you recall that trend?

6 **A.**   Yes, sir.

7 **Q.**   With regard to follow-up visits, what would be

8 important for Dr. Evans to do or any doctor, who would see

9 a patient once every three months?  Would a physical exam

10 be important to conduct?

11 **A.**   Yes.

12 **Q.**   Did you see any evidence that Dr. Evans conducted a

13 physical exam?

14 **A.**   I did not.

15 **Q.**   That is --

16 **A.**   Other than the occasional range of motion.

17 **Q.**   And I was specifically asking about those cases where

18 a patient would only come in every three months.

19         Now, let's go back for a second to one of your

20 points earlier about some of the diagnostic tools that

21 Dr. Evans used in the notes indicated that the patient's

22 pain level either did not get better, or it actually

23 increased over months or over periods of time.  When the

24 pain goes up, what does that tell the doctor, or what

25 should it tell the doctor?

*Direct-Owen/By Mr. Joubert*

1    **A.**   That you're not achieving a therapeutic benefit.

2    **Q.**   That is not achieving a therapeutic benefit from the

3    prescribed controlled substances?

4    **A.**   Yes, sir.

12:14:10    5    **Q.**   And then would it be correct to suggest that

6    alternative forms of treatment would then be either

7    necessary or required?

8    **A.**   Yes, sir.

9    **Q.**   Let me ask you about with regard to persons who are

12:14:22    10    showing an aberrant drug behavior, such as injecting

11    themselves in the hands with a controlled substance or if

12    a family member actually called Dr. Evans' office and

13    reported that a family member was injecting drugs in the

14    hand, would that be an indication of an aberrant drug

12:14:45    15    behavior?

16    **A.**   Yes, sir.

17    **Q.**   Would it likely by an indication of addiction?

18    **A.**   Yes, sir.

19    **Q.**   What would be the proper followup that the doctor

12:14:52    20    either should know or should conduct if he saw a patient

21    within a couple of days of a family member calling in

22    complaining about this patient shooting drugs in their

23    hand?

24    **A.**   Well, you would have to stop prescribing their drug

12:15:10    25    of choice and you would refer them to an addiction

*Direct-Owen/By Mr. Joubert*

1    treatment facility so they can get it taken care of.

2    Q.    Would it accomplish a proper -- well, would it be a

3    proper standard of care to give another prescription to

4    that same patient within a day or two after a family

12:15:27  5    member has called the office and has documented that the

6    patient is injecting drugs, would it be proper standard of

7    care to write a prescription and then terminate the

8    patient or fire the patient?

9    A.    It would not be the standard of care to reissue the

12:15:44  10   prescription from their drug of choice because you're just

11   enabling their addiction problem.

12   Q.    Well, let's say that the doctor reduced the dosage of

13   oxycodone or Roxicodone for that same patient, he reduced

14   the dosage by about 60 pills, but nevertheless gave them

12:16:01  15   another prescription and told the patient that they were

16   giving them prescriptions simply to manage their

17   withdrawals, would that be a proper standard of care?

18   A.    No, sir, there's other ways you can manage opioid

19   withdrawals without giving them an opioid.

12:16:15  20   Q.    Well, let's be candid now.  When you say there are

21   other ways, are you saying that the way that in my example

22   that Dr. Evans would have handled the situation, assuming

23   I was correct, would that be one way and there would be

24   other alternative ways?

12:16:31  25   A.    You would not want to give the person who is

1    injecting oxycodone a prescription of oxycodone because

2    they've lost control.  They're doing very, very dangerous

3    behaviors and they could accidentally kill themselves with

4    the next injection.  So you don't want to allow them to

12:16:48    5    have a drug they've lost control over.  You could give

6    them Suboxone or you could give Clonidine and Bentyl to

7    manage their withdrawal symptoms.

8    **Q.**   If there's no indication in the patient's file that

9    the doctor gave them Suboxone or any other treatment,

12:17:06   10    would that be considered, for lack of a standard of care

11    or improper standard of care?

12    **A.**   Yes, sir.

13    **Q.**   Would it also be an indication that that prescription

14    that Dr. Evans gave the patient when he did see her, and

12:17:18   15    then noticed the injection marks on the hand, would that

16    be a prescription that's written outside the course of

17    professional practice and not for legitimate medical

18    purpose?

19    **A.**   Yes, sir.

12:17:37   20    **Q.**   Before I went through the last series of questions

21    about the example of a person injecting drugs, I was

22    asking about functionality and when the diagnostic tools

23    in a patient's chart indicates that the pain is going up,

24    what does that usually indicate about the function of the

12:17:58   25    patient?

*Direct-Owen/By Mr. Joubert*

1    A.    Typically when pain is reduced, function goes up.

2    And if pain increases, function goes down.  I went and

3    looked at all the outcome literature in pain management

4    and -- that looked at functional improvement and pain

5    reduction, there's a pretty strong correlation that when

6    pain goes up, function goes down and vice versa.

7    Q.    Would it be correct to say, then, in the chart of

8    Kimberly Richardson, she consistently indicated that her

9    pain score, at least the subjective SOAPP was at a 10 and

10   it remained at a ten, would it be incumbent upon the

11   doctor to find some other form of treatment, or to take

12   some other approach, other than simply refilling or

13   writing new prescriptions every month?

14   A.    I think you misused SOAPP in there.  I think you're

15   talking about the 0 to 10 pain scale was 10 out of 10.

16   Q.    Yes.  I'm sorry.  You're correct.  Thank you for

17   correcting me.

18   A.    So if you're still at 10 out of 10 pain, one you know

19   it's symptom execration and you need to be addressing the

20   suffering.  And, two, if they're constantly having 10 out

21   of 10 pain, you're not achieving a therapeutic benefit.

22   So you need to move in a different direction.

23   Q.    And what would be a different direction?

24   A.    Well, not everybody's pain responds to pain

25   medicines, surprisingly.  So you would go back to the

*Direct-Owen/By Mr. Joubert*

1    fundamentals and look at exercise and cognitive behavioral

2    therapy.  There may be injections that are possible.  It

3    just depends on the context.

4    **Q.**   And I notice that you often come back to the idea of

12:19:39  5    not achieving "a therapeutic benefit".  Can you tell the

6    jury why it's important to look for achievement of a

7    therapeutic benefit?

8    **A.**   Because I'm prescribing something, I'm prescribing a

9    treatment, and that treatment has to produce a therapeutic

12:19:56  10   benefit, a good outcome.  That's what I'm trying to do,

11   I'm trying to get my patient better.  And when you give a

12   treatment that doesn't produce a good outcome, you don't

13   have medical necessity to continue it.  So you have to

14   change gears and go in a different direction.

12:20:15  15   **Q.**   And if a patient such as Kimberly Richardson would

16   indicate consistent level of 10 out of 1 to 10 pain

17   levels, would that suggest that there was no therapeutic

18   benefit being achieved by the previous prescriptions?

19   **A.**   Could you say that again?  I lost concentration.

12:20:36  20   **Q.**   I'm sorry.  It's not a very good question.  I just

21   wanted to be clear that, are you saying then that if

22   Kimberly Richardson indicated that her pain level was 10

23   out of a level of possible 1 to 10, would that be an

24   indication she was not receiving a therapeutic benefit?

12:20:54  25   **A.**   That's one indication, yes, sir.

*Direct-Owen/By Mr. Joubert*

1  Q.   And would it be within the standard of care or --

2  well, let me withdraw that.

3            Would it be practicing medicine properly

4  to continue to issue prescriptions for Schedule II

12:21:08  5  narcotics such as oxycodone to her?

6  A.   It would not.

7  Q.   You saw within the medical files that you reviewed

8  from patients of Dr. Evans, there were a number of

9  prescriptions that were copies of prescriptions, is hat

12:21:27  10  correct?

11  A.   Yes, sir.

12  Q.   Tell the jury why it's important to put copies of the

13  prescriptions in a patient chart or file?

14  A.   It's important to have copies of a prescription in

12:21:39  15  your chart.  One is a record of when you prescribed, but

16  also as a record should somebody alter your prescription

17  down the road, you know what you wrote on the

18  prescription.

19  Q.   So to the extent that Dr. Evans made photocopies of

12:21:54  20  the prescriptions, that was within the standard of care,

21  would you say?

22  A.   Yes, sir.

23  Q.   Now, in looking at those prescriptions, did you

24  notice a trend that many of the prescriptions were for at

12:22:08  25  least one form of oxycodone, at least one form of

*Direct-Owen/By Mr. Joubert*

1    hydrocodone, and then it would also include other drugs,

2    such as the benzodiazapine that would be Valium or -- I

3    don't think he ever had Xanax, but did you see a trend

4    where those usually were prescribed together?

12:22:30   5    **A.**   Yes, sir.

6    **Q.**   Can you first tell the jury what is a benzodiazapine?

7    **A.**   A benzodiazapine is a tranquilizer.  It works on your

8    brain kind of like alcohol does.

9    **Q.**   How does it work in conjunction with oxycodone or

12:22:47   10   and/ or hydrocodone?

11   **A.**   Well, they're both sedatives.  So it gives an extra

12   punch to the euphoria or the high associated with opioids.

13   **Q.**   It gives an increase to the high associated with

14   opioids?

12:23:07   15   **A.**   Yes, sir.

16   **Q.**   Did you also see prescriptions that would include

17   Lortab which is hydrocodone, Roxicodone which is

18   oxycodone, a benzodiazapine, usually Valium and perhaps

19   Soma?

12:23:24   20   **A.**   Yes, sir.

21   **Q.**   And sometimes Mobic?

22   **A.**   Yes, sir.

23   **Q.**   Now, in your experience, when you see those types of

24   drugs together, how would you describe that prescription

12:23:39   25   or those groups of prescriptions?  What do those

*Direct-Owen/By Mr. Joubert*

1  constitute?

2  **A.**   Excluding Mobic, the use of Soma with the

3  benzodiazapine and some form of opioid is a very popular

4  drug cocktail.

12:23:52  5  **Q.**   And how popular is that drug cocktail?  Is there in

6  fact a version of it known as the Houston cocktail?

7  **A.**   Yes, sir.

8  **Q.**   What Dr. Evans was prescribing, would that be

9  considered a Houston cocktail, if you know?

12:24:09  10  **A.**   Well, it would be version 2.0 of the Houston

11  cocktail.  The hydrocodone was substituted with oxycodone

12  or oxycodone was added to hydrocodone, and the Xanax was

13  replaced with Valium.

14  **Q.**   Okay.  Would that be the same as saying that when

12:24:26  15  this so-called Houston cocktail first started, the

16  combination was hydrocodone, a tranquilizer such as Valium

17  or Xanax, as well as Soma?

18  **A.**   Yes, sir.

19  **Q.**   And today -- well, and in your observation and review

12:24:44  20  of the patient files of Dr. Evans, when you looked through

21  those patient charts, the 17 or 18 that you reviewed, did

22  you see consistently that at least three of those drugs

23  were always prescribed in combination?

24  **A.**   Yes, sir.

12:24:59  25  **Q.**   And would those be some form of oxycodone, usually

*Direct-Owen/By Mr. Joubert*

1   Roxicodone, and then Lortab or some Lorcet in the form of

2   hydrocodone, and then Soma?

3   **A.**   Yes, sir.

4   **Q.**   And Valium?

12:25:13   5   **A.**   Yes, sir.

6   **Q.**   Now, in your professional practice and opinion, if a

7   doctor is prescribing this cocktail, that is a group of

8   those drugs we just talked about, a combination, should

9   the doctor -- does the doctor have a diligence or a

12:25:41   10   responsibility to know that that is a popular cocktail for

11   use?

12   **A.**   Yes, sir.

13   **Q.**   And I didn't ask you that, but are these -- this

14   concept of this term cocktail, is that, in fact, street

12:25:56   15   language for drugs of abuse?

16   **A.**   Yes, sir.

17   **Q.**   And so, back to my question, does a doctor have --

18   should Dr. Evans know or should have known, that he was

19   prescribing a cocktail that was highly abused in the

12:26:11   20   street?

21   **A.**   Yes, sir.

22   **Q.**   I'd like to talk just briefly about multisite pain in

23   terms of a diagnostic tool, and what it means that a

24   doctor should or should not do if there was multisite pain

12:26:36   25   indicated.

1    **A.**    Yes, sir.  When the somebody presents with multisite

2    pain, they's got neck pain, they have low back pain and

3    maybe other areas of pain.  There are many reasons you

4    could have multisite pain.  So you have to come up with a

12:26:50    5    list of these reasons.  It's called a differential

6    diagnosis, and then you systematically work through and

7    try to eliminate the causes that might be going on to

8    produce this diffused pain problem.

9    **Q.**    In your review of the files of some of the patients

12:27:08    10    of Dr. Evans, did you see indications that many patients

11    had historical injuries, that is, injuries which had

12    occurred five years or more prior to the time that they

13    were seeing the doctor?

14    **A.**    Yes, sir.

12:27:20    15    **Q.**    And, in fact, were many of the juries indicated to be

16    the result of automobile accidents?

17    **A.**    Yes, sir.

18    **Q.**    Or some type of a blunt trauma?

19    **A.**    Some type of trauma, yes, sir.

12:27:33    20    **Q.**    Did you see any records indication in the files that

21    you reviewed, that Dr. Evans made it a point to verify,

22    other than getting those historical patient records, did

23    Dr. Evans make any effort to verify by way of a physical

24    examination the current state of those alleged historical

12:27:53    25    injuries?

Direct-Owen/By Mr. Joubert

1   **A.**   I did not.

2   **Q.**   Can you tell the jury with regard to multisite pain,

3   what differential diagnosis would be?

4   **A.**   The multisite pain could be caused by a thyroid

12:28:13   5   problem, or a perithyroid problem, it could be caused by

6   rheumatological problems like ankylosing spondylitis,

7   Lupus, multiple sclerosis.  It could she caused by

8   fibromyalgia.  It could be caused by opioid induced

9   hyperalgia in which the pain medication can actually have

12:28:32   10   you have more pain, or it can be psychological pain from

11   severe depression or other psychological issues.  And

12   you'd want to work through trying to figure out and

13   eliminate this list, so that you can understand what's

14   really driving the pain problem.

12:28:49   15   **Q.**   So if a patient by the name of Kimberly Richardson

16   reported to the doctor that she was suffering with Lupus,

17   would that be an indication -- well, and she also reported

18   that her pain level was consistently 10 of 10, would that

19   be something that the doctor should take in consideration?

12:29:07   20   **A.**   Yes.  And you might want to get a rheumatology

21   consult to try to help you understand the Lupus is out of

22   control or is it managed well.

23   **Q.**   But with regard to your comment earlier, if I

24   understood you correctly to continue to prescribe opioid

12:29:24   25   such as oxycodone and hydrocodone, would that perhaps in

*Direct-Owen/By Mr. Joubert*

1  fact, irritate or inflame the Lupus or some of the other

2  conditions?

3  **A.**   Well, opioids can cause more pain, so they could be a

4  compounding variable that you have to consider.

5  **Q.**   Right.

6  **A.**   And that's called opioid induced hyperalgesia.

7  **Q.**   Well, let's talk about if a patient reported,

8  Number 1 we talked about the patient who was injecting

9  oxycodone in their pants and if they also showed a history

10  of fibromyalgia, would that be an indication that the

11  doctor should look for some other alternate form of

12  treatment?

13  **A.**   Well, the treatment guideline by the American College

14  of Rheumatology for fibromyalgia, does not recommend using

15  opioids to treat fibromyalgia, so if somebody's got

16  fibromyalgia, they would not be may good candidate for

17  opioids.

18          THE COURT:  Can you mark your position, mark

19 your spot?

20          MR. JOUBERT:  Yes, Your Honor.

21          THE COURT:  All right.  Let's go ahead and take

22 lunch.  Let's be back in at 1:45, please.

23   **(The following was held out of the presence of the jury)**

24          THE COURT:  You may step down, sir.  You may be

25 excused.  I'm just trying to get my notes right.

1          MR. JOUBERT:  Thank you, Your Honor.

2                   **(Recessed at 12:31 p.m.)**

3          MR. JOUBERT:  Your Honor, my paralegal wants to

4  be sure that by turning it down, you meant the temperature

01:49:54   5  would go up?

6          THE COURT:  That means the temperature will go

7  down.  No, by turning the temperature up, yeah, we will

8  turn it up then.  But I'm comfortable.  Please be seated.

9  Who got wet?  The temperature outside dropped, obviously,

01:51:04   10  that means that we're sensitive to that with the unit

11  upstairs, and so the temperature in here seems to be

12  dropping.  We're going to try to make an adjustment so that

13  we don't freeze you out, but if you feel like you're

14  getting a little bit too cool, and I know that drops down

01:51:21   15  on the back of your neck, we'll just take a short break and

16  then kind of go outside and turn around and come back in

17  and see if that, would.  Please have a seat.  All right.

18  We're ready to proceed, I think.

19          Mr. Joubert, whenever you're ready.

01:51:38   20          MR. JOUBERT:  Thank you, Your Honor.

21  BY MR. JOUBERT:

22  Q.   Dr. Owen, before the lunch break, we were talking

23  about -- I asked you about pain being rated, do you

24  remember I had questions about if pain is rated say 10

01:51:59   25  out of 10, was that an indication of not achieving a

*Direct-Owen/By Mr. Joubert*

1  therapeutic benefit from the medication?

2  **A.**   Yes, sir.

3  **Q.**   Well, I failed to ask you about -- it came to my

4  attention that even if the pain is not rated at 10 out of

01:52:12   5  10, let's say it's 6 or 7 out of 10 in that area for a

6  range of time and it appears not be getting any better,

7  would that also indicate that the patient is not achieving

8  a therapeutic benefit?

9  **A.**   If there's not a significant change in the pain, yes,

01:52:32  10  sir.

11  **Q.**   Okay.  If not a significant change, whether it

12  remains the same or fluctuates just a little?

13  **A.**   Yes, sir.

14  **Q.**   Let me ask you now if -- do you recall in the files

01:53:03  15  you reviewed the patient charts for Dr. Evans, was there

16  indication of at least one or more patients who may have

17  been the subject of a sexual abuse?

18  **A.**   There was at least one that I remember.

19  **Q.**   In a situation like that, is that a situation that

01:53:23  20  would call for more attention being given to the way the

21  pain is described by the patient or the -- well, the

22  circumstances under which a prescription is given?

23  **A.**   Yes, sir.

24  **Q.**   And if you will, tell the jury again what type of

01:53:41  25  further either investigation or further questions the

*Direct-Owen/By Mr. Joubert*

1  physician would have asked or should have asked in a

2  situation like that?

3  **A.**   Well, sexual abuse is a risk factor for aberrant drug

4  pain behavior.  When you're repetitively abused, sexually

01:54:03  5  or otherwise, you develop kind of a hypervigilant state

6  and you kind of similar to post-traumatic disorder, and

7  your nervous center is wound really tight and you're

8  fearful all the time.  So you're at risk to use these

9  drugs to self medicate that fear and anxiety.  So you

01:54:24  10  would try to the mitigate that by getting some intensive

11  psychotherapy to help that person bring things into order

12  and wind down their nervous system.

13  **Q.**   In your observation and review of the patient charts

14  from Dr. Evans, did you see any indication that any

01:54:44  15  patients were referred for any type of psychological

16  treatment or --

17  **A.**   I did not.

18  **Q.**   And I'd like to talk just a little bit more.  You

19  mentioned this earlier in talking about multisite pain, I

01:55:03  20  think you may have alluded to, or at least suggested to

21  me, that opioids can cause pain to spread from one or more

22  sites, is that correct?  Did I understand you correctly?

23  **A.**   Yes, sir.  It can cause pain to spread for multiple

24  sites.  It can make your pain more intense.

01:55:20  25  **Q.**   What about -- can you tell the jury about the term

*Direct-Owen/By Mr. Joubert*

1   radiculopathy?  Am I pronouncing that correctly?

2   **A.**   Yes, sir, radiculopathy.

3   **Q.**   Okay.  What is that and --

4   **A.**   That's a special kind of pain, nerve pain from a

01:55:42   5   compressed nerve in the spine, and it runs down your arm

6   or down your leg in a very special distribution that

7   follows the nerve maps that we have developed over the

8   years.

9   **Q.**   Is that fairly common by a bulging disc or

01:56:00   10   degenerative disc in the map?

11   **A.**   No, sir.

12   **Q.**   Okay.  Well, then let's talk about disc pain.  If a

13   person has -- coincidentally, I should ask you in

14   reviewing the file of Dr. Evans, did you see that a fair

01:56:20   15   number of the charts indicated that the patients had some

16   type of degenerative disc disease or bulging disc?

17   **A.**   Yes, sir.

18   **Q.**   And is it uncommon for persons who are, let's say

19   even over 30 or 35 years old, to have any bulging discs or

01:56:40   20   degenerative disc disease?

21   **A.**   It's very common to have these nonspecific findings

22   in people without back pain.  And it's age related and

23   it's also if you follow these people throughout the years,

24   you cannot predict who will develop back pain because they

01:57:00   25   had degenerative disc disease or bulges or even

*Direct-Owen/By Mr. Joubert*

1    herniations that are not symptomatic.  So the best we can

2    say is that these are nonspecific findings that you

3    commonly find in people with and without pain.

4    **Q.**    I'm thinking now about your testimony earlier where

01:57:27    5    you indicated -- I asked you a question whether you found

6    in your review of the files a number of files with

7    historical, or let's say medical documentation, a history

8    going back more than five years.  And also I think I asked

9    you about persons who may have had a bad car accident.

01:57:52    10                Would a disc problem or a degenerative

11    disc disease be the kind of thing that you would expect,

12    let's say even if you did not have a bad car accident or,

13    you know, if you didn't have this historical medical

14    problem?  Am I making myself clear?

01:58:10    15    **A.**    Yes, sir.  You can find these kind of nonspecific

16    abnormalities in people who have never had any serious

17    injuries and they don't have any pain.  So you have to be

18    very careful when somebody has pain and you see these

19    findings that they may or may not be a problem.  And the

01:58:30    20    literature has advanced quite a bit over the last 10-plus

21    years, and we now are very comfortable in saying that

22    these are nonspecific findings.

23    **Q.**    In fact, as to degenerative disc disease, is it no

24    longer considered a reliable cause for pain?

01:58:48    25    **A.**    Correct.  And surgery for degenerative disc disease

*Direct-Owen/By Mr. Joubert*

1  in discogenic discs are no longer recommended because the

2  outcomes are so poor.

3  Q.   Can you explain to the jury just a little bit more

4  and in layman's terms, are you saying essentially that

5  most of us are going to have some problems with our backs

6  as we get older, and to the extent that they may be

7  reflected or it may be given to a doctor, a pain

8  management doctor as the basis for a person coming to see

9  the doctor, would that be a cause for the pain doctor to

10 pay more attention to that, to see if it's really valid

11 or -- am I correct?

12 A.   Well, 85 percent of us will have back pain that we

13 can't find the cause of because the pathological model

14 that we have had in the past is incomplete at best case,

15 or at worse, it's just wrong.  So when somebody has back

16 pain, you've got to be very cautious to say it's coming

17 from the disc because that model is eroding away.  It's

18 got lots of evidence against it and almost none evidence

19 for that.

20        With the exception of a disc pinching a

21 nerve, causing what would be called commonly sciatica or

22 more specific a radiculopathy and that's a surgically

23 reversibly condition.

24 Q.   And the proper treatment for that would be surgery?

25 A.   First rest, and then surgery, and you could do an

*Direct-Owen/By Mr. Joubert*

1   injection of steroid in between.

2   **Q.**  Okay.  Now, can you tell the jury a little about the

3   different kinds of treatment for pain categories?

4   **A.**  There's three basic categories for pain treatment.

02:00:48  5   Interventional, rehabilitative and pharmaceutical.

6   Interventionally you have procedures like surgery or

7   injections, from a rehabilitative standpoint you have

8   treatments such as physical therapy, occupational therapy,

9   yoga, Pilates, some form of exercise, swimming, you can

02:01:11  10   have psychotherapy, which cognitive behavioral therapy is

11   the primary type of treatment, and then pharmaceutical,

12   you have a whole vast of types of pharmaceutical agents

13   you can treat with.

14   **Q.**  So, interventional, which means injection or surgery,

02:01:35  15   rehabilitation would be light to moderate exercise and

16   pharmaceutical?

17   **A.**  Different types of exercises combined with plus or

18   minus different ways of thinking about your pain.

19   **Q.**  All right.  Now, in assessing pain, when someone

02:01:57  20   reports pain, you mentioned earlier when you were

21   describing suffering, can you tell us a little bit about

22   the psychological component of that, can you tell the jury

23   a little bit more about how you would -- when you would

24   find it necessary to refer a person for psychological

02:02:19  25   assessment?

*Direct-Owen/By Mr. Joubert*

1   **A.**   Well, if there's any disconnect between their

2   objective findings and their self report, I would want a

3   psychological input to help me figure it out.  There's a

4   number of questionnaires you can do to screen for

02:02:34   5   depression, anxiety, maladaptive coping mechanisms and

6   various other issues that could magnify the perception of

7   pain and disability.

8   **Q.**   In your review of the patient charts from Dr. Evans,

9   did you find instances in which it appeared that a patient

02:02:52   10   had expressed some need or some concern of a psychological

11   nature, but there appeared to be no followup within the

12   patient chart that the patient either was referred to a

13   psychologist or any other type of alternative treatment?

14   **A.**   Yes, sir.  I never saw any evidence that alternative

02:03:16   15   treatments were offered or taken up on.

16   **Q.**   Let's talk a little bit more about you mentioned

17   addiction earlier today.  With regard to addiction, would

18   a lack of employment possibly be an indication that a

19   person may be addicted if they're on heavy narcotics?

02:03:45   20   **A.**   Well, if they're disabled and there's not any

21   pathology to explain their disability, it would imply that

22   they have some unstable behavioral issues, plus or minus

23   an addiction.  There's a whole array of possibilities to

24   explain why they perceive themselves as disabled, not

02:04:08   25   necessarily addiction alone.

*Direct-Owen/By Mr. Joubert*

1  Q.   I want to get to the concept of function, I think you

2  indicated earlier that function is a -- one of the best

3  reliability or best tools to try to assess a person's

4  response to these heavy narcotic drugs, is that correct?

02:04:24  5  A.   Yes, sir.

6  Q.   And that's what I was -- trying to get to on the

7  question about employment.  If a person has been

8  unemployed for a long time since they had a tragic

9  automobile accident or a tragic jar injury years ago, is

02:04:40  10  that something that a good pain management doctor should

11  look into further and determine whether that could be a

12  risk aberrant of addiction?

13  A.   Well, you want to determine what's driving that

14  disability perception and what you can do to restore

02:04:54  15  function to a much more normal level.

16  Q.   What's driving the disability?

17  A.   Yes, sir.

18  Q.   And also you mentioned, I think earlier, the

19  component of the -- well, I guess you'd have earlier

02:05:18  20  today, the psychosocial ability, did you mention about a

21  person's assessment of themselves, how they describe pain

22  and their living conditions, is that something that a pain

23  management doctor should be concerned about?

24  A.   Yes.  You want to assess their physical and

02:05:39  25  psychosocial functioning, how long can they sit, how long

1    can they walk, how long can they stand, are they

2    participating in pleasurable activities with family?  Do

3    they have any hobbies?  You want to look at all their

4    physical and psychosocial function and what their baseline

02:05:58    5    is and what their functioning is at this point.

6    **Q.**   What is chronic pain?

7    **A.**   Chronic pain is pain that persists after the tissue's

8    healed, generally considered three months.  So there's no

9    longer an injury creating the pain.

02:06:17    10    **Q.**   And can you explain to the jury how it would happen

11    that if a injury has healed, after three months if a

12    person is still having pain, what would be the function of

13    narcotic drugs, if any, or what would be the effect of

14    them?

02:06:35    15    **A.**   Well, what you're hoping to do with narcotics, if you

16    have to use it as a treatment, is to restore the person's

17    function and quality of life so that they can have a full

18    and rich life.

19    **Q.**   Now, we're not saying that in each case if a person

02:06:56    20    is still having pain after three months, that they should

21    not need the drugs, are we?

22    **A.**   No, sir.  There's a lot of other treatments you do as

23    first line treatment.  That's a high risk, nonevidenced

24    base treatment of last resort.

02:07:13    25    **Q.**   That is prescription of the narcotic drugs?

*Direct-Owen/By Mr. Joubert*

1  **A.**    Yes, sir.

2  **Q.**    Is the last treatment of resort.  What about cancer

3  pain, tell the jury about cancer pain.

4  **A.**    Well, cancer pain is pain that's caused by invasion

02:07:28  5  of the cancer into your body.  So in that situation,

6  opioids would be a first line treatment.

7  **Q.**    And in your experience, are they often first line

8  treatment in cancer patients?

9  **A.**    When the pain is severe enough.

02:07:46  10  **Q.**    Okay.  What about chronic pain that is noncancer, is

11  that a -- is that something that a doctor should be

12  concerned about?

13  **A.**    Well, certainly you want to help people with chronic

14  pain that's not cancer related, but you have to approach

02:08:04  15  it different than you would a cancer pain patient.

16  **Q.**    All right.  And with regard to chronic pain, tell the

17  jury a little about these psychosocial modalities or

18  psychosocial issues that you mentioned just briefly ago

19  with regard to chronic pain.

02:08:26  20  **A.**    So the most common maladaptive coping mechanisms in

21  the chronic pain population basically divide into about

22  four categories.  Fear avoidance, which I'm afraid of

23  hurting myself, so I'm going to stop moving, which leads

24  to a lot of muscle degeneration, and then

02:08:47  25  it's catastrophizing, which is doing the chicken little

*Direct-Owen/By Mr. Joubert*

1  dance, the sky is falling, the sky is falling, so

2  ruminating thoughts, a lot of dramatization about their

3  situation which may not be realistic, sense of injustice

4  and injustice covers things like entitlement and

02:09:13  5  entitlement and -- I'm blocking -- I'll come back to that

6  one and the last one is disability conviction.  So on the

7  injustice it's entitlement and victimization.

8  So, you know, I'm entitled to be pain free

9  and I'm a victim because I'm not pain free.  And although

02:09:33  10  certainly we can understand those emotions as a human,

11  they're just not productive and we have to teach them ways

12  of thinking about their problem in a different way.  And

13  that's all based on a foundation called cognitive

14  distortion.  And that's what a psychologist does is come

02:09:48  15  in, recognize these thought processes which are not

16  helpful, and trains the person to think differently, which

17  can be very helpful.

18  **Q.**   Tell the jury a little about perceived pain,

19  cognitive functioning that you just talked about, and how

02:10:06  20  that may or may not be related to a disability.

21  **A.**   Well, these maladaptive coping mechanisms can --

22  **Q.**   I'm sorry.  Say that again.

23  **A.**   Maladaptive coping mechanisms can magnify your

24  perception of pain and disability.  For example,

02:10:24  25  depression can take your motivation away to do exercise.

*Direct-Owen/By Mr. Joubert*

1    Anxiety will tighten your muscles up and if you have

2    muscle spasms that's going to make your pain worse.  So

3    it's a very complex interaction, but it all contributes

4    more to the concept of suffering than it necessarily does

02:10:44    5    to the physical pain component.

6    **Q.**    But as regard to a patient who may be disabled, that

7    would be cause for a doctor to look deeper as to what was

8    a true motivation?

9    **A.**    Yes, sir.  Especially when the pathology is not

02:11:02    10    severe enough to predict their perceived disability.

11    **Q.**    In reviewing the files of Dr. Evans, did you find

12    evidence that did not support a pathology that was

13    reported by the patient?

14    **A.**    I found evidence of mild to moderate pathology, which

02:11:20    15    was nonspecific and would not predict the level of

16    perceived disability.

17    **Q.**    Would it be fair to say that that mild to moderate

18    pathology would not support the level of prescription

19    narcotics that Dr. Evans was prescribing?

02:11:40    20    **A.**    I think it is certainly a risk factor to consider

21    opioids in that group of people who have a higher risk of

22    unstable behavioral issues that might be -- they may use

23    those drugs to chemically cope or to self medicate with

24    those controlled substances.

02:11:58    25    **Q.**    Is there an incident of suicides among opioid

*Direct-Owen/By Mr. Joubert*

1  abusers?

2  **A.**   There is.  The chronic pain population has three

3  times the normal population incident of suicide, but when

4  you separate the people with pain and no psychological

5  comorbidities from the people with pain and psychological

6  comorbidities, it's the people with the unstable

7  psychological comorbidities who commit suicide.

8           So pain of itself is not a risk factor for

9  suicide if the unrecognized mental health disorders that's

10  driving the suicide problem.

11  **Q.**   Is that significant in assessing cases of overdose

12  deaths?  Well, let he me ask a different way.

13           What you just said about patients who may

14  engage in -- well, suicide or action that would lead to

15  that, is that the same as the patient who may accidentally

16  overdose?

17           MS. BOLEN:  Your Honor.  I object to the

18  relevance of this line of questioning.

19           THE COURT:  Let's approach just a second,

20  please.

21           **(The following was held at sidebar)**

22           THE COURT:  Where are you going?

23           MR. JOUBERT:  Just about to wrap up, Your

24  Honor.

25           THE COURT:  No, with the suicide because I

*Direct-Owen/By Mr. Joubert*

1 thought you had explained that you would not go to this --
2 I think there was some hint that one or more people taking
3 medication have died.

4          MS. BOLEN:  That was no connection back to
5 March 11th.

6          THE COURT:  I know we dealt with that, that's
7 what I'm saying we dealt with that.  I'm just trying to
8 make sure we're not opening that up without recognizing
9 that.  Unless he takes the witness stand, that ain't coming
10 in or won't be questioned about.  So let's deal -- let's
11 leave the suicide part alone and move on to wherever you
12 are.

13          MR. JOUBERT:  Yes, sir.

14          THE COURT:  You should be finishing up.

15          MR. JOUBERT:  Pretty close.  Thank you, Your
16 Honor.

17     **(The following was held in the presence of the jury)**

18          THE COURT:  Hold on just one second, counsel.
19 All right.  Go ahead and proceed.

20 BY MR. JOUBERT:

21  Q.   All right, Dr. Evans.  I just have one or two more
22  areas to talk to you about briefly, and those would be --
23  we've talked about nontherapeutic prescribing.  I know I
24  asked you some questions, but I want to be clear that
25  we -- did I ask you about the risk factors associated with

1179

1  aberrant drug behavior?

2  **A.**   Yes, sir.

3  **Q.**   Did I ask -- we talked about that already?

4  **A.**   Yes, we did.

02:15:09  5  **Q.**   What about outcome benchmarks, if the pain goes up

6  and the function goes down, I think you've already told

7  the jury, then what does that suggest to the doctor?

8  **A.**   It's that you're not achieving a therapeutic benefit

9  or something new is happening and you need to assess

02:15:33  10  what's changed physically or psychologically.

11  **Q.**   We talked a little about urine drug testing.  And I

12  think you've already told the jury -- did you find any

13  indication -- well, I'm sorry.  I remember now.  You only

14  found one file where there was a request for a drug test,

02:15:54  15  a urine drug test?

16  **A.**   Yes, sir.

17  **Q.**   Now, before we get to the conclusion, I just want to

18  ask you if in making your assessment of the files you

19  reviewed from Dr. Evans' office, did you pay close

02:16:19  20  attention to the pain management section of the Texas

21  Administrative Code?  I think it's Chapter 170.

22  **A.**   Yes, sir.

23  **Q.**   Is that the current standard and was it back in 2011

24  and '12?

02:16:32  25  **A.**   Yes, sir.

*Direct-Owen/By Mr. Joubert*

1    MR. JOUBERT:  One second, Your Honor.

2    THE COURT:  All right.

3  BY MR. JOUBERT:

4    **Q.**   In your review of the files of Dr. Evans, were there

02:17:03   5  at least two or three files -- charts that you found that

6    the patient appeared to their overall health would

7    deteriorate after they saw Dr. Evans for a while?

8    **A.**   Yes, sir.

9    **Q.**   Do you remember the names of those patients?

02:17:14   10  **A.**   I do not.

11    **Q.**   And with regard to -- what are you able to tell the

12    jury about the continued use of opioids and narcotic

13    drugs, with regard to the declining health of a patient

14    who consistently get these prescriptions?

02:17:36   15  **A.**   Well, they're nontherapeutic in nature.

16    **Q.**   And if they're nontherapeutic, then the prescriptions

17    are then outside the course of professional practice --

18    medical practice?

19    **A.**   If they're nontherapeutic, you don't have medical

02:17:51   20  necessity to use them.  If you don't have medical

21    necessity, then they're not for legitimate medical

22    purpose.

23    **Q.**   Did you find a trend among the files that you

24    reviewed, the charts you reviewed, that the opioids

02:18:09   25  prescribed were in very high doses?

1    **A.**   Yes, sir.

2    **Q.**   And the dosage units, does it -- you're not saying

3    necessarily that just because there were -- a patient got

4    210 dosages, dosage units of oxycodone, 30 milligrams,

02:18:32   5    that that was necessarily in itself either dangerous or

6    unreasonable, but you did see a trend throughout the cases

7    you reviewed, is that correct?

8    **A.**   Yes, sir.  The only concern about the higher dose is

9    the risk of an accidental overdose increases the higher

02:18:49   10   the dose, but the more important thing is there wasn't a

11   clear therapeutic benefit.

12   **Q.**   And with regard to documentation in the files, what

13   did you -- if you have an opinion, what did you observe

14   with regard to the documentation by Dr. Evans and his

02:19:11   15   staff?

16   **A.**   It was very sparse and had partially legible and

17   eligible comments in the documentation.

18   **Q.**   What is the significance of the documentation being

19   legible?  Why is it important?

02:19:29   20   **A.**   The purpose of a medical record is for continuity of

21   care, not only from visit to visit with the same

22   physician, but for a consultant to review the records and

23   understand what's going on, or a future physician who

24   inherits the records down the road, needs to be able to

02:19:48   25   read the document and understand what treatment had been

*Direct-Owen/By Mr. Joubert*

1    ongoing and how they benefited or did not benefit

2    somebody.

3    **Q.**   With regard to the -- you saw the diagnostic tools of

4    the medical notes made by the staff members of Dr. Evans

02:20:15  5    with regard to stretching.  Can you tell the jury if you

6    noticed a pattern there and what significance, if any,

7    those stretching exercise sheets would have?

8    **A.**   Well, the first thing about the stretching exercise

9    is the vast majority of them reported severe pain.  They

02:20:32  10   had severe pain while on controlled substances on a daily

11   method, further supporting the position I had that the

12   medications were nontherapeutic.  The second point is

13   stretching alone is not a adequate alternative treatment,

14   such as overall exercise program, and it just doesn't

02:20:57  15   provide any really realistic probability that it was going

16   to produce a clinically and meaningful improvement in

17   their condition.

18   **Q.**   Did you make an observation that the majority of the

19   patient files that you reviewed, if not all of them, the

02:21:15  20   patients that traveled for an unusually long distances to

21   obtain controlled substances?

22   **A.**   Yes, sir.

23   **Q.**   Do you have an opinion about that?

24   **A.**   Yes.  You would not expect an average clinic to get

02:21:29  25   customers from hundreds of miles away to come to you.

*Direct-Owen/By Mr. Joubert*

1  **Q.**   I notice you use the term "customers."  Why not

2  "patients"?

3  **A.**   Well, I didn't see any evidence that the practice of

4  medicine was going on.  It looked more like these were

02:21:47   5  customers.

6  **Q.**   So in conclusion, Dr. Owen, did you -- do you have an

7  opinion with regard to the treatment of pain that

8  Dr. Evans was demonstrated and its relative or standard of

9  care of either minimal or low standard of care?

02:22:06  10  **A.**   I do.

11  **Q.**   And in your opinion, did that represent an imminent

12  threat to public health and welfare?

13  **A.**   Yes, sir.

14  **Q.**   Did you find evidence that Dr. Evans in fact did

02:22:19  15  prescribe in good faith?

16  **A.**   There's no evidence he prescribed in good faith.

17  **Q.**   In your assessment of the medical charts you

18  reviewed, did you find evidence that Dr. Evans failed to

19  perform the basic responsibilities of a physician

02:22:42  20  practicing medicine?

21  **A.**   Yes, sir.

22  **Q.**   And by these omissions and act or a lack of acts, did

23  the treatment that Dr. Evans gave with controlled

24  substances, was that outside the scope of professional

02:22:59  25  practice and not for a medical purpose?

1   **A.**   Yes, sir.  If you're not getting pertinent records,

2   if you're not doing the right kind of history or physical

3   exam or getting consultations, and you're

4   nontherapeutically prescribing and you're not monitoring

02:23:13   5   for urine drug testing, et cetera, as we've discussed

6   about, you're not practicing medicine.  And if you're not

7   practicing medicine, you're outside the scope of medicine.

8   And if you're outside the scope of medicine, none of your

9   prescriptions can be for a legitimate medical purpose.

02:23:29   10   **Q.**   With regard to your review of the files you saw that

11   many times patients were sending money orders to Dr. Evans

12   in the amount of $240, are there indications in the file

13   that Dr. Evans essentially had a cash business?  Was that

14   a factor that you assessed in your review of his files?

02:23:51   15   **A.**   It was -- it's not a standard of care issue, but it

16   is a profile of what we call a pill mill where you're

17   trading drugs for cash.

18   **Q.**   Did you say "trading drugs for cash"?

19   **A.**   Yes, sir.

02:24:18   20   **Q.**   You already told the jury that you found no -- that

21   there was no exhaustive of conservative evidence based

22   treatments and establish for a reliable clinically

23   meaningful therapeutic benefits and, therefore, medical

24   necessity to prescribe controlled substances was not

02:24:33   25   established; is that correct?

1    **A.**   Yes, sir.

2    **Q.**   And, therefore, without medical necessity, would that

3    be that -- did you conclude that the prescriptions of

4    controlled substances provided by Dr. Evans were not

02:24:44   5    provided for a legitimate medical purpose?

6    **A.**   Yes, sir.

7    **Q.**   And, finally, did you conclude that Dr. Evans

8    prescribed controlled substances outside the scope of

9    medical practice and not for legitimate medical purpose?

02:24:58   10    **A.**   Yes, sir.

11          MR. JOUBERT:  No further questions of

12    Dr. Evans -- I'm sorry -- Dr. Owen at this time, Your

13    Honor.

14          THE COURT:  All right.

02:25:11   15          Did you gather all your papers already?

16          Yes, you may proceed on cross-examination.

17          MS. BOLEN:  Thank you, Your Honor.  One moment.

18                    **CROSS-EXAMINATION**

19    BY MS. BOLEN:

02:25:27   20    **Q.**   Good afternoon, Dr. Owen.  How are you?

21    **A.**   Good.

22    **Q.**   Who selected the charts that you reviewed in

23    connection with this case?

24    **A.**   The -- the government.

02:26:00   25    **Q.**   All right.  And you didn't read any other charts

1  beyond the ones that you've mentioned in your direct

2  testimony; correct?

3  **A.**   No, ma'am.  I did see a few other charts Sunday, and

4  I think maybe last Friday.

02:26:16  5  **Q.**   Total of how many charts did you look at?

6  **A.**   I'm guesstimating another eight or nine, maybe 10.

7  **Q.**   All right.  Do you remember the names of any of those

8  people?

9  **A.**   No, ma'am.

02:26:26  10  **Q.**   You didn't get a chance to look at the discharge

11  patient files, did you?

12  **A.**   Those were the charts I looked at, yes, ma'am.

13  **Q.**   Did you look at the rejected patient charts?

14  **A.**   I don't remember that.

02:26:39  15  **Q.**   Did you look at the charts post -- excuse me --

16  September of 2012?

17  **A.**   I don't remember seeing any.

18  **Q.**   Did you look at the charts that spanned a framework

19  of from 2008 to 2013?

02:26:56  20  **A.**   Can you say that again?

21  **Q.**   Did you look at the charts that spanned a period 2008

22  to 2013?

23  **A.**   2010 to 2012, I think were the most of the dates I

24  looked at.

02:27:10  25  **Q.**   Is it fair to say that there's been a lot of changes

1    that took place in the area of pain management post 2013?

2    **A.**    The primary change since 2013 was using the

3    prescription monitoring program.

4    **Q.**    We'll talk about that in a minute, but let's talk

02:27:30   5    about the other change.

6                        Isn't it true, Dr. Owen, that the State of

7    Texas, the Texas Medical Board, changed its rule for pain

8    management and that that change took place in August of

9    2011?

02:27:42   10   **A.**    Yes, ma'am.

11   **Q.**    And is it fair to say, that that rule change --

12   changed words "should" to "must"?

13   **A.**    "Should" and "shall" were substituted with a "must"

14   and "should," I think.

02:27:56   15   **Q.**    So before in the period that we're talking about,

16   2008 to 2013, the Texas Medical Board rule relating to

17   pain management dealt with the physician should, the

18   physician may consider, and those types of things;

19   correct?

02:28:10   20   **A.**    Yes, ma'am.

21   **Q.**    And then afterward, it's changed that a physician

22   must, meaning they're required to do something; correct?

23   **A.**    Yes.  But "shall" also meant "must."

24   **Q.**    I understand that.  We'll come back to that as well.

02:28:26   25                       So, you understand that we're not in a

*Cross-Owen/By Ms. Bolen*

1  medical malpractice case; correct?

2  **A.**   Yes, ma'am.

3  **Q.**   And you understand that we're not in a disability

4  case; right?

02:28:33  5  **A.**   Yes, ma'am.

6  **Q.**   All right.  And you understand that this man over

7  here is in a fight for life?  He is here to prove in some

8  ways that he's not a drug dealer.  He doesn't have to

9  prove anything to the jury.

02:28:44  10          MR. JOUBERT:  Objection, Your Honor.

11          MS. BOLEN:  That's what he's here to do.

12          MR. JOUBERT:  Objection.  Improper question.

13          THE COURT:  I'm going to sustain it.

14  BY MS. BOLEN:

02:28:52  15  **Q.**   You never found a situation in your review of the

16  charts where Dr. Evans -- where Dr. Evans prescribed when

17  there wasn't a complaint of pain, did you?

18  **A.**   Correct.

19  **Q.**   And you never found a situation where Dr. Evans met

02:29:08  20  with somebody outside the practice and just gave them a

21  prescription without having a medical chart on them, did

22  you?

23  **A.**   Correct.

24  **Q.**   And you did not find any evidence of Dr. Evans

02:29:21  25  trading prescriptions for sex or for trading prescriptions

*Cross-Owen/By Ms. Bolen*

1    for work around the house or anything like that, did you?

2    **A.**    Yes, ma'am.

3    **Q.**    In fact, have you ever been to Dr. Evans' practice?

4    **A.**    No, ma'am.

02:29:33    5    **Q.**    Did you ever -- you weren't around when those

6    patients came to see him, were you?

7    **A.**    Correct.

8    **Q.**    And, in fact, you know very well, don't you,

9    Dr. Owen, that physicians sometimes get fooled?

02:29:45    10    **A.**    Yes.

11    **Q.**    You're currently practicing?  Yes or no?

12    **A.**    No, ma'am.

13    **Q.**    When did you give up practicing?

14    **A.**    December 2011.

02:29:51    15    **Q.**    And that's also around the time you gave up your X

16    registration?

17    **A.**    No.  I treated opioid addiction for another year

18    before I stopped.

19    **Q.**    All right.  And so, that would be about 2012;

02:30:03    20    correct?

21    **A.**    Yes.  It could be into 2013.  It's in that area.

22    **Q.**    Were you aware that Dr. Evans had a Suboxone

23    registration -- an X registration from DEA?

24    **A.**    Yes, ma'am.

02:30:15    25    **Q.**    Tell the jury what that means?

1  **A.**   That means that you've taken a course so that you

2  understand addiction and some of the ways of treating

3  addiction, but limited to the drug Suboxone.

4  **Q.**   And that's the drug that's used to treat opioid

02:30:35  5  addiction?

6  **A.**   Yes, ma'am.

7  **Q.**   And it can be used in a couple of capacities, can't

8  it not, doctor, one for treating pain and one for treating

9  addiction.  In other words, different formulations of the

02:30:44  10  drug?

11  **A.**   Yes, ma'am.

12  **Q.**   Now, you keep using terms like "evidence based

13  medicine, exhausting all conservative treatments, how well

14  a doctor did."  Do you recall that testimony?

02:30:55  15  **A.**   Yes, ma'am.

16  **Q.**   Tell the ladies and gentlemen of the jury what

17  "evidence based medicine" is.

18  **A.**   Evidence based medicine is medicine that has been

19  studied using strict criteria and proven to be effective.

02:31:10  20  **Q.**   There's not a reference to evidence based medicine in

21  the Texas pain management rule, is there?

22  **A.**   No, ma'am.

23  **Q.**   And isn't it true, that during the period 2008 to

24  2013, that in pain management, there really wasn't a lot

02:31:24  25  of evidence based medicine on certain issues like how long

1   you could use opioids, or whether there was a ceiling dose

2   to opioids?

3   **A.**    There was some evidence that we didn't have good

4   evidence on opioids, and you should be more cautious with

02:31:41   5   it.

6   **Q.**    And what you mean by that is that people were taking

7   different positions and they were publishing papers trying

8   to encourage the community to go forward and study these

9   things; correct?

02:31:51   10   **A.**    Partially, that's part of it, yes, ma'am.

11   **Q.**    And another thing that happened during that period of

12   is the evolution of education for pain management

13   practitioners and primary care practitioners who treat

14   pain.  Do you remember that?

02:32:04   15   **A.**    Yes, ma'am.

16   **Q.**    All right.  And that evolution has, in part, involved

17   the Texas Pain Society; right?

18   **A.**    Yes, ma'am.

19   **Q.**    And the federal government through various agencies;

02:32:11   20   correct?

21   **A.**    Yes, ma'am.

22   **Q.**    And even the American Medical Association; right?

23   **A.**    Yes, ma'am.

24   **Q.**    And the CDC ultimately got involved; correct?

02:32:23   25   **A.**    Yes, ma'am.

1    Q.    But that happened after 2013; right?

2    A.    Yes.

3    Q.    All right.  Now, when you say words like "a

4    significant change in pain," that it requires a

02:32:35    5    significant change in pain for somebody to continue using

6    opioids, that's not in the Texas Medical Board rule, is

7    it?

8    A.    No, ma'am.

9    Q.    And if you don't like somebody's opinion, then that

02:32:47    10    just might mean you disagree with the way that they've

11    approached the practice of medicine; correct?

12    A.    It's possible.

13    Q.    All right.  Doctors disagree with each other

14    occasionally, don't they?

02:32:56    15    A.    Yes.

16    Q.    And doctors get hired to give opinions that are based

17    on their look at a set of files now, in today's state of

18    mind, looking backwards; is that correct?

19    A.    I think that's a two-part question.  Can you ask me

02:33:12    20    again?

21    Q.    Sure.  When you look at patient charts to give an

22    opinion, you're looking at them with today's mindset;

23    correct?

24    A.    No, ma'am.

02:33:18    25    Q.    You're looking at them with all of the information

1    that you've studied up-to-date; correct?

2    **A.**   I'm applying what we knew in that time period to the

3    standard of care.

4    **Q.**   Well, you just told us a little bit ago, that what

02:33:32   5    you knew regarding the standard of care was that the Texas

6    Medical Board didn't require certain things, didn't have

7    certain language in it; is that right?

8    **A.**   Yes.

9    **Q.**   Like drug testing.  Let's go back to that for a

02:33:44   10   second.  The Texas Medical Board doesn't require drug

11   testing, does it?

12   **A.**   That rule is a documentation guideline, and it didn't

13   require it, but the standard of care does require it.

14   **Q.**   The rule, I believe, Dr. Owen, is a minimum standard

02:33:57   15   in the state, and that language is in the rule.  Do you

16   recall that?

17   **A.**   The new rule or the old rule?

18   **Q.**   The one in effect during the time you said you were

19   using the one during the timeframe 2008 to 2013.  I'm

02:34:10   20   talking about that rule.

21   **A.**   Yes.  Although it doesn't require in the rule that

22   you do urine drug tests; the standard of care does.

23   **Q.**   But we're talking about a criminal case, and you

24   understand the difference between standard of care

02:34:23   25   language and the issue of whether a doctor has stepped

*Cross-Owen/By Ms. Bolen*

1  completely outside the bounds of being a doctor and turned

2  into something else?

3  **A.**   I do.

4  **Q.**   All right.  So in the Texas Medical Board rule,

02:34:35  5  during the period of time 2008 to 2013, tell the ladies

6  and gentlemen of the jury whether drug testing was

7  required.

8  **A.**   Drug testing was not required by the rule.

9  **Q.**   But it is now, isn't it?

02:34:49  10  **A.**   Yes.

11  **Q.**   And that happened in 2015; correct?

12  **A.**   Yes.

13        MR. JOUBERT:  We object to any further

14  questions about what happened in 2015 and the change of the

02:34:58  15  law.

16        THE COURT:  Overruled.

17  BY MS. BOLEN:

18  **Q.**   Did you go through any charts and find evidence of

19  the laboratory that Dr. Evans used for testing?

02:35:19  20  **A.**   Testing what?

21  **Q.**   Drugs.

22  **A.**   No, ma'am.

23  **Q.**   You spoke earlier of the fact that Dr. Evans didn't

24  perform any confirmation testing; correct?

02:35:31  25  **A.**   Yes, ma'am.

1    Q.   Confirmation testing is something that a clinical

2    laboratory does; right?

3    A.   Correct.

4    Q.   And that testing can be very expensive; correct?

02:35:42    5    A.   About $300, yes.

6    Q.   In fact, during the timeframe from 2008 to 2013,

7    isn't it true that those tests cost quite a bit more back

8    then?

9    A.   It depended on the vendor.

02:35:53    10   Q.   Depending on the laboratory that sold the testing;

11   correct?

12   A.   Yes, ma'am.

13   Q.   And some of the doctors actually had their own

14   clinical laboratories, very expensive equipment put into

02:36:03    15   their office; right?

16   A.   Yes, ma'am.

17   Q.   And they made money off of that; right?

18   A.   Yes.

19   Q.   And you know that Dr. Evans didn't do that; correct?

02:36:08    20   A.   Yes.

21   Q.   Didn't have a lab in his office?

22   A.   Correct.

23   Q.   Have you heard a lab AGIS?

24   A.   No, ma'am.

02:36:16    25   Q.   So you don't know whether or not Dr. Evans used AGIS

*Cross-Owen/By Ms. Bolen*

1    in his drug testing, do you?

2    **A.**    No, ma'am.

3    **Q.**    You didn't look at anything more than what the

4    prosecutor gave you; correct?

02:36:26    5    **A.**    Yes, ma'am.

6    **Q.**    Now, I want to talk about indicia of a bona fide

7    physician patient relationship.

8                          When you get a patient in practice, before

9    you establish that relationship with them, you have to set

02:36:51   10    up an appointment; correct?

11    **A.**    Yes, ma'am.

12    **Q.**    And there might be some paperwork that precedes that

13    appointment; correct?

14    **A.**    Yes, ma'am.

02:36:57   15    **Q.**    And sometimes that's handled by your staff, in terms

16    of getting the paperwork out; correct?

17    **A.**    Yes, ma'am.

18    **Q.**    And then from there, the doctor receives the

19    information, there's a chart that's made up; right?

02:37:09   20    **A.**    Yes.

21    **Q.**    And there's different components of the chart;

22    correct?

23    **A.**    Yes.

24    **Q.**    There's a component of a face sheet or a coversheet

02:37:16   25    that tracks what's happened to the patient in the

1 practice.  Is that true?

2 **A.**   It's possible.

3 **Q.**   All right.  Some practices use it, some practices

4 don't; right?

02:37:25  5 **A.**   Yes, ma'am.

6 **Q.**   And some practices will use handwriting, and other

7 practices will use electronic medical records; correct?

8 **A.**   And dictation, yes, ma'am.

9 **Q.**   And some practices even blend it together; correct?

02:37:40  10 **A.**   Yes.

11 **Q.**   So in the charts you looked at, you surely noticed

12 the electronic medical records that Dr. Evans kept in many

13 of his charts, didn't you?

14 **A.**   May have seen one or two that looked like something

02:37:55  15 along that lines, yes.

16 **Q.**   But that's in the charts the prosecutor gave you;

17 right?

18 **A.**   Yes.

19 **Q.**   Were you aware that Dr. Evans also treated Workers'

02:38:02  20 Comp cases?

21 **A.**   No.

22 **Q.**   Were you aware that he treated motor vehicle accident

23 patients?

24 **A.**   Yes.

02:38:11  25 **Q.**   All right.  And those treatments sometimes involved

Cross-Owen/By Ms. Bolen

1    stuff other than opioids; correct?

2    A.   I don't know.

3    Q.   Because you didn't look at the rest of the file, did

4    you?

02:38:19  5    A.   Correct.

6    Q.   Do you have any idea how many charts are in the

7    government's possession?

8    A.   I do not.

9    Q.   Now, back to the indicia.  So we now have a chart set

02:38:30  10   up, patient shows up for an appointment, in doctor's

11   offices they sign in, don't they?

12   A.   Yes.

13   Q.   And that's to keep track of the fact that the patient

14   came; correct?

02:38:41  15   A.   Yes.

16   Q.   And that sign-in sheet is maintained on an ongoing

17   basis; correct?

18   A.   Yes.

19   Q.   And then in different practices, the patient may

02:38:50  20   route directly to the caregiver to the doctor; correct?

21   A.   Yes.

22   Q.   Other times they may see a nurse or a nurse

23   practitioner; right?

24   A.   Yes.

02:38:59  25   Q.   And doctors' offices take people's blood pressure,

1   don't they?

2   **A.**   Yes.

3   **Q.**   And they track it from visit to visit in order to

4   make sure that that patient has a healthy blood pressure;

02:39:10   5   correct?

6   **A.**   Yes.

7   **Q.**   And you would expect a doctor to point out a high

8   blood pressure issue with a patient if they noticed it,

9   even if they were not the primary care physician for that

02:39:21   10   patient?

11   **A.**   Yes, ma'am.

12   **Q.**   And then you also would have in most doctors' office

13   and even pain management offices, the ability to weigh a

14   patient; correct?

02:39:32   15   **A.**   Yes.

16   **Q.**   Have a scale, a patient steps on it -- we don't like

17   doing it, but that's what we do; right?

18   **A.**   Yes, ma'am.

19   **Q.**   And me track it over time; correct?

02:39:39   20   **A.**   Yes, ma'am.

21   **Q.**   And the loss of weight in connection with pain

22   management is pretty important, isn't it?

23   **A.**   Depends on the context.

24   **Q.**   Depends on the person, too, doesn't it?

02:39:48   25   **A.**   Yes.

1  Q.   All right.  And so, somebody that is overweight, a

2  little bit like me, if I have a bad back, losing weight

3  might help me strengthen my abdominal muscles and actually

4  strengthen my back in that situation?

02:39:59  5  A.   It's possible.

6  Q.   All right.  And would it be possible for somebody

7  that had a horse fall on them and have their facets kind

8  of twisted sideways, the little spiny things on the back

9  of your spine here, the little wings, aren't those called

02:40:14  10  wings, the facets?

11  A.   You could use that term.

12  Q.   That can produce pain in an individual; correct?

13  A.   It could, yes.

14  Q.   And it's hard to really tell unless you see that

02:40:25  15  patient; right?

16  A.   Hard to tell what?

17  Q.   If a person really has pain?

18  A.   Nobody can tell if somebody has pain or doesn't have

19  pain.

02:40:34  20  Q.   That's right.  You have to take what the patient

21  represents that pain to be; correct?

22  A.   With certain caveats.

23  Q.   Sure.  A 10 for me might be a 2 for you, or vice

24  versa; correct?

02:40:45  25  A.   Yes.

1201

*Cross-Owen/By Ms. Bolen*

1   Q.   And by 10 and 2, I'm talking about the rating of the

2   pain; right?

3   A.   Yes, ma'am.

4   Q.   All right.  So, now, let's walk on in on our

02:40:55   5   treatment of this individual.  They've come in and they've

6   decided in a situation with Dr. Evans that you realize

7   that he routed patients first to somebody for stretching?

8   A.   It appeared that way.

9   Q.   All right.  Stretching is a good thing for people

02:41:10   10   that have tight muscles that can contribute to the pain

11   that they're having; correct?

12   A.   It can be, if it's done correctly.

13   Q.   And it's a form of exercise, isn't it, or a warmup

14   for exercise?

02:41:21   15   A.   It's a warmup, yes.

16   Q.   And stretching can help people develop stronger

17   muscles that can support the structure of their back to

18   help rid themselves of pain, or at least minimize the

19   pain?

02:41:32   20   A.   I don't believe stretching builds muscle.  It can

21   limber muscles.

22   Q.   It can improve the muscle?

23   A.   It can give you better range of motion.

24   Q.   And improve the muscle; right?

02:41:43   25   A.   If the muscle is keeping you from having good range

*Cross-Owen/By Ms. Bolen*

1  of motion.

2  Q.   So if I have a problem in the back of my neck and I

3  can't turn my neck one way or another, if I get some

4  stretching exercises, that may help me actually keep my

02:41:57  5  top of my head up straight and walk better and not having

6  perhaps as much pain in my neck; correct?

7  A.   Yes, ma'am.

8  Q.   Now, we've walked on, we've got somebody doing the

9  stretching and that person also puts hands on the patient.

02:42:13  10  That's a good thing in pain management; correct?

11  A.   Yes, ma'am.

12  Q.   You're aware that not all doctors in this country do

13  a physical examination every time they see somebody who is

14  using opioids on a long-term basis; right?

02:42:26  15  A.   I would not advise it.

16  Q.   I didn't ask whether you advised it.  You're aware

17  that there's physicians around this country that don't

18  perform a physical exam every single time they see a

19  patient?

02:42:39  20  A.   Not the ones who are practicing medicine.

21  Q.   All right.  State of Texas and the Texas Medical

22  Board rule doesn't require a physical examination every

23  time, does it?

24  A.   No, it doesn't.

02:42:50  25  Q.   And that is the minimum standard in this state, is it

*Cross-Owen/By Ms. Bolen*

1  not, sir?

2  **A.**   The Rule 170 is not a standard of care document.

3  It's a documentation guideline.

4  **Q.**   So the use of the phrase "minimum standard" in the

5  Texas Medical Board rule is irrelevant in your mind?

6  **A.**   It refers to a minimum documentation standard.

7  **Q.**   We'll come back to that.  So we've got a person now

8  who has seen somebody for stretching, and now they're

9  going to go have somebody else lay their hands on them and

10  have muscle issues addressed.  That's a good thing, is it

11  not?

12  **A.**   Yes.

13  **Q.**   And then that person may ultimately have to go back

14  out in the waiting room and then ultimately get to see the

15  doctor; right?

16  **A.**   Possibly.

17  **Q.**   You don't know whether Dr. Evans performed a physical

18  examination because you weren't there in the room with

19  him, were you?

20  **A.**   Correct.

21  **Q.**   But the people that were there were the patient;

22  right?

23  **A.**   Yes.

24  **Q.**   Staff members; right?

25  **A.**   Possibly.

*Cross-Owen/By Ms. Bolen*

1  Q.   And if they were to say that there was an examination

2  performed, that's not something you would doubt, is it?

3  A.   It depends.

4  Q.   The doctor under Texas Rule 170 has to take a

02:44:04  5  history, or do a patient evaluation; is that right?

6  A.   Yes.

7  Q.   All right.  And that evaluation has certain

8  components to it.  They have to document a problem focused

9  exam; correct?

02:44:16  10  A.   Correct.

11  Q.   And in some cases, patients that come to see doctors

12  who are going to treat them with an opioid for pain

13  management, it had exams by doctors; correct?

14  A.   It's possible.

02:44:27  15  Q.   You certainly saw the information in Derek Guitreau's

16  file about the prior treatment of another doctor, didn't

17  you?

18  A.   Yes, ma'am.

19  Q.   And, in fact, there were notes in the chart from that

02:44:37  20  other doctor; correct?

21  A.   One or two notes, I think.

22  Q.   And, in fact, those notes actually acknowledged that

23  Dr. Evans was treating this patient for medication

24  management, while the doctor, I believe his name was

02:44:52  25  Isaza -- I-S-A-Z-A -- he was the orthopedic involved in

1  trying to help with injections and other things to help

2  treat the pain.  Do you remember that?

3  **A.**   I don't remember all the details, but it's something

4  along that, yes, ma'am.

02:45:07  5  **Q.**   And when that happens between doctors, that's

6  something called coordination of care; correct?

7  **A.**   Yes.

8  **Q.**   That's a good thing, isn't it?

9  **A.**   Yes.

02:45:14  10  **Q.**   And you remember that there was nothing in there that

11  Dr. Isaza said that commented negatively on the opioids

12  that were being prescribed; right?

13  **A.**   Correct.

14  **Q.**   And, in fact, Dr. Isaza seemed to be aware of all the

02:45:27  15  medication that Mr. Guitreau was receiving from Dr. Evans

16  and even had that written down in the chart; correct?

17  **A.**   I believe so, yes.

18  **Q.**   And that's a good thing, isn't it?

19  **A.**   Yes.

02:45:37  20  **Q.**   That's what doctors do; right?

21  **A.**   Yes.

22  **Q.**   Now, the patient evaluation involves nature and

23  intensity of the pain; right?

24  **A.**   Yes.

02:45:47  25  **Q.**   The nature of the pain is expressed by the patient to

1206

*Cross-Owen/By Ms. Bolen*

1    the doctor; correct?

2    **A.**    Yes.

3    **Q.**    I have burning pain, that's a nature of pain; right?

4    **A.**    Yes.

02:45:55   5    **Q.**    I have tingling in my foot?

6    **A.**    Yes.

7    **Q.**    I have cramping in my back and can't straighten up

8    and even when I do, it pinches something and almost knocks

9    me to my knees; right?  That's a nature of pain?

02:46:08  10    **A.**    Yes.

11    **Q.**    And the intensity is the scale, right?  The 1 to 10,

12    or however it's scored in a particular practice?

13    **A.**    Yes, ma'am.

14    **Q.**    And there have been a lot of controversy about the

02:46:18  15    use of those pain scales, hasn't there, at least back in

16    the time period we're talking about?

17    **A.**    Yes.

18    **Q.**    Whether we use smiley faces or numbers or describe

19    what the numbers mean, people take different approaches to

02:46:29  20    that; correct?

21    **A.**    Yes.

22    **Q.**    And there's nothing wrong with that, is there?

23    **A.**    No.

24    **Q.**    In fact, when you looked at the records, you surely

02:46:39  25    noticed that Dr. Evans was asking his patients what was

1   their pain right now.  Do you remember that?

2   **A.**   Yes.

3   **Q.**   And then what was your pain at the worst, do you

4   remember that?

02:46:47   5   **A.**   Yes.

6   **Q.**   And do you remember the middle number, what was your

7   pain at the best; right?

8   **A.**   Yes.

9   **Q.**   And those numbers varied over a visit; correct?

02:46:55   10   **A.**   Yes.

11   **Q.**   And, in fact, there were examples in the charts that

12   you reviewed where the patient came in and said, "hey, I'm

13   back at work.  The pain has increased."  And you might see

14   that reflected in the numbers, but that's nothing bad, is

02:47:08   15   it?

16   **A.**   It depends on the documentation to explain it.

17   **Q.**   Well, with the numbers are recorded in the chart,

18   surely that's part of what the Texas Medical Board

19   requires; right?

02:47:18   20   **A.**   That's just a small part of what you should be

21   documenting.

22   **Q.**   But it is one part; correct?

23   **A.**   Yes.

24   **Q.**   And, you know, you keep coming back to what you

02:47:27   25   should be documenting.  There's actually a separate

*Cross-Owen/By Ms. Bolen*

1   section in the Texas Medical Board rule that talks about

2   medical records; right?

3   **A.**   Yes.

4   **Q.**   And in the front part of the Texas Medical Board

5   rule, it actually says that these are the things that the

6   Texas Medical Board wants doctors to do as a minimum

7   standard in the state; correct?

8   **A.**   Yes.

9   **Q.**   It doesn't say "minimum standard of documentation,"

10   does it?

11   **A.**   I don't remember the rule.

12   **Q.**   So the doctor also is supposed to ask about current

13   and past treatments for pain; correct?

14   **A.**   Yes.

15   **Q.**   And you saw that reflected in the chart by the fact

16   that the patients were asked to provide their prior

17   doctors; correct?

18   **A.**   I saw that part.

19   **Q.**   Did you also see the part where the patients were

20   asked to talk about the prior medications that they

21   received?

22   **A.**   No, I did see a copy of prior medications, like a

23   pharmacy record.

24   **Q.**   So you didn't see the sheet in the part where the

25   patient wrote down that these are the medications I've had

02:47:38
02:47:50
02:48:02
02:48:16
02:48:28

1    in the past?

2    **A.**   It wasn't real clear if those were the current meds

3    or the meds that were going to be part of the treatment

4    plan, but I did see that written down, yes.

02:48:41    5    **Q.**   Would you agree with me that at least in the

6    paperwork in Dr. Evans' chart organization there was a

7    piece of paper called history of injury, do you remember

8    that piece of paper?

9    **A.**   I think I remember that being on the initial

02:48:57   10    evaluation form.

11    **Q.**   But you don't really remember, do you?

12    **A.**   I think that's where I saw it.

13    **Q.**   A history of injuries is something that a patient

14    would fill out; correct?

02:49:05   15    **A.**   Yes.

16    **Q.**   All right.  And so, if a patient is asked in the

17    history of injury what medications they've taken and

18    whether they worked, then they would write that down;

19    right?

02:49:16   20    **A.**   Yes.

21    **Q.**   So that's part of gathering that information that the

22    State Medical Board requires; right?

23    **A.**   It's a small part of it, yes.

24    **Q.**   But that's what doctors do; correct?

02:49:24   25    **A.**   Yes.

*Cross-Owen/By Ms. Bolen*

1  Q.   They're also supposed to look at underlying or

2  coexisting diseases and conditions; right?

3  A.   Yes.

4  Q.   And some doctors that do medication management may

02:49:34  5  not be the doctor that actually treats that patient for

6  that underlying disease; correct?

7  A.   It's possible.

8  Q.   In other words, some patients will have a primary

9  care physician that's managing maybe their anxiety or

02:49:47  10  managing, you know, other issues like blood clotting

11  disorder, things like that; right?

12  A.   Yes, ma'am.

13  Q.   And a patient may have a rheumatologist to manage the

14  Lupus or autoimmune disorders; correct?

02:50:00  15  A.   Yes.

16  Q.   Do you realize that the State Medical Board requires

17  the doctor to evaluate the effect of pain on physical and

18  psychological function; right?

19  A.   The effect of pain on physical and psychosocial

02:50:16  20  function, yes.

21  Q.   It says psychological in the older version of 170,

22  Dr. Owen.  Do you remember that?

23  A.   It may, yes.

24  Q.   So when a doctor does that, they do it in terms of

02:50:30  25  asking the patient about the baseline that you mentioned

*Cross-Owen/By Ms. Bolen*

1   earlier; correct?  Baseline for family relationships;

2   right?

3   **A.**   Yes, ma'am.

4   **Q.**   Baseline for social interactions, whether you get

02:50:41   5   together for a barbecue or you go to church; right?

6   **A.**   Yes, ma'am.

7   **Q.**   And baseline for sleep; right?

8   **A.**   Yes, ma'am.

9   **Q.**   Baseline for mood?

02:50:48   10   **A.**   Yes.

11   **Q.**   And baseline for physical function; correct?

12   **A.**   Yes.

13   **Q.**   And if a doctor assesses those at the beginning or in

14   the early part of the relationship with the physician, or

02:50:58   15   with the patient -- excuse me -- then that is in -- at

16   least a good-faith effort to comply with the Texas Medical

17   Board standard; right?

18   **A.**   If it's adequately performed, yes, ma'am.

19   **Q.**   Well, again, we're going back to these words,

02:51:12   20   "adequately" and "proper" and things like that.  The

21   language is not that way in the Texas Medical Board rule,

22   is it?

23   **A.**   It's not a standard of care rule.  It's a

24   documentation guideline.

02:51:22   25   **Q.**   We're not in a standard of care negligence case, are

*Cross-Owen/By Ms. Bolen*

1  we, Dr. Owen?

2  **A.**   No, ma'am.

3  **Q.**   And the real nuts and bolts of the prescribing of an

4  opioid, according to the Texas Medical Board is that

02:51:37  5  there's a presence of one or more generally recognized

6  indications for the use of an opioid; correct?

7  **A.**   Yes.

8  **Q.**   And that can be, you know, from the FDA label for the

9  drug.  Do you know what that is?

02:51:51  10  **A.**   I'm sorry.  Can you say that again?

11  **Q.**   Do you need some water?

12  **A.**   I'm fine.

13  **Q.**   Okay.  One or more generally recognized indications

14  for the use of an opioid or a controlled substance, or any

02:52:03  15  medication for that matter, comes in part from the FDA

16  label for the drug; right?

17  **A.**   Yes, ma'am.

18  **Q.**   And the FDA is the Food and Drug Administration;

19  correct?

02:52:13  20  **A.**   Yes, ma'am.

21  **Q.**   That's a federal agency that approves drugs for use

22  in the public that doctors can write a prescription or

23  somehow get it out to patients; right?

24  **A.**   Yes, ma'am.

02:52:22  25  **Q.**   And in this situation, with opioids, in fact, the FDA

Cross-Owen/By Ms. Bolen

1  changed some of the labels during the period 2012 to 2013,

2  didn't they?

3  **A.**   Can you give me some specifics?  I'm not recalling.

4  **Q.**   Have you not tracked what has happened with opioids

02:52:40   5  in the changing of the labels through the period of time?

6  **A.**   I'm not catching onto what you're implying.

7  **Q.**   You stopped prescribing and doing work like that in

8  2012, didn't you?

9  **A.**   Yes, ma'am.

02:52:51   10  **Q.**   So one or more recognized medical indications for the

11  use of a controlled substance can be if somebody has a

12  pain that's caused by a crushing injury to their spine and

13  they've had hardware implanted into their body, and the

14  patient comes in and says I have pain or walking with a

02:53:11   15  cane, a doctor would at least have a recognized indication

16  for the use of the opioid; right?

17  **A.**   If you've exhausted the other treatment options.

18  **Q.**   And by "exhausted," again, you're going back to a

19  word that is not in the Texas Medical Board rule; right?

02:53:26   20  **A.**   Correct.

21  **Q.**   And the Texas Medical Board rule, just to go even

22  further, Dr. Owen, is about being a doctor, is it not?

23  **A.**   Yes.

24  **Q.**   It's the minimum standard for being a doctor;

02:53:36   25  correct?

*Cross-Owen/By Ms. Bolen*

1    **A.**    It's the minimum documentation.

2    **Q.**    Now, the medical board rule also talks about

3    treatment plan; right?

4    **A.**    Yes, ma'am.

02:53:46    5    **Q.**    And you've testified not only here, but in other

6    situations that function is the most important goal of a

7    treatment plan; right?

8    **A.**    Yes, ma'am.

9    **Q.**    And we want to get people back on their feet so that

02:53:59    10    they don't have to walk with canes anymore, so they don't

11    have to rely on it as much or whatever is best for them?

12    **A.**    Yes, ma'am.

13    **Q.**    And that requires patient input, does it not?

14    **A.**    Yes.

02:54:11    15    **Q.**    And the patient has responsibilities in these cases,

16    do they not?

17    **A.**    Yes.

18    **Q.**    And the treatment goals are definitely to improve

19    function and that comes kind of slowly with some people

02:54:22    20    with chronic pain; right?

21    **A.**    It can.

22    **Q.**    It doesn't happen on the first visit, does it,

23    Dr. Owen?

24    **A.**    Typically not.

02:54:28    25    **Q.**    In fact, it can take many months of visits to figure

1    out what's going on with the patient; correct?

2    **A.**    It can take some time, yes, ma'am.

3    **Q.**    And by "some time," it can take many months; right?

4    **A.**    Depends on the situation.

02:54:42    5    **Q.**    Now, another one of the goals is improving quality of

6    life; right?

7    **A.**    Yes.

8    **Q.**    Do you remember the patient Audie Decoteau and what

9    he said to Dr. Evans when he came in for the first visit?

02:54:56    10    **A.**    I do not.

11    **Q.**    He's disgusted with the quality of his life and he

12    wants it back.  That's a fair statement from a patient, is

13    it not?

14    **A.**    Yes.

02:55:07    15    **Q.**    And when we talk about reducing pain levels, we're

16    not talking about something that has to go from 10 to 0,

17    or 10 to 1, are we?

18    **A.**    No, ma'am.

19    **Q.**    In fact, it can go from 10 to 6 and still be

02:55:21    20    meaningful; correct?

21    **A.**    Yes, ma'am.

22    **Q.**    And it, again, is individual to that person; right?

23    **A.**    Yes.

24    **Q.**    And so, if somebody goes back to work and has worked

02:55:31    25    for the first time in three years, then that's a good

*Cross-Owen/By Ms. Bolen*

1    thing, is it not?

2    **A.**    Yes.

3    **Q.**    And you saw that in the files that you reviewed,

4    didn't you?

02:55:38    5    **A.**    I don't remember that.

6    **Q.**    Now, the treatment plan also requires that dosage and

7    frequency of any drugs prescribed be reported; is that

8    right?

9    **A.**    Yes, ma'am.

02:55:54    10    **Q.**    And you saw that on the face sheet of Dr. Evans'

11    charts, did you not?

12    **A.**    Yes.  They're supposed to be in the treatment plan.

13    **Q.**    You didn't see all of the typewritten notes, did you?

14    **A.**    I only saw what I was given.

02:56:08    15    **Q.**    It's also supposed to say whether or not other

16    treatments are planned; correct?

17    **A.**    Yes.

18    **Q.**    And you've talked about a lot about these other

19    treatments, you know.  There might be a surgery option,

02:56:20    20    there might be an injection option; correct?

21    **A.**    Yes, ma'am.

22    **Q.**    Those things are expensive, aren't they?

23    **A.**    It can be.

24    **Q.**    And you realize that Dr. Evans' patient population,

02:56:29    25    many of them didn't have insurance; right?

*Cross-Owen/By Ms. Bolen*

1   **A.**   Yes.

2   **Q.**   Some of them did, and some of them didn't?

3   **A.**   Could be.

4   **Q.**   All right.  You certainly realize that Dr. Evans took

02:56:40   5   insurance, didn't you?

6   **A.**   I only can opine about what I saw.

7   **Q.**   You know some doctors do opt out of insurance, do

8   they not, Dr. Owen?

9   **A.**   I don't know of any that have.

02:56:54   10   **Q.**   You, yourself, didn't participate in the Medicare

11   program at one point in time; is that correct?

12   **A.**   That's true.

13   **Q.**   And you yourself didn't participate in the Medicaid

14   program at one point in time?

02:57:07   15   **A.**   Let me backup.  Did you say I didn't participate in

16   Medicare was the question before that?  Because I may have

17   misanswered.

18   **Q.**   Medicare I said first and Medicaid second.

19   **A.**   I always participated in Medicare.  I opted out of

02:57:19   20   Medicaid.

21   **Q.**   And you opted out of Medicaid in part because of the

22   complexities of reimbursement associated with it; right?

23   **A.**   No, ma'am.

24   **Q.**   Why did you opt out?

02:57:28   25   **A.**   Medicaid was -- had a high risk of high population of

1    addiction and mental health disorders, and it just was

2    extra complicated treatments that I didn't care to

3    continue.

4    **Q.**    I thought you were treating addiction between 2011

02:57:51    5    and 2012?

6    **A.**    Yes, but I opted out of Medicaid in '98 or '9.

7    **Q.**    All right.  And you just evolved into that same

8    patient population that you opted out of; right?

9    **A.**    Eventually, yes.

02:58:07    10   **Q.**    And you realize that some people don't have the high

11   end Cadillac health plans that cover some of the

12   procedures that pain management specialists do; right?

13   **A.**    Yes.

14   **Q.**    In fact, implanting pumps that deliver medication to

02:58:20    15   the spine, that's expensive, is it not?

16   **A.**    Yes.

17   **Q.**    And implanting stimulators that stimulate nerves and

18   help the patient with the pain problem that way, those are

19   expensive, are they not?

02:58:28    20   **A.**    Yes.

21   **Q.**    And even injections, some people just don't want to

22   have needles put in their body anymore; right?

23   **A.**    Yes.

24   **Q.**    And those needles can come quite frequently in an

02:58:41    25   interventional pain practice, is that correct?

*Cross-Owen/By Ms. Bolen*

1  **A.**   Not if they're really responding to the injections.

2  They, you know, don't need to have frequent repeated

3  injections.

4  **Q.**   Would it be fair to say that the health insurance

02:58:52  5  allows right to about six of -- let's say SI joint

6  injections, the sacroiliac joint injection?

7  **A.**   Well, I think Blue Cross limits you to two per year.

8  **Q.**   All right.  Was that during the timeframe, or did

9  that develop after 2012?

02:59:11  10  **A.**   That was 2008 or '9.

11  **Q.**   All right.  Now, I want to go back to this drug

12  testing issue for just a minute.  I recall that you

13  testified about the finding of THC in a patient's urine.

14  Do you remember that testimony?

02:59:31  15  **A.**   Yes.

16  **Q.**   Isn't it fair to say, Dr. Owen, that there is no real

17  agreement in the world of pain medicine about what a

18  doctor should do regarding THC?

19  **A.**   There is in Texas.

02:59:44  20  **Q.**   And that agreement comes from what entity?

21  **A.**   It's one of the acts of -- I think it's a Texas Pain

22  Act, that if you know or should have known that somebody

23  has a substance use disorder, you can no longer treat them

24  with controlled substances, unless you also get them help

03:00:05  25  with an addictionologist or a psychologist with experience

*Cross-Owen/By Ms. Bolen*

1    in addiction medicine.

2    **Q.**    Now, that's not what the Texas Pain Society's

3    statement on drug testing says, is it?

4    **A.**    It's possible that there's other opinions, but when

03:00:20    5    you talk to the medical board, they'll tell you, Mary

6    Robinson, the executive director, has said in meetings,

7    that if somebody is using marijuana, you must assume that

8    they have a substance use disorder until proven otherwise.

9    **Q.**    And this is the same medical board that didn't

03:00:36    10    require drug testing until 2015; right?

11    **A.**    Correct.

12    **Q.**    All right.  Now, with regard to what you just said in

13    the THC, certainly you're aware that some of the

14    laboratories out there often take THC off of the test

03:00:54    15    panels; right?

16    **A.**    They can if the physician requests it.

17    **Q.**    Right.  Or in many cases, some of the companies that

18    sell the little cups that do the testing in the practice,

19    they're not manufactured with those strips either; right?

03:01:07    20    **A.**    I'm not aware of that.

21    **Q.**    You didn't ever use point of care cups in your

22    practice?

23    **A.**    I did for a brief period and they were so inaccurate

24    I abandoned them.

03:01:16    25    **Q.**    Did you go to a lab?

1221

*Cross-Owen/By Ms. Bolen*

```
        1   A.   Yes.

        2   Q.   Was it your own lab?

        3   A.   No.

        4   Q.   All right.  Now, we have a treatment plan and the
03:01:24 5   next the thing that we talk about is informed consent and

        6   treatment agreement.  Do you recall that from the Texas

        7   Medical Board?

        8   A.   Yes, ma'am.

        9   Q.   You didn't mention that in your direct testimony, did
03:01:32 10  you?

       11   A.   No.

       12   Q.   But you found a patient contract in Dr. Evans'

       13   charts; correct?

       14   A.   Yes.

03:01:38 15  Q.   And you also found a patient medication management

       16   agreement; right?  Or pain management agreement?

       17   A.   A pain management agreement, yes.

       18   Q.   And those are very similar to what the Texas Pain

       19   Society put out for its members to use; right?

03:01:51 20  A.   Yes.

       21   Q.   Were you aware that Dr. Evans was a member of the

       22   Texas Pain Society?

       23   A.   Yes.

       24   Q.   Were you aware that he has tracked what the Texas
03:02:02 25  Pain Society has done over time and implemented changes in
```

*Cross-Owen/By Ms. Bolen*

1       his practice, according to what the pain society wanted?

2   **A.**   No.

3   **Q.**   You didn't look at all the records to know that,

4       though, did you?

03:02:11   5   **A.**   I looked at the records I was provided.

6   **Q.**   And so, with regard to informed consent, the purpose

7       of that is to provide patients with information about the

8       risks and potential benefits or expected benefits of using

9       opioids; right?

03:02:27   10   **A.**   Yes.

11   **Q.**   And that was in Dr. Evans' paperwork; correct?

12   **A.**   I saw pain management agreement.  I don't think I saw

13       informed consent.

14               MS. BOLEN:  Your Honor, may I have a moment,

03:02:38   15   please?

16               THE COURT:  Yes.

17               MS. BOLEN:  May I approach the witness, Your

18   Honor?

19               THE COURT:  Why don't you approach counsel

03:03:01   20   first.

21               MS. BOLEN:  Sure.

22               THE COURT:  Make sure you're on the same page.

23   You have an exhibit number?

24               MS. BOLEN:  Yes.  Exhibit 103, Defense 103,

03:03:30   25   Your Honor.

1        THE COURT:  All right.  You may.

2   BY MS. BOLEN:

3   **Q.**   And I'm referring to page -- Bates Stamp 9122.

4   Dr. Owen, this is a page out of one of the medical charts,

03:03:45   5   that I believe you were given to review.  Do you recognize

6   that document?

7   **A.**   It's titled "patient contract."

8   **Q.**   All right.  Does it have consent elements in it about

9   the risks of using opioids?

03:03:58   10   **A.**   I see in Line 8 it says, "The purpose is to improve

11   quality of life."  It says that, "The opioids can cause

12   disorientation, respiratory depression, kidney and 'lover'

13   dysfunction."

14   **Q.**   There's a typo in there; right?

03:05:03   15   **A.**   Yes.

16   **Q.**   People make typos, don't they?

17   **A.**   Yes.  I'm aware that alcohol and illegal drugs is

18   contraindicated and can be life threatening.

19   **Q.**   That's a term of informed consent; correct?

03:05:20   20   **A.**   Yes.  And I've been made aware the potential danger

21   and detrimental effects of narcotics and tranquilizers

22   used in combination or alone, yes.  Okay.

23   **Q.**   So this essentially operates as a informed consent

24   document; correct?

03:05:35   25   **A.**   Yes.

*Cross-Owen/By Ms. Bolen*

1  **Q.**   But informed consent is a little bit more than that.

2  Obviously, the physician talks to the patient about these

3  things; right?

4  **A.**   Yes.

03:05:42  5  **Q.**   And the patients would be in the best position to

6  know whether that happened as well as the staff; correct?

7  **A.**   Yes.

8  **Q.**   Not you, because you weren't there; right?

9  **A.**   I can only look at what's documented.

03:05:54  10  **Q.**   So we also have that pain management agreement and

11  you certainly remember that; correct?

12  **A.**   Yes.

13  **Q.**   And you remember that one of the provisions used in

14  the State of Texas, and used quite commonly around the

03:06:04  15  country, is that the patient is limited to one pharmacy;

16  correct?

17  **A.**   Yes.

18  **Q.**   That's something that the Texas Pain Society

19  recommends to its members; right?

03:06:19  20  **A.**   Yes.

21  **Q.**   You mentioned about long-acting and short-acting

22  opioids.  Do you recall testifying about that general

23  topic?

24  **A.**   I testified about opioids versus opiates, but I don't

03:06:30  25  think we talked about long versus short-acting.

1225

1    Q.    All right.  Then let's explain it to the jury.  A

2    long-acting opioid is something that the patient can take

3    they don't have to take as many doses and it helps work on

4    a long-term around the clock, right -- in layman's terms?

03:06:46   5    A.    It provides extended duration therapy.

6    Q.    And sometimes that works well for people and

7    sometimes it doesn't work well; correct?

8    A.    Yes.

9    Q.    And sometimes the doctor has to try changing medicine

03:06:58   10   and other times they may add in another opioid to address

11   if the dose doesn't work, the long-acting medication

12   doesn't work or at the end of the dose; right?

13   A.    Yes.

14   Q.    And there's nothing unusual about that, is there?

03:07:12   15   A.    As long as it's documented about your rational to do

16   it.

17   Q.    Well, again, back to as long as it's documented to

18   your rationale, that language about long-acting and short

19   acting isn't in the Texas Medical Board rule, is it?

03:07:27   20   A.    No, ma'am.

21   Q.    Now, long-acting, short-acting opioid, one that lasts

22   longer, one that lasts shorter, that's been kind of a

23   subject matter of debate in the pain medicine community;

24   right?

03:07:41   25   A.    Yes.

*Cross-Owen/By Ms. Bolen*

1  **Q.**   And some people go on the conservative side and won't

2  do it; right?

3  **A.**   Won't do what?

4  **Q.**   Won't prescribe both of those medications together?

03:07:52  5  **A.**   There is a -- it's possible, yes.

6  **Q.**   You also stated that part of the problem that you had

7  with Dr. Evans' medical records was that he did not

8  exhaust all conservative evidence based treatments.  Do

9  you remember that?

03:08:08  10  **A.**   Yes.

11  **Q.**   That's not something that the Texas Medical Board

12  requires them to do; right?

13  **A.**   No.  But the standard of care does.

14  **Q.**   And so, also, so many of these patients that you

03:08:20  15  reviewed, they came in after having other treatments;

16  correct?

17  **A.**   I don't know what treatments they've had.  There

18  wasn't adequate records.

19  **Q.**   Well, surely you've read where the patient

03:08:29  20  represented -- some information about what they had;

21  correct?

22  **A.**   There's minimum information, yes.

23  **Q.**   There is some information, is there not, Dr. Owen?

24  **A.**   There was some, yes.

03:08:38  25  **Q.**   There was also MRIs and X-rays in the charts;

*Cross-Owen/By Ms. Bolen*

1   correct?

2   **A.**   Yes.

3   **Q.**   And in some cases there were notes from other

4   doctors; right?

03:08:46   5   **A.**   Yes.

6   **Q.**   And so those notes, like Derek Guitreau explained

7   some of the other treatments that Mr. Guitreau had.  Do

8   you recall that?

9   **A.**   Yes.

03:08:55   10   **Q.**   He had in some injections; right?

11   **A.**   Yes.

12   **Q.**   He had dyes stuck into his body so that they could

13   look at his discs; right?

14   **A.**   Yes.

03:09:06   15   **Q.**   Those things are ways of diagnosing a pain condition

16   or a pain generator; right?

17   **A.**   Yes.

18   **Q.**   And the doctor that receives that information can use

19   it in the treatment of that patient; correct?

03:09:20   20   **A.**   Yes.

21   **Q.**   Nothing unusual about that; right?

22   **A.**   Correct.

23   **Q.**   That's what doctors do; right?

24   **A.**   Yes.

03:09:34   25   **Q.**   Now, you mentioned -- I'm out of order here.  Excuse

1    me just one second.  The next section that we get to in

2    the Texas Medical Board rules is called periodic review.

3    And in periodic review the medical board says it's at

4    reasonable intervals based on the patient's individual

03:09:52  5    needs; right?

6    **A.**    Yes.

7    **Q.**    And so, sometimes that can be seeing the patient

8    three months in a row, skip a month and then come back the

9    next month; right?

03:10:01  10    **A.**    Yes.

11    **Q.**    It could be you see the patient several months in a

12    row and maybe skip two or three months; right?

13    **A.**    Yes.

14    **Q.**    Now, you're not telling this jury that in each

03:10:09  15    instance of the charts that you reviewed, that you found a

16    pattern of going three months in visits and then three

17    months off, you didn't find that, did you?

18    **A.**    Three months on, and three months off?

19    **Q.**    Yes.

03:10:20  20    **A.**    No, ma'am, I did not.

21    **Q.**    You found variations based on the patient; correct?

22    **A.**    I found one or two visits close together at the

23    beginning and then three months, I believe, was the most

24    common.  There may have been an exception.

03:10:33  25    **Q.**    Let's talk about those exceptions.  You recall a

*Cross-Owen/By Ms. Bolen*

1   Calvin McDonald?

2   **A.**   I remember the name, yes.

3   **Q.**   Visits on 4-11, 5-11, 6-11.  Do you recall those?

4   **A.**   Yes.

03:10:48   5   **Q.**   Visit on 7-11?

6   **A.**   Yes.

7   **Q.**   Visit on 8-25-11?

8   **A.**   Yes.

9   **Q.**   And then there were three months off and then another

03:10:57   10   visit; right?

11   **A.**   Yes, ma'am.

12   **Q.**   And two months after that, off?

13   **A.**   Yes.

14   **Q.**   And then on and off, on and off, until the end of the

03:11:04   15   time.  Do you remember that?

16   **A.**   Yes.

17   **Q.**   That's a varied pattern that didn't quite fit to what

18   you just testified, did it?

19   **A.**   Correct.

03:11:14   20   **Q.**   How about Wayne Evans, do you remember that chart?

21   **A.**   I remember the page.

22   **Q.**   All right.  Two months on, visits in 12-10 and 1-11,

23   off a month, on a month, off a month.  Do you remember

24   that pattern?

03:11:29   25   **A.**   Yes.

Cross-Owen/By Ms. Bolen

1    Q.   And, again, on a month, off a month, on a month, off

2    a month, on a month, and then it took from December of

3    2010, until September of 2011, before Mr. Evans ever got

4    to go to a three-month period, and that was only for a

03:11:44   5    short-term.  Do you remember that?

6    A.   I don't remember the details, but I accept your word

7    on it.

8    Q.   So at reasonable intervals, those patterns can

9    represent reasonable intervals; correct?

03:11:56   10   A.   Yes.

11   Q.   And those things are documented in Dr. Evans' medical

12   charts, are they not?

13   A.   Yes.

14   Q.   The fact that he encountered the patient?

03:12:05   15   A.   Yes.

16   Q.   And, in fact, they actually numbered the visits in

17   the top right-hand corner of their revisit or followup

18   form, did they not?

19   A.   Yes, ma'am.

03:12:17   20   Q.   And you can tell by looking at those records that the

21   staff and/or Dr. Evans actually inquired about new

22   information related to the pain, do you remember that?

23   A.   Yes.

24   Q.   And that's part of what the Texas Medical Board

03:12:30   25   requires; correct?

*Cross-Owen/By Ms. Bolen*

 1   **A.**   A part.

 2   **Q.**   And you could see notes of any medication adjustment

 3   in the chart, could you not?

 4   **A.**   Only by looking at the prescriptions, I believe.

03:12:43  5   **Q.**   So you ignored the face sheet that was in each of the

 6   charts?

 7   **A.**   I don't remember seeing the face sheet.  I remember

 8   the stretching sheet, but it's possible, yes.

 9   **Q.**   Do you remember the sheet that tracked the so far and

03:12:58  10   calm, the chronological fashion of it, do you remember

11   that piece of paper?

12   **A.**   Yes.

13   **Q.**   Do you remember that piece of paper also had the

14   writing in it about the medications prescribed to the

03:13:07  15   patient and the dose?

16   **A.**   I don't remember that, but it's possible.

17   **Q.**   Now, you also talked about aberrant behaviors and

18   we've already talked about the drug testing.  I think you

19   used the language that the physician should look for

03:13:26  20   certain things; right?  Do you remember that?

21   **A.**   In what context?

22   **Q.**   Well, I believe you stated that the physician should

23   look for aberrant behaviors; right?

24   **A.**   Yes.

03:13:38  25   **Q.**   Those aberrant behaviors can develop right away with

1   some people and over time with others; right?

2   **A.**   Yes.

3   **Q.**   And sometimes it takes a little bit of navigating to

4   figure out what those aberrant behaviors mean; right?

03:13:52   5   **A.**   It could be, yes.

6   **Q.**   Because not all aberrant behaviors are really

7   aberrant; correct?

8   **A.**   Well, if they're not aberrant, you wouldn't call them

9   aberrant anymore.

03:14:02   10   **Q.**   You're right.  So, for example, a patient asking for

11   a specific drug, that may or may not be an aberrant

12   pattern of behavior; right?

13   **A.**   Correct.

14   **Q.**   There's nothing wrong with me coming in to you and

03:14:15   15   say, "Hey, in the past with my doctor, this is the drug

16   that that worked best for me.  I'd like to have that

17   again, if you don't mind."  I could say that.  There's

18   nothing wrong with that?

19   **A.**   Correct.

03:14:24   20   **Q.**   And the doctor is supposed to take all of the

21   information that he has and make a decision; correct?

22   **A.**   Right.

23   **Q.**   That's what doctors do, right?

24   **A.**   Yes.

03:14:32   25   **Q.**   And if a patient came in on a drug that was working

1    for them, for example, Derek Guitreau, where he has had

2    the orthopedic surgeon overseeing him, comes to Dr. Evans

3    for pain management, there's nothing wrong about talking

4    about those drugs he's been on; correct?

03:14:48    5    **A.**    Correct.

6    **Q.**    And there's no set guideline or standard that tells

7    the doctor exactly how to act when they encounter an

8    aberrant behavior, is there?

9    **A.**    There's a spectrum of things you can do with, given

03:15:01    10   the context of aberrant drug taking behavior.

11   **Q.**    Right.  And the physician actually has some

12   discretion on how to respond; correct?

13   **A.**    Yes.

14   **Q.**    And different physicians respond different ways?

03:15:12    15   **A.**    Correct.

16   **Q.**    Somebody conservative with regard to opioids might

17   have a zero tolerance policy and say, "Hey, you just asked

18   me for a certain drug.  I think that's bad.  I'm going to

19   get you out of here."  Somebody might do that?

03:15:25    20   **A.**    I don't think anybody's ever said that asking for a

21   certain drug is aberrant drug taking behavior.

22   **Q.**    In fact, they've said the opposite; is that correct?

23   **A.**    Correct.

24   **Q.**    Now, what about with regard to the drug testing.

03:15:36    25   There's no algorithm of formula or a map that a physician

1  follows if somebody has a positive THC; right?

2  **A.**   There are patterns, not exact algorithm, but there

3  are certain things that you do like confirm the test.

4  **Q.**   Right.  If your patients can afford it?

03:15:57  5  **A.**   If you can't afford the test to watch your safety, I

6  don't think you can afford the treatment.

7  **Q.**   But, again, that's not required by the Texas Medical

8  Board during this period?

9  **A.**   No, it wasn't.  But the standard of care required it.

03:16:08  10  **Q.**   And, in fact, it wasn't even the Texas Pain Society's

11  position until 2014, when it put out its drug testing

12  policy; correct?

13  **A.**   No.  We published an article in 2012 on urine drug

14  testing.

03:16:21  15  **Q.**   You published the article, but the actual policy

16  didn't come out until 2014; correct?

17  **A.**   I don't know that -- we have -- we wrote a white

18  paper, I think.  But I don't know what you mean about

19  putting a policy out.  I think a urine drug testing

03:16:41  20  article gave physicians a very clear idea of what you

21  should be doing as your standard of care.

22  **Q.**   Do you recall that the Texas Pain Society actually

23  put out a drug testing policy?

24  **A.**   I don't recall what you're referring to.

03:17:07  25  **Q.**   All right.  I'll come back to that in a moment if I

1  just a few more questions here.  The Texas Medical Board

2  rule back then, during the period we're talking about said

3  the records should include and then it gave a list of

4  things; right?

03:17:29  5  **A.**   Yes.

6  **Q.**   It should include a medical history and a physical

7  exam; correct?

8  **A.**   Yes.

9  **Q.**   And just because you may not like the way that a

03:17:37  10  doctor has documented something, that doesn't make him

11  somebody who stepped outside of being a doctor into

12  something else, does it?

13  **A.**   No.

14  **Q.**   And the doctor's medical records should reflect any

03:17:50  15  diagnostic therapeutic or lab results; right?

16  **A.**   Yes.

17  **Q.**   Did you see the lab reports in some of the charts

18  that you looked at?

19  **A.**   Yes.

03:17:57  20  **Q.**   And it's supposed to include treatment objectives;

21  correct --

22  **A.**   Yes.

23  **Q.**   -- written down?  A discussion of the risk and

24  benefits like the informed consent that we just looked at;

03:18:09  25  correct?

*Cross-Owen/By Ms. Bolen*

1   **A.**   Yes.

2   **Q.**   And the treatments that were done; correct?

3   **A.**   Yes.

4   **Q.**   And the medications that were prescribed, the date;

03:18:17   5   right?

6   **A.**   Yes.

7   **Q.**   The dose; right?

8   **A.**   Yes.

9   **Q.**   And the quantity that's prescribed?

03:18:22   10   **A.**   Yes.

11   **Q.**   And any changes to that; right?

12   **A.**   Yes.

13   **Q.**   And you saw that in those charts, didn't you?

14   **A.**   I saw it in some of the documentation, in the record,

03:18:33   15   yes.

16   **Q.**   There were prescription copies in all of the charts

17   you reviewed, weren't there, Dr. Owen?

18   **A.**   Yes.

19   **Q.**   Now, you mentioned about the Texas prescription drug

03:18:47   20   monitoring program.  Do you remember testifying about that

21   topic?

22   **A.**   Yes.

23   **Q.**   Now, you actually gave testimony on that -- some of

24   the recent changes to the law on the Texas prescription

03:18:59   25   drug monitoring program?

*Cross-Owen/By Ms. Bolen*

 1    **A.**   Yes.

 2    **Q.**   The Texas prescription drug monitoring program -- I'm

 3    just going to call it the drug database, to be short --

 4    that is a tool that doctors now have and law enforcement

 5    have to look in to see what medicine a patient has

 6    received from a pharmacy; right?

 7    **A.**   Yes.

 8    **Q.**   And isn't it true, Dr. Owen, that at least during

 9    part of the period of 2008 to 2013, doctors didn't have an

10    electronic option until later in that period?  They had to

11    make an order to the Texas Department of Public Safety to

12    get a copy of it in the mail; correct?

13    **A.**   Yes.

14    **Q.**   And then they got the ability to dial in, if you

15    will, electronically, and then download the reports;

16    right?

17    **A.**   Yes.

18    **Q.**   Are you aware, sir, that in Dr. Evans' charts there

19    are many examples of downloaded DPS records on patient

20    medication in those charts, are you aware of that?

21    **A.**   I think in the newer charts I saw with the discharge

22    patients, I saw some of that, yes.

23    **Q.**   Sure.  And that's because of the timing of getting

24    the electronic version; right?

25    **A.**   Yes.

Cross-Owen/By Ms. Bolen

1    Q.    Do you remember the date, approximately?

2    A.    I'm thinking it was 2013, but I don't remember

3    exactly.

4    Q.    You're right.  It was 2013, at least by my

03:20:15   5    understanding.

6                     And then recently something else happened

7    where the doctor could use an agent to dial in to get the

8    information; right?

9    A.    Yes, ma'am.

03:20:24   10    Q.    And that was really important to doctors to have

11    that; correct?

12    A.    Yes.

13    Q.    And the reason it was important is because your time

14    is spent doing certain doctor things and to be able to

03:20:34   15    have a staff member to do that was a good thing.  It saved

16    time for everybody; right?

17    A.    Yes, ma'am.

18    Q.    You mentioned about Ms. Gardner, the patient,

19    Samantha Gardner, and I believe government counsel asked

03:20:50   20    you about what you thought should happen if somebody had a

21    third-party phone call come in saying that they were

22    shooting up their drugs.  Do you recall that testimony?

23    A.    Yes.

24    Q.    Now, isn't it true, that doctors actually have an

03:21:04   25    ethical obligation not to abandon their patients?

1    **A.**    Yes.

2    **Q.**    And the definition of abandonment can mean just

3    dropkick a patient to the curb, or it can mean other

4    things, depending on the facts; right?

03:21:16    5    **A.**    Yes.

6    **Q.**    And in the situation of Ms. Gardner, Dr. Evans

7    actually downward adjusted her medication and you don't

8    know what discussion went on between that physician and

9    that patient, do you?

03:21:27    10    **A.**    Correct.

11    **Q.**    Now, in the review of the charts that you did,

12    certainly you saw the downward adjustments that Dr. Evans

13    made at the beginning of treatment of certain of these

14    patients?

03:21:42    15    **A.**    I did.

16    **Q.**    You did.  Can you think of an example of where that

17    happened?

18    **A.**    I can't remember the individual names.

19    **Q.**    It happened on Audie Decoteau.  Do you recall that?

03:21:52    20    **A.**    I believe I remember seeing that, yes.

21    **Q.**    In fact, Audie Decoteau reported he had been using

22    Fentanyl, which is a very powerful opioid; correct?

23    **A.**    Yes.

24    **Q.**    And Dr. Evans didn't prescribe it, do you remember

03:22:06    25    that?

*Cross-Owen/By Ms. Bolen*

1   **A.**   I vaguely remember, yes.

2   **Q.**   But you're not going to dispute the fact that there

3   were downward adjustments?

4   **A.**   I'm not.

03:22:16   5   **Q.**   And you don't know how many downward adjustments,

6   because you only looked at the charts that government

7   counsel gave you?

8   **A.**   Correct.

9           MS. BOLEN:  Your Honor, may I have a moment?

03:23:07   10  BY MS. BOLEN:

11  **Q.**   Isn't it a fair statement, Dr. Owen, that evidence

12  based medicine talks about best practices essentially;

13  right?

14  **A.**   No.  It defines the standard of care.

03:23:21   15  **Q.**   By your definition; right?

16  **A.**   Yes.

17  **Q.**   And that's not something that the Texas Medical Board

18  referred to, did it?

19  **A.**   In the rule?

03:23:31   20  **Q.**   Correct.

21  **A.**   Correct.

22  **Q.**   And isn't it true that a doctor can be outside of

23  what you're calling standard of care, and still not be

24  dealing drugs?

03:23:40   25  **A.**   Correct.

1          MS. BOLEN:  I'll pass the witness, Your Honor.

2          THE COURT:  Why don't we take a break.  I know

3  you've got some redirect, but let's go ahead and take a

4  30-minute break.

03:24:20    5      **(The following was held out of the presence of the jury)**

6          THE COURT:  Might be a little less than 3:30,

7  but it will be 3:50.

8                    **(Recessed at 3:24 p.m.)**

9          THE COURT:  Mr. Joubert, would you and counsel

03:53:44   10  approach just a second.

11          MR. JOUBERT:  Yes, sir.

12          THE COURT:  How much time do you need with this

13  witness?

14          MR. JOUBERT:  Ten, 12 minutes.

03:53:57   15          THE COURT:  Do you have another witness ready?

16          MR. JOUBERT:  Yes, sir.

17          THE COURT:  Okay.  Good deal, I didn't want you

18  to spend our time just filling  in time just in case you

19  were going to have another witness.

03:54:06   20          MR. JOUBERT:  Yes, sir.  So the Court --

21          THE COURT:  I get so suspicious when I'm

22  dealing with lawyers.

23          MR. OLLISON:  Judge.

24          MR. JOUBERT:  Judge, there's something I need

03:54:30   25  to ask you -- oh, yes, sir.  I did not -- intentionally did

1  not ask the expert to be designated as such in the presence

2  of the jury.

3               THE COURT:  It hasn't been objected to.

4               MR. JOUBERT:  No.  But is it -- I'll do so now

03:54:48  5  on the record and ask that the Court will designate him as

6  an expert, and I will not have --

7               THE COURT:  Has he been designated as an expert

8  previously?

9               MR. JOUBERT:  Yes.

03:54:58  10              THE COURT:  He's testified?

11              MR. JOUBERT:  Yes.

12              THE COURT:  That's fine.  I just wanted to make

13  sure that you didn't want run into that objection.

14              MS. BOLEN:  No.  I think you put the

03:55:07  15  credentials in and essentially it did, without saying it, I

16  think.

17              MR. JOUBERT:  I just wanted to be on the

18  record.

19              THE COURT:  Okay.  Would you have the witness

03:55:16  20  come in, please.

21      **(The following was held in the presence of the jury)**

22              THE COURT:  All right.  Be seated, please.  All

23  right, Mr. Joubert, you may go ahead and proceed when

24  you're ready.

03:56:07  25              MR. JOUBERT:  Thank you, Your Honor.

1                    **REDIRECT EXAMINATION**

2  BY MR. JOUBERT:

3  **Q.**   Dr. Owen, do you need any water?

4  **A.**   I have half a bottle.  Yes.  Thank you.

03:56:15   5  **Q.**   Good.  I noticed you need some earlier.  Not that

6  we're going to have you much longer, I just want to be

7  sure.  I want to go over a few points that Ms. Bolen asked

8  you about.

9               First, I want to start with, if you will,

03:56:37  10  compare for the jury or Ms. Bolen ran through this rather

11  quickly, but she asked you questions whether the standard

12  of care set the minimum standards and then juxtaposed that

13  with the Texas Administrative Code, and Chapter 170, which

14  talks about pain management.  Can you explain that

03:57:02  15  distinction to the jury, quickly?

16  **A.**   Yes, sir.  So in 170, it tells you what you need to

17  do documentation wise.  So it says you should perform an

18  adequate -- it says you perform a problem focused

19  evaluation.  But it doesn't tell you how to perform a

03:57:21  20  problem focused evaluation.  The standard of care does.

21  So Rule 170 does not dictate the standard care, it

22  dictates the documentation that's required to justify your

23  treatments.

24  **Q.**   I failed to ask you earlier, and I'm glad you

03:57:37  25  mentioned this term again.  But can you tell the jury what

*Redirect-Owen/By Mr. Joubert*

1    "problem focused evaluation" means?

2    **A.**   It means that you don't have to do a comprehensive

3    evaluation if they have one small problem.  You focus on

4    the problem.  If you got low back pain, you don't need to

03:57:54   5    look in their ear or their throat.  You just focus on the

6    issues pertaining to treatments of low back problems.

7    **Q.**   Now, I think Ms. Bolen made it clear that there's a

8    distinction between the standard of care and what

9    Chapter 170 of the Texas Administrative Code says with

03:58:12   10   regard to standards.  And as I understand that, the

11   minimum standard is set under Chapter 170; correct?

12   **A.**   The minimum documentation standard is set under 170.

13   **Q.**   And when you say documentation standard, does that

14   include things like maintaining proper medical records?

03:58:31   15   **A.**   Yes, sir.

16   **Q.**   That would be the patient files we're looking at;

17   correct?

18   **A.**   Yes, sir.

19   **Q.**   Now, I think you told us that in your opinion -- in

03:58:38   20   your opinion, Dr. Evans did not maintain a standard of

21   proper standard of care, is that correct?

22   **A.**   Yes, sir.

23   **Q.**   My question to you now is in consideration 170,

24   Paragraph 170, or is it Rule 170?

03:58:54   25   **A.**   It's a Rule 170, yes.

1  **Q.**   Rule 170 under the pain management and the Texas

2  Administrative Code, in your opinion, did Dr. Evans

3  maintain the minimum standards under Rule 170?

4  **A.**   He did not.

03:59:08  5  **Q.**   So in the --words of Ms. Bolen when she asked you

6  about whether the doctor completely stepped outside of the

7  minimal guidelines and requirements, is it your opinion

8  that Dr. Evans, in fact, did step outside of the minimum

9  guidelines of requirements?

03:59:28  10  **A.**   Yes, sir.

11  **Q.**   Ms. Bolen asked you a number of questions about

12  whether drug testing was a -- I'm not clear if it was a

13  minimally required tool or standard tool to use when

14  treating pain management or doctors using -- practicing

04:00:11  15  pain management.

16              My question is whether the finding of

17  THC -- that would be the active ingredient in marijuana --

18  in a blood test, would that fall with -- well, finding

19  that and failing to take action on it, or continuing to

04:00:29  20  write prescriptions for a patient with evidence of taking

21  marijuana, would that below the standards, even the

22  minimum standard under Rule 170?

23  **A.**   Yes, sir, it would, whether you find the THC in the

24  urine or blood.

04:00:44  25  **Q.**   And, of course, if you're not doing medical tests at

*Redirect-Owen/By Mr. Joubert*

1  all, which you testified of the files you saw, you only

2  saw one file out of 17 and 18 where blood test was

3  ordered.  Would that be below the minimum standards of

4  Rule 170?

04:00:59  5  **A.**   It's below the standard of care.  170 doesn't address

6  urine drug.

7  **Q.**   Okay.  So then my question is urine drug testing part

8  of the minimum standards under Rule 170?

9  **A.**   It's part of the minimum standard of care, but it's

04:01:15  10  not something required by Rule 170.

11  **Q.**   Not required by 170.  Ms. Bolen also asked you about

12  a patient by the name of Calvin McDonald and she asked if

13  in fact you agreed that the pattern of prescribing for

14  Ms. McDonald did not fit a pattern that, I guess, the

04:01:46  15  other files did or the files -- well, did not fit a

16  pattern that the patient receive the same prescription or

17  the same level of drugs every month.

18          My question to you is whether, in your

19  opinion, you found a pattern of prescribing by Dr. Evans

04:02:04  20  which was inconsistent with the proper standard of care?

21  **A.**   I did primarily because there wasn't therapeutic

22  benefit reliably documented; therefore, there wasn't

23  medical necessity to continue to prescribe it.

24  **Q.**   And I think she asked you about a couple of other

04:02:24  25  files, including a Audie Decoteau and Eddie Mathern.  And

1  if you would agree then that in those cases that this

2  pattern of prescribing by the doctor where he made

3  adjustment, whether that was -- those were significant

4  medical adjustments.  My question to you is, if you recall

04:02:46  5  the name, did you see the name, Audie Decoteau, in the

6  file?

7  **A.**    I remember the name.

8  **Q.**    Did you see the file for Eddie Methern or Mathern?

9  **A.**    Yes, sir.

04:02:56  10  **Q.**    M-A-T-H-E-R-N, I think it is.

11  **A.**    Yes, sir.

12  **Q.**    And there was a third one we talked about, was it --

13  perhaps it was a Samantha Gardner?

14  **A.**    Yes.

04:03:07  15  **Q.**    With regard to those files, is it your testimony,

16  that it appears that Dr. Evans prescribed opioid and

17  narcotic medications outside the course of professional

18  practice and not for legitimate medical purpose?

19  **A.**    Yes, sir.

04:03:22  20  **Q.**    Now specifically, as to those persons -- well, Calvin

21  McDonald and Eddie Mathern, I think you also testified on

22  direct examination that you -- in review of patient files

23  for those patients or the patient charts, you found that

24  the patients actually got worse after they continued on

04:03:48  25  narcotic medication, is that correct?

1   A.   Yes, sir.

2   Q.   My question to you is:  Ms. Bolen asked you questions

3   about whether doctors have an ethical obligation to

4   abandon medication because then the fact with Ms. Gardner,

04:04:06   5   you've talked about earlier, the fact that the doctor gave

6   her a prescription even after she came in with what

7   appeared to be injection track mark on her hands.  Do you

8   remember that?

9   A.   Yes.

04:04:18   10   Q.   So my question is:  If doctor prescribes medication

11   as Dr. Evans did, is that consistent with his ethical

12   obligation in the case of Samantha Gardner under the

13   Hippocratic oath?

14   A.   No, you don't have to abandon her.  But if she's

04:04:34   15   injecting the drug, you don't want to further endanger her

16   or enable her addiction, so you don't have to prescribe

17   the oxycodone, but you can either treat her with Suboxone,

18   give her other kind of withdrawal medication treatment, or

19   send her to an addiction facility.

04:04:50   20   Q.   And if you recall reviewing the file of Samantha

21   Gardner, was there any indication that Dr. Evans referred

22   her for Suboxone treatment?

23   A.   No, sir.

24   Q.   You heard -- in fact, Ms. Bolen brought to the

04:05:05   25   attention, your attention, the fact that she asked you if

*Redirect-Owen/By Mr. Joubert*

1  you were aware that Dr. Evans had -- is it an X

2  registration, is that Suboxone registration?

3  **A.**   Yes, sir.

4  **Q.**   And you did see that in the files you reviewed, did

04:05:20  5  you not?

6  **A.**   I know that he had an X number.

7  **Q.**   But then back to Samantha Gardner, was there any

8  indication that Dr. Evans offered to treat her for

9  Suboxone, or at least is there any documentation in his

04:05:34  10  files that it was either the suggested, recommended or, in

11  fact, done, that he treated her with Suboxone?

12  **A.**   No, sir, there's no evidence.

13  **Q.**   Is there any other reference documentation in the

14  file that he may have referred her to a drug

04:05:49  15  rehabilitation facility?

16  **A.**   No, sir.

17  **Q.**   And back to Hippocratic Oath now.  My question is

18  with regard to Samantha Gardner, Calvin McDonald, Eddie

19  Mathern, did Dr. Evans have -- under the Hippocratic Oath,

04:06:07  20  didn't he have an obligation to do no harm?

21  **A.**   Correct.

22  **Q.**   In your professional opinion, in prescribing another

23  prescription for Samantha Gardner and releasing her as a

24  patient, even though the prescription may have been less

04:06:18  25  than the prior prescription, in terms of dosage units, was

1  that an -- a violation of Dr. Owen's ethical obligation?

2  **A.**    Of doctor whose ethical obligation?

3  **Q.**    I'm sorry.  I'm sorry.  I said Dr. Owen.  I should

4  have said Dr. Evans.

04:06:34    5  **A.**    It is a violation.  You don't want to do any harm and

6  further enable a situation, giving her oxycodone when

7  she's misusing it, increases -- gives her a potential risk

8  for harm.

9  **Q.**    Let me ask you if -- I'm going to ask this question

04:07:02   10  because Ms. Bolen asked you on no less than three

11  occasions whether you observed any downward adjustments in

12  medications among the patient charts you reviewed.  I want

13  to direct your attention to the chart of Kimberly

14  Richardson and ask you if -- if you recall, she was first

04:07:21   15  prescribed approximately 250 -- I'm sorry 250 dosage units

16  of Roxicodone and then it was -- it went --

17            THE COURT:  250 or 150?

18            MR. JOUBERT:  150, I'm sorry, Your Honor, thank

19  you.

04:07:37   20  BY MR. JOUBERT:

21  **Q.**    150, dosage units or pills, and it went up to 180 and

22  then came back down to 150.  Now, if the patient has an

23  argument with the physician in which in her mind she felt

24  that that downward adjustment was made because of the

04:07:55   25  argument, not because of any medical change in her

1    circumstance, would that be proper medical care under --

2    well, by Dr. Evans under the standard of care?

3    **A.**    No.  You would use a does that's providing a

4    therapeutic benefit, regardless of other situations.

04:08:12    5    **Q.**    You review the dosage that would provide therapeutic

6    benefit?

7    **A.**    Yes, sir.

8    **Q.**    So then if the patient, Ms. Richardson comes back and

9    has a second argument with the doctor because he lowered

04:08:23    10    it to 150, and she wants it raised higher, and he does so,

11    he in fact raises it higher, in her mind, she would say

12    that the -- he raised it -- the amount because of the

13    argument because she told him she was going to take her

14    business elsewhere.  Would that be a therapeutic benefit

04:08:42    15    or a legitimate basis in which to increase the dosage

16    back, say, up to 210 dosage units?

17    **A.**    No, sir.

18    **Q.**    Is it your opinion that physicians who practice pain

19    medicine must abide by the regulations by the Texas

04:09:05    20    Medical Board as well as in the case we talked about under

21    Rule 170 for pain management under the Texas

22    Administrative Code, as well as federal guidelines and

23    regulations?

24    **A.**    Yes, sir.

04:09:19    25    **Q.**    And, lastly, have you ever had staff, medically

1    untrained staff, have you ever had medically untrained

2    staff in your office who would conduct blood pressure,

3    take blood pressure, interview the witness as far as

4    medical notes go with regard to how they're doing on their

04:09:47    5    drugs, things of that sort, have you ever had an

6    unlicensed massage therapist in your pain practice when

7    you had one?

8    **A.**    No, sir.

9    **Q.**    Have you ever had an unlicensed physical therapist?

04:10:00    10    **A.**    No, sir.

11    **Q.**    Or massage therapist in your practice?

12    **A.**    No, sir.

13            MR. JOUBERT:  No further questions at this

14    time, Your Honor.

04:10:16    15            THE COURT:  All right, sir, you may step down.

16    Thank you very much.  Do you want to excuse this witness or

17    do you want to --

18            MR. JOUBERT:  Yes, Your Honor.

19            THE COURT:  Are you waiting to see whether or

04:10:29    20    not this is going to be something else, some rebuttal or

21    otherwise?

22            MR. JOUBERT:  I've discussed that with him,

23    Your Honor.  We'd like for him to be able to go back to the

24    Austin area today.  I'm not sure his schedule would permit,

04:10:40    25    but we will inform the Court.

1        THE COURT:  Well, I want him to remain under

2  the Rule if he's going to be potentially -- if there's any

3  potential for call back.  That's what I'm doing.  In other

4  words, he would not be able to talk about this case to

04:10:55   5  anyone except you and opposing counsel, or particularly any

6  other witnesses in the case during the course of his

7  absence --

8        MR. JOUBERT:  Yes, Your Honor.

9        THE COURT:  -- during the course of his

04:11:05  10  absence.

11        MR. JOUBERT:  We'd ask that he remain under the

12  Rule and instructed not to.

13        THE COURT:  All right.  I just did.  Thank you,

14  sir.  Have a good day.  Who's your next witness?

04:11:17  15        MR. JOUBERT:  Your Honor, the United States

16  calls Mr. David DiVido.

17        THE COURT:  All right.  Is he outside?

18        MR. JOUBERT:  I think he is, Your Honor.

19        THE COURT:  All right.  Good afternoon, sir.

04:11:48  20        THE WITNESS:  Good afternoon.

21        THE COURT:  I'll take -- I don't think I swore

22  you in.

23        THE WITNESS:  Not yet.

24        THE COURT:  All right.  Raise your right hand.

04:11:55  25        Do you solemnly swear that the testimony

*Direct-Devido/By Mr. Joubert*

1  you are about to give will be the truth, the whole truth

2  and nothing but the truth, so help you God?

3           THE WITNESS: Yes, sir.

4           THE COURT:  Please have a seat and adjust the

04:12:07  5  microphone, please, sir so that you're speaking directly

6  into it.

7                    **DAVID DEVIDO,**

8  after having been first cautioned and duly sworn, testified

9  as follows:

04:12:33  10                  **DIRECT EXAMINATION**

11  BY MR. JOUBERT:

12  **Q.**   Good afternoon?

13  **A.**   Good afternoon.

14  **Q.**   Would you pull that microphone close to you, please?

04:12:39  15  It does move.  Thank you.

16  **A.**   That okay?

17  **Q.**   That's better.  Much better.  Thank you, sir.  Will

18  you state your name and spell your last name for the

19  ladies and gentlemen of the jury, please?

04:12:49  20  **A.**   David DeVido, D-e-V-i-d-o.

21  **Q.**   Mr. DeVido, are you or have you been in the past a

22  registered pharmacist in the state of Texas?

23  **A.**   Yes, sir.

24  **Q.**   And I'm going to get to that question in a few

04:13:09  25  minutes, but before we do, I'd like to ask you a few other

1    questions about your appearing here today.  Were you

2    originally named in a indictment with Dr. Richard Arthur

3    Evans?

4    **A.**    Yes.

04:13:28   5    **Q.**    And were you and Dr. Evans charged together in a

6    number of different charges, including conspiracy to

7    distribute narcotic drugs, as well as mail fraud and in

8    your case, I believe healthcare fraud?

9    **A.**    Yes, sir.

04:13:49   10   **Q.**    Now, are you appearing here today because you have in

11   fact made an agreement with the United States to testify

12   and to do so truthfully, which has led to your testimony

13   here today, or to you appearing for testimony today?

14   **A.**    Yes, sir.

04:14:13   15   **Q.**    Before I go any further on your background, I want to

16   go through with you, your understanding of the agreement

17   that you have with the United States.  First of all, did

18   you enter a plea to a separate charge, that is one

19   different from what's in the indictment?

04:14:30   20   **A.**    Yes, sir.

21   **Q.**    Under section -- I'm sorry, Title 21 Section 843A3 of

22   the United States Code?

23   **A.**    Yes, sir.

24   **Q.**    And did you enter a guilty plea to that charge in

04:14:48   25   exchange -- well, as part of your agreement with the

1  United States, understanding that if you were to cooperate

2  and do things, that we would ask such as testify here,

3  then your charges in the original indictment would be

4  dismissed?

04:15:02  5  **A.**    Yes, sir.

6  **Q.**    In fact, there were, there was an original indictment

7  and there was a second indictment; correct?

8  **A.**    Yes, sir.

9  **Q.**    And both of those will be dismissed pursuant to this

04:15:13  10  agreement and based on your guilty plea to the 843 charge,

11  is that correct?

12  **A.**    Yes, sir.

13  **Q.**    Now, I want to go through with a little bit more

14  detail your understanding of this agreement.  First of

04:15:29  15  all, does the agreement call for your full cooperation?

16  **A.**    Yes, sir.

17  **Q.**    And did I ask you -- I did not ask you, did you in

18  fact enter a guilty plea to the charge I just discussed

19  with you on 843, last Monday the 11th of July?

04:15:48  20  **A.**    Yes, sir.

21  **Q.**    So you did that before this trial started?

22  **A.**    Yes, sir.

23  **Q.**    Now, as part of your agreement, if you cooperate and

24  continue to cooperate fully, the United States has

04:16:10  25  agreed -- well, let's first talk about your part of the

1    agreement.  You agreed that this -- first of all, the

2    agreement only binds the local district here, the Southern

3    District of Texas, is that correct?

4    **A.**   Yes, sir.

04:16:24    5    **Q.**   And then it, also -- you have agreed to testify

6    truthfully as a witness if you're called to do so such as

7    you are here today; correct?

8    **A.**   Yes, sir.

9    **Q.**   And have you agreed to voluntarily attend any

04:16:35   10    conferences and interviews and we'll talk about those in a

11    few minutes, which you've done with me, have you not?

12    **A.**   Yes, sir.

13    **Q.**   Did you also agree to provide truthful and complete

14    and accurate information and understand that any false

04:16:48   15    statements made by you in a court could later be

16    prosecuted under the appropriate perjury or false

17    statement and obstruction charges?  Did you agree to that?

18    **A.**   Yes, sir.

19    **Q.**   Did you also agree to provide the United States any

04:17:09   20    documents or documents in your control which we may

21    request?

22    **A.**   Yes, sir.

23    **Q.**   Now, as to the agreements of the United States is it

24    your understanding that the United States as I indicated,

04:17:29   25    has agreed that you should enter a plea, we call it the

*Direct-Devido/By Mr. Joubert*

1    criminal information, the charge you pled under 841 last

2    Monday, and you persist in that plea, that the -- and if

3    the Court accepts this agreement the Court will move to

4    dismiss the original indictment and any subsequent

04:17:47    5    indictments as I mentioned before; correct?

6    **A.**    Yes, sir.

7    **Q.**    And at the time of sentencing the United States

8    agrees not to oppose your request for what may be called a

9    downward level departure under the sentencing guidelines,

04:17:59    10    which has certain other regulations regarding those.  Do

11    you remember that?

12    **A.**    Yes, sir.

13    **Q.**    And then also, did you agree that as part of this

14    agreement, you would make contributions of any proceeds

04:18:12    15    that you gained out of this criminal conduct, in what we

16    would call ill-gotten gains, you've agreed to make

17    donations both to the University of Houston School of

18    Pharmacy and to the Texas Southern University, is that

19    correct?

04:18:28    20    **A.**    Yes, sir.

21    **Q.**    In the amounts of $250,000 each?

22    **A.**    Yes, sir.

23    **Q.**    Did you further agree that -- understand that part of

24    the agreement is that if you fulfill your obligations

04:18:45    25    under the agreement and the United States would agree to

1    recommend a sentence at a lower end of the applicable

2    guideline range, that's similar to what I asked you about

3    earlier about the reductions in levels.  Do you remember

4    that?

04:18:58    5    **A.**   Yes, sir.

6    **Q.**   Okay.  And then lastly as part of your cooperation,

7    you understand within the agreement, that you may be

8    entitled to, if at the discretion of the United States, if

9    you qualify for what we would call an additional

04:19:14   10    reduction, we could ask the judge for based on your

11    substantial assistance we call it.  Do you understand

12    that?

13    **A.**   Yes, sir.

14    **Q.**   Did your lawyer talk to you about this agreement and

04:19:25   15    go through all the details?

16    **A.**   Yes, sir.

17    **Q.**   Is there any question you have about the agreement

18    before we proceed here with your testimony?

19    **A.**   No, sir.

04:19:33   20    **Q.**   And you understand pursuant to your written

21    agreement, which, in fact, exists in 13 pages that the

22    ultimate issue concerning your sentence or any punishment

23    you may receive will be left up to the Court?

24    **A.**   Yes, sir.

04:20:01   25                THE COURT:  I don't think we gave you any

1  water.  Do you need some water there, sir?

2            THE WITNESS:  I will.

3            THE COURT:  I think they brought some up.

4            MR. JOUBERT:  Thank you, Your Honor.

04:20:09  5  BY MR. JOUBERT:

6  **Q.**  If you'd like.

7  **A.**  Thank you.

8  **Q.**  Now, Mr. DeVido, as the last part of the agreement, I

9  want to ask you about is exactly what you pled guilty to

04:20:35  10  doing, and I want to go through -- I can ask you if you

11  could explain it in your own language, if you'd like, or I

12  can go through the questions pertaining to the factual

13  basis for your guilty plea.  Which would you prefer?

14  **A.**  Could you read it, please?

04:20:51  15  **Q.**  Okay.

16  **A.**  And then I can comment.

17  **Q.**  Thank you.  We talked about before the Court last

18  Monday that you have been a licensed pharmacist in Houston

19  and Texas since 1964 until 2015, do you remember that?

04:21:01  20  **A.**  Yes, sir.

21  **Q.**  And that you were -- been registered with the Drug

22  Enforcement Administration under a special registration

23  number to be able to dispense controlled substances?

24  **A.**  Yes, sir.

04:21:15  25  **Q.**  And that as part of your -- part of that

1 registration, you are permitted to dispense Scheduled III

2 and Schedule II controlled substances in this case

3 particularly, oxycodone and hydrocodone, do you remember

4 that?

04:21:32    5    **A.**    Yes, sir.

6    **Q.**    Now, as part of the agreement, you did fill and

7 dispense certain prescriptions written by Dr. Richard

8 Evans, did you not?

9    **A.**    Yes, sir.

04:21:42   10    **Q.**    And that you have agreed that and pled guilty to the

11 fact that between 2009 and 2012, you filled prescriptions

12 for Dr. Evans written for oxycodone and hydrocodone

13 outside the course of professional practice and not for

14 legitimate medical purpose.  Do you remember that?

04:21:59   15    **A.**    Yes, sir.

16    **Q.**    And that most of these prescriptions were for

17 customers from the state of the Louisiana and these were

18 Dr. Evans' prescriptions, large quantities of oxycodone

19 products, do you understand that?

04:22:13   20    **A.**    Yes, sir.

21    **Q.**    And then further, the section of the law that you

22 pled to had to do with in order to maintain the supply of

23 oxycodone products sufficient to fill the prescriptions

24 written by Dr. Evans, you had to make maximum daily orders

04:22:32   25 of oxycodone from your wholesaler, do you remember that?

Direct-Devido/By Mr. Joubert

1    **A.**   Yes, sir.

2    **Q.**   And that in so doing, you deliberately and willfully

3    were blind to the fact that Dr. Evans was writing these

4    prescriptions outside the course of legitimate medical

04:22:50    5    practice and not for legitimate medical purpose.  Do you

6    remember that?

7    **A.**   Yes, sir.

8    **Q.**   And that you, in fact, knowingly did acquire, that is

9    order new shipments of oxycodone in order to be able to

04:23:02   10    meet the high volume of scripts and supply or let's say

11    the dosage units of oxycodone written by Dr. Evans?

12   **A.**   Yes, sir.

13            MS. BOLEN:  Your Honor, I object to counsel

14   leading his witness it.

04:23:16   15            THE COURT:  Let's approach just a second,

16   please.

17            **(The following was held at sidebar)**

18            THE COURT:  He's reading from a document that's

19   in evidence, but not in this evidence.

04:23:42   20            MR. JOUBERT:  Right.

21            THE COURT:  I'm not sure that that's improper,

22   but what I believe you're challenging is the form of the

23   question?

24            MS. BOLEN:  Yes.

04:23:52   25            THE COURT:  Asked.

Direct-Devido/By Mr. Joubert

1          MS. BOLEN:  An additional objection because of

2  what he's injecting into the question, it's more of a legal

3  standard.

4          THE COURT:  Well, I think he can read that as a

04:24:02  5  legal standard, that's what the jury is going to have to

6  deal with about the definitions and whatever I give in

7  determining whether it's a fact issue, whether or not that

8  standard has been breached.  The question I guess I have is

9  how long is this?

04:24:18  10          MR. JOUBERT:  That was my last question, Judge.

11          THE COURT:  Okay.  I was trying to remember how

12  long the factual basis statement was.

13          MR. JOUBERT:  About four paragraphs.

14          THE COURT:  Was that all?

04:24:30  15          MR. JOUBERT:  Yes, sir.

16          THE COURT:  I thought it was several pages.

17  But any event, the objection as to the form of the

18  question, I'm going to sustain and if there are other

19  questions to ask about that, then they should be asked in a

04:24:44  20  different way.

21          MR. JOUBERT:  Yes, Your Honor.

22          THE COURT:  All right.  Let's proceed.

23      **(The following was held in the presence of the jury)**

24          THE COURT:  All right, counsel, proceed.

25

1  BY MR. JOUBERT:

2  **Q.**   Lastly, Mr. DeVido, I want to ask you whether you

3  recall in your agreement that you also agreed to give up

4  your claim against any matters that were forfeited as a

04:25:16  5  result of a search warrant executed at your pharmacy back

6  in September 13th, 2012, do you remember that?

7  **A.**   Yes, sir.

8  **Q.**   And I think that amount was about $29,000 in -- was

9  that checks or cash?

04:25:33  10  **A.**   It was cash.

11  **Q.**   Is there any other part of the agreement that I have

12  not covered that you understand to be part of your

13  agreement here?

14  **A.**   I think that's covered it.

04:25:48  15  **Q.**   All right.  Thank you.  Now, let's talk to the jury a

16  little about who you are, David DeVido.  Tell the jury

17  where you were born, Mr. DeVido.

18  **A.**   I was born in a village in up state New York called

19  Peekskill.

04:26:08  20  **Q.**   Peekskill, New York?

21  **A.**   Yes, sir.

22  **Q.**   And somewhere in your early life, did you come to

23  Texas?

24  **A.**   Yes.

04:26:13  25  **Q.**   Tell the jury -- explain to the jury how that came

*Direct-Devido/By Mr. Joubert*

1 about.

2 **A.**   I have an aunt and uncle in Fort Worth who knew I

3 wanted to go to school and I could not afford it, and they

4 invited me to come live with them.

04:26:28   5 **Q.**   Okay.  And what part of Texas were you living in when

6 you came to Texas?

7 **A.**   Fort Worth, Texas.

8 **Q.**   Fort Worth.  All right.  At some point to further

9 your education, did you come to Houston to the University

04:26:51   10 of Houston?

11 **A.**   Yes.

12 **Q.**   And what year did you study there?

13 **A.**   At the University of Houston I studied pharmacy.

14 **Q.**   And what year did you finish your pharmacy studies?

04:27:02   15 **A.**   I got my BS in 1964.

16 **Q.**   And shortly thereafter were you became a registered

17 pharmacist?

18 **A.**   Yes, sir.

19 **Q.**   We've already told the jury you were a registered

04:27:15   20 pharmacist at least until through last year.  Tell the

21 jury, have you either not renewed your pharmacy license or

22 did you allow it to lapse or --

23 **A.**   I did not renew it on my birthday.

24 **Q.**   Last year?

04:27:29   25 **A.**   Yes, sir.

*Direct-Devido/By Mr. Joubert*

1  **Q.**   2015.  All right.

2  **A.**   Yes.

3  **Q.**   All right.  As part of your training as a pharmacist,

4  did you have occasion to study chemistry?

04:27:51  5  **A.**   Yes, sir.

6  **Q.**   In fact, did you have chemistry courses?

7  **A.**   Yes, sir.

8  **Q.**   And as part of that training, did you also learn

9  about narcotic drugs?

04:28:01  10  **A.**   Only the chemistry of it.

11  **Q.**   The chemistry of it, that's what I meant.  Now, as a

12  pharmacist were you required over the years to maintain

13  what we would call a continuing education about pharmacy?

14  **A.**   Yes, sir.

04:28:19  15  **Q.**   How many hours of continuing education were required,

16  at least through the last time you were licensed?

17  **A.**   If I remember correctly it's 15 hours a year.

18  **Q.**   All right.  Now, tell the jury a little about the

19  number of different pharmacies you've owned.  At some

04:28:47  20  point shortly after, in fact, you finished your pharmacy

21  studies, did you open up your own pharmacy?

22  **A.**   In 1969.

23  **Q.**   1969.  And you had a number of pharmacies, let's say

24  I think at least 6 between 1969 and 2001, is that correct?

04:29:11  25  **A.**   Yes, sir.

*Direct-Devido/By Mr. Joubert*

1    **Q.**    Now, as regard to Briargrove Pharmacy, have you owned

2    Briargrove Pharmacy twice?

3    **A.**    Yes, sir.

4    **Q.**    You first owned it back in 2001, you bought it and a

04:29:25  5    couple years after you left; correct -- or you sold it?

6    **A.**    I sold it in 1999.

7    **Q.**    1999.  I'm sorry.

8    **A.**    And purchased it back in 2001.

9    **Q.**    I'm sorry.  You first purchased it in 1992?

04:29:41  10    **A.**    Yes, sir.

11    **Q.**    Is that correct?

12    **A.**    Yes, sir.

13    **Q.**    And then you sold it in '99.  And then you bought it

14    back in 2000 -- what year?

04:29:50  15    **A.**    '1.

16    **Q.**    Tell the jury how that came about?  How did you

17    happen to buy it back?

18    **A.**    I sold it to a small chain called Horizon.

19    **Q.**    Is that a group of pharmacies or cooperate

04:30:02  20    pharmacies?

21    **A.**    They owned 35 pharmacies.  And they wanted to expand

22    and they changed from an independent type pharmacy into a

23    chain pharmacy.  And my customers didn't like the type of

24    service and they left.  And the business dropped

04:30:24  25    60-percent and they did the same thing in their other

*Direct-Devido/By Mr. Joubert*

1    pharmacies and they could not pay their bills and they

2    went bankrupt.

3    **Q.**    And did you buy it out of bankruptcy?

4    **A.**    I bought the pharmacy back out of bankruptcy because

04:30:37   5    they were going to close it.

6    **Q.**    In 2002?

7    **A.**    2001.

8    **Q.**    I'm sorry.  2001.  Thank you.  Now, I want to show

9    you a photograph that's been -- Exhibit 87.  If it has

04:30:52   10    not, I'd like to show it to you first, and just tell me

11    first of all if this is a photograph of Briargrove

12    Pharmacy?

13    **A.**    Yes, sir, that's the front of the pharmacy with two

14    delivery vehicles.

04:31:08   15    **Q.**    With two vehicles.  Okay.

16            MR. JOUBERT:  We'd offer Exhibit 87.

17            THE COURT:  Objection?

18            MS. BOLEN:  Your Honor, I need to see it.  No

19    objection.

04:31:19   20            THE COURT:  Admitted.

21              **(Government Exhibit 87 admitted)**

22            MR. JOUBERT:  Thank you, Your Honor.

23    BY MR. JOUBERT:

24    **Q.**    Mr. DeVido, I just wanted to show a picture of

04:31:28   25    Briargrove and ask you if this was your pharmacy.  What's

1269

*Direct-Devido/By Mr. Joubert*

1  the address of Briargrove Pharmacy?

2  **A.**   6435 San Felipe.

3  **Q.**   And has that always been the address since you owned

4  it starting in '82?

04:31:41  5  **A.**   No, sir.  It was on Voss Road.

6  **Q.**   All right.  Very near the same location?

7  **A.**   Next to the Randall's Pharmacy on Voss Road, next to

8  Randall's Grocery Store on Voss Road.

9  **Q.**   Okay.  And that would be pretty close to this current

04:31:56  10  address?

11  **A.**   Exactly.  Just around the corner.

12  **Q.**   Around the corner.  What year did it move around the

13  corner?  That's okay it's not that important.

14  **A.**   I don't remember.

04:32:13  15  **Q.**   Okay.  But you -- as indicated earlier, without going

16  through the details of each one, you've owned six

17  different pharmacies primarily on the west side of Houston

18  during the last 30 years, or maybe 40 years?

19  **A.**   Yes, sir.

04:32:27  20  **Q.**   Key Rexall Pharmacy?

21  **A.**   That was my first one.

22  **Q.**   Kirkwood Pharmacy?

23  **A.**   Yes, sir.

24  **Q.**   Briargrove, we talked about the first time?

04:32:32  25  **A.**   Uh-huh.

*Direct-Devido/By Mr. Joubert*

1   Q.   Park Plaza Pharmacy and Inter Urban Pharmacy?

2   A.   There were two Inter Urban Pharmacies.

3   Q.   Two Inter Urban Pharmacies.  One on Lantern Lane and

4   Gessner and the other one at Kirkwood at Memorial?

04:32:48  5   A.   Yes, sir.

6   Q.   Now, let's direct your attention to 2008.  Were you a

7   registered pharmacist still and practicing at Briargrove

8   Pharmacy?

9   A.   Yes, sir.

04:32:59  10  Q.   And were you, in fact, what we call the head pharmacy

11  in charge or chief pharmacist in charge?

12  A.   Yes, sir.

13  Q.   Which is it?

14  A.   Well, in Texas they call it the PIC, the pharmacist

04:33:10  15  in charge.

16  Q.   Okay.  Now, at some point in about 2009, did you

17  begin to fill prescriptions for Dr. Richard Evans?

18  A.   Late 2009.

19  Q.   Okay.  And that's not to say you may not have filled

04:33:35  20  some earlier, but my question is whether in late 2009, you

21  noticed an increase in the number of prescriptions written

22  by Dr. Evans for oxycodone, did you not?

23  A.   We started to receive from him in December of 2009.

24  Q.   Okay.

04:33:54  25  A.   I think we had a few the month before, maybe 2 or 3.

*Direct-Devido/By Mr. Joubert*

1    **Q.**   All right.  And then were these -- again, were these

2    scripts for oxycodone and hydrocodone?

3    **A.**   Yes, sir.

4    **Q.**   Now, what about 2010, as you went into 2010, tell the

04:34:11   5    jury what you observed about the number of scripts from

6    Dr. Evans?

7    **A.**   Well, in January around the 10th of January, we

8    started seeing an increase of a number of his patients

9    coming in with prescriptions for the oxycodone.

04:34:26   10   **Q.**   And about that date, or about that month at least in

11   January 2010, did you have occasion to have a telephone

12   conversation with Dr. Evans?

13   **A.**   In either late 2009 or early 2010, when I started

14   having patients come in with the prescriptions from his

04:34:51   15   office and I wasn't familiar with them, I called the

16   office to speak with him.

17   **Q.**   Okay.  And who did you speak with when you called the

18   office?

19   **A.**   The lady identified herself as Rhoda.

04:35:01   20   **Q.**   All right.

21            MR. JOUBERT:  Your Honor, as part of his

22   testimony, we're going to offer under Rule 802(d)(3), not

23   only as co-conspirator statements, but maybe not

24   necessarily for the truth of the matter, but to simply show

04:35:19   25   what he did.

1            THE COURT:  When you say statements, what

2    statements are you talking about?  The statements of Rhoda?

3            MR. JOUBERT:  Yes.

4            THE COURT:  Or the statements of Dr. --

04:35:28    5            MR. JOUBERT:  One of his employees, yes.

6            THE COURT:  All right.  Let me hear it.

7    BY MR. JOUBERT:

8    **Q.**  Now, when you called Dr. Evans' office, did you speak

9    to a lady who identified herself as Rhoda?

04:35:41   10    **A.**  Yes, sir.

11    **Q.**  And what did you do, did you ask to speak with

12    Dr. Evans?

13    **A.**  I told her I was receiving some prescriptions at my

14    pharmacy from Dr. Evans and I needed to talk to him about

04:35:51   15    it.

16    **Q.**  Okay.  And what did she tell you?

17    **A.**  She said just a moment, please.

18    **Q.**  Did Dr. Evans come to the phone?

19    **A.**  Yes.

04:35:56   20    **Q.**  And did you have a conversation with Dr. Evans about

21    the prescriptions at that time?

22    **A.**  Yes.

23    **Q.**  What did Dr. Evans -- what did you ask him and what

24    did he tell you?

04:36:05   25    **A.**  Well, one, I wanted to find out about his pain

1    practice, and I asked him if -- a number of questions at

2    first.  I think I asked was is he practicing pain

3    management only in this clinic and from the time he opened

4    up the clinic until the time he closed it, and he wasn't

04:36:23    5    practicing another form of medicine with it.

6    **Q.**    In asking that question, was it your intent to

7    determine whether he was practicing pain medicine

8    full-time?

9    **A.**    Yes, sir.

04:36:32    10    **Q.**    Okay.  What did Dr. Evans tell you?

11    **A.**    He told me he was.

12    **Q.**    And did you ask about his address at that time?

13    **A.**    No.  I asked him the next question was is that the

14    only place he was practicing pain management and he was

04:36:48    15    not practicing any other place -- another office.

16    **Q.**    And what did Dr. Evans tell you?

17    **A.**    He told me he was not practicing anyplace but

18    Augusta.

19    **Q.**    All right.  And what did you ask him next?

04:37:04    20    **A.**    Then I asked him on patients who come in, was he

21    getting his patients on referral or were they just walking

22    in or how he was getting his patients.  And he said most

23    of his patients were in referral.

24    **Q.**    All right.  Did you ask him anymore questions after

04:37:27    25    that?

Direct-Devido/By Mr. Joubert

1    A.   Yes, I asked him then the patients who came in if

2    they had MRIs or X-rays, would he accept them from them,

3    if they were at least two years old, and he said, yes.

4    And then I asked what if they were over two years, he said

5    if he knew the physician that the patient had visited, he

6    would accept them.

7    Q.   Okay.  And did you also ask if he -- patients brought

8    in records, if they were verified?

9    A.   Yes.  I asked if the patients brought in the records

10   or the MRIs and so forth, if they would call the physician

11   who did them and get the followup on them.

12   Q.   Did you ask Dr. Evans any questions about urinalysis?

13   A.   Yes.

14   Q.   What did you ask him?

15   A.   I asked him does he conduct urinalysis on his

16   patients that were taking the oxycodone and so forth.

17   Q.   In your mind, what was the importance of having a

18   urinalysis test?

19   A.   Well, the urinalysis if there's an immediate test you

20   can test check for opioids, hydrocodone, other street

21   drugs and so forth.  And to see if the people were a

22   patient who is abusing medicines.

23   Q.   According to your understanding as a pharmacist,

24   doctors use the drug test as a diagnostic tool for those

25   purposes you just mentioned?

Direct-Devido/By Mr. Joubert

1   **A.**   All the other doctors I filled with were running them

2   on every patient.

3   **Q.**   What did Dr. Evans tell you about urinalysis?

4   **A.**   He said he was doing it.

04:39:08    5   **Q.**   Now, you just mentioned all the other doctors you

6   filled for were using the drug -- was it called urine drug

7   test, UDT?

8   **A.**   Yes.

9   **Q.**   UDT.  Tell the jury now, during this time period you

04:39:26    10   had in fact been filling these controlled substances

11   prescriptions for a number of other doctors; right?

12   **A.**   Yes, sir.

13   **Q.**   Give the jury some idea of how many other doctors you

14   may have been filling for at the time.

04:39:36    15   **A.**   Approximately eight.

16   **Q.**   Eight.  We may go through those names later, but my

17   point in asking that question now is you just testified

18   that you always -- I think you said you always ask

19   doctors, or you would call doctors whom you began to fill

04:39:50    20   controlled substance prescriptions for and you wanted to

21   talk to them before you continued to fill them.  Is that

22   fair statement?

23   **A.**   Yes, sir.

24   **Q.**   Was that the nature of your call to Dr. Evans in

04:40:04    25   January of 2010?

1    **A.**    Yes.

2    **Q.**    Furthermore with regard to the type of test, the

3    diagnostic -- well, let's say the medical history and the

4    test that Dr. Evans said he got from patients, did you ask

04:40:16    5    him about the age of those tests?

6    **A.**    Well, I asked if he would accept them over two years,

7    like five years.

8    **Q.**    And what did he tell you?

9    **A.**    He said no, that if they got to be that old then he

04:40:27    10    would run his own tests.  He would run his -- send them

11    for the X-ray and MRI.

12    **Q.**    So he said if the test was more than five years he

13    would conduct his own tests?

14    **A.**    Yes, sir.

04:40:41    15    **Q.**    Did he tell you that if there were tests that were

16    only two-years old, was that an exception or certain

17    special consideration he would give?

18    **A.**    He would accept them and especially if he knew the

19    physician who was referring.

04:40:59    20    **Q.**    If he knew the physician referring.  All right.  Now,

21    tell the jury this conversation you first had with

22    Dr. Evans, had you ever met him prior to that?

23    **A.**    Pardon me?

24    **Q.**    Had you ever met Dr. Evans prior to your telephone

04:41:16    25    conversation?

*Direct-Devido/By Mr. Joubert*

1  **A.**  No, sir.

2  **Q.**  In January 2010?

3  **A.**  No.

4  **Q.**  Did Dr. Evans seem either surprised, or was he short

5  with you or curt or anything less than professional?

6  **A.**  No, he answered all the questions.

7  **Q.**  He answered all your questions and you accepted those

8  answers truthfully?

9  **A.**  Yes, sir.

10  **Q.**  As being truthful.

11          Now, let me go to -- fast forward to a

12  year later, around January of 2011, did you have occasion

13  to have another telephone call that you made over to

14  Dr. Evans' office -- or I'm sorry -- or either you called

15  or did someone from Dr. Evans's call you?

16  **A.**  Yes.

17  **Q.**  Who called you?

18  **A.**  Rhoda called me.

19  **Q.**  Rhoda.  Do you know Rhoda's last name?  If you don't

20  that's fine?

21  **A.**  I only know her as Rhoda.

22  **Q.**  Have you ever met Rhoda?

23  **A.**  Not that I know of.

24  **Q.**  Not that you know of.  What did Rhoda call about a

25  year later in January of 2011?

*Direct-Devido/By Mr. Joubert*

1   **A.**   Rhoda called me and told me that she was calling for

2   Dr. Evans and that he was going to start seeing a lot more

3   patients from Louisiana and wanted to know if I could ship

4   the medications to Louisiana to the patients so that they

04:42:39   5   wouldn't have to come every month.

6   **Q.**   All right.  And what did you tell her?

7   **A.**   I said I did not know.  I would have to look in the

8   regulation -- the book of regulations and to look it up.

9   **Q.**   And, in fact, did you do that?

04:42:54   10   **A.**   Yes, sir, I looked it up.

11   **Q.**   What did you conclude after you looked it up?

12   **A.**   I concluded that I could mail and ship to Louisiana.

13   **Q.**   Was this a book under the Texas Pharmacy Laws and

14   Regulations?

04:43:05   15   **A.**   Yes, sir.

16   **Q.**   And so once you made the determination that you

17   could -- I'm sorry, did you say already that you called

18   her back?

19   **A.**   I called her back.

04:43:16   20   **Q.**   Okay.  And what did you tell her?

21   **A.**   I told her, yes, that I looked it up and that we were

22   permitted to ship to Louisiana.

23   **Q.**   And did you have any other questions for Rhoda at the

24   time?

04:43:26   25   **A.**   Yes.  I asked her how it was going to work.

*Direct-Devido/By Mr. Joubert*

1    Q.   And when you say "this going to work" what were you

2    referring to?

3    A.   Referring to how the patients were going to get their

4    prescriptions to the pharmacy.

04:43:38    5    Q.   Okay.

6    A.   And other physicians would write three prescriptions

7    in a row and give it to the patient and they would bring

8    it to the pharmacy.  And they would give us one, some held

9    on to the one prescription, the other prescriptions, they

04:43:57    10   would take with them, some asked us to put them in our

11   file box in our pharmacy and when they needed it, they

12   would call us.  And I asked Rhoda if the doctor is going

13   to write all three prescriptions at one time and then give

14   it to the patient for the patient to bring to the

04:44:14    15   pharmacy.

16   Q.   Now, why did you ask that question or why was that

17   important to you?

18   A.   It was -- I didn't know how we were going to receive

19   the prescriptions to be able to fill them because I had to

04:44:25    20   have --

21   Q.   Well, I'm asking more specifically about -- the part

22   about whether you were going to write -- the doctor would

23   write the prescription at one time and give them all to

24   the patient or send them to the pharmacy.  What was your

04:44:40    25   understanding about the ability of a physician to write

*Direct-Devido/By Mr. Joubert*

1  multiple prescriptions for what we call controlled

2  substances or C2 narcotic drugs?

3  **A.**  If the physician saw the patient for one month he was

4  permitted to write for a total of three months, but on the

04:44:57  5  second and third prescription, there was is a line on the

6  bottom that says do not fill until, and the physician

7  would write the date in.  So --

8  **Q.**  Go ahead.

9  **A.**  If the physician wrote a prescription for July 1st,

04:45:12  10  originally he didn't have to put that on the bottom.  But

11  on the second prescription for the patient to be filled on

12  August 1st, he would date the prescription on the top

13  right-hand corner today's date, or the first date --

14  July 1st, and on the line on the bottom he would write, do

04:45:31  15  not fill until August 1st and on the third prescription he

16  would write on that line September the 1st.

17  **Q.**  Okay.

18  **A.**  So he was permitted to write -- to write three

19  prescriptions.

04:45:43  20  **Q.**  Okay.  And that was your understanding under the laws

21  of the State of Texas regarding the prescriptions for

22  controlled substance drugs, correct?

23  **A.**  Yes, sir.

24  **Q.**  And, in fact, was that your experience with other

04:45:57  25  physicians?  You mentioned there were some eight or so

1  other doctors you would fill C2 or narcotic drug

2  prescriptions for, is that correct?

3  **A.**  Yes, sir.

4  **Q.**  Now, in your experience with the other doctors just

04:46:07  5  by comparison, did most of the doctors utilize the 90-day

6  option we call it or did they send over -- let me ask --

7  rephrase the question.  In your experience, did other

8  physicians typically send all three prescriptions to you

9  at the time that they gave the first one to the patient or

04:46:26  10  how did you get them?

11  **A.**  They gave the three prescriptions at one time to the

12  patient.  They made one office visit and the physician has

13  written three prescriptions at that time.

14  **Q.**  Okay.  Now, let's go back to your conversation with

04:46:38  15  Rhoda.  What did Ms. Mann tell you with regard to what

16  they planned to do?

17  **A.**  Well, she told me that Dr. Evans would see the

18  patient in the initial office visit and write the

19  prescriptions, give the patient the prescription to be

04:46:54  20  filled for that day.

21  **Q.**  The first one?

22  **A.**  The first one.  The other prescriptions would be put

23  into the file, and that the doctor would do a telephone

24  interview to see if the patient was having any problems

04:47:07  25  with the medication, and if it was relieving their pain

1  and he would ask them whatever other questions that was

2  necessary.

3  Q.   Now, tell the jury why you made it a point to call

4  doctors or to ask them these elaborate questions about how

5  they planned to handle these prescriptions for C2 drugs.

6  Why did you go through all these questions and want to

7  have an understanding with the physician?

8  A.   I wanted to have an understanding on how I was going

9  to be able to receive the prescription because I could not

10 dispense it to a patient or I cannot ship it to them

11 without having a prescription at my pharmacy to fill it.

12 Q.   Right.  Now, since you would be the pharmacist

13 dispensing these drugs under these prescriptions, was it

14 your understanding that you had a responsibility to be

15 sure that these prescriptions were being filled legally

16 and properly?

17 A.   Yes, sir.

18 Q.   And in order to do that, is it your testimony take

19 that that's why you would have these conversations with

20 both Dr. Evans and with his assistant, Rhoda?

21 A.   Yes.

22 Q.   And in your conversation with Rhoda, did you ask her

23 again about a telephone interview, if you recall?

24 A.   I asked her how it was going to work with the

25 Dr. Evans, that he was going to write the one prescription

Direct-Devido/By Mr. Joubert

1    for the day, or for that day the patient was in, and other

2    two prescriptions he would write at that time and place

3    them in the patient's file.

4    **Q.**   All right.

04:48:44   5    **A.**   And then they would send the prescription to the

6    pharmacy after the patient had an interview with the

7    doctor on the telephone.

8    **Q.**   Okay.  Explain that last part.  I want the jury to

9    understand that.  What was your understanding about the

04:48:59   10   telephone interview?

11   **A.**   Well, my understanding was the doctor would write the

12   prescription say like on July 1st.

13   **Q.**   Okay.

14   **A.**   On August 1st or a day before when the patient would

04:49:11   15   need the medication, the patient would call in to

16   Dr. Evans' office and identify themselves and the doctor

17   would then interview patient about their taking of the

18   medication, how they were reacting to it, if it was

19   relieving their pain and whatever other questions that he

04:49:31   20   had.

21   **Q.**   And was it your understanding that that would be

22   sufficient to comply with the law with regard to the

23   prescribing and dispensing of C2 narcotics?

24   **A.**   Yes.

04:49:42   25   **Q.**   Okay.  Now, I may have not heard you, but did you

1  tell the jury again, still in your conversation with

2  Rhoda, how -- did you ask her how you would get the

3  prescriptions, how your pharmacy would get the

4  prescriptions?

04:50:00  5  **A.**   Yes, I asked her how I was going to receive those

6  prescriptions, if they were going to mail them to us, or

7  did she want me to send my delivery driver down.  She said

8  no.  When the doctor was satisfied with the phone

9  interview, they would have someone from the office to

04:50:18  10  bring it to me.

11  **Q.**   All right.  Now, we were talking about this call with

12  Rhoda in January of 2011, and shortly thereafter, did you

13  observe the fact that Dr. Evans -- well, some of his

14  patients were calling you to see about shipping their

04:50:49  15  drugs to them?

16  **A.**   Yes.

17  **Q.**   And specifically with regard to the State of

18  Louisiana, did you have a number of requests for drugs to

19  be shipped to you -- I'm sorry, drugs to be shipped by you

04:51:03  20  to the state of Louisiana?

21  **A.**   Yes.

22  **Q.**   Okay.  Explain to the jury how that would work now,

23  according to your understanding, at least as far as

24  receiving a script on your end.  Who -- how would you get

04:51:14  25  the script?  You've already told us your conversation with

1    Rhoda?

2    **A.**    An employee of Dr. Evans named Jason.

3    **Q.**    Okay.

4    **A.**    He brought in an envelope and he handed it to me and

04:51:27    5    he said these are the prescriptions for the people to

6    ship.  And I asked him, have these people -- these

7    prescriptions of these people, have they been interviewed

8    on the telephone and he told me, yes.

9    **Q.**    And was this conversation with Jason within a few

04:51:42    10    days, or weeks after your telephone conversation with

11    Rhoda?

12    **A.**    I don't remember exactly.

13    **Q.**    Right.  But within a reasonable --

14    **A.**    It was shortly after.

04:51:53    15    **Q.**    Shortly after?

16    **A.**    Yeah.

17    **Q.**    And did Jason -- how often would Jason deliver

18    scripts to your pharmacy on average weekly basis?  Was it

19    daily?

04:52:05    20    **A.**    Monday through Friday.

21    **Q.**    And how long did that continue?

22    **A.**    Until I think July of '12.

23    **Q.**    Now, within your pharmacy, who was the pharmacist,

24    the pharmacist who filled most of these prescriptions,

04:52:22    25    these controlled substance prescriptions for Dr. Evans?

Direct-Devido/By Mr. Joubert

1  **A.**   Myself.

2  **Q.**   You, yourself.  In fact, you filled the majority of

3  them, didn't you?

4  **A.**   Yes, sir.

04:52:29  5  **Q.**   Now, how many other pharmacists did you have working

6  for you at the time.

7  **A.**   Three.

8  **Q.**   Is there any particular reason why you happened to be

9  the pharmacist who filled them?

04:52:38  10  **A.**   Well, we were a very busy pharmacy.  We filled for a

11  lot of prescriptions.

12  **Q.**   Yes, sir.

13  **A.**   And I wanted to make sure that when the prescriptions

14  came in, if it was the first time the patient was in I

04:52:52  15  went out to talk to them at least the first time.

16  **Q.**   Well, we'll get to that a little later, but with

17  regard to the prescriptions being brought over by Jason,

18  was there any particular reason that you happened to fill

19  most of them?

04:53:05  20  **A.**   I just decided that I would do it, to make sure that

21  the patient -- that I would get the prescriptions and I

22  would be able to talk to Jason to ask him the question,

23  have they been interviewed by the doctor on the phone.

24  **Q.**   Now, it's not reasonable that you would have spoken

04:53:25  25  to Jason every day to ask him those questions, is it?

Direct-Devido/By Mr. Joubert

1   **A.**   For about the first 6 to 10 times he came in, he came

2   in approximately 1:30 to 2:00 o'clock.

3   **Q.**   Okay.

4   **A.**   And I was available, so he asked for me.  He saw me

04:53:42   5   and I saw him and went out and received the prescriptions

6   from him, and I asked him all those times, are these

7   patients been interviewed on the telephone?  And he said

8   yes.

9   **Q.**   And after the first 6 or 10 times, did there come a

04:53:59   10   time that Jason began to bring prescriptions over at a

11   different time other than at 1:30 or 2:00?

12   **A.**   Yes, he started coming in later in the afternoon,

13   3:30, sometimes after 4:00 o'clock.

14   **Q.**   Now, during the time that he began too bring

04:54:16   15   prescriptions over later in the afternoon, did you notice

16   an increase in the number of prescriptions that you were

17   receiving from Dr. Evans?

18   **A.**   Yes.

19   **Q.**   Do you have an understanding, or do you know why

04:54:28   20   there was an increase in the number of the prescriptions

21   that you began to receive around 3:30 or 4:00 from Jason?

22   **A.**   Those were the patients that he -- when I was

23   informed that he wanted to save money, save the money not

24   to make, you know, three trips in three months.  So they

04:54:50   25   would make just one trip and then the prescriptions would

*Direct-Devido/By Mr. Joubert*

1  be written ahead of time for them.

2  **Q.**  All right.  So are you telling the jury in so many

3  words that you think that these were examples of the --

4  well, the increase came about because of the number of

04:55:03  5  people who were receiving the three scripts in one office

6  visit every three months?

7  **A.**  Yes.  It was an increase in prescriptions and from

8  what I can remember we filled hundreds of prescriptions a

9  month for these patients from Louisiana.

04:55:19  10  **Q.**  All right.  Let me direct your attention now to a few

11  weeks or months later in 2011.  We still -- let's say to

12  the spring of 2011, did you have another conversation with

13  Dr. Evans on the telephone?

14  **A.**  Yes.

04:55:48  15  **Q.**  Tell the jury what that was about.

16  **A.**  He called me.  He said he had a patient who was

17  having trouble with his high blood pressure and he didn't

18  know what the blood pressure medication was.  And so, he

19  asked me what the medication was, and it was a brand name

04:56:11  20  blood pressure pill.

21  **Q.**  Do you remember that name?

22  **A.**  I'm not a hundred percent positive, but I think it

23  was Verelan.

24  **Q.**  How do you spell that?

04:56:20  25  **A.**  Verelan, V-E-R-E-L-A-N.

Direct-Devido/By Mr. Joubert

1   Q.   And what was the nature of the question?  Was it

2   simply about blood pressure or was it blood pressure in

3   conjunction with taking other medication?

4   A.   No.  It was just about the medication that the

5   patient was having trouble regulating his blood pressure.

6   So he wanted to know what it was.

7   Q.   All right.  Now, sometime thereafter in 2011, or

8   possibly even 2012, did you have another telephone

9   conversation with Dr. Evans?

10  A.   Yes.

11  Q.   And to the best of your knowledge, about when do you

12  think that was?

13  A.   I believe it was early 2012, I don't remember.

14  Q.   Tell the jury about that conversation.

15  A.   It was another patient who was having blood pressure

16  problems.

17  Q.   Okay.  Was there any discussion about narcotic

18  prescriptions?

19  A.   No, not that I can remember.

20  Q.   Now, after that fourth conversation in early 2012

21  with Dr. Evans, did you have any other phone call

22  conversations with him?

23  A.   I remember a couple more phone calls, but I do not

24  remember what we talked about.

25  Q.   Would it be fair to say, that those other phone calls

*Direct-Devido/By Mr. Joubert*

1  were either not significant, or at least you don't recall

2  what they were?

3  **A.**  I do not recall.

4  **Q.**  Now, explain to the jury how would it work in your

04:57:58  5  office once you received the prescriptions from Jason to

6  be shipped to Louisiana?  What would your pharmacy do, you

7  and your employees?

8  **A.**  I would give them to my pharmacy technician to type

9  the prescription into the computer and they would generate

04:58:14  10  a prescription label.

11  **Q.**  All right.

12  **A.**  And then she would put them in a pile for me, one

13  after another, like if there were six of them, there would

14  be six prescription labels in the pile, and I would look

04:58:31  15  at them, take them, and go to the shelf with the oxycodone

16  if it was an oxycodone prescription, and fill the

17  prescription.  And after I got all six of them filled, I

18  would then go to fill out the paper forms for Fed Ex

19  shipping.

04:58:51  20  **Q.**  Okay.

21  **A.**  And since we were so busy and I would get a lot of

22  phone calls and people would come to the counter want to

23  talk to me, my bookkeeper started -- volunteered to help

24  me do it and she then eventually started doing all of

04:59:06  25  them.

*Direct-Devido/By Mr. Joubert*

1  **Q.**   Okay.   Essentially your bookkeeper began to do all of

2  the shipping?

3  **A.**   Yes.

4  **Q.**   So about how many per day do you think you were

04:59:15  5  shipping on average or what was the maximum number you

6  recall?

7  **A.**   The maximum number was about 10.

8  **Q.**   Okay.

9  **A.**   If I remember correctly.

04:59:23  10  **Q.**   All right.   Now, how would you obtain payment for the

11  drugs and I'm sure you obtained payment before they were

12  shipped; correct?

13  **A.**   Some of the patients would call Dr. Evans' office and

14  ask if they've sent the prescriptions over to us.   And

04:59:36  15  once they knew the prescriptions were sent to us, they

16  would call and give us a credit card, a few people, a few

17  patients ahead of time would mail a money order to us so

18  that when the prescription came in we had the money order

19  for payment and we could ship it that day.

04:59:57  20  **Q.**   All right.   And did that procedure work pretty well,

21  that is, getting the credit card information or money

22  orders?

23  **A.**   Pretty well.

24  **Q.**   And, of course, in some cases if the patient had not

05:00:08  25  called you, did you and your staff, in fact, call the

*Direct-Devido/By Mr. Joubert*

1  patient to obtain payment?

2  **A.**   Yes.

3  **Q.**   And you would ask for credit card information.

4  **A.**   Credit card, yes.

05:00:19   5  **Q.**   All right.  Now, at that time, what was your

6  understanding with regard to being a pharmacist in Texas

7  shipping drugs to Louisiana.  Did you understand?

8  **A.**   Well, at that time, when I read the regulations in

9  the book that I could ship them I didn't think there was a

05:00:41  10  problem with it.  I didn't find out until later.

11  **Q.**   All right.  Did there come a time in early 2012, when

12  you received a phone call from a patient of Dr. Evans?

13          THE COURT:  Tell you what, let's break at this

14  point.  It looks like you're shifting into a new subject

05:01:11  15  area.

16          MR. JOUBERT:  Yes, Your Honor.

17          THE COURT:  It's going to take more than 10 or

18  15 minutes, so let's break until tomorrow morning.  We'll

19  pick it up at 9:00 o'clock.  Y'all be careful out there.

05:01:22  20  Remember admonitions and don't block the freeway.  I want

21  the lawyers and everybody to get here on time.

22  **(The following was held out of the presence of the jury)**

23          THE COURT:  All right.  You may step down, sir.

24  All right, gentlemen, lady, anything before we all break

05:01:56  25  for dinner?

1          MS. BOLEN:  Nothing, Your Honor.  Thank you.

2          MR. DAVIDSON:  Judge, the only thing --

3          THE COURT:  Come closer.

4          MR. DAVIDSON:  This is kind of a conversation I

05:02:04   5 guess we have with the government to try to get of sense of

6 where they are in terms of their case so we can figure out

7 where we are in terms of...

8          THE COURT:  Well, all they really have to tell

9 you is who the witnesses are going to be tomorrow.

05:02:14  10          MR. DAVIDSON:  That's true.

11          THE COURT:  And I know who one of them is going

12 to be.  So what do you anticipate?  Are you handling this

13 witness?

14          MR. DAVIDSON:  No, Ms. Bolen.

05:02:25  15          THE COURT:  Okay.  So...

16          MR. JOUBERT:  Judge, it's kind of hard to say.

17 We are hoping that we still could get 1 or 2 other patients

18 out of Louisiana.

19          THE COURT:  I got them locked up.  I'm just

05:02:40  20 kidding.

21          MR. JOUBERT:  I'm sorry.

22          Who are not locked up?

23          THE COURT:  Who are not locked up.  There's

24 some trouble over there.

05:02:48  25          MR. JOUBERT:  After Mr. DeVido, I think we

1   would have about three other witnesses, Judge.

2              THE COURT:  Okay.

3              MR. JOUBERT:  Including I told Mr. Davidson

4   earlier Osman Savillion.

05:03:00   5              THE COURT:  Are these patients?

6              MR. JOUBERT:  No, he was a former employee of

7   Dr. Evans.

8              THE COURT:  Oh, that's right.  I see.

9              MR. JOUBERT:  The therapist.  And after that --

05:03:10  10              THE COURT:  Depends on whether you can get the

11   witnesses or not?

12              MR. JOUBERT:  Yes.  We'll still work on that.

13   But if we are unable to, we'll probably begin to call our

14   agents to begin their testimony.

05:03:24  15              THE COURT:  All right.  Okay.  So that's it.

16   All right.  Thank you very much.  Looks like we'll probably

17   going to be here -- you're not going to be able to start

18   your case before Wednesday.

19              MR. DAVIDSON:  Right.

05:03:35  20              THE COURT:  All right.  Have a good evening.

21              MR. JOUBERT:  Thank you, Your Honor.

22              **(Recessed at 5:03 p.m.)**

23

24

25

1                    **COURT REPORTER'S CERTIFICATE**

2

3  I, Johnny C. Sanchez, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6

                                    /s/
7                                   _____
                                    Johnny C. Sanchez, CRR, RMR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$240** [3] - 1099:21, 1099:22, 1184:12
**$250,000** [1] - 1258:21
**$29,000** [1] - 1264:8
**$300** [1] - 1195:5

## '

**'1** [1] - 1267:15
**'11** [1] - 1121:15
**'12** [3] - 1145:1, 1179:24, 1285:22
**'82** [1] - 1269:4
**'9** [2] - 1218:6, 1219:10
**'90s** [1] - 1128:24
**'95** [1] - 1119:3
**'98** [1] - 1218:6
**'99** [1] - 1267:13
**'lover'** [1] - 1223:12

## /

**/s** [1] - 1295:6

## 0

**0** [3] - 1088:25, 1155:15, 1215:16
**0063** [1] - 1109:7

## 1

**1** [6] - 1156:16, 1156:23, 1163:8, 1206:11, 1215:17, 1293:17
**1-11** [1] - 1229:22
**10** [40] - 1088:25, 1091:23, 1104:18, 1143:18, 1143:20, 1143:25, 1155:9, 1155:15, 1155:18, 1155:20, 1155:21, 1156:16, 1156:22, 1156:23, 1162:18, 1164:24, 1164:25, 1165:4, 1165:5, 1186:6, 1200:23, 1201:1, 1206:11, 1215:16, 1215:17, 1215:19, 1287:1, 1287:9, 1291:7, 1292:17
**10-plus** [1] - 1168:20
**1000** [1] - 1082:23
**103** [2] - 1222:24
**107** [1] - 1059:23
**10:30** [1] - 1056:11
**10:51** [1] - 1114:23
**10th** [4] - 1104:16, 1105:11, 1105:15, 1271:7
**11:00** [2] - 1056:11, 1056:14
**11:15** [2] - 1114:17, 1114:22
**11th** [2] - 1178:5, 1256:19
**12** [2] - 1130:19, 1241:14
**12-10** [1] - 1229:22
**12-15-10** [1] - 1104:9
**1268** [1] - 1030:1
**12:31** [1] - 1164:2
**13** [2] - 1077:21, 1259:21

**13th** [1] - 1264:6
**14** [1] - 1109:8
**142** [1] - 1070:9
**15** [4] - 1033:19, 1113:17, 1266:17, 1292:18
**150** [20] - 1062:9, 1064:19, 1065:22, 1066:5, 1068:7, 1068:8, 1069:5, 1069:16, 1072:13, 1073:1, 1073:25, 1077:1, 1098:5, 1098:7, 1098:9, 1250:17, 1250:18, 1250:21, 1250:22, 1251:10
**15th** [3] - 1104:9, 1105:8, 1105:16
**16th** [2] - 1063:20, 1064:25
**17** [7] - 1033:19, 1033:21, 1037:13, 1063:18, 1138:25, 1159:21, 1246:2
**170** [25] - 1046:10, 1068:7, 1179:21, 1203:2, 1204:4, 1210:21, 1243:13, 1243:16, 1243:21, 1244:9, 1244:11, 1244:12, 1244:23, 1244:24, 1244:25, 1245:1, 1245:3, 1245:22, 1246:4, 1246:5, 1246:8, 1246:10, 1246:11, 1251:21
**17th** [1] - 1079:23
**18** [7] - 1037:13, 1091:18, 1107:25, 1109:15, 1138:25, 1159:21, 1246:2
**180** [10] - 1064:19, 1065:21, 1066:5, 1068:8, 1069:5, 1069:16, 1073:1, 1098:5, 1098:9, 1250:21
**18th** [1] - 1066:15
**19** [2] - 1064:25, 1110:5
**1964** [2] - 1260:19, 1265:15
**1969** [3] - 1266:22, 1266:23, 1266:24
**1986** [1] - 1117:6
**1990** [2] - 1116:25, 1118:5
**1990s** [1] - 1128:23
**1992** [1] - 1267:9
**1994** [1] - 1117:23
**1995** [3] - 1117:23, 1119:5, 1119:11
**1999** [2] - 1267:6, 1267:7
**1:30** [2] - 1287:2, 1287:11
**1:45** [1] - 1163:22
**1st** [7] - 1280:9, 1280:12, 1280:14, 1280:15, 1280:16, 1283:12, 1283:14

## 2

**2** [7] - 1044:11, 1067:5, 1076:13, 1200:23, 1201:1, 1270:25, 1293:17
**2.0** [1] - 1159:10
**20** [3] - 1031:17, 1114:21, 1130:6
**20-minute** [1] - 1113:17
**2000** [5] - 1057:12, 1058:17, 1060:12, 1129:4, 1267:14
**2000s** [1] - 1129:2
**2001** [7] - 1059:11, 1060:2, 1266:24, 1267:4, 1267:8, 1268:7, 1268:8
**2001-4002-84401** [1] - 1059:13
**2002** [1] - 1268:6
**2007** [1] - 1123:10
**2008** [7] - 1119:13, 1186:19, 1186:21, 1187:16, 1190:23, 1193:19, 1194:5, 1265:6, 1219:10, 1237:9, 1274:8

**2009** [8] - 1060:15, 1075:19, 1261:11, 1270:16, 1270:18, 1270:20, 1270:23, 1271:13
**2010** [20] - 1058:17, 1060:22, 1064:23, 1072:3, 1077:23, 1104:9, 1104:16, 1104:18, 1104:24, 1105:5, 1105:9, 1111:12, 1186:23, 1230:3, 1271:4, 1271:11, 1271:13, 1275:25, 1277:2
**2011** [36] - 1063:13, 1063:20, 1064:25, 1066:3, 1066:15, 1068:17, 1069:15, 1071:11, 1071:15, 1072:4, 1073:19, 1075:21, 1076:9, 1076:17, 1078:12, 1079:23, 1080:6, 1098:10, 1119:5, 1119:11, 1119:12, 1119:13, 1119:18, 1144:22, 1145:1, 1179:23, 1187:9, 1189:14, 1218:4, 1230:3, 1277:12, 1277:25, 1284:12, 1288:11, 1288:12, 1289:7
**2012** [25] - 1047:13, 1078:24, 1080:14, 1080:18, 1081:17, 1081:22, 1083:9, 1084:22, 1094:20, 1121:15, 1144:22, 1186:16, 1186:23, 1189:19, 1213:1, 1213:8, 1218:5, 1219:9, 1234:13, 1261:11, 1264:6, 1289:8, 1289:13, 1289:20, 1292:11
**2013** [17] - 1057:19, 1121:15, 1186:19, 1186:22, 1187:1, 1187:2, 1187:16, 1189:21, 1190:24, 1192:1, 1193:19, 1194:5, 1195:6, 1213:1, 1237:9, 1238:2, 1238:4
**2014** [3] - 1057:19, 1234:11, 1234:16
**2015** [5] - 1194:11, 1194:14, 1220:10, 1260:19, 1266:1
**21** [3] - 1066:15, 1141:9, 1255:21
**210** [8] - 1072:13, 1073:2, 1073:25, 1076:15, 1077:1, 1098:7, 1181:4, 1251:16
**22** [1] - 1068:18
**226** [1] - 1074:7
**22nd** [1] - 1059:11
**24** [1] - 1110:21
**2417** [1] - 1059:22
**25** [2] - 1114:16, 1114:21
**250** [2] - 1250:15, 1250:17
**26** [1] - 1071:15
**29** [1] - 1079:13
**2:00** [2] - 1287:2, 1287:11

## 3

**3** [1] - 1270:25
**30** [17] - 1031:18, 1054:19, 1062:8, 1065:20, 1066:4, 1067:4, 1067:15, 1069:3, 1080:3, 1094:15, 1103:21, 1108:18, 1109:7, 1114:14, 1167:19, 1181:4, 1269:18
**30-minute** [1] - 1241:4
**30-plus** [1] - 1047:25
**32** [1] - 1032:4
**35** [2] - 1167:19, 1267:21
**3:24** [1] - 1241:8
**3:30** [3] - 1241:6, 1287:13, 1287:21

**3:50** [1] - 1241:7

## 4

**4-11** [1] - 1229:3
**40** [1] - 1269:18
**43** [1] - 1141:9
**45** [1] - 1133:21
**49** [6] - 1032:16, 1032:18, 1032:25, 1035:20, 1044:11
**4:00** [2] - 1287:13, 1287:21
**4th** [2] - 1071:15, 1073:19

## 5

**5** [1] - 1106:12
**5-11** [1] - 1229:3
**50** [3] - 1035:20, 1039:11, 1103:19
**500** [1] - 1036:18
**53** [2] - 1108:17
**5:03** [1] - 1294:22

## 6

**6** [5] - 1165:5, 1215:19, 1266:24, 1287:1, 1287:9
**6-11** [1] - 1229:3
**60** [2] - 1104:7, 1153:14
**60-percent** [1] - 1267:25
**62** [1] - 1104:7
**6435** [1] - 1269:2

## 7

**7** [1] - 1165:5
**7-11** [1] - 1229:5

## 8

**8** [2] - 1091:23, 1223:10
**8-25-11** [1] - 1229:7
**802(d)(3** [1] - 1271:22
**841** [1] - 1258:1
**843** [2] - 1256:10, 1256:19
**843A3** [1] - 1255:21
**85** [1] - 1169:12
**87** [4] - 1030:1, 1268:9, 1268:16, 1268:21
**8th** [1] - 1069:15

## 9

**9** [1] - 1106:23
**90-day** [1] - 1281:5
**9122** [1] - 1223:3
**95-CF-2106** [1] - 1058:15
**98** [1] - 1070:9
**9:00** [1] - 1292:19

**9:30** [1] - 1056:6
**9:35** [1] - 1056:19

## A

**a.m** [2] - 1056:19, 1114:23
**AA** [1] - 1110:5, 1110:6
**abandon** [3] - 1238:25, 1248:4, 1248:14
**abandoned** [2] - 1043:13, 1220:24
**abandoning** [2] - 1045:18, 1051:11
**abandonment** [1] - 1239:2
**abdominal** [1] - 1200:3
**aberrant** [31] - 1133:18, 1135:12, 1136:11, 1136:13, 1136:14, 1136:17, 1136:18, 1136:19, 1136:24, 1137:11, 1146:5, 1146:6, 1147:4, 1148:15, 1152:10, 1152:14, 1166:3, 1172:12, 1179:1, 1231:17, 1231:23, 1231:25, 1232:4, 1232:6, 1232:7, 1232:8, 1232:9, 1232:11, 1233:8, 1233:10, 1233:21
**abide** [1] - 1251:19
**ability** [6] - 1064:13, 1125:17, 1172:20, 1199:13, 1237:14, 1279:25
**able** [20] - 1036:3, 1041:3, 1041:4, 1042:10, 1052:14, 1065:5, 1065:6, 1087:20, 1138:24, 1180:11, 1181:24, 1238:14, 1252:23, 1253:4, 1260:23, 1262:9, 1279:19, 1282:9, 1286:22, 1294:17
**abnormal** [1] - 1135:13
**abnormalities** [1] - 1168:16
**above-entitled** [1] - 1295:5
**absence** [2] - 1253:7, 1253:10
**absent** [1] - 1037:18
**abuse** [4] - 1129:3, 1160:15, 1165:17, 1166:3
**abused** [2] - 1160:19, 1166:4
**abusers** [1] - 1177:1
**abusing** [1] - 1274:22
**Academy** [3] - 1118:10, 1121:10, 1121:12
**accept** [5] - 1230:6, 1274:2, 1274:6, 1276:6, 1276:18
**acceptable** [1] - 1147:10
**accepted** [1] - 1277:7
**accepts** [1] - 1258:3
**accident** [5] - 1139:11, 1168:9, 1168:12, 1172:9, 1197:22
**accidental** [1] - 1181:9
**accidentally** [2] - 1154:3, 1177:15
**accidents** [3] - 1114:1, 1130:24, 1161:16
**accomplish** [1] - 1153:2
**accomplishments** [1] - 1115:19
**according** [7] - 1065:16, 1091:22, 1109:12, 1212:4, 1222:1, 1274:23, 1284:23
**accuracy** [1] - 1141:6
**accurate** [4] - 1140:3, 1141:10, 1256:24, 1257:14

**accurately** [1] - 1044:25
**accused** [1] - 1120:25
**accusing** [1] - 1050:10
**achieved** [1] - 1156:18
**achievement** [1] - 1156:6
**achieving** [7] - 1152:1, 1152:2, 1155:21, 1156:5, 1164:25, 1165:7, 1179:8
**acknowledged** [1] - 1204:22
**acquire** [1] - 1262:8
**act** [3] - 1149:24, 1183:22, 1233:7
**Act** [1] - 1219:22
**acted** [1] - 1101:1
**acting** [9] - 1224:21, 1224:25, 1225:2, 1225:11, 1225:18, 1225:19, 1225:21
**action** [4] - 1121:6, 1146:6, 1177:14, 1245:19
**active** [1] - 1245:17
**activities** [4] - 1065:4, 1087:20, 1136:21, 1173:2
**activity** [6] - 1066:22, 1066:24, 1067:3, 1067:22, 1119:17
**acts** [3] - 1121:3, 1183:22, 1219:21
**actual** [2] - 1054:1, 1234:15
**acupuncture** [1] - 1101:2
**acute** [1] - 1118:19
**add** [2] - 1093:24, 1225:10
**ADD** [1] - 1134:6
**added** [1] - 1159:12
**addict** [2] - 1063:10, 1131:3
**addicted** [1] - 1171:19
**addiction** [28] - 1121:14, 1121:21, 1130:14, 1130:15, 1130:17, 1130:25, 1137:2, 1137:3, 1137:7, 1149:4, 1152:17, 1152:25, 1153:11, 1171:17, 1171:23, 1171:25, 1172:12, 1189:17, 1190:2, 1190:3, 1190:5, 1190:9, 1218:1, 1218:4, 1220:1, 1248:16, 1248:19
**addictionologist** [1] - 1219:25
**addition** [1] - 1093:16
**additional** [8] - 1048:22, 1049:9, 1049:10, 1068:23, 1068:24, 1121:6, 1259:9, 1263:1
**address** [7] - 1116:13, 1225:10, 1246:5, 1269:1, 1269:3, 1269:10, 1273:12
**addressed** [3] - 1048:15, 1050:2, 1203:10
**addresses** [1] - 1051:10
**addressing** [1] - 1155:19
**adequate** [6] - 1137:18, 1139:6, 1139:9, 1182:13, 1226:18, 1243:18
**adequately** [2] - 1211:18, 1211:20
**ADHD** [1] - 1134:6
**adjust** [3] - 1093:22, 1148:4, 1254:4
**adjusted** [1] - 1239:7
**adjustment** [4] - 1164:12, 1231:2, 1247:3, 1250:24
**adjustments** [5] - 1239:12, 1240:3, 1240:5, 1247:4, 1250:11
**Administration** [2] - 1212:18, 1260:22

**Administrative** [5] - 1179:21, 1243:13, 1244:9, 1245:2, 1251:22
**administrative** [1] - 1124:9
**administrator** [1] - 1050:11
**admission** [1] - 1115:11
**admit** [1] - 1060:3
**admitted** [4] - 1030:1, 1147:2, 1268:20, 1268:21
**admonitions** [1] - 1292:20
**advanced** [1] - 1168:20
**adversely** [1] - 1125:18
**adversity** [3] - 1125:20, 1129:23, 1133:3
**advise** [1] - 1202:15
**advised** [1] - 1202:16
**advises** [1] - 1120:5
**advisor** [1] - 1120:11
**advisory** [2] - 1119:19, 1122:6
**affect** [1] - 1127:8
**affected** [1] - 1125:18
**affecting** [1] - 1064:13
**afford** [4] - 1234:4, 1234:5, 1234:6, 1265:3
**afraid** [1] - 1174:22
**afternoon** [8] - 1057:3, 1185:20, 1253:19, 1253:20, 1254:12, 1254:13, 1287:12, 1287:15
**age** [3] - 1133:21, 1167:22, 1276:5
**agencies** [1] - 1191:19
**agency** [1] - 1212:21
**agent** [2] - 1082:11, 1238:7
**agents** [7] - 1081:18, 1082:1, 1082:4, 1082:10, 1133:7, 1170:12, 1294:14
**AGIS** [2] - 1195:23, 1195:25
**ago** [10] - 1057:23, 1084:2, 1131:8, 1139:11, 1144:22, 1147:17, 1172:9, 1174:18, 1193:4
**agree** [13] - 1034:3, 1041:12, 1063:8, 1064:16, 1068:6, 1209:5, 1247:1, 1257:13, 1257:17, 1257:19, 1258:13, 1258:23, 1258:25
**agreed** [9] - 1246:13, 1256:25, 1257:1, 1257:5, 1257:9, 1257:25, 1258:16, 1261:10, 1264:3
**agreement** [30] - 1219:17, 1219:20, 1221:6, 1221:16, 1221:17, 1222:12, 1224:10, 1255:11, 1255:16, 1255:25, 1256:10, 1256:14, 1256:15, 1256:23, 1257:1, 1257:2, 1258:3, 1258:14, 1258:24, 1258:25, 1259:7, 1259:14, 1259:17, 1259:21, 1260:8, 1261:6, 1264:3, 1264:11, 1264:13
**agreements** [1] - 1257:23
**agrees** [1] - 1258:8
**ahead** [11] - 1051:6, 1072:3, 1113:7, 1115:22, 1163:21, 1178:19, 1241:3, 1242:23, 1280:8, 1288:1, 1291:17
**ain't** [1] - 1178:9
**airline** [2] - 1122:12, 1122:13
**airlines** [2] - 1122:14, 1122:16
**alcohol** [3] - 1110:22, 1158:8, 1223:17
**alcoholics** [1] - 1110:8

**alcoholism** [1] - 1133:22
**algorithm** [2] - 1233:25, 1234:2
**alleged** [1] - 1161:24
**allegedly** [1] - 1145:12
**Allen** [1] - 1114:8
**allow** [4] - 1091:10, 1095:15, 1154:4, 1265:22
**allows** [2] - 1046:11, 1219:5
**alluded** [1] - 1166:20
**almost** [2] - 1169:18, 1206:8
**alone** [4] - 1171:25, 1178:11, 1182:13, 1223:22
**alter** [1] - 1157:16
**alternate** [2] - 1095:6, 1163:11
**alternative** [5] - 1152:6, 1153:24, 1171:13, 1171:14, 1182:13
**American** [5] - 1118:7, 1118:10, 1121:12, 1163:13, 1191:22
**amount** [11] - 1065:20, 1066:10, 1067:3, 1074:6, 1075:15, 1091:22, 1097:18, 1097:19, 1184:12, 1251:22, 1264:8
**amounts** [1] - 1258:21
**analogous** [1] - 1139:12
**analysis** [7] - 1033:19, 1034:1, 1129:5, 1132:2, 1137:8, 1145:19, 1148:2
**anatomical** [1] - 1127:3
**anesthesia** [2] - 1117:16, 1117:18
**anesthesiologist** [1] - 1123:16
**anesthesiology** [1] - 1118:8
**angel** [2] - 1058:3, 1060:3
**ankylosing** [1] - 1162:6
**Anonymous** [1] - 1110:8
**anonymous** [1] - 1110:8
**answer** [10] - 1040:15, 1072:20, 1079:16, 1083:14, 1084:4, 1106:23, 1107:2, 1109:12, 1111:10, 1138:14
**answered** [9] - 1071:7, 1080:21, 1084:18, 1094:18, 1098:16, 1099:1, 1106:2, 1277:6, 1277:7
**answers** [5] - 1048:9, 1081:3, 1081:8, 1082:17, 1277:8
**anticipate** [3] - 1031:12, 1048:14, 1293:12
**anticipated** [1] - 1126:5
**anticipating** [1] - 1108:4
**antidepressant** [1] - 1070:2
**anxiety** [6] - 1094:9, 1133:24, 1166:9, 1171:5, 1176:1, 1210:9
**anyplace** [1] - 1273:17
**anyway** [1] - 1046:4
**Apartment** [1] - 1059:23
**apologize** [2] - 1054:7, 1054:10
**appear** [1] - 1054:25
**appearance** [1] - 1104:8
**appeared** [7] - 1068:8, 1124:9, 1171:9, 1171:11, 1180:6, 1201:8, 1248:7
**appearing** [3] - 1255:1, 1255:10, 1255:13
**applicable** [1] - 1259:1
**apply** [1] - 1128:17
**applying** [1] - 1193:2

**appointment** [3] - 1196:10, 1196:13, 1198:10
**approach** [13] - 1040:22, 1071:18, 1082:19, 1113:2, 1132:10, 1147:9, 1155:12, 1174:14, 1177:19, 1222:17, 1222:19, 1241:10, 1262:15
**approached** [2] - 1081:18, 1192:11
**approaches** [1] - 1206:19
**appropriate** [6] - 1031:6, 1036:25, 1040:21, 1054:5, 1054:25, 1257:16
**appropriately** [3] - 1041:1, 1052:15, 1053:9
**approves** [1] - 1212:21
**arbiter** [4] - 1120:20, 1120:21, 1120:23, 1120:24
**area** [14] - 1034:13, 1055:4, 1058:2, 1059:1, 1071:20, 1097:21, 1130:22, 1149:7, 1149:16, 1165:5, 1187:1, 1189:21, 1252:24, 1292:15
**areas** [1] - 1052:2, 1061:9, 1061:10, 1089:24, 1097:1, 1161:3, 1178:22
**argument** [7] - 1073:21, 1074:1, 1098:20, 1250:23, 1250:25, 1251:9, 1251:13
**arguments** [4] - 1098:20, 1098:22, 1099:8, 1108:10
**arm** [1] - 1167:5
**arose** [1] - 1093:22
**arrangements** [1] - 1142:19
**array** [1] - 1171:23
**arrested** [1] - 1109:16
**arrived** [1] - 1044:15
**Arthur** [1] - 1255:2
**article** [3] - 1234:13, 1234:15, 1234:20
**as-needed-basis** [1] - 1093:25
**aspects** [3] - 1047:12, 1049:21, 1094:10
**assess** [5] - 1126:16, 1126:17, 1172:3, 1172:24, 1179:9
**assessed** [1] - 1184:14
**assesses** [1] - 1211:13
**assessing** [5] - 1100:12, 1126:20, 1135:2, 1170:19, 1177:11
**assessment** [9] - 1052:12, 1117:17, 1130:3, 1142:25, 1145:18, 1170:25, 1172:21, 1179:18, 1183:17
**assistance** [5] - 1075:10, 1075:15, 1075:23, 1076:10, 1076:22, 1259:11
**assistant** [1] - 1282:20
**associate** [1] - 1042:2
**associated** [10] - 1034:2, 1036:21, 1042:3, 1075:14, 1076:11, 1138:7, 1158:12, 1158:13, 1178:25, 1217:22
**Association** [1] - 1191:22
**assume** [1] - 1220:7
**assumed** [4] - 1062:2, 1067:13, 1102:9, 1102:11
**assuming** [6] - 1045:13, 1047:10, 1132:8, 1147:11, 1150:4, 1153:22
**attempt** [1] - 1053:20
**attempting** [1] - 1053:23
**attend** [1] - 1257:9

**attended** [2] - 1110:5, 1110:16

**attention** [12] - 1034:6, 1047:1, 1134:1, 1165:4, 1165:20, 1169:10, 1179:20, 1248:25, 1250:13, 1270:6, 1288:10

**attorney** [1] - 1121:2

**Audie** [5] - 1215:8, 1239:19, 1239:21, 1246:25, 1247:5

**August** [11] - 1068:17, 1069:15, 1070:9, 1071:6, 1071:11, 1080:6, 1081:17, 1187:8, 1280:12, 1280:15, 1283:14

**Augusta** [5] - 1060:22, 1104:16, 1104:23, 1273:18

**aunt** [1] - 1265:2

**Austin** [1] - 1252:24

**authored** [2] - 1123:1, 1123:3

**autoimmune** [2] - 1074:21, 1210:14

**automobile** [2] - 1161:16, 1172:9

**available** [2] - 1092:14, 1287:4

**Avenue** [1] - 1114:5

**average** [5] - 1108:8, 1133:16, 1182:24, 1285:18, 1291:5

**aviation** [2] - 1122:11, 1122:15

**avoidance** [1] - 1174:22

**aware** [19] - 1062:16, 1075:7, 1076:19, 1076:20, 1189:22, 1197:19, 1197:22, 1202:12, 1202:16, 1205:14, 1220:13, 1220:20, 1221:21, 1221:24, 1223:17, 1223:20, 1237:18, 1237:20, 1249:1

**awhile** [1] - 1102:24

**B**

**backed** [1] - 1069:4

**background** [9] - 1033:13, 1052:11, 1060:25, 1061:6, 1102:5, 1102:22, 1116:20, 1118:3, 1255:15

**backs** [1] - 1169:5

**backup** [1] - 1217:15

**backwards** [1] - 1192:18

**bad** [8] - 1051:19, 1109:9, 1109:11, 1168:9, 1168:12, 1200:2, 1207:14, 1233:18

**balls** [2] - 1050:12, 1125:2

**bankrupt** [1] - 1268:2

**bankruptcy** [2] - 1268:3, 1268:4

**barbecue** [1] - 1211:5

**base** [2] - 1128:17, 1173:24

**based** [35] - 1039:8, 1043:19, 1046:15, 1053:25, 1065:13, 1065:14, 1066:11, 1067:16, 1067:17, 1068:6, 1068:23, 1069:2, 1092:24, 1093:25, 1094:13, 1129:10, 1129:11, 1129:15, 1129:17, 1131:3, 1135:11, 1175:13, 1184:21, 1190:12, 1190:17, 1190:18, 1190:20, 1190:25, 1192:16, 1226:8, 1228:4, 1228:21, 1240:12, 1256:10, 1259:10

**baseline** [10] - 1134:19, 1134:20, 1134:22, 1173:4, 1210:25, 1211:1, 1211:4, 1211:7, 1211:9, 1211:11

**basic** [5] - 1127:16, 1129:24, 1138:11,

**basis** [16] - 1034:21, 1054:24, 1072:12, 1072:20, 1072:21, 1078:23, 1087:21, 1093:25, 1095:21, 1169:8, 1198:17, 1202:14, 1251:15, 1260:13, 1263:12, 1285:18

**Bates** [5] - 1104:7, 1108:17, 1109:7, 1223:3

**Baton** [1] - 1055:22

**battle** [1] - 1035:4

**bear** [1] - 1037:15

**became** [3] - 1119:15, 1119:17, 1265:16

**become** [4] - 1119:13, 1119:18, 1126:4, 1130:7

**becomes** [2] - 1037:21, 1037:24

**becoming** [1] - 1135:9

**beg** [1] - 1118:1

**began** [5] - 1275:19, 1287:10, 1287:14, 1287:21, 1291:1

**begin** [4] - 1151:4, 1270:17, 1294:13, 1294:14

**beginning** [4] - 1151:3, 1211:13, 1228:23, 1239:13

**begs** [1] - 1101:1

**behavior** [19] - 1129:20, 1133:17, 1136:11, 1136:13, 1136:18, 1136:25, 1137:11, 1147:4, 1147:10, 1148:16, 1152:10, 1152:15, 1166:4, 1179:1, 1232:12, 1233:8, 1233:10, 1233:21

**behavioral** [10] - 1129:18, 1129:21, 1130:4, 1130:7, 1132:17, 1133:12, 1156:1, 1170:10, 1171:22, 1176:22

**behaviors** [7] - 1135:12, 1154:3, 1231:17, 1231:23, 1231:25, 1232:4, 1232:6

**behavorial** [1] - 1132:13

**behind** [1] - 1041:22

**below** [3] - 1245:21, 1246:3, 1246:5

**bench** [2] - 1031:6, 1071:18

**benchmarks** [1] - 1179:5

**benefit** [28] - 1034:2, 1135:16, 1135:17, 1135:21, 1135:22, 1136:3, 1145:23, 1145:24, 1145:25, 1147:11, 1150:2, 1152:1, 1152:2, 1155:21, 1156:7, 1156:10, 1156:18, 1156:24, 1165:1, 1165:8, 1179:8, 1181:11, 1182:1, 1246:22, 1251:4, 1251:6, 1251:14

**benefit"** [1] - 1156:5

**benefited** [1] - 1182:1

**benefits** [5] - 1062:15, 1184:23, 1222:8, 1235:24

**Bentyl** [1] - 1154:6

**benzodiazapine** [5] - 1158:2, 1158:6, 1158:7, 1158:18, 1159:3

**best** [16] - 1047:6, 1050:13, 1056:15, 1058:12, 1064:5, 1123:2, 1168:1, 1169:14, 1172:2, 1172:3, 1207:7, 1214:11, 1224:5, 1232:16, 1240:12, 1289:11

**bet** [2] - 1124:20, 1125:6

**between** [14] - 1035:5, 1050:18, 1052:21, 1128:6, 1142:12, 1170:1, 1171:1, 1193:24, 1205:5, 1218:4, 1239:8, 1244:8, 1261:11, 1266:24

**beyond** [4] - 1073:25, 1078:12, 1186:1

**big** [5] - 1085:25, 1101:1, 1104:25, 1124:19, 1125:12

**bills** [2] - 1097:14, 1268:1

**binds** [1] - 1257:2

**bipolar** [3] - 1134:1, 1148:14, 1148:18

**birthday** [1] - 1265:23

**bit** [22] - 1043:18, 1047:3, 1060:8, 1065:3, 1097:13, 1118:2, 1139:8, 1150:3, 1150:25, 1164:14, 1166:18, 1168:20, 1169:3, 1170:21, 1170:23, 1171:16, 1193:4, 1195:7, 1200:2, 1224:1, 1232:3, 1256:13

**bladder** [1] - 1138:8

**blend** [1] - 1197:9

**blind** [1] - 1262:3

**blindness** [3] - 1044:11, 1045:2, 1045:5, 1045:10, 1045:20

**block** [1] - 1292:20

**blocking** [1] - 1175:5

**blood** [30] - 1070:6, 1070:7, 1070:8, 1070:14, 1070:17, 1070:24, 1070:25, 1081:16, 1088:9, 1088:10, 1135:18, 1135:19, 1135:20, 1135:22, 1198:25, 1199:4, 1199:8, 1210:10, 1245:18, 1245:24, 1246:2, 1252:2, 1252:3, 1288:17, 1288:18, 1288:20, 1289:2, 1289:5, 1289:15

**Blue** [1] - 1219:7

**blunt** [1] - 1161:18

**Board** [34] - 1046:24, 1118:7, 1123:25, 1124:5, 1124:7, 1187:7, 1187:16, 1192:6, 1193:6, 1193:10, 1194:4, 1202:22, 1203:5, 1207:18, 1208:1, 1208:4, 1208:6, 1209:22, 1210:16, 1211:17, 1211:21, 1212:4, 1213:19, 1213:21, 1221:7, 1225:19, 1226:11, 1228:2, 1230:24, 1234:8, 1235:1, 1240:17, 1251:20

**board** [20] - 1094:22, 1094:25, 1095:4, 1095:10, 1095:17, 1096:6, 1100:19, 1100:22, 1100:24, 1101:1, 1101:8, 1101:9, 1118:6, 1119:9, 1120:11, 1122:6, 1214:2, 1220:5, 1220:9, 1228:3

**boards** [1] - 1095:1

**Bob** [1] - 1052:9

**body** [6] - 1127:8, 1142:16, 1174:5, 1213:13, 1218:22, 1227:12

**bogged** [2] - 1037:7, 1038:17

**Bolen** [11] - 1044:24, 1243:7, 1243:10, 1244:7, 1244:5, 1245:11, 1246:11, 1248:2, 1248:24, 1250:10, 1293:14

**BOLEN** [58] - 1032:16, 1032:19, 1034:16, 1035:18, 1043:1, 1043:6, 1043:13, 1043:22, 1044:2, 1044:5,

1044:8, 1044:13, 1045:24, 1046:2, 1046:6, 1046:8, 1051:9, 1051:15, 1051:22, 1052:8, 1052:17, 1052:19, 1052:23, 1053:2, 1053:11, 1053:21, 1053:24, 1054:6, 1054:11, 1054:13, 1054:17, 1054:19, 1054:21, 1055:7, 1072:3, 1114:2, 1115:13, 1177:17, 1178:4, 1185:17, 1185:19, 1188:11, 1188:14, 1194:17, 1222:14, 1222:17, 1222:21, 1222:24, 1223:2, 1240:9, 1240:10, 1241:1, 1242:14, 1262:13, 1262:24, 1263:1, 1268:18, 1293:1

**bolts** [1] - 1212:3
**bona** [1] - 1196:6
**book** [6] - 1035:7, 1035:8, 1278:8, 1278:13, 1292:9
**bookkeeper** [2] - 1290:23, 1291:1
**books** [1] - 1035:24
**bored** [1] - 1106:20
**born** [2] - 1264:17, 1264:18
**bottle** [1] - 1243:4
**bottom** [7] - 1032:12, 1078:6, 1101:8, 1104:8, 1280:6, 1280:10, 1280:14
**bought** [3] - 1267:4, 1267:13, 1268:4
**bounds** [1] - 1194:1
**Bourke** [1] - 1049:9
**bowel** [1] - 1138:8
**box** [1] - 1279:11
**bracketed** [1] - 1044:10
**brain** [3] - 1119:25, 1133:6, 1158:8
**brand** [1] - 1288:19
**breached** [1] - 1263:8
**break** [15] - 1056:4, 1113:7, 1113:8, 1113:13, 1113:16, 1113:17, 1114:12, 1164:15, 1164:22, 1241:2, 1241:4, 1292:13, 1292:18, 1292:24
**Brenda** [8] - 1067:7, 1091:15, 1092:3, 1103:11, 1103:12, 1106:15, 1106:16
**Briar** [1] - 1086:3
**Briargrove** [7] - 1267:1, 1267:2, 1268:11, 1268:25, 1269:1, 1269:24, 1270:7
**brief** [5] - 1061:21, 1092:23, 1095:23, 1095:24, 1220:23
**briefly** [4] - 1106:15, 1160:22, 1174:18, 1178:22
**bring** [8] - 1109:2, 1166:11, 1279:7, 1279:14, 1284:10, 1287:10, 1287:14
**bringing** [1] - 1034:6
**broke** [1] - 1097:14
**brought** [8] - 1036:1, 1048:22, 1248:24, 1260:3, 1274:7, 1274:9, 1285:4, 1286:17
**BS** [1] - 1265:15
**bubble** [1] - 1079:15
**builds** [1] - 1201:20
**bulges** [1] - 1167:25
**bulging** [3] - 1167:9, 1167:16, 1167:19
**bulk** [1] - 1035:12
**bullet** [2] - 1044:9, 1044:11
**bunch** [1] - 1082:16
**burning** [1] - 1206:3

**business** [4] - 1099:14, 1184:13, 1251:14, 1267:24
**busy** [2] - 1286:10, 1290:21
**but..** [1] - 1063:11
**buy** [3] - 1125:2, 1267:17, 1268:3
**BY** [37] - 1057:7, 1059:10, 1059:19, 1063:17, 1068:5, 1069:12, 1071:9, 1073:18, 1076:7, 1083:1, 1084:20, 1094:19, 1096:23, 1098:18, 1099:3, 1103:23, 1104:5, 1105:4, 1106:3, 1108:15, 1111:9, 1116:3, 1164:21, 1178:20, 1180:3, 1185:19, 1188:14, 1194:17, 1223:2, 1240:10, 1243:2, 1250:20, 1254:11, 1260:5, 1264:1, 1268:23, 1272:7

# C

**C2** [4] - 1280:2, 1281:1, 1282:5, 1283:23
**Cadillac** [1] - 1218:11
**calm** [1] - 1231:10
**Calvin** [5] - 1149:11, 1229:1, 1246:12, 1247:20, 1249:18
**Campbell** [1] - 1085:17
**cancer** [16] - 1060:9, 1060:12, 1075:19, 1077:5, 1077:8, 1077:10, 1077:16, 1077:19, 1078:9, 1174:2, 1174:3, 1174:4, 1174:5, 1174:8, 1174:14, 1174:15
**candid** [1] - 1153:20
**candidate** [1] - 1163:16
**candor** [1] - 1144:17
**cane** [1] - 1213:15
**canes** [1] - 1214:10
**cannot** [6] - 1038:17, 1045:4, 1053:8, 1147:12, 1167:24, 1282:10
**capacities** [1] - 1190:7
**capacity** [1] - 1121:16
**car** [3] - 1139:11, 1168:9, 1168:12
**card** [4] - 1291:16, 1291:21, 1292:3, 1292:4
**care** [60] - 1042:6, 1045:18, 1051:14, 1051:16, 1064:14, 1089:9, 1089:11, 1120:25, 1128:12, 1128:13, 1128:14, 1128:19, 1128:22, 1144:15, 1144:19, 1144:25, 1144:2, 1145:4, 1153:1, 1153:3, 1153:7, 1153:9, 1153:17, 1154:10, 1154:11, 1157:1, 1157:20, 1181:21, 1183:9, 1184:15, 1191:13, 1193:3, 1193:5, 1193:13, 1193:22, 1193:24, 1199:9, 1203:2, 1205:6, 1210:9, 1211:23, 1211:25, 1218:2, 1220:21, 1226:13, 1234:9, 1234:21, 1240:14, 1240:23, 1243:12, 1243:20, 1243:21, 1244:8, 1244:21, 1246:5, 1246:9, 1246:20, 1251:1, 1251:2
**careful** [4] - 1043:7, 1043:17, 1168:18, 1292:19
**caregiver** [1] - 1198:20
**carry** [1] - 1048:4
**case** [31] - 1031:14, 1033:23, 1036:14,

1043:4, 1050:18, 1053:6, 1054:25, 1057:11, 1057:12, 1057:14, 1057:21, 1058:18, 1113:19, 1132:5, 1146:4, 1169:14, 1173:19, 1185:23, 1188:1, 1188:4, 1193:23, 1211:25, 1241:18, 1248:12, 1251:20, 1253:4, 1253:6, 1255:8, 1261:2, 1293:6, 1294:18
**cases** [13] - 1043:10, 1046:11, 1150:15, 1151:17, 1177:11, 1181:6, 1197:20, 1204:11, 1214:15, 1220:17, 1227:3, 1247:1, 1291:24
**cash** [5] - 1184:13, 1184:17, 1184:18, 1264:9, 1264:10
**catastrophic** [1] - 1119:24
**catastrophizing** [1] - 1174:25
**catch** [1] - 1137:9
**catching** [1] - 1213:6
**categories** [3] - 1170:3, 1170:4, 1174:22
**category** [2] - 1065:6, 1080:21, 1080:22
**caused** [7] - 1063:8, 1162:4, 1162:5, 1162:7, 1162:8, 1174:4, 1213:12
**causes** [1] - 1161:7
**causing** [4] - 1090:11, 1090:21, 1148:18, 1169:21
**cautioned** [2] - 1115:25, 1254:8
**cautious** [2] - 1169:16, 1191:4
**caveats** [1] - 1200:22
**CDC** [1] - 1191:24
**ceiling** [1] - 1191:1
**Celexa** [6] - 1069:22, 1069:25, 1070:2, 1093:24, 1094:1, 1094:8
**center** [1] - 1166:7
**Center** [2] - 1117:10, 1117:23
**certain** [21] - 1036:1, 1036:10, 1039:20, 1049:10, 1053:15, 1099:16, 1133:7, 1190:25, 1193:6, 1193:7, 1200:22, 1204:7, 1231:20, 1233:18, 1233:21, 1234:3, 1238:14, 1239:13, 1258:10, 1261:7, 1276:16
**certainly** [13] - 1035:8, 1041:24, 1051:8, 1063:16, 1073:13, 1174:13, 1175:10, 1176:20, 1204:15, 1217:4, 1220:13, 1224:11, 1239:12
**CERTIFICATE** [1] - 1295:1
**certification** [3] - 1103:13, 1118:15, 1118:16
**certifications** [2] - 1118:6, 1118:9
**Certified** [1] - 1118:7
**certified** [3] - 1118:18, 1118:20, 1118:24
**certify** [1] - 1295:3
**cervical** [5] - 1089:23, 1089:24, 1090:4, 1090:10, 1132:14
**cetera** [3] - 1038:13, 1107:11, 1184:5
**chain** [2] - 1267:18, 1267:23
**chair** [3] - 1096:6, 1101:7, 1101:8
**challenge** [1] - 1034:10
**challenged** [1] - 1034:10
**challenging** [1] - 1262:22
**chance** [2] - 1055:2, 1186:10

**change** [16] - 1092:25, 1093:2, 1093:4, 1128:19, 1136:1, 1156:14, 1165:9, 1165:11, 1187:2, 1187:5, 1187:8, 1187:11, 1192:4, 1192:5, 1194:14, 1250:25

**changed** [6] - 1179:10, 1187:7, 1187:12, 1187:21, 1213:1, 1267:22

**changes** [8] - 1047:17, 1047:21, 1047:22, 1076:14, 1186:25, 1221:25, 1236:11, 1236:24

**changing** [2] - 1213:5, 1225:9

**Chapter** [5] - 1046:10, 1179:21, 1243:13, 1244:9, 1244:11

**charge** [9] - 1058:11, 1255:18, 1255:24, 1256:10, 1256:18, 1258:1, 1270:11, 1270:15

**charged** [2] - 1039:9, 1255:5

**charges** [4] - 1059:7, 1255:6, 1256:3, 1257:17

**Chart** [1] - 1063:18

**chart** [38] - 1047:18, 1061:23, 1064:17, 1072:20, 1072:21, 1073:19, 1086:21, 1086:22, 1089:8, 1090:7, 1092:15, 1092:17, 1092:21, 1092:22, 1093:6, 1100:13, 1104:6, 1108:18, 1139:16, 1148:20, 1154:23, 1155:7, 1157:13, 1157:15, 1171:12, 1188:21, 1196:19, 1196:21, 1198:9, 1204:19, 1205:16, 1207:17, 1208:15, 1209:6, 1229:20, 1231:3, 1250:13

**charts** [60] - 1047:16, 1094:18, 1100:3, 1100:5, 1100:16, 1103:15, 1103:16, 1139:2, 1139:5, 1139:16, 1140:18, 1140:22, 1141:1, 1141:3, 1141:13, 1142:25, 1144:9, 1147:18, 1159:21, 1165:15, 1166:13, 1167:15, 1171:8, 1180:5, 1180:24, 1183:17, 1185:22, 1185:25, 1186:3, 1186:5, 1186:12, 1186:13, 1186:15, 1186:18, 1186:21, 1188:16, 1192:21, 1194:18, 1197:11, 1197:13, 1197:16, 1198:6, 1207:11, 1216:11, 1221:13, 1223:4, 1226:25, 1228:15, 1230:12, 1231:6, 1235:17, 1236:13, 1236:16, 1237:18, 1237:20, 1237:21, 1239:11, 1240:6, 1247:23, 1250:12

**check** [4] - 1113:5, 1113:10, 1113:14, 1274:20

**checked** [3] - 1061:18, 1085:16, 1088:11

**checking** [2] - 1091:24, 1093:16

**checks** [1] - 1264:9

**chemical** [1] - 1133:6

**chemically** [2] - 1128:1, 1176:23

**chemist** [2] - 1127:25, 1128:4

**chemistry** [5] - 1117:8, 1266:4, 1266:6, 1266:10, 1266:11

**chemotherapy** [10] - 1075:13, 1075:14, 1075:22, 1076:10, 1076:11, 1076:15, 1076:21, 1077:9, 1077:13, 1078:21

**Chicago** [6] - 1057:11, 1057:14, 1057:15, 1057:21, 1058:2, 1059:1

**chicken** [1] - 1174:25

**chief** [1] - 1270:11

**child** [2] - 1064:14, 1089:9

**choice** [2] - 1152:25, 1153:10

**chosen** [1] - 1054:5

**chronic** [12] - 1067:20, 1118:19, 1128:25, 1173:6, 1173:7, 1174:10, 1174:13, 1174:16, 1174:19, 1174:21, 1177:2, 1214:20

**chronological** [1] - 1231:10

**church** [1] - 1211:5

**Cicero** [1] - 1059:23

**circumstance** [2] - 1128:15, 1251:1

**circumstances** [2] - 1147:7, 1165:22

**civil** [2] - 1043:8, 1046:15

**claim** [1] - 1264:4

**claiming** [1] - 1076:20

**class** [2] - 1122:14, 1122:17

**Clayton** [4] - 1067:7, 1103:11, 1103:12

**clean** [1] - 1062:23

**clear** [12] - 1132:21, 1140:19, 1141:18, 1141:21, 1156:21, 1168:14, 1178:24, 1181:11, 1209:2, 1234:20, 1244:7, 1245:12

**clearly** [1] - 1150:4

**client** [1] - 1054:8

**clinic** [4] - 1119:4, 1182:24, 1273:3, 1273:4

**clinical** [12] - 1052:10, 1052:17, 1052:21, 1052:23, 1052:25, 1053:3, 1053:7, 1053:11, 1053:16, 1145:22, 1195:1, 1195:14

**clinically** [2] - 1182:16, 1184:22

**clock** [2] - 1091:22, 1225:4

**Clonidine** [1] - 1154:6

**close** [9] - 1041:6, 1044:8, 1101:15, 1178:15, 1179:19, 1228:22, 1254:14, 1268:5, 1269:9

**closed** [1] - 1273:4

**closer** [2] - 1031:7, 1293:3

**clotting** [1] - 1210:10

**co** [1] - 1271:23

**co-conspirator** [1] - 1271:23

**coat** [1] - 1046:17

**cocktail** [10] - 1159:4, 1159:5, 1159:6, 1159:9, 1159:11, 1159:15, 1160:7, 1160:10, 1160:14, 1160:19

**Code** [6] - 1179:21, 1243:13, 1244:9, 1245:2, 1251:22, 1255:22

**coexisting** [1] - 1210:2

**cognitive** [12] - 1129:18, 1129:20, 1129:21, 1130:4, 1130:7, 1132:13, 1132:17, 1133:12, 1156:1, 1170:10, 1175:13, 1175:19

**cognitively** [1] - 1129:22

**coincidentally** [1] - 1167:13

**collectively** [1] - 1050:17

**College** [1] - 1163:13

**collision** [1] - 1050:21

**combination** [4] - 1159:16, 1159:23, 1160:8, 1223:22

**combined** [1] - 1170:17

**comfortable** [2] - 1164:8, 1168:21

**coming** [12] - 1043:25, 1046:13, 1052:9, 1054:3, 1114:3, 1169:8, 1169:16, 1178:9, 1207:24, 1232:14, 1271:9, 1287:12

**COMM** [8] - 1079:7, 1079:25, 1080:7, 1111:24, 1147:21

**comment** [3] - 1044:16, 1162:23, 1260:16

**commented** [1] - 1205:11

**comments** [1] - 1181:17

**commercial** [2] - 1122:15, 1122:16

**commit** [1] - 1177:7

**common** [6] - 1120:6, 1144:6, 1167:9, 1167:21, 1174:20, 1228:24

**commonly** [3] - 1168:3, 1169:21, 1224:14

**community** [2] - 1191:8, 1225:23

**comorbidities** [3] - 1177:5, 1177:6, 1177:7

**Comp** [2] - 1120:20, 1197:20

**companies** [1] - 1220:17

**compare** [3] - 1134:12, 1134:15, 1243:10

**compared** [1] - 1128:23

**comparing** [1] - 1134:20

**comparison** [1] - 1281:5

**compensate** [1] - 1068:2

**Compensation** [1] - 1120:14

**complain** [2] - 1078:13, 1137:25

**complaining** [1] - 1152:22

**complaint** [1] - 1188:17

**complaints** [2] - 1078:7, 1093:25

**complete** [2] - 1063:22, 1257:13

**completed** [1] - 1057:13, 1080:18

**completely** [3] - 1046:17, 1194:1, 1245:6

**completing** [2] - 1079:25, 1080:11

**complex** [1] - 1176:3

**complexities** [1] - 1217:22

**complicated** [1] - 1218:2

**comply** [2] - 1211:16, 1283:22

**component** [9] - 1051:10, 1054:1, 1127:23, 1130:2, 1170:22, 1172:19, 1176:5, 1196:24

**components** [2] - 1196:21, 1204:8

**compounding** [1] - 1163:4

**comprehensive** [1] - 1244:2

**compressed** [1] - 1167:5

**compression** [1] - 1145:16

**compulsive** [2] - 1133:25

**computer** [1] - 1290:9

**con** [1] - 1137:17

**concentration** [1] - 1156:19

**concept** [3] - 1160:14, 1172:1, 1176:4

**concern** [5] - 1042:8, 1042:19, 1043:3, 1171:10, 1181:8

**concerned** [10] - 1041:19, 1043:9, 1043:18, 1043:22, 1050:8, 1055:3, 1070:6, 1071:25, 1172:23, 1174:12

**concerning** [7] - 1035:1, 1039:17, 1099:5, 1123:1, 1123:10, 1123:16,

1259:22

**concerns** [1] - 1043:16
**conclude** [4] - 1045:9, 1185:3, 1185:7, 1278:11
**concluded** [2] - 1037:5, 1278:12
**conclusion** [6] - 1032:7, 1035:15, 1040:6, 1088:9, 1179:17, 1183:6
**conclusions** [1] - 1035:21
**condition** [3] - 1169:23, 1182:17, 1227:15
**conditions** [4] - 1118:19, 1163:2, 1172:22, 1210:2
**conduct** [10] - 1142:4, 1142:7, 1142:14, 1144:1, 1151:10, 1152:20, 1252:2, 1258:15, 1274:15, 1276:13
**conducted** [2] - 1141:15, 1141:23, 1142:21, 1151:12
**conducting** [1] - 1141:25
**conferences** [1] - 1257:10
**confirm** [2] - 1140:3, 1234:3
**confirmation** [4] - 1139:18, 1139:20, 1194:24, 1195:1
**conflicting** [1] - 1060:8
**confused** [1] - 1146:17
**conjunction** [2] - 1158:9, 1289:3
**connection** [5] - 1053:4, 1053:13, 1178:4, 1185:23, 1199:21
**consent** [8] - 1221:5, 1222:6, 1222:13, 1223:8, 1223:19, 1223:23, 1224:1, 1235:24
**conservative** [10] - 1129:9, 1131:14, 1131:16, 1131:19, 1133:14, 1184:21, 1190:13, 1226:1, 1226:8, 1233:16
**conservatively** [1] - 1132:11
**consider** [5] - 1132:13, 1133:21, 1163:4, 1176:20, 1187:18
**consideration** [7] - 1121:24, 1134:24, 1135:24, 1136:2, 1162:19, 1244:23, 1276:17
**considered** [6] - 1137:10, 1149:22, 1154:10, 1159:9, 1168:24, 1173:8
**consistent** [5] - 1090:16, 1143:12, 1144:14, 1156:16, 1248:11
**consistently** [4] - 1155:8, 1159:22, 1162:18, 1180:14
**conspiracy** [1] - 1255:6
**conspirator** [1] - 1271:23
**constantly** [1] - 1155:20
**constitute** [1] - 1159:1
**constitutes** [1] - 1044:23
**consult** [3] - 1132:15, 1162:21
**consultant** [1] - 1181:22
**consultation** [1] - 1132:9
**consultations** [3] - 1131:25, 1138:11, 1184:3
**content** [1] - 1118:14
**context** [6] - 1124:24, 1148:3, 1156:3, 1199:23, 1231:21, 1233:10
**continue** [10] - 1096:7, 1096:9, 1156:13, 1157:4, 1162:24, 1192:5, 1218:3, 1246:23, 1256:24, 1285:21
**continued** [8] - 1048:13, 1078:13,

1082:3, 1130:22, 1131:6, 1180:12, 1247:24, 1275:21
**CONTINUED** [1] - 1057:6
**continuing** [3] - 1245:19, 1266:13, 1266:15
**continuity** [1] - 1181:20
**contract** [2] - 1221:12, 1223:7
**contradicts** [1] - 1034:23
**contraindicated** [1] - 1223:18
**contrary** [1] - 1072:21, 1079:2
**contribute** [1] - 1201:10
**contributes** [1] - 1176:3
**contributing** [1] - 1125:24
**contributions** [1] - 1258:14
**contributors** [1] - 1131:16
**control** [8] - 1050:7, 1050:22, 1133:24, 1137:9, 1154:2, 1154:5, 1162:22, 1257:20
**controlled** [27] - 1126:12, 1134:23, 1135:6, 1135:8, 1135:10, 1137:16, 1145:13, 1147:13, 1152:3, 1152:11, 1176:24, 1182:10, 1182:21, 1183:23, 1184:24, 1185:4, 1185:8, 1212:14, 1213:11, 1219:24, 1260:23, 1261:2, 1275:10, 1275:20, 1280:1, 1280:22, 1285:25
**controversy** [1] - 1206:14
**conversation** [23] - 1076:17, 1086:1, 1087:6, 1087:13, 1087:14, 1089:17, 1089:18, 1100:8, 1271:12, 1272:20, 1276:21, 1276:25, 1281:14, 1282:22, 1284:1, 1284:25, 1285:9, 1285:10, 1288:12, 1289:9, 1289:14, 1289:20, 1293:4
**conversations** [5] - 1085:23, 1086:9, 1088:15, 1282:19, 1289:22
**convicted** [11] - 1058:6, 1058:7, 1058:14, 1058:17, 1058:18, 1058:25, 1059:6, 1059:12, 1059:21, 1060:1, 1060:3
**convicting** [1] - 1039:10
**conviction** [4] - 1049:17, 1058:22, 1059:20, 1175:6
**convictions** [9] - 1048:16, 1048:17, 1048:21, 1048:25, 1049:9, 1057:10, 1058:1, 1058:10, 1110:3
**Cooke** [1] - 1059:13
**cool** [1] - 1164:14
**cooperate** [4] - 1256:1, 1256:23, 1256:24, 1267:19
**cooperation** [2] - 1256:15, 1259:6
**coordination** [1] - 1205:6
**cope** [3] - 1125:6, 1125:17, 1176:23
**copes** [1] - 1125:20
**copies** [4] - 1157:9, 1157:12, 1157:14, 1236:16
**coping** [6] - 1122:1, 1129:24, 1171:5, 1174:20, 1175:21, 1175:23
**copy** [2] - 1208:22, 1237:12
**copying** [1] - 1133:2
**cord** [1] - 1119:25
**corner** [1] - 1230:17, 1269:11,

**correct** [196] - 1033:20, 1033:24, 1034:4, 1037:4, 1060:13, 1060:18, 1061:11, 1062:12, 1064:1, 1067:9, 1068:24, 1070:3, 1074:2, 1074:3, 1074:21, 1074:22, 1074:25, 1075:3, 1078:4, 1078:24, 1081:23, 1083:22, 1084:4, 1084:25, 1085:8, 1086:3, 1086:4, 1086:23, 1087:17, 1089:21, 1090:17, 1092:19, 1093:1, 1094:10, 1095:7, 1095:16, 1095:19, 1096:16, 1098:6, 1100:17, 1105:9, 1109:13, 1109:22, 1110:13, 1112:1, 1132:18, 1136:23, 1137:8, 1140:20, 1140:21, 1144:22, 1152:5, 1153:23, 1155:7, 1155:16, 1157:10, 1166:22, 1168:25, 1169:11, 1172:4, 1181:7, 1184:25, 1186:2, 1187:19, 1187:22, 1188:1, 1188:18, 1188:23, 1189:7, 1189:20, 1191:9, 1191:20, 1191:24, 1192:11, 1192:18, 1192:23, 1193:1, 1194:11, 1194:24, 1195:3, 1195:4, 1195:11, 1195:19, 1195:22, 1196:4, 1196:10, 1196:13, 1196:16, 1196:22, 1197:7, 1197:9, 1198:1, 1198:5, 1198:14, 1198:17, 1198:20, 1199:5, 1199:14, 1199:19, 1200:12, 1200:21, 1200:24, 1201:11, 1202:6, 1202:10, 1203:20, 1204:9, 1204:10, 1204:13, 1204:20, 1205:6, 1205:13, 1205:16, 1206:1, 1206:20, 1207:9, 1207:22, 1208:7, 1208:13, 1208:17, 1209:14, 1209:24, 1210:6, 1210:14, 1211:1, 1211:11, 1212:6, 1212:19, 1213:20, 1213:25, 1215:1, 1215:20, 1216:16, 1216:20, 1217:11, 1218:25, 1220:11, 1221:13, 1222:11, 1223:19, 1223:24, 1224:6, 1224:11, 1224:16, 1225:7, 1226:16, 1226:21, 1227:1, 1227:19, 1227:22, 1228:21, 1229:19, 1230:9, 1230:25, 1232:7, 1232:13, 1232:19, 1232:21, 1233:4, 1233:5, 1233:12, 1233:15, 1233:22, 1233:23, 1234:12, 1234:16, 1235:7, 1235:21, 1235:25, 1236:2, 1237:12, 1238:11, 1239:10, 1239:22, 1240:8, 1240:20, 1240:21, 1240:25, 1244:11, 1244:17, 1244:21, 1247:25, 1249:21, 1256:7, 1256:11, 1257:3, 1257:7, 1258:5, 1258:19, 1266:24, 1267:5, 1267:11, 1280:22, 1281:2, 1291:12, 1295:4
**correcting** [1] - 1155:17
**corrective** [3] - 1121:5, 1137:8, 1146:6
**correctly** [8] - 1063:1, 1147:25, 1162:24, 1166:22, 1167:1, 1201:12, 1266:17, 1291:9
**correlate** [1] - 1127:2
**correlation** [1] - 1155:5
**correspond** [1] - 1138:20
**cost** [1] - 1195:7
**Counsel** [1] - 1073:8
**counsel** [16] - 1042:23, 1048:1, 1071:16, 1084:18, 1094:17, 1106:2, 1113:2, 1115:10, 1178:18, 1222:19,

1238:19, 1240:7, 1241:9, 1253:5, 1262:13, 1263:24

**count** [3] - 1064:19, 1069:5
**counter** [1] - 1290:22
**country** [4] - 1130:18, 1202:12, 1202:17, 1224:15
**County** [2] - 1058:16, 1059:13
**couple** [12] - 1044:13, 1124:13, 1127:16, 1128:9, 1131:13, 1136:9, 1137:20, 1152:21, 1190:7, 1246:24, 1267:5, 1289:23
**course** [16] - 1038:24, 1065:18, 1070:5, 1093:20, 1147:6, 1150:21, 1154:16, 1180:17, 1190:1, 1245:25, 1247:17, 1253:6, 1253:9, 1261:13, 1262:4, 1291:24
**courses** [1] - 1266:6
**COURT** [221] - 1031:2, 1031:13, 1031:20, 1032:2, 1032:6, 1032:11, 1032:18, 1032:20, 1032:24, 1033:3, 1033:6, 1033:9, 1033:21, 1034:1, 1034:5, 1034:17, 1035:22, 1036:3, 1036:7, 1036:12, 1037:6, 1038:9, 1038:12, 1038:22, 1039:2, 1039:6, 1039:13, 1039:19, 1039:24, 1040:4, 1040:8, 1040:10, 1040:13, 1041:8, 1041:15, 1041:19, 1042:13, 1042:23, 1043:5, 1043:12, 1043:20, 1043:25, 1044:4, 1044:7, 1044:12, 1044:17, 1044:21, 1045:3, 1045:25, 1046:3, 1046:7, 1047:5, 1047:8, 1047:14, 1047:18, 1047:20, 1047:24, 1048:17, 1048:19, 1048:24, 1049:5, 1049:15, 1049:22, 1049:25, 1050:3, 1050:22, 1051:1, 1051:5, 1051:13, 1051:20, 1051:25, 1052:14, 1052:18, 1052:20, 1052:25, 1053:5, 1053:17, 1053:22, 1054:3, 1054:10, 1054:12, 1054:15, 1054:18, 1054:20, 1055:1, 1055:8, 1055:15, 1055:17, 1055:22, 1056:2, 1056:5, 1056:10, 1056:14, 1056:17, 1056:21, 1056:24, 1057:1, 1059:5, 1059:18, 1063:16, 1068:4, 1069:11, 1071:7, 1071:16, 1071:20, 1072:4, 1072:9, 1072:14, 1072:23, 1073:7, 1073:12, 1073:14, 1073:17, 1076:6, 1082:21, 1084:18, 1094:17, 1096:19, 1096:21, 1098:17, 1099:2, 1103:21, 1103:25, 1105:1, 1106:2, 1111:4, 1111:7, 1112:18, 1112:23, 1113:1, 1113:4, 1113:6, 1113:12, 1113:15, 1113:20, 1113:24, 1114:3, 1114:8, 1114:12, 1114:16, 1114:20, 1114:25, 1115:4, 1115:9, 1115:17, 1115:21, 1163:18, 1163:21, 1163:24, 1164:6, 1177:19, 1177:22, 1177:25, 1178:6, 1178:14, 1178:18, 1180:2, 1185:14, 1188:13, 1194:16, 1222:16, 1222:19, 1222:22, 1223:1, 1241:2, 1241:6, 1241:9, 1241:12, 1241:15, 1241:17, 1241:21, 1242:3, 1242:7, 1242:10, 1242:12, 1242:19, 1242:22, 1250:17, 1252:15, 1252:19, 1253:1, 1253:9,

1253:13, 1253:17, 1253:19, 1253:21, 1253:24, 1254:4, 1259:25, 1260:3, 1262:15, 1262:18, 1262:21, 1262:25, 1263:4, 1263:11, 1263:14, 1263:16, 1263:22, 1263:24, 1268:17, 1268:20, 1272:1, 1272:4, 1272:6, 1292:13, 1292:17, 1292:23, 1293:3, 1293:8, 1293:11, 1293:15, 1293:19, 1293:23, 1294:2, 1294:5, 1294:8, 1294:10, 1294:15, 1294:20, 1295:1
**court** [2] - 1147:20, 1257:15
**Court** [20] - 1031:15, 1033:25, 1035:19, 1038:23, 1040:1, 1043:10, 1046:11, 1048:11, 1050:15, 1050:25, 1052:8, 1053:14, 1054:24, 1241:20, 1242:5, 1252:25, 1258:3, 1259:23, 1260:17
**cover** [5] - 1039:16, 1048:7, 1071:21, 1218:11
**covered** [6] - 1048:19, 1071:16, 1071:20, 1072:2, 1264:12, 1264:14
**covers** [1] - 1175:4
**coversheet** [1] - 1196:24
**cramping** [1] - 1206:7
**craving** [3] - 1131:6, 1149:1, 1149:3
**cravings** [3] - 1121:25, 1130:17, 1149:15
**crazy** [3] - 1113:25, 1114:2, 1114:7
**creating** [1] - 1173:9
**credentials** [1] - 1242:15
**credibility** [6] - 1049:13, 1049:15, 1049:16, 1049:17, 1049:18
**credit** [4] - 1291:16, 1291:21, 1292:3, 1292:4
**crime** [1] - 1059:16
**criminal** [9] - 1043:3, 1048:15, 1048:17, 1049:4, 1057:9, 1109:21, 1193:23, 1258:1, 1258:15
**criteria** [2] - 1131:4, 1190:19
**critical** [1] - 1148:13
**Cross** [1] - 1219:7
**cross** [13] - 1034:7, 1034:14, 1038:5, 1042:15, 1042:24, 1043:2, 1047:3, 1048:13, 1050:20, 1072:10, 1072:24, 1125:11, 1185:16
**CROSS** [2] - 1057:6, 1185:18
**cross-examination** [7] - 1034:7, 1034:14, 1038:5, 1047:3, 1050:20, 1072:10, 1185:16
**CROSS-EXAMINATION** [2] - 1057:6, 1185:18
**cross-examinations** [1] - 1043:2
**cross-examine** [1] - 1042:24
**cross-examined** [1] - 1072:24
**crossing** [1] - 1055:4
**crossover** [1] - 1055:5
**CRR** [1] - 1295:7
**crushing** [1] - 1213:12
**cups** [2] - 1220:18, 1220:21
**curb** [2] - 1130:21, 1239:3
**current** [9] - 1064:4, 1068:22, 1078:7, 1101:17, 1161:24, 1179:23, 1208:12,

**curriculum** [2] - 1115:11, 1115:19
**curt** [1] - 1277:5
**curve** [1] - 1121:25
**cuss** [1] - 1072:15
**customers** [5] - 1182:25, 1183:1, 1183:5, 1261:17, 1267:23
**cut** [3] - 1042:21, 1055:11, 1077:11
**cutting** [1] - 1076:5

# D

**D-e-V-i-d-o** [1] - 1254:20
**daily** [6] - 1087:19, 1087:20, 1095:21, 1182:10, 1261:24, 1285:19
**Dallas** [3] - 1123:12, 1123:18, 1123:19
**dance** [1] - 1175:1
**danger** [1] - 1223:20
**dangerous** [3] - 1129:7, 1154:2, 1181:5
**database** [1] - 1237:3
**date** [10] - 1104:8, 1109:4, 1193:1, 1236:4, 1238:1, 1271:10, 1280:7, 1280:12, 1280:13
**dates** [3] - 1058:8, 1108:10, 1186:23
**David** [3] - 1253:16, 1254:20, 1264:16
**DAVID** [1] - 1254:7
**DAVIDSON** [60] - 1047:10, 1047:15, 1047:19, 1047:21, 1048:11, 1048:18, 1048:21, 1049:2, 1049:8, 1049:20, 1049:23, 1050:2, 1050:14, 1050:24, 1051:3, 1054:7, 1057:4, 1057:7, 1059:9, 1059:10, 1059:16, 1059:19, 1063:15, 1063:17, 1068:5, 1069:9, 1069:12, 1071:9, 1072:7, 1072:11, 1072:18, 1073:3, 1073:11, 1073:13, 1073:16, 1073:18, 1076:2, 1076:7, 1082:19, 1082:22, 1083:1, 1084:20, 1094:19, 1096:18, 1098:15, 1098:25, 1104:14, 1104:18, 1104:21, 1111:3, 1112:25, 1113:22, 1113:25, 1114:4, 1114:6, 1293:2, 1293:4, 1293:10, 1293:14, 1294:19
**Davidson** [9] - 1057:3, 1097:2, 1099:4, 1100:4, 1100:19, 1103:15, 1105:6, 1107:22, 1294:3
**Davis** [1] - 1047:8
**day's** [1] - 1119:17
**days** [5] - 1050:18, 1105:12, 1105:14, 1152:21, 1285:10
**DEA** [1] - 1189:23
**deal** [5] - 1075:24, 1104:25, 1178:10, 1241:17, 1263:6
**dealer** [2] - 1046:18, 1188:8
**dealing** [3] - 1133:5, 1240:24, 1241:22
**deals** [1] - 1070:3
**dealt** [3] - 1178:6, 1178:7, 1187:17
**deaths** [1] - 1177:12
**debate** [1] - 1225:23
**December** [19] - 1060:22, 1064:23, 1077:22, 1104:9, 1104:16, 1104:18, 1104:24, 1105:6, 1105:7, 1105:8, 1105:11, 1105:15, 1105:16, 1119:5,

1119:11, 1119:12, 1189:14, 1230:2, 1270:23
**decide** [1] - 1121:4
**decided** [2] - 1201:6, 1286:20
**decision** [1] - 1232:21
**declining** [1] - 1180:13
**Decoteau** [5] - 1215:8, 1239:19, 1239:21, 1246:25, 1247:5
**decrease** [3] - 1093:23, 1098:1, 1099:6
**deeper** [3] - 1144:7, 1144:9, 1176:7
**defendant** [1] - 1044:16
**Defense** [2] - 1082:22, 1222:24
**defense** [3] - 1042:14, 1048:1, 1050:17
**deficient** [1] - 1134:1
**define** [9] - 1117:17, 1124:15, 1126:9, 1127:5, 1128:13, 1130:13, 1134:5, 1137:22
**defined** [3] - 1124:17, 1130:17, 1144:20
**defines** [1] - 1240:14
**definitely** [1] - 1214:18
**definition** [11] - 1044:23, 1124:16, 1125:19, 1126:6, 1127:6, 1129:25, 1130:12, 1130:25, 1132:21, 1239:2, 1240:15
**definitions** [1] - 1263:6
**degeneration** [1] - 1174:24
**degenerative** [7] - 1167:10, 1167:16, 1167:20, 1167:25, 1168:10, 1168:23, 1168:25
**degrees** [2] - 1141:9
**deliberate** [3] - 1044:19, 1045:5, 1045:10
**deliberately** [1] - 1262:2
**deliver** [2] - 1218:14, 1285:17
**delivered** [1] - 1086:2
**delivery** [2] - 1268:14, 1284:7
**demonstrated** [1] - 1183:8
**Department** [3] - 1120:13, 1120:19, 1237:11
**departure** [1] - 1258:9
**depended** [1] - 1195:9
**dependency** [3] - 1118:21, 1121:16, 1149:1
**depositions** [2] - 1124:6, 1124:7
**depressed** [1] - 1069:19
**depression** [8] - 1069:20, 1070:3, 1094:9, 1133:24, 1162:11, 1171:5, 1175:25, 1223:12
**Derek** [3] - 1204:15, 1227:6, 1233:1
**describe** [3] - 1158:24, 1172:21, 1206:18
**described** [2] - 1058:19, 1165:21
**describing** [3] - 1057:21, 1100:13, 1170:21
**description** [2] - 1143:10, 1143:11
**designate** [1] - 1242:5
**designated** [2] - 1242:1, 1242:7
**designed** [3] - 1079:7, 1094:9, 1095:6
**despite** [2] - 1130:23, 1131:7
**detail** [3] - 1037:23, 1040:8, 1256:14

**details** [12] - 1038:6, 1040:23, 1041:22, 1041:23, 1042:18, 1042:20, 1043:21, 1148:23, 1205:3, 1230:6, 1259:15, 1269:16
**deteriorate** [1] - 1180:7
**determination** [1] - 1278:16
**determine** [3] - 1172:11, 1172:13, 1273:7
**determining** [1] - 1263:7
**detrimental** [1] - 1223:21
**develop** [7] - 1122:4, 1129:24, 1166:5, 1167:24, 1201:16, 1219:9, 1231:25
**developed** [2] - 1149:4, 1167:7
**developing** [3] - 1129:2, 1137:7, 1149:5
**development** [1] - 1052:12
**develops** [1] - 1129:23
**DEVIDO** [1] - 1254:7
**DeVido** [6] - 1254:20, 1260:8, 1264:2, 1264:16, 1264:17, 1293:25
**deVido** [2] - 1254:21, 1268:24
**diagnose** [1] - 1132:25
**diagnosed** [3] - 1077:16, 1077:19, 1078:9
**diagnosing** [1] - 1227:15
**diagnosis** [8] - 1140:14, 1140:16, 1144:14, 1150:14, 1150:16, 1150:17, 1161:6, 1162:3
**diagnostic** [3] - 1126:8, 1140:15, 1143:3, 1147:20, 1147:24, 1148:25, 1151:20, 1154:22, 1160:23, 1182:3, 1235:15, 1274:24, 1276:3
**diagnostics** [1] - 1140:5
**dial** [2] - 1237:14, 1238:7
**dictate** [1] - 1144:1, 1243:21
**dictates** [1] - 1243:22
**dictation** [1] - 1197:8
**died** [1] - 1178:3
**difference** [3] - 1128:5, 1128:7, 1193:24
**differences** [1] - 1128:8
**different** [38] - 1035:9, 1035:10, 1051:22, 1052:1, 1052:2, 1094:9, 1095:5, 1099:8, 1103:25, 1104:1, 1122:1, 1127:9, 1135:23, 1141:20, 1144:20, 1148:12, 1155:22, 1155:23, 1156:14, 1170:3, 1170:17, 1170:18, 1174:15, 1175:12, 1177:12, 1190:9, 1191:7, 1196:21, 1198:19, 1206:19, 1233:14, 1255:6, 1255:19, 1263:20, 1266:19, 1269:17, 1287:11
**differential** [2] - 1161:5, 1162:3
**differently** [4] - 1037:25, 1080:25, 1146:18, 1175:16
**diffused** [1] - 1161:8
**dig** [2] - 1144:6, 1144:9
**diligence** [1] - 1160:9
**dinner** [1] - 1292:25
**diplomat** [2] - 1118:10, 1118:12
**DIRECT** [2] - 1116:2, 1254:10
**direct** [10] - 1056:12, 1072:8, 1072:9, 1141:22, 1186:1, 1221:9, 1247:22,

1250:13, 1270:6, 1288:10
**direction** [3] - 1155:22, 1155:23, 1156:14
**directly** [3] - 1127:10, 1198:20, 1254:5
**director** [2] - 1119:15, 1220:6
**disability** [14] - 1122:7, 1122:8, 1122:10, 1134:11, 1171:7, 1171:21, 1172:14, 1172:16, 1175:6, 1175:20, 1175:24, 1176:10, 1176:16, 1188:3
**disabled** [3] - 1171:20, 1171:24, 1176:6
**disagree** [4] - 1035:2, 1192:10, 1192:13
**disc** [13] - 1167:9, 1167:10, 1167:12, 1167:16, 1167:20, 1167:25, 1168:10, 1168:11, 1168:23, 1168:25, 1169:17, 1169:20
**discharge** [2] - 1186:10, 1237:21
**discogenic** [1] - 1169:1
**disconnect** [2] - 1144:5, 1171:1
**discretion** [2] - 1233:12, 1259:8
**discs** [3] - 1167:19, 1169:1, 1227:13
**discuss** [15] - 1031:14, 1047:17, 1070:21, 1098:19, 1105:22, 1106:8, 1106:13, 1106:20, 1107:4, 1107:14, 1108:25, 1109:25, 1110:2, 1110:19, 1110:24
**discussed** [19] - 1047:21, 1050:15, 1061:9, 1061:19, 1070:15, 1071:1, 1071:5, 1071:12, 1086:6, 1086:18, 1090:23, 1106:15, 1106:22, 1110:25, 1138:2, 1148:13, 1184:5, 1252:22, 1256:18
**discussing** [6] - 1060:21, 1069:19, 1074:15, 1074:18, 1088:7, 1090:20
**discussion** [7] - 1061:23, 1086:25, 1088:5, 1089:12, 1235:23, 1239:8, 1289:17
**disease** [11] - 1074:22, 1130:15, 1130:16, 1138:19, 1167:16, 1167:20, 1167:25, 1168:11, 1168:23, 1168:25, 1210:6
**diseases** [1] - 1210:2
**disgusted** [1] - 1215:11
**dismiss** [1] - 1258:4
**dismissed** [2] - 1256:4, 1256:9
**disorder** [9] - 1134:1, 1134:3, 1148:15, 1148:18, 1166:6, 1210:11, 1219:23, 1220:8
**disorders** [8] - 1133:23, 1133:24, 1133:25, 1134:2, 1134:6, 1177:9, 1210:14, 1218:1
**disorientation** [1] - 1223:12
**dispense** [4] - 1260:23, 1261:1, 1261:7, 1282:10
**dispensing** [2] - 1282:13, 1283:23
**disprove** [1] - 1041:22
**dispute** [1] - 1240:2
**disputing** [1] - 1053:5
**disruption** [1] - 1114:8
**distances** [1] - 1182:20
**distinction** [3] - 1142:12, 1243:15, 1244:8

**distinguish** [3] - 1127:5, 1127:16, 1131:2
**distinguished** [1] - 1128:2
**distortion** [1] - 1175:14
**distribute** [1] - 1255:7
**distribution** [2] - 1083:24, 1167:6
**district** [1] - 1257:2
**District** [1] - 1257:3
**divert** [1] - 1120:6
**diverting** [1] - 1081:12
**divide** [1] - 1174:21
**DiVido** [1] - 1253:16
**division** [5] - 1119:25, 1120:2, 1120:14, 1120:20, 1121:2
**divisions** [1] - 1119:24
**divorce** [1] - 1134:7
**doctor** [130] - 1035:7, 1035:10, 1036:22, 1040:3, 1040:15, 1041:2, 1043:11, 1044:22, 1045:3, 1045:15, 1045:16, 1045:18, 1046:16, 1051:11, 1052:15, 1053:9, 1054:23, 1055:18, 1064:4, 1068:1, 1070:14, 1071:1, 1072:15, 1074:24, 1075:2, 1092:4, 1097:8, 1097:17, 1097:19, 1098:20, 1099:8, 1099:13, 1099:23, 1100:1, 1100:4, 1105:14, 1108:22, 1111:13, 1115:21, 1116:16, 1119:19, 1131:18, 1136:22, 1137:10, 1137:13, 1137:15, 1137:25, 1144:1, 1146:9, 1146:14, 1146:20, 1146:22, 1147:3, 1148:7, 1149:7, 1149:16, 1150:22, 1151:8, 1151:24, 1151:25, 1152:19, 1153:12, 1154:9, 1155:11, 1160:7, 1160:9, 1160:17, 1160:24, 1161:13, 1162:16, 1162:19, 1163:11, 1169:7, 1169:8, 1169:9, 1172:10, 1172:23, 1174:11, 1176:7, 1179:7, 1190:8, 1190:14, 1193:25, 1194:1, 1196:18, 1198:20, 1199:7, 1203:15, 1204:4, 1204:16, 1204:20, 1204:24, 1206:1, 1208:12, 1210:5, 1210:17, 1210:24, 1211:13, 1213:15, 1213:22, 1213:24, 1219:18, 1225:9, 1227:18, 1232:15, 1232:20, 1233:7, 1235:10, 1235:11, 1238:7, 1238:14, 1240:22, 1245:6, 1247:2, 1248:5, 1248:10, 1250:2, 1251:9, 1279:12, 1279:22, 1281:23, 1283:7, 1283:11, 1283:16, 1284:8, 1286:23
**doctor's** [11] - 1031:23, 1039:25, 1040:5, 1040:16, 1043:23, 1044:25, 1076:14, 1085:14, 1123:19, 1198:10, 1235:14
**doctors** [47] - 1033:11, 1064:1, 1075:7, 1079:15, 1097:20, 1100:16, 1101:9, 1101:20, 1101:22, 1137:15, 1137:17, 1137:24, 1137:25, 1192:13, 1192:16, 1195:13, 1202:12, 1204:11, 1204:13, 1205:5, 1205:20, 1208:6, 1208:17, 1209:24, 1210:4, 1212:22, 1217:7, 1227:4, 1227:23, 1232:23, 1237:4, 1237:9, 1238:10, 1238:24, 1245:14, 1248:3, 1274:24, 1275:1, 1275:5, 1275:11, 1275:13, 1275:19,

1281:1, 1281:4, 1281:5, 1282:4
**doctors'** [2] - 1198:25, 1199:12
**document** [10] - 1105:8, 1135:15, 1141:5, 1148:2, 1181:25, 1203:2, 1204:8, 1223:6, 1223:24, 1262:18
**documentation** [24] - 1141:8, 1141:11, 1141:17, 1141:19, 1145:22, 1168:7, 1181:12, 1181:14, 1181:17, 1181:18, 1193:12, 1203:3, 1203:6, 1207:16, 1208:9, 1211:24, 1214:1, 1236:14, 1243:17, 1243:22, 1244:12, 1244:13, 1249:9, 1249:13
**documented** [10] - 1139:4, 1139:6, 1143:12, 1153:5, 1224:9, 1225:15, 1225:17, 1230:11, 1235:10, 1246:22
**documenting** [2] - 1207:21, 1207:25
**documents** [7] - 1034:18, 1034:20, 1036:17, 1077:23, 1257:20
**dollar** [2] - 1125:1, 1125:4
**dollars** [1] - 1125:7
**donations** [1] - 1258:17
**done** [14] - 1039:7, 1039:8, 1041:3, 1043:15, 1066:21, 1089:20, 1122:11, 1124:2, 1127:1, 1201:12, 1221:25, 1236:2, 1249:11, 1257:11
**dope** [2] - 1071:23, 1072:25
**dosage** [17] - 1046:22, 1066:4, 1068:1, 1098:3, 1106:5, 1153:12, 1153:14, 1181:2, 1181:4, 1216:6, 1249:25, 1250:15, 1250:21, 1251:5, 1251:15, 1251:16, 1262:11
**dosages** [1] - 1181:4
**dose** [7] - 1181:8, 1181:10, 1191:1, 1225:11, 1225:12, 1231:15, 1236:7
**doses** [2] - 1180:25, 1225:3
**dot** [1] - 1125:11
**doubt** [1] - 1204:2
**doubts** [1] - 1063:10
**down** [42] - 1037:7, 1038:17, 1042:21, 1047:7, 1065:2, 1065:22, 1066:5, 1068:21, 1069:5, 1069:16, 1071:24, 1074:7, 1089:25, 1090:7, 1092:12, 1098:7, 1110:21, 1112:3, 1112:18, 1126:3, 1155:2, 1155:6, 1157:17, 1163:24, 1164:4, 1164:7, 1164:14, 1166:12, 1167:5, 1167:6, 1179:6, 1181:24, 1205:16, 1208:25, 1209:4, 1209:18, 1235:23, 1250:22, 1252:15, 1284:7, 1292:23
**download** [1] - 1237:15
**downloaded** [1] - 1237:19
**downstairs** [1] - 1061:6
**downtown** [1] - 1114:7
**downward** [7] - 1239:7, 1239:12, 1240:3, 1240:5, 1250:11, 1250:24, 1258:9
**DPS** [1] - 1237:19
**dr** [1] - 1164:22
**Dr** [284] - 1032:1, 1034:20, 1043:11, 1043:19, 1044:5, 1044:10, 1045:6, 1045:11, 1051:21, 1051:23, 1052:9, 1053:15, 1053:18, 1053:19, 1053:23, 1054:4, 1054:8, 1054:10, 1056:1,

1057:13, 1060:21, 1061:14, 1061:16, 1062:7, 1063:2, 1063:4, 1063:5, 1063:19, 1063:21, 1064:9, 1064:18, 1064:24, 1065:13, 1065:17, 1065:20, 1066:2, 1066:8, 1066:14, 1067:2, 1068:10, 1068:24, 1069:2, 1070:6, 1070:19, 1070:22, 1071:3, 1071:4, 1071:14, 1073:21, 1074:10, 1074:15, 1075:2, 1075:4, 1075:8, 1075:12, 1075:21, 1075:25, 1076:8, 1076:17, 1077:12, 1077:18, 1078:11, 1079:5, 1079:21, 1080:7, 1081:4, 1081:10, 1084:22, 1085:10, 1086:15, 1086:22, 1090:17, 1092:11, 1093:11, 1093:12, 1093:21, 1094:5, 1094:13, 1094:22, 1096:14, 1097:2, 1097:6, 1097:10, 1097:16, 1097:19, 1097:22, 1098:3, 1098:13, 1100:14, 1101:12, 1101:17, 1101:23, 1101:25, 1102:2, 1102:23, 1102:25, 1104:10, 1105:5, 1105:24, 1106:10, 1106:14, 1106:18, 1107:5, 1107:15, 1107:17, 1108:3, 1108:5, 1109:24, 1110:18, 1110:23, 1111:2, 1112:5, 1115:3, 1120:3, 1120:5, 1123:10, 1131:10, 1138:24, 1140:18, 1140:25, 1141:22, 1142:20, 1142:25, 1144:9, 1144:13, 1144:17, 1145:1, 1146:8, 1146:10, 1147:18, 1150:4, 1150:9, 1150:14, 1151:1, 1151:2, 1151:8, 1151:12, 1151:21, 1152:12, 1153:22, 1154:14, 1157:8, 1157:19, 1159:8, 1159:20, 1160:18, 1161:10, 1161:21, 1161:23, 1165:15, 1166:14, 1167:14, 1171:8, 1176:11, 1176:19, 1178:21, 1179:19, 1180:4, 1180:7, 1181:14, 1182:4, 1183:6, 1183:8, 1183:14, 1183:18, 1183:23, 1184:11, 1184:13, 1185:4, 1185:7, 1185:12, 1185:20, 1187:6, 1188:16, 1188:19, 1188:24, 1189:3, 1189:9, 1189:22, 1193:14, 1194:19, 1194:23, 1195:19, 1195:25, 1197:12, 1197:19, 1201:6, 1203:17, 1204:23, 1205:11, 1205:14, 1205:15, 1206:25, 1209:6, 1210:22, 1212:1, 1213:22, 1214:23, 1215:9, 1216:10, 1216:24, 1217:4, 1217:8, 1219:16, 1221:12, 1221:21, 1222:11, 1223:4, 1226:7, 1226:23, 1230:11, 1230:21, 1233:2, 1236:17, 1237:8, 1237:18, 1239:6, 1239:12, 1239:24, 1240:11, 1243:3, 1244:20, 1245:2, 1245:8, 1246:19, 1247:16, 1248:11, 1248:21, 1249:1, 1249:8, 1249:19, 1250:1, 1250:3, 1250:4, 1251:2, 1255:2, 1255:5, 1261:7, 1261:12, 1261:18, 1261:24, 1262:3, 1262:11, 1270:17, 1270:22, 1271:6, 1271:12, 1272:4, 1272:8, 1272:12, 1272:14, 1272:18, 1272:20, 1272:23, 1273:10, 1273:16, 1274:12, 1275:3, 1275:24, 1276:4, 1276:22, 1276:24, 1277:4, 1277:14, 1277:15, 1278:2, 1281:17, 1282:20, 1282:25, 1283:16, 1284:13,

1285:2, 1285:25, 1287:17, 1288:13, 1289:9, 1289:21, 1291:13, 1292:12, 1294:7
**dramatization** [1] - 1175:2
**driver** [1] - 1284:7
**driving** [5] - 1124:24, 1162:14, 1172:13, 1172:16, 1177:10
**dropkick** [1] - 1239:3
**dropped** [2] - 1164:9, 1267:24
**dropping** [1] - 1164:12
**drops** [1] - 1164:14
**drug** [93] - 1046:18, 1057:12, 1057:14, 1057:21, 1110:22, 1127:23, 1127:25, 1130:17, 1130:20, 1133:17, 1135:12, 1135:13, 1136:11, 1136:14, 1136:15, 1136:16, 1136:17, 1136:18, 1136:19, 1136:24, 1137:11, 1139:14, 1139:17, 1139:20, 1139:21, 1146:3, 1146:4, 1146:7, 1146:10, 1146:14, 1146:22, 1146:24, 1147:1, 1147:4, 1148:15, 1149:20, 1152:10, 1152:14, 1152:24, 1153:10, 1154:5, 1159:4, 1159:5, 1166:3, 1179:1, 1179:11, 1179:14, 1179:15, 1184:5, 1188:8, 1190:3, 1190:4, 1190:10, 1193:9, 1193:10, 1193:22, 1194:6, 1194:8, 1196:1, 1212:9, 1212:16, 1219:11, 1220:3, 1220:10, 1231:18, 1232:11, 1232:15, 1232:25, 1233:10, 1233:18, 1233:21, 1233:24, 1234:11, 1234:13, 1234:19, 1234:23, 1236:19, 1236:25, 1237:2, 1237:3, 1245:12, 1246:6, 1246:7, 1248:15, 1249:14, 1274:24, 1275:6, 1281:1
**Drug** [2] - 1212:18, 1260:21
**drugs** [53] - 1040:18, 1120:7, 1136:21, 1137:18, 1137:19, 1139:23, 1140:9, 1146:1, 1147:11, 1147:14, 1149:1, 1149:15, 1150:5, 1152:13, 1152:22, 1153:6, 1154:21, 1158:1, 1158:24, 1159:22, 1160:8, 1160:15, 1166:9, 1172:4, 1173:13, 1173:21, 1173:25, 1176:23, 1180:13, 1184:17, 1184:18, 1194:21, 1212:21, 1216:7, 1223:17, 1233:4, 1238:22, 1240:24, 1246:17, 1252:5, 1255:7, 1266:9, 1274:21, 1280:2, 1280:22, 1282:5, 1282:13, 1284:15, 1284:18, 1284:19, 1291:11, 1292:7
**due** [3] - 1067:8, 1115:21, 1144:17
**duly** [2] - 1115:25, 1254:8
**DuPage** [2] - 1058:15, 1058:16
**duration** [1] - 1225:5
**during** [31] - 1061:24, 1062:24, 1070:5, 1070:18, 1071:1, 1071:2, 1071:5, 1076:15, 1076:22, 1078:10, 1079:4, 1094:12, 1094:14, 1134:8, 1190:23, 1191:11, 1193:18, 1193:19, 1194:5, 1195:6, 1213:1, 1219:8, 1234:8, 1235:2, 1237:8, 1253:6, 1253:9, 1269:18, 1275:9, 1287:14
**duty** [1] - 1052:15
**dyes** [1] - 1227:12

**dysfunction** [1] - 1223:13

# E

**ear** [1] - 1244:5
**early** [12] - 1060:12, 1103:6, 1129:2, 1135:13, 1136:20, 1137:1, 1211:14, 1264:22, 1271:13, 1289:13, 1289:20, 1292:11
**Eddie** [4] - 1246:25, 1247:8, 1247:21, 1249:18
**editorial** [1] - 1122:9
**education** [7] - 1034:22, 1120:7, 1121:6, 1191:12, 1265:9, 1266:13, 1266:15
**educational** [3] - 1033:14, 1033:15, 1034:9
**effect** [4] - 1173:13, 1193:18, 1210:17, 1210:19
**effective** [1] - 1190:19
**effects** [2] - 1128:7, 1223:21
**effort** [2] - 1161:23, 1211:16
**eight** [5] - 1051:4, 1186:6, 1275:15, 1275:16, 1280:25
**either** [25] - 1093:23, 1102:17, 1123:24, 1130:8, 1134:13, 1138:4, 1142:3, 1144:10, 1147:10, 1149:4, 1151:22, 1152:6, 1152:20, 1165:25, 1171:12, 1181:5, 1183:9, 1220:19, 1248:17, 1249:10, 1265:21, 1271:13, 1277:4, 1277:14, 1290:1
**elaborate** [1] - 1282:4
**electronic** [4] - 1197:7, 1197:12, 1237:10, 1237:24
**electronically** [1] - 1237:15
**elements** [5] - 1125:24, 1127:23, 1130:16, 1131:2, 1223:8
**eligible** [1] - 1181:17
**eliminate** [2] - 1161:7, 1162:13
**ELMO** [3] - 1104:1, 1104:4, 1108:17
**elsewhere** [2] - 1099:15, 1251:14
**emotional** [8] - 1124:18, 1124:21, 1124:23, 1130:2, 1130:5, 1134:8, 1143:8
**emotions** [1] - 1175:10
**employee** [2] - 1285:2, 1294:6
**employees** [2] - 1272:5, 1290:7
**employment** [3] - 1119:12, 1171:18, 1172:7
**enable** [2] - 1248:16, 1250:6
**enabling** [1] - 1153:11
**encounter** [1] - 1233:7
**encountered** [1] - 1230:14
**encourage** [1] - 1191:8
**end** [7] - 1113:8, 1127:6, 1218:11, 1225:12, 1229:14, 1259:1, 1284:24
**endanger** [1] - 1248:15
**enforcement** [1] - 1237:4
**Enforcement** [1] - 1260:22
**engage** [1] - 1177:14
**engaged** [1] - 1085:22

1257:25
**entire** [2] - 1084:25, 1085:7
**entitled** [3] - 1175:8, 1259:8, 1295:5
**entitlement** [3] - 1175:4, 1175:5, 1175:7
**entity** [1] - 1219:20
**envelope** [1] - 1285:4
**environmental** [1] - 1130:15
**equated** [1] - 1134:9
**equipment** [1] - 1195:14
**eroding** [1] - 1169:17
**error** [1] - 1105:2
**escalate** [3] - 1130:20, 1133:14, 1137:5
**escalation** [1] - 1136:24
**especially** [2] - 1176:9, 1276:18
**essentially** [9] - 1031:25, 1128:5, 1140:2, 1169:4, 1184:13, 1223:23, 1240:12, 1242:15, 1291:1
**establish** [3] - 1038:25, 1184:22, 1196:9
**established** [1] - 1184:25
**et** [3] - 1038:13, 1107:11, 1184:5
**ethical** [5] - 1238:25, 1248:3, 1248:11, 1250:1, 1250:2
**euphoria** [1] - 1158:12
**evaluate** [1] - 1210:17
**evaluating** [1] - 1136:12
**evaluation** [10] - 1053:12, 1148:17, 1204:5, 1204:7, 1205:22, 1209:10, 1243:19, 1243:20, 1244:1, 1244:3
**Evans** [207] - 1032:1, 1043:11, 1045:6, 1045:11, 1051:23, 1053:18, 1053:19, 1054:4, 1054:8, 1057:13, 1061:14, 1061:16, 1062:7, 1063:2, 1064:18, 1064:24, 1065:13, 1065:17, 1065:20, 1066:2, 1066:8, 1066:14, 1067:2, 1068:10, 1068:24, 1069:2, 1070:6, 1070:19, 1070:22, 1071:3, 1071:4, 1071:14, 1073:21, 1074:10, 1074:15, 1075:4, 1075:8, 1075:12, 1075:21, 1076:8, 1076:17, 1078:11, 1079:5, 1079:21, 1081:4, 1081:10, 1086:15, 1086:22, 1090:17, 1092:11, 1093:12, 1093:21, 1094:5, 1094:22, 1096:14, 1097:6, 1097:10, 1097:16, 1097:19, 1097:22, 1098:3, 1098:13, 1100:14, 1101:12, 1101:17, 1101:25, 1102:2, 1102:23, 1102:25, 1104:10, 1105:5, 1105:24, 1106:10, 1106:14, 1106:18, 1107:5, 1107:15, 1107:17, 1108:3, 1108:5, 1110:18, 1111:2, 1131:10, 1138:24, 1140:25, 1141:22, 1142:20, 1142:25, 1144:9, 1144:13, 1144:17, 1145:1, 1147:18, 1150:4, 1150:9, 1150:14, 1151:2, 1151:8, 1151:12, 1151:21, 1153:22, 1154:14, 1157:8, 1157:19, 1159:8, 1159:20, 1160:18, 1161:10, 1161:21, 1161:23, 1165:15, 1166:14, 1167:14, 1171:8, 1176:11, 1176:19, 1178:21, 1180:4, 1180:7, 1181:14, 1182:4, 1183:8, 1183:14, 1183:18, 1183:23, 1184:11, 1184:13,

1185:4, 1185:7, 1185:12, 1188:16, 1188:19, 1188:24, 1189:22, 1194:19, 1194:23, 1195:19, 1195:25, 1197:12, 1197:19, 1201:6, 1203:17, 1204:23, 1205:15, 1206:25, 1215:9, 1217:4, 1221:21, 1229:20, 1230:3, 1230:21, 1233:2, 1239:6, 1239:12, 1239:24, 1244:20, 1245:2, 1245:8, 1246:19, 1247:16, 1248:11, 1248:21, 1249:1, 1249:8, 1249:19, 1250:4, 1251:2, 1255:3, 1255:5, 1261:8, 1261:12, 1261:24, 1262:3, 1262:11, 1270:17, 1270:22, 1271:6, 1271:12, 1272:12, 1272:14, 1272:18, 1272:20, 1272:23, 1273:10, 1273:16, 1274:12, 1275:3, 1275:24, 1276:4, 1276:22, 1276:24, 1277:4, 1278:2, 1281:17, 1282:20, 1282:25, 1284:13, 1285:2, 1285:25, 1287:17, 1288:13, 1289:9, 1289:21, 1292:12, 1294:7

**Evans'** [36] - 1034:20, 1053:15, 1053:23, 1060:21, 1063:19, 1063:21, 1064:9, 1075:2, 1077:18, 1080:7, 1084:22, 1085:10, 1093:11, 1093:12, 1094:13, 1109:24, 1110:23, 1112:5, 1140:18, 1146:10, 1152:12, 1179:19, 1189:3, 1209:6, 1216:10, 1216:24, 1221:12, 1222:11, 1226:7, 1230:11, 1237:18, 1261:18, 1272:8, 1277:14, 1283:16, 1291:13

**Evans's** [1] - 1277:15

**evening** [2] - 1031:18, 1294:20

**event** [2] - 1134:4, 1263:17

**eventually** [2] - 1218:9, 1290:24

**evidence** [62] - 1033:22, 1035:24, 1038:7, 1038:9, 1039:7, 1039:8, 1040:20, 1041:9, 1041:11, 1041:21, 1044:1, 1046:14, 1053:7, 1053:13, 1055:10, 1128:17, 1128:24, 1129:6, 1129:10, 1129:15, 1129:16, 1130:10, 1131:17, 1135:11, 1141:4, 1143:7, 1143:13, 1144:8, 1144:13, 1145:1, 1145:3, 1147:17, 1148:10, 1150:12, 1150:25, 1151:12, 1169:18, 1171:14, 1176:12, 1176:14, 1183:3, 1183:14, 1183:16, 1183:18, 1184:21, 1188:24, 1190:12, 1190:17, 1190:18, 1190:20, 1190:25, 1191:3, 1191:4, 1194:18, 1226:8, 1240:11, 1245:20, 1249:12, 1262:19

**evidentiary** [2] - 1039:3, 1039:5

**evolution** [2] - 1191:12, 1191:16

**evolved** [2] - 1128:22, 1218:7

**evolves** [1] - 1128:20

**Ex** [2] - 1086:1, 1290:18

**exact** [2] - 1124:4, 1234:2

**exactly** [13] - 1055:24, 1055:25, 1075:6, 1076:16, 1077:3, 1085:13, 1098:12, 1105:18, 1233:7, 1238:3, 1260:9, 1269:11, 1285:12

**exam** [19] - 1127:2, 1132:13, 1134:20, 1138:16, 1138:17, 1138:22, 1140:14, 1141:2, 1144:2, 1145:14, 1145:15,

1148:8, 1149:19, 1151:9, 1151:13, 1184:3, 1202:18, 1204:9, 1235:7

**EXAMINATION** [6] - 1057:6, 1096:22, 1116:2, 1185:18, 1243:1, 1254:10

**examination** [25] - 1034:3, 1034:7, 1034:14, 1038:2, 1038:5, 1047:3, 1050:20, 1056:12, 1061:18, 1072:10, 1101:16, 1126:21, 1138:15, 1140:7, 1140:8, 1141:4, 1146:24, 1185:16, 1202:13, 1202:22, 1203:18, 1204:1, 1247:22

**examinations** [3] - 1043:2, 1140:24, 1144:10

**examine** [3] - 1042:24, 1140:19, 1149:16

**examined** [1] - 1072:24

**examiner** [1] - 1122:12

**examining** [2] - 1122:12, 1149:7

**example** [15] - 1044:11, 1045:12, 1128:21, 1129:12, 1134:5, 1140:4, 1143:16, 1148:9, 1153:21, 1154:21, 1175:24, 1232:10, 1233:1, 1239:16

**examples** [4] - 1145:5, 1207:11, 1237:19, 1288:3

**exams** [5] - 1122:13, 1145:16, 1145:17, 1150:7, 1204:13

**except** [1] - 1253:5

**exception** [4] - 1146:3, 1169:20, 1228:24, 1276:16

**exceptions** [1] - 1228:25

**exchange** [1] - 1255:25

**exchanged** [1] - 1099:11

**excited** [1] - 1125:4

**excluding** [1] - 1159:2

**excruciating** [1] - 1087:17

**excuse** [6] - 1104:14, 1111:7, 1186:15, 1211:15, 1227:25, 1252:16

**excused** [1] - 1163:25

**execration** [2] - 1143:13, 1155:19

**executed** [1] - 1264:5

**executive** [1] - 1220:6

**exercise** [10] - 1129:16, 1156:1, 1170:9, 1170:15, 1175:25, 1182:7, 1182:8, 1182:14, 1201:13, 1201:14

**exercises** [3] - 1142:18, 1170:17, 1202:4

**exertion** [1] - 1067:24

**exhaust** [4] - 1129:9, 1129:13, 1131:18, 1226:8

**exhausted** [5] - 1131:17, 1132:6, 1132:9, 1213:17, 1213:18

**exhausting** [1] - 1190:13

**exhaustive** [1] - 1184:21

**Exhibit** [1] - 1030:1, 1077:21, 1082:23, 1103:19, 1104:7, 1108:18, 1109:7, 1222:24, 1268:9, 1268:16, 1268:21

**exhibit** [1] - 1222:23

**exists** [1] - 1259:21

**expand** [1] - 1267:21

**expect** [6] - 1037:19, 1056:4, 1136:13, 1168:11, 1182:24, 1199:7

**expected** [1] - 1222:8

**expensive** [5] - 1195:4, 1195:14, 1216:22, 1218:15, 1218:19

**experience** [13] - 1033:14, 1033:16, 1034:9, 1100:12, 1118:3, 1119:1, 1119:2, 1158:23, 1174:7, 1219:25, 1280:24, 1281:4, 1281:7

**experienced** [1] - 1047:25

**expert** [20] - 1031:15, 1032:16, 1036:15, 1039:16, 1041:21, 1042:17, 1043:23, 1044:14, 1046:13, 1113:11, 1113:18, 1114:10, 1123:6, 1123:9, 1123:16, 1123:24, 1124:6, 1242:1, 1242:6, 1242:7

**expertise** [1] - 1052:11

**experts** [3] - 1043:15, 1051:7, 1115:12

**explain** [24] - 1121:18, 1126:10, 1126:23, 1127:4, 1127:15, 1128:3, 1129:19, 1136:10, 1136:11, 1139:19, 1144:10, 1169:3, 1171:21, 1171:24, 1173:10, 1207:16, 1225:1, 1243:14, 1260:11, 1264:25, 1283:8, 1284:22, 1290:4

**explained** [2] - 1178:1, 1227:6

**explanation** [3] - 1035:13, 1072:16, 1121:3

**explanations** [1] - 1137:21

**expressed** [2] - 1171:10, 1205:25

**extended** [2] - 1075:22, 1225:5

**extent** [8] - 1034:24, 1041:20, 1046:19, 1064:15, 1105:1, 1143:24, 1157:19, 1169:6

**external** [1] - 1125:18

**extra** [2] - 1158:11, 1218:2

## F

**face** [4] - 1196:24, 1216:10, 1231:5, 1231:7

**faces** [1] - 1206:18

**facets** [2] - 1200:7, 1200:10

**facility** [4] - 1117:13, 1153:1, 1248:19, 1249:15

**fact** [80] - 1034:21, 1039:22, 1041:23, 1042:16, 1070:9, 1074:4, 1074:11, 1075:4, 1075:7, 1076:13, 1076:16, 1076:25, 1077:3, 1079:1, 1086:1, 1090:23, 1097:13, 1099:22, 1101:6, 1102:17, 1107:21, 1109:11, 1110:2, 1110:3, 1110:15, 1114:13, 1141:22, 1146:10, 1159:6, 1160:14, 1161:15, 1163:1, 1168:23, 1183:14, 1189:3, 1189:8, 1194:23, 1195:6, 1198:13, 1204:19, 1204:22, 1205:14, 1206:24, 1207:11, 1208:15, 1212:25, 1214:25, 1215:19, 1218:14, 1230:14, 1230:16, 1233:22, 1234:10, 1239:21, 1240:2, 1245:8, 1246:13, 1248:4, 1248:5, 1248:24, 1248:25, 1249:11, 1251:11, 1255:11, 1256:6, 1256:18, 1259:21, 1261:11, 1262:3, 1262:8, 1263:7, 1266:6, 1266:20, 1270:10, 1275:10,

1278:9, 1280:24, 1284:13, 1286:2, 1291:25

**factor** [6] - 1133:22, 1148:15, 1166:3, 1176:20, 1177:8, 1184:14

**factors** [6] - 1126:12, 1133:16, 1133:18, 1133:20, 1178:25

**facts** [2] - 1132:12, 1239:4

**factual** [2] - 1260:12, 1263:12

**failed** [4] - 1115:9, 1165:3, 1183:18, 1243:24

**failing** [1] - 1245:19

**fails** [1] - 1045:19

**fair** [21] - 1064:21, 1066:9, 1078:10, 1084:16, 1085:6, 1093:10, 1093:21, 1094:4, 1094:12, 1096:14, 1134:12, 1167:14, 1176:17, 1186:25, 1187:11, 1215:12, 1219:4, 1219:16, 1240:11, 1275:22, 1289:25

**fairly** [1] - 1167:9

**fairness** [1] - 1144:17

**faith** [3] - 1183:15, 1183:16, 1211:16

**fall** [3] - 1083:9, 1200:7, 1245:18

**falling** [3] - 1130:23, 1175:1

**false** [5] - 1071:25, 1139:25, 1257:14, 1257:16

**familiar** [2] - 1044:6, 1271:15

**family** [8] - 1133:22, 1134:6, 1152:12, 1152:13, 1152:21, 1153:4, 1173:2, 1211:1

**far** [5] - 1132:17, 1133:8, 1231:9, 1252:3, 1284:23

**fashion** [1] - 1231:10

**fast** [1] - 1277:11

**FDA** [4] - 1212:8, 1212:15, 1212:18, 1212:25

**fear** [3] - 1083:23, 1166:9, 1174:22

**fearful** [1] - 1166:8

**features** [1] - 1063:21

**February** [3] - 1063:13, 1063:20, 1065:22

**Fed** [2] - 1086:1, 1290:18

**federal** [4] - 1123:9, 1191:19, 1212:21, 1251:22

**fee** [1] - 1121:7

**feet** [2] - 1090:21, 1214:9

**Felipe** [1] - 1269:2

**fellowship** [1] - 1117:22

**felon** [1] - 1060:3

**felony** [6] - 1057:10, 1057:11, 1057:24, 1058:1, 1058:18, 1058:20

**felt** [4] - 1066:9, 1096:4, 1106:5, 1250:23

**Fentanyl** [1] - 1239:22

**few** [23] - 1058:3, 1074:17, 1088:14, 1097:1, 1104:9, 1118:22, 1124:4, 1131:12, 1137:2, 1141:1, 1141:3, 1144:22, 1186:3, 1235:1, 1243:7, 1254:24, 1254:25, 1257:11, 1270:25, 1285:9, 1288:10, 1291:16

**fibromyalgia** [5] - 1162:8, 1163:10, 1163:14, 1163:15, 1163:16

**fide** [1] - 1196:6

**field** [2] - 1100:10, 1137:14

**fight** [1] - 1188:7

**figure** [7] - 1031:20, 1129:3, 1162:12, 1171:3, 1214:25, 1232:4, 1293:6

**file** [36] - 1037:3, 1038:14, 1039:1, 1039:3, 1039:6, 1039:13, 1039:21, 1040:2, 1040:20, 1041:2, 1042:2, 1061:23, 1087:15, 1109:5, 1143:12, 1146:15, 1148:20, 1148:23, 1149:10, 1154:8, 1157:13, 1167:14, 1179:14, 1184:12, 1198:3, 1204:16, 1246:2, 1247:6, 1247:8, 1248:20, 1249:14, 1279:11, 1281:23, 1283:3

**files** [50] - 1036:2, 1036:4, 1036:5, 1036:10, 1036:15, 1037:8, 1037:12, 1037:18, 1038:6, 1038:7, 1038:25, 1040:23, 1041:3, 1041:4, 1041:13, 1131:9, 1139:14, 1140:17, 1142:24, 1143:9, 1150:13, 1151:1, 1157:7, 1159:20, 1161:9, 1161:20, 1165:14, 1168:6, 1176:11, 1179:18, 1180:4, 1180:5, 1180:23, 1181:12, 1182:19, 1184:10, 1184:14, 1186:11, 1192:17, 1216:3, 1244:16, 1246:1, 1246:15, 1246:25, 1247:15, 1247:22, 1249:4, 1249:10

**fill** [20] - 1077:23, 1079:16, 1104:13, 1107:11, 1108:25, 1111:13, 1209:14, 1261:6, 1261:23, 1270:17, 1275:19, 1275:21, 1279:19, 1280:6, 1280:15, 1281:1, 1282:11, 1286:18, 1290:16, 1290:18

**filled** [21] - 1062:18, 1062:21, 1062:24, 1100:16, 1105:8, 1108:21, 1108:23, 1112:4, 1261:11, 1270:19, 1275:1, 1275:6, 1280:11, 1281:20, 1282:15, 1285:24, 1286:2, 1286:9, 1286:10, 1288:8, 1290:17

**filling** [6] - 1108:21, 1111:2, 1111:14, 1241:18, 1275:10, 1275:14

**finally** [1] - 1185:7

**findings** [6] - 1127:3, 1167:21, 1168:2, 1168:19, 1168:22, 1171:2

**fine** [5] - 1058:9, 1116:7, 1212:12, 1242:12, 1277:20

**finish** [3] - 1116:24, 1117:5, 1265:14

**finished** [6] - 1061:4, 1091:14, 1116:25, 1117:9, 1119:2, 1266:20

**finishing** [1] - 1178:14

**fire** [1] - 1153:8

**first** [63] - 1031:17, 1032:4, 1052:9, 1053:8, 1055:13, 1055:15, 1060:21, 1063:4, 1064:5, 1074:4, 1077:22, 1080:22, 1082:4, 1085:16, 1090:16, 1104:10, 1104:15, 1104:18, 1104:23, 1105:18, 1115:25, 1116:19, 1122:17, 1123:8, 1124:14, 1131:21, 1142:2, 1158:6, 1159:15, 1169:25, 1173:23, 1174:6, 1174:7, 1182:8, 1201:7, 1214:22, 1215:9, 1215:25, 1217:18, 1222:20, 1243:9, 1250:14, 1254:8, 1255:17, 1256:14, 1256:25, 1257:1, 1267:4, 1267:9, 1268:10, 1268:11,

**fit** [3] - 1229:17, 1246:14, 1246:15

**five** [12] - 1037:14, 1037:22, 1052:2, 1052:3, 1056:17, 1105:11, 1105:14, 1108:12, 1161:12, 1168:8, 1276:7, 1276:12

**fixed** [1] - 1096:1

**flag** [2] - 1040:18, 1040:19

**flight** [1] - 1090:5

**flip** [1] - 1125:9

**fluctuates** [1] - 1165:12

**fluctuation** [1] - 1136:1

**fluid** [1] - 1090:14

**focus** [2] - 1244:3, 1244:5

**focused** [4] - 1204:8, 1243:18, 1243:20, 1244:1

**focuses** [1] - 1133:2

**follow** [4] - 1145:2, 1145:3, 1151:7, 1167:23

**follow-up** [1] - 1151:7

**following** [15] - 1031:1, 1056:20, 1071:19, 1073:15, 1113:3, 1114:19, 1114:24, 1163:23, 1177:21, 1178:17, 1241:5, 1242:21, 1262:17, 1263:23, 1292:22

**follows** [4] - 1116:1, 1167:7, 1234:1, 1254:9

**followup** [4] - 1152:19, 1171:11, 1230:17, 1274:11

**Food** [1] - 1212:18

**fooled** [1] - 1189:9

**foot** [1] - 1206:5

**foregoing** [1] - 1295:3

**forfeited** [1] - 1264:4

**forgery** [2] - 1058:15, 1058:20

**forgot** [2] - 1049:11, 1049:19

**forgotten** [1] - 1055:16

**form** [19] - 1111:5, 1111:24, 1128:1, 1129:15, 1129:17, 1155:11, 1157:25, 1159:3, 1159:25, 1160:1, 1163:11, 1170:9, 1201:13, 1209:10, 1230:18, 1262:22, 1263:17, 1273:5

**former** [1] - 1294:6

**forms** [5] - 1111:1, 1111:13, 1112:4, 1152:6, 1290:18

**formula** [1] - 1233:25

**formulating** [1] - 1033:15

**formulations** [1] - 1190:9

**Fort** [4] - 1123:17, 1265:2, 1265:7, 1265:8

**forth** [3] - 1274:10, 1274:16, 1274:21

**forthcoming** [1] - 1082:7

**forum** [1] - 1123:5

**forward** [3] - 1115:1, 1191:8, 1277:11

**foundation** [3] - 1122:3, 1128:17, 1175:13

**four** [4] - 1048:3, 1117:24, 1174:22, 1263:13

**four-year** [1] - 1117:24

**fourth** [1] - 1289:20

**framework** [1] - 1186:18
**frankly** [1] - 1047:23
**fraud** [2] - 1255:7, 1255:8
**free** [2] - 1175:8, 1175:9
**freeway** [2] - 1113:21, 1292:20
**freeze** [1] - 1164:13
**frequency** [1] - 1216:7
**frequent** [1] - 1219:2
**frequently** [3] - 1068:1, 1079:17, 1218:24
**Friday** [17] - 1039:17, 1048:4, 1048:8, 1048:13, 1048:15, 1050:2, 1057:2, 1057:8, 1058:19, 1060:8, 1060:20, 1084:21, 1092:10, 1098:2, 1098:19, 1186:4, 1285:20
**front** [2] - 1208:4, 1268:13
**fulfill** [1] - 1258:24
**full** [3] - 1173:17, 1256:15, 1273:8
**full-time** [1] - 1273:8
**fully** [1] - 1256:24
**function** [23] - 1064:13, 1065:5, 1065:6, 1087:20, 1089:12, 1095:15, 1134:19, 1154:24, 1155:1, 1155:2, 1155:6, 1172:1, 1172:2, 1172:15, 1173:4, 1173:12, 1173:17, 1179:6, 1210:18, 1210:20, 1211:11, 1214:6, 1214:19
**functional** [3] - 1126:4, 1136:8, 1155:4
**functionality** [1] - 1154:22
**functioning** [5] - 1088:1, 1093:18, 1172:25, 1173:5, 1175:19
**fundamental** [1] - 1133:4
**fundamentals** [2] - 1132:7, 1156:1
**furthermore** [1] - 1276:2
**future** [2] - 1126:13, 1181:23

## G

**gained** [2] - 1130:11, 1258:15
**gains** [1] - 1258:16
**Gardner** [11] - 1039:18, 1238:18, 1238:19, 1239:6, 1247:13, 1248:4, 1248:12, 1248:21, 1249:7, 1249:18, 1249:23
**gas** [2] - 1124:25
**gather** [3] - 1033:18, 1034:20, 1185:15
**gathered** [1] - 1051:24
**gathering** [1] - 1209:21
**gears** [1] - 1156:14
**general** [6] - 1059:8, 1070:15, 1070:16, 1121:11, 1122:15, 1224:22
**generally** [4] - 1116:14, 1173:8, 1212:5, 1212:13
**generate** [1] - 1290:9
**generator** [1] - 1227:16
**generic** [1] - 1127:17
**genetic** [1] - 1130:16
**gentlemen** [7] - 1056:22, 1114:20, 1116:9, 1190:16, 1194:6, 1254:19, 1292:24
**Gessner** [1] - 1270:4
**given** [12] - 1071:24, 1081:13, 1095:3,

1095:17, 1123:25, 1124:6, 1165:20, 1165:22, 1169:7, 1216:14, 1223:5, 1233:9
**glad** [2] - 1035:25, 1243:24
**global** [1] - 1036:7
**globally** [1] - 1038:4
**goal** [2] - 1136:5, 1214:6
**goals** [2] - 1214:18, 1215:5
**God** [2] - 1115:7, 1254:2
**good-faith** [1] - 1211:16
**Government** [2] - 1030:1, 1268:21
**government** [6] - 1048:1, 1185:24, 1191:19, 1238:19, 1240:6, 1293:5
**government's** [2] - 1103:21, 1198:7
**Government's** [3] - 1104:7, 1108:18, 1109:7
**grades** [1] - 1080:10
**graduated** [1] - 1117:1
**Graves** [2] - 1115:3, 1116:10
**GRAVES** [1] - 1115:24
**grew** [2] - 1119:16
**Grocery** [1] - 1269:8
**ground** [2] - 1072:2, 1073:10
**group** [4] - 1119:14, 1160:7, 1176:21, 1267:19
**groups** [1] - 1158:25
**Grove** [1] - 1086:3
**guess** [5] - 1054:11, 1172:19, 1246:14, 1263:8, 1293:5
**guesstimating** [1] - 1186:6
**guide** [1] - 1032:9
**guideline** [6] - 1163:13, 1193:12, 1203:3, 1211:24, 1233:6, 1259:2
**guidelines** [4] - 1245:7, 1245:9, 1251:22, 1258:9
**guides** [1] - 1122:10
**guilty** [6] - 1255:24, 1256:10, 1256:18, 1260:9, 1260:13, 1261:10
**Guitreau** [4] - 1205:15, 1227:6, 1227:7, 1233:1
**Guitreau's** [1] - 1204:15

## H

**half** [6] - 1045:22, 1047:7, 1048:3, 1101:15, 1243:4
**hallway** [1] - 1114:11
**hammer** [4] - 1124:19, 1124:22, 1125:5, 1125:16
**hand** [6] - 1039:22, 1137:19, 1152:14, 1152:23, 1154:15, 1230:17, 1253:24, 1280:13
**handed** [1] - 1285:4
**handle** [3] - 1040:19, 1133:4, 1282:5
**handled** [4] - 1040:6, 1041:1, 1153:22, 1196:15
**handling** [2] - 1080:25, 1293:12
**hands** [7] - 1061:17, 1090:21, 1091:6, 1152:11, 1202:9, 1203:9, 1248:7
**hands-on** [1] - 1061:17
**handwrite** [1] - 1082:17
**handwriting** [1] - 1079:1, 1082:5

1197:6
**happy** [2] - 1043:9, 1071:18
**hard** [5] - 1080:21, 1143:21, 1200:14, 1200:16, 1293:16
**hardware** [1] - 1213:13
**harm** [5] - 1130:23, 1131:7, 1249:20, 1250:5, 1250:8
**hat** [2] - 1129:1, 1157:9
**hate** [1] - 1048:4
**head** [4] - 1052:21, 1123:23, 1202:5, 1270:10
**head-on** [1] - 1052:21
**healed** [2] - 1173:8, 1173:11
**health** [8] - 1133:1, 1177:9, 1180:6, 1180:13, 1183:12, 1218:1, 1218:11, 1219:4
**Health** [1] - 1117:10
**healthcare** [1] - 1255:8
**healthy** [1] - 1199:4
**hear** [3] - 1054:3, 1121:2, 1272:6
**heard** [9] - 1040:4, 1109:21, 1111:24, 1113:24, 1126:8, 1128:11, 1195:23, 1248:24, 1283:25
**hearing** [1] - 1038:5
**hearings** [1] - 1124:10
**hearsay** [1] - 1036:13
**heated** [2] - 1099:10, 1099:11
**heavy** [3] - 1133:23, 1171:19, 1172:4
**held** [17] - 1031:1, 1056:20, 1071:19, 1073:15, 1113:3, 1114:19, 1114:24, 1122:22, 1163:23, 1177:21, 1178:17, 1241:5, 1242:21, 1262:17, 1263:23, 1279:8, 1292:22
**help** [23] - 1075:2, 1091:8, 1095:6, 1115:7, 1125:25, 1129:16, 1137:3, 1138:10, 1162:21, 1166:11, 1171:3, 1174:13, 1200:3, 1201:16, 1201:18, 1202:4, 1205:1, 1218:18, 1219:24, 1254:2, 1290:23
**helped** [1] - 1101:3
**helpful** [2] - 1175:16, 1175:17
**helping** [1] - 1130:4
**helps** [3] - 1122:3, 1129:23, 1225:3
**herniations** [1] - 1168:1
**herself** [2] - 1271:19, 1272:9
**high** [16] - 1070:8, 1070:10, 1070:25, 1106:5, 1129:10, 1135:18, 1158:12, 1158:13, 1173:23, 1180:25, 1199:7, 1217:25, 1218:10, 1262:10, 1288:10
**higher** [7] - 1065:4, 1129:3, 1176:21, 1181:8, 1181:9, 1251:10, 1251:11
**highlighting** [1] - 1083:3
**highly** [1] - 1160:19
**hint** [1] - 1178:2
**Hippocratic** [3] - 1248:13, 1249:17, 1249:19
**hired** [1] - 1192:16
**historical** [5] - 1161:11, 1161:22, 1161:24, 1168:7, 1168:13
**history** [31] - 1038:13, 1049:4, 1057:10, 1070:8, 1077:24, 1109:21, 1126:24, 1132:12, 1133:22, 1137:23,

1138:2, 1138:13, 1139:5, 1139:6, 1139:9, 1139:10, 1140:13, 1140:14, 1145:14, 1148:3, 1149:19, 1150:7, 1163:9, 1168:7, 1184:2, 1204:5, 1209:7, 1209:13, 1209:17, 1235:6, 1276:3

**hit** [1] - 1039:15
**hobbies** [1] - 1173:3
**hold** [1] - 1178:18
**holding** [1] - 1031:4
**home** [12] - 1055:21, 1066:17, 1066:20, 1067:8, 1067:10, 1067:11, 1067:22, 1089:10, 1106:13, 1124:24, 1125:10, 1139:22
**honest** [3] - 1081:3, 1081:8, 1082:6
**honesty** [1] - 1080:10
**Honor** [79] - 1031:10, 1031:18, 1032:8, 1032:15, 1033:1, 1033:8, 1033:24, 1034:4, 1035:17, 1035:25, 1036:9, 1037:4, 1038:8, 1038:21, 1039:12, 1042:12, 1042:19, 1044:14, 1044:20, 1046:2, 1047:6, 1051:9, 1053:2, 1054:19, 1054:22, 1055:14, 1055:19, 1055:24, 1056:13, 1056:16, 1059:3, 1059:14, 1076:4, 1096:20, 1103:22, 1104:3, 1108:14, 1112:15, 1112:17, 1112:21, 1113:9, 1114:15, 1115:3, 1115:13, 1115:14, 1115:23, 1163:20, 1164:1, 1164:3, 1164:20, 1177:17, 1177:24, 1178:16, 1180:1, 1185:13, 1185:17, 1188:10, 1222:14, 1222:18, 1222:25, 1240:9, 1241:1, 1242:25, 1250:18, 1252:14, 1252:18, 1253:2, 1253:8, 1253:15, 1253:18, 1260:4, 1262:13, 1263:21, 1268:18, 1268:22, 1271:21, 1292:16, 1293:1, 1294:21
**hoped** [1] - 1036:1
**hoping** [2] - 1173:15, 1293:17
**Horizon** [1] - 1267:18
**horse** [1] - 1200:7
**hospital** [1] - 1087:11
**hour** [13] - 1035:23, 1042:10, 1042:24, 1045:22, 1046:2, 1046:3, 1047:7, 1047:13, 1085:8, 1115:18
**hours** [5] - 1042:21, 1048:3, 1067:23, 1266:15, 1266:17
**house** [1] - 1189:1
**Houston** [15] - 1114:5, 1116:23, 1117:10, 1117:12, 1123:12, 1159:6, 1159:9, 1159:10, 1159:15, 1258:17, 1260:18, 1265:9, 1265:10, 1265:13, 1269:17
**human** [2] - 1128:8, 1175:10
**hundred** [8] - 1034:11, 1038:15, 1125:1, 1125:3, 1125:7, 1140:2, 1288:22
**hundreds** [1] - 1036:16, 1182:25, 1288:8
**hurricane** [1] - 1085:25
**hurt** [5] - 1090:2, 1138:5, 1138:6, 1143:21
**hurting** [2] - 1064:10, 1174:23
**hurts** [3] - 1090:3, 1090:4, 1093:18

**hydro** [1] - 1134:2
**hydrocodone** [18] - 1127:17, 1127:19, 1127:22, 1128:1, 1128:6, 1150:6, 1158:1, 1158:10, 1158:17, 1159:11, 1159:12, 1159:16, 1160:2, 1162:25, 1261:3, 1261:12, 1271:2, 1271:4, 1274:20
**hyperalgesia** [1] - 1163:6
**hyperalgia** [1] - 1162:9
**hypervigilant** [1] - 1166:5

# I

**I's** [1] - 1125:11
**I-10** [1] - 1114:4
**idea** [5] - 1100:9, 1156:4, 1198:6, 1234:20, 1275:13
**identification** [1] - 1082:23
**identified** [3] - 1143:1, 1271:19, 1272:9
**identify** [3] - 1125:24, 1137:3, 1283:16
**ignorance** [2] - 1044:19, 1045:10
**ignored** [2] - 1045:8, 1231:5
**ignores** [1] - 1045:16
**II** [4] - 1150:5, 1150:18, 1157:4, 1261:2
**III** [1] - 1261:1
**ill** [1] - 1258:16
**ill-gotten** [1] - 1258:16
**illegal** [5] - 1039:11, 1136:16, 1147:8, 1147:14, 1223:17
**Illinois** [2] - 1058:16, 1059:23
**illness** [1] - 1138:13
**imbalance** [1] - 1133:6
**immediate** [2] - 1122:24, 1274:19
**imminent** [1] - 1183:11
**impeach** [2] - 1034:25, 1053:23
**impeached** [2] - 1034:24, 1049:1
**impeaching** [1] - 1035:1
**impeachment** [4] - 1035:11, 1049:16, 1049:17, 1053:20
**implanted** [1] - 1213:13
**implanting** [2] - 1218:14, 1218:17
**implemented** [2] - 1064:22, 1221:25
**imply** [1] - 1171:21
**implying** [1] - 1213:6
**importance** [2] - 1130:9, 1274:17
**important** [18] - 1040:8, 1126:21, 1131:5, 1135:4, 1135:7, 1151:8, 1151:10, 1156:6, 1157:12, 1157:14, 1181:10, 1181:19, 1199:22, 1214:6, 1238:10, 1238:13, 1269:13, 1279:17
**imposed** [1] - 1058:7
**impression** [3] - 1111:14, 1111:23, 1111:24
**improper** [3] - 1154:11, 1188:12, 1262:21
**improve** [4] - 1201:22, 1201:24, 1214:18, 1223:10
**improved** [1] - 1135:22
**improvement** [3] - 1136:8, 1155:4, 1182:16
**improves** [1] - 1120:7

**impulse** [1] - 1133:24
**inability** [3] - 1130:18, 1131:6, 1137:3
**inaccuracies** [1] - 1139:24
**inaccurate** [1] - 1220:23
**inadequate** [5] - 1145:13, 1145:14, 1149:19
**inadequately** [1] - 1150:6
**incident** [2] - 1176:25, 1177:3
**incidentally** [1] - 1108:20
**include** [9] - 1121:19, 1127:22, 1134:7, 1158:1, 1158:16, 1235:3, 1235:6, 1235:20, 1244:14
**included** [1] - 1033:9
**includes** [2] - 1127:7, 1127:11
**including** [7] - 1071:25, 1106:10, 1107:4, 1110:18, 1246:25, 1255:6, 1294:3
**incomplete** [1] - 1169:14
**inconsistent** [1] - 1246:20
**incorporated** [1] - 1145:19
**increase** [7] - 1067:8, 1067:14, 1067:18, 1067:25, 1068:1, 1068:6, 1072:12, 1072:22, 1073:23, 1076:15, 1078:17, 1079:1, 1093:23, 1098:1, 1098:2, 1099:7, 1099:14, 1099:17, 1100:1, 1158:13, 1251:15, 1270:21, 1271:8, 1287:16, 1287:20, 1288:4, 1288:7
**increased** [7] - 1064:18, 1067:3, 1072:15, 1073:24, 1076:25, 1151:23, 1207:13
**increases** [3] - 1155:2, 1181:9, 1250:7
**incumbent** [1] - 1155:10
**independent** [1] - 1267:22
**indicate** [5] - 1110:12, 1146:21, 1154:24, 1156:16, 1165:7
**indicated** [23] - 1066:17, 1066:18, 1071:17, 1103:16, 1106:6, 1106:13, 1106:21, 1106:25, 1109:9, 1109:17, 1110:10, 1110:23, 1148:6, 1151:21, 1155:8, 1156:22, 1160:25, 1161:15, 1167:15, 1168:5, 1172:2, 1257:24, 1269:15
**indicates** [2] - 1067:7, 1154:23
**indicating** [3] - 1080:24, 1087:14, 1105:19
**indication** [23] - 1107:8, 1141:22, 1142:21, 1147:4, 1147:23, 1148:9, 1152:14, 1152:17, 1154:8, 1154:13, 1156:24, 1156:25, 1161:20, 1162:17, 1163:10, 1164:25, 1165:16, 1166:14, 1171:18, 1179:13, 1213:15, 1248:21, 1249:8
**indications** [6] - 1149:14, 1161:10, 1184:12, 1212:6, 1212:13, 1213:10
**indicia** [4] - 1051:17, 1053:25, 1196:6, 1198:9
**indictment** [7] - 1039:9, 1255:2, 1255:19, 1256:3, 1256:6, 1256:7, 1258:4
**indictments** [1] - 1258:5
**individual** [14] - 1034:3, 1036:19, 1037:8, 1038:18, 1040:25, 1041:1,

1080:11, 1082:13, 1147:9, 1200:12, 1201:5, 1215:22, 1228:4, 1239:18

**individualized** [1] - 1040:22

**individually** [2] - 1036:14, 1038:3

**induced** [2] - 1162:8, 1163:6

**inflame** [1] - 1163:1

**inform** [1] - 1252:25

**information** [39] - 1043:19, 1051:23, 1060:25, 1061:6, 1062:3, 1063:22, 1064:3, 1064:17, 1065:13, 1066:3, 1081:4, 1081:14, 1081:15, 1086:20, 1086:21, 1088:24, 1089:9, 1089:19, 1090:7, 1093:7, 1094:13, 1145:20, 1149:6, 1192:25, 1196:19, 1204:15, 1209:21, 1222:7, 1226:20, 1226:22, 1226:23, 1227:18, 1230:22, 1232:21, 1238:8, 1257:14, 1258:1, 1291:21, 1292:3

**informed** [8] - 1221:5, 1222:6, 1222:13, 1223:19, 1223:23, 1224:1, 1235:24, 1287:23

**ingredient** [1] - 1245:17

**inherently** [1] - 1129:7

**inherits** [1] - 1181:24

**initial** [3] - 1107:17, 1209:9, 1281:18

**injecting** [11] - 1039:23, 1040:18, 1053:6, 1152:10, 1152:13, 1153:6, 1154:1, 1154:21, 1163:8, 1248:15, 1263:2

**injection** [7] - 1154:4, 1154:15, 1170:1, 1170:14, 1216:20, 1219:6, 1248:7

**injections** [8] - 1156:2, 1170:7, 1205:1, 1218:21, 1219:1, 1219:3, 1219:6, 1227:10

**injuries** [6] - 1078:22, 1161:11, 1161:25, 1168:17, 1209:13

**injury** [9] - 1061:10, 1077:24, 1119:25, 1172:9, 1173:9, 1173:11, 1209:7, 1209:17, 1213:12

**injustice** [3] - 1175:3, 1175:4, 1175:7

**input** [2] - 1171:3, 1214:13

**inquired** [1] - 1230:21

**inquiry** [1] - 1046:20

**inspector** [5] - 1081:18, 1082:12, 1082:24

**Inspector** [5] - 1083:8, 1083:14, 1083:20, 1084:1, 1084:17

**instance** [2] - 1041:25, 1228:15

**instances** [4] - 1037:9, 1046:11, 1147:19, 1171:9

**instead** [1] - 1122:2

**Institute** [1] - 1119:9

**instructed** [1] - 1253:12

**instruction** [2] - 1044:18, 1044:19

**instruments** [1] - 1141:10

**insufficient** [1] - 1041:23

**insurance** [4] - 1216:25, 1217:5, 1217:7, 1219:4

**Insurance** [2] - 1120:13, 1120:20

**integrated** [3] - 1147:24, 1148:11, 1149:21

**integrity** [1] - 1080:10

**intending** [1] - 1066:17

**intense** [2] - 1133:15, 1166:24

**intensity** [2] - 1205:23, 1206:11

**intensive** [1] - 1166:10

**intent** [6] - 1043:23, 1043:24, 1044:9, 1045:1, 1057:17, 1273:6

**intention** [1] - 1048:12

**intentionally** [1] - 1241:25

**Inter** [3] - 1270:1, 1270:2, 1270:3

**interaction** [1] - 1176:3

**interactions** [1] - 1211:4

**interest** [1] - 1125:12

**interested** [3] - 1038:4, 1038:24, 1069:8

**internal** [1] - 1117:15

**internship** [1] - 1117:15

**intervals** [3] - 1228:4, 1230:8, 1230:9

**interventional** [3] - 1170:5, 1170:14, 1218:25

**interventionally** [1] - 1170:6

**interview** [10] - 1082:15, 1082:23, 1083:7, 1252:3, 1281:24, 1282:23, 1283:6, 1283:10, 1283:17, 1284:9

**interviewed** [8] - 1081:20, 1081:23, 1082:11, 1084:17, 1285:7, 1286:23, 1287:7

**interviews** [1] - 1257:10

**intoxicated** [1] - 1130:24

**introduce** [1] - 1048:5

**invasion** [1] - 1174:4

**investigation** [1] - 1165:25

**invited** [1] - 1265:4

**involved** [8] - 1060:23, 1066:23, 1067:2, 1091:24, 1191:16, 1191:24, 1197:25, 1204:25

**involves** [2] - 1121:6, 1205:22

**involving** [1] - 1058:25

**irrelevant** [1] - 1203:5

**irritate** [1] - 1163:1

**IRS** [2] - 1125:11, 1134:10

**Isaza** [3] - 1204:25, 1205:11, 1205:14

**ISAZA** [1] - 1204:25

**issue** [22] - 1043:10, 1043:22, 1044:9, 1044:21, 1044:25, 1049:15, 1049:16, 1049:23, 1054:6, 1055:14, 1055:15, 1070:12, 1070:24, 1075:8, 1076:18, 1157:4, 1184:15, 1193:25, 1199:8, 1219:12, 1259:22, 1263:7

**issues** [21] - 1034:13, 1051:10, 1060:18, 1060:19, 1074:16, 1075:20, 1078:4, 1078:14, 1082:7, 1093:22, 1133:7, 1162:11, 1171:6, 1171:22, 1174:18, 1176:22, 1190:25, 1203:10, 1210:10, 1244:6

**itself** [2] - 1177:8, 1181:5

## J

**January** [9] - 1079:23, 1271:7, 1271:11, 1275:25, 1277:2, 1277:12, 1277:25, 1284:12

**jar** [1] - 1172:9

**Jason** [12] - 1085:17, 1285:2, 1285:9, 1285:17, 1286:17, 1286:22, 1286:25, 1287:10, 1287:21, 1290:5

**Jeff** [1] - 1037:13

**job** [1] - 1073:8

**Johnny** [2] - 1295:3, 1295:7

**joint** [2] - 1219:5, 1219:6

**Josephine** [1] - 1042:7

**Joubert** [3] - 1164:19, 1241:9, 1242:23

**JOUBERT** [139] - 1031:10, 1031:17, 1031:25, 1032:4, 1032:8, 1032:15, 1033:1, 1033:5, 1033:8, 1033:20, 1033:24, 1034:4, 1035:17, 1035:19, 1035:25, 1036:6, 1036:9, 1037:4, 1038:8, 1038:10, 1038:21, 1038:23, 1039:5, 1039:12, 1039:14, 1039:20, 1040:1, 1040:5, 1040:9, 1040:11, 1041:6, 1041:12, 1041:16, 1042:12, 1042:19, 1044:20, 1044:24, 1047:6, 1054:22, 1055:13, 1055:16, 1055:19, 1055:24, 1056:4, 1056:8, 1056:13, 1056:16, 1059:3, 1059:14, 1068:3, 1076:4, 1096:20, 1096:23, 1098:18, 1099:3, 1103:22, 1103:23, 1104:3, 1104:5, 1104:17, 1104:20, 1105:4, 1106:3, 1108:14, 1108:15, 1111:9, 1112:15, 1112:21, 1113:5, 1113:9, 1113:18, 1114:5, 1114:15, 1114:18, 1115:2, 1115:14, 1115:20, 1115:23, 1116:3, 1163:20, 1164:1, 1164:3, 1164:20, 1164:21, 1177:23, 1178:13, 1178:15, 1178:20, 1180:1, 1180:3, 1185:11, 1188:10, 1188:12, 1194:13, 1241:11, 1241:14, 1241:16, 1241:20, 1241:24, 1242:4, 1242:9, 1242:11, 1242:17, 1242:25, 1243:2, 1250:18, 1250:20, 1252:13, 1252:18, 1252:22, 1253:8, 1253:11, 1253:15, 1253:18, 1254:11, 1260:4, 1260:5, 1262:20, 1263:10, 1263:13, 1263:15, 1263:21, 1264:1, 1268:16, 1268:22, 1268:23, 1271:21, 1272:3, 1272:5, 1272:7, 1292:16, 1293:16, 1293:21, 1293:25, 1294:3, 1294:6, 1294:9, 1294:12, 1294:21

**Joubert's** [1] - 1057:9

**Journal** [1] - 1121:10

**journal** [1] - 1121:12

**judge** [6] - 1069:9, 1072:11, 1076:2, 1085:7, 1241:23, 1259:10

**Judge** [40] - 1031:12, 1040:12, 1041:13, 1047:10, 1047:15, 1047:23, 1048:11, 1048:22, 1049:2, 1049:8, 1049:21, 1049:23, 1050:14, 1051:3, 1054:7, 1056:9, 1057:4, 1059:16, 1063:15, 1072:7, 1072:8, 1072:18, 1073:3, 1073:11, 1073:16, 1082:20, 1082:22, 1096:18, 1098:15, 1098:25, 1104:14, 1104:24, 1111:3, 1112:25, 1113:5, 1241:24, 1263:10, 1293:2, 1293:16, 1294:1

**July** [5] - 1256:19, 1280:9, 1280:14, 1283:12, 1285:22

**jumped** [1] - 1042:9
**juries** [1] - 1161:15
**juror's** [1] - 1050:4
**JURORS** [2] - 1056:23, 1056:25
**jurors** [1] - 1040:4
**jury** [109] - 1031:1, 1037:8, 1037:23, 1042:15, 1045:9, 1049:3, 1049:13, 1053:7, 1053:8, 1053:14, 1056:20, 1057:8, 1058:4, 1073:15, 1074:1, 1077:9, 1078:7, 1082:8, 1098:8, 1098:12, 1099:7, 1114:19, 1114:24, 1116:9, 1116:20, 1118:12, 1119:2, 1119:22, 1120:3, 1120:22, 1121:23, 1123:8, 1124:15, 1126:8, 1126:9, 1126:23, 1127:4, 1127:15, 1128:13, 1128:21, 1129:12, 1130:13, 1133:18, 1134:5, 1134:13, 1137:13, 1137:21, 1139:8, 1139:19, 1142:12, 1143:15, 1145:5, 1146:10, 1156:6, 1157:12, 1158:6, 1162:2, 1163:23, 1165:24, 1166:25, 1169:3, 1170:2, 1170:22, 1173:10, 1174:3, 1174:17, 1175:18, 1178:17, 1179:7, 1179:12, 1180:12, 1182:5, 1184:20, 1188:9, 1189:25, 1190:16, 1194:6, 1225:1, 1228:14, 1241:5, 1242:2, 1242:21, 1243:10, 1243:15, 1243:25, 1254:19, 1263:5, 1263:23, 1264:15, 1264:16, 1264:25, 1265:19, 1265:21, 1266:18, 1267:16, 1271:5, 1275:9, 1275:13, 1276:21, 1282:3, 1283:8, 1284:1, 1284:22, 1288:2, 1288:15, 1289:14, 1290:4, 1292:22
**jury's** [2] - 1073:20, 1128:11
**justify** [1] - 1243:22
**juxtaposed** [1] - 1243:12

## K

**Kansas** [1] - 1123:14
**Keecoo** [2] - 1123:20, 1123:21
**keep** [10] - 1047:7, 1054:8, 1129:19, 1130:23, 1130:24, 1146:1, 1190:12, 1198:13, 1202:4, 1207:24
**keeping** [2] - 1091:2, 1201:25
**kept** [1] - 1197:12
**key** [1] - 1269:20
**kick** [1] - 1143:21
**kidding** [2] - 1055:23, 1293:20
**kidney** [1] - 1223:12
**kill** [2] - 1085:7, 1154:3
**Kimberly** [7] - 1059:25, 1148:21, 1155:8, 1156:15, 1156:22, 1162:15, 1250:13
**KIMBERLY** [1] - 1057:5
**kind** [30] - 1033:13, 1039:15, 1048:8, 1048:10, 1055:5, 1089:19, 1111:18, 1120:4, 1121:5, 1133:5, 1134:4, 1135:17, 1137:7, 1137:16, 1138:11, 1139:21, 1158:8, 1164:16, 1166:5, 1166:6, 1167:4, 1168:11, 1168:15, 1184:2, 1200:7, 1214:19, 1225:22,

1248:18, 1293:4, 1293:16
**kinds** [5] - 1120:7, 1136:21, 1139:21, 1150:8, 1170:3
**Kirkwood** [2] - 1269:22, 1270:4
**knees** [1] - 1206:9
**knocks** [1] - 1206:8
**knowingly** [1] - 1262:8
**knowledge** [4] - 1033:14, 1102:7, 1102:13, 1289:11
**known** [5] - 1045:7, 1117:3, 1159:6, 1160:18, 1219:22

## L

**lab** [6] - 1195:21, 1195:23, 1220:25, 1221:2, 1235:15, 1235:17
**label** [3] - 1212:8, 1212:16, 1290:10
**labels** [3] - 1213:1, 1213:5, 1290:14
**labor** [1] - 1067:12
**laboratories** [2] - 1195:14, 1220:14
**laboratory** [4] - 1140:1, 1194:19, 1195:2, 1195:10
**lack** [7] - 1036:21, 1036:22, 1037:16, 1148:4, 1154:10, 1171:18, 1183:22
**ladies** [6] - 1056:21, 1114:20, 1116:8, 1190:16, 1194:5, 1254:19
**lady** [3] - 1271:19, 1272:9, 1292:24
**Lane** [1] - 1270:3
**language** [12] - 1043:7, 1043:17, 1059:4, 1160:15, 1193:7, 1193:15, 1193:25, 1211:21, 1225:18, 1231:19, 1260:11
**Lantern** [1] - 1270:3
**lapse** [1] - 1265:22
**large** [1] - 1261:18
**last** [27] - 1047:25, 1071:11, 1071:16, 1071:21, 1097:5, 1116:11, 1123:17, 1128:22, 1130:6, 1154:20, 1168:20, 1173:24, 1174:2, 1175:6, 1186:4, 1254:18, 1256:19, 1258:1, 1260:8, 1260:17, 1263:10, 1265:20, 1265:24, 1266:16, 1269:18, 1277:19, 1283:8
**lastly** [3] - 1251:25, 1259:6, 1264:2
**lasts** [2] - 1225:21, 1225:22
**late** [3] - 1270:18, 1270:20, 1271:13
**latitude** [1] - 1046:12
**law** [6] - 1044:14, 1194:15, 1236:24, 1237:4, 1261:21, 1283:22
**Laws** [1] - 1278:13
**laws** [1] - 1280:20
**lawyer** [2] - 1035:5, 1259:14
**lawyers** [5] - 1031:3, 1035:5, 1036:17, 1241:22, 1292:21
**lay** [1] - 1203:9
**layman's** [2] - 1169:4, 1225:4
**lead** [1] - 1177:14
**leading** [1] - 1262:14
**leads** [1] - 1174:23
**Leal** [1] - 1094:9
**learn** [3] - 1122:1, 1128:19, 1266:8
**learned** [1] - 1053:10

1113:11, 1140:18, 1155:9, 1157:25, 1159:22, 1165:16, 1165:18, 1166:20, 1180:5, 1201:18, 1206:15, 1209:5, 1211:16, 1213:15, 1237:8, 1238:4, 1249:9, 1265:20, 1266:16, 1266:24, 1271:10, 1274:3, 1284:23, 1286:15, 1290:1
**leave** [1] - 1178:11
**leaves** [1] - 1045:9
**lectured** [1] - 1123:3
**led** [1] - 1255:12
**left** [6] - 1080:22, 1090:11, 1118:22, 1259:23, 1267:5, 1267:24
**leg** [1] - 1167:6
**legal** [5] - 1059:4, 1109:16, 1136:16, 1263:2, 1263:5
**legally** [1] - 1282:15
**legible** [2] - 1181:16, 1181:19
**legitimate** [14] - 1150:22, 1154:17, 1180:21, 1184:9, 1185:5, 1185:9, 1247:18, 1251:15, 1261:14, 1262:4, 1262:5
**length** [3] - 1050:15, 1072:25, 1091:19
**less** [9] - 1042:21, 1047:23, 1089:6, 1108:5, 1133:21, 1241:6, 1249:24, 1250:10, 1277:5
**letter** [1] - 1039:22, 1125:10
**level** [28] - 1061:19, 1064:4, 1065:2, 1065:14, 1068:22, 1069:14, 1086:18, 1086:25, 1087:3, 1088:21, 1089:1, 1093:17, 1097:22, 1133:14, 1133:15, 1134:15, 1143:11, 1143:25, 1151:22, 1156:16, 1156:22, 1156:23, 1162:18, 1172:15, 1176:15, 1176:18, 1246:17, 1258:9
**levels** [4] - 1094:21, 1156:17, 1215:15, 1259:3
**license** [2] - 1118:22, 1265:21
**licensed** [4] - 1103:9, 1118:3, 1260:18, 1266:16
**licensure** [2] - 1118:15, 1118:16
**lied** [1] - 1084:16
**lies** [1] - 1034:22
**life** [12] - 1122:1, 1122:4, 1129:23, 1129:24, 1173:17, 1173:18, 1188:7, 1215:6, 1215:11, 1223:11, 1223:18, 1264:22
**lifetime** [1] - 1109:16
**light** [1] - 1170:15
**likely** [1] - 1152:17
**limber** [1] - 1201:21
**limit** [2] - 1042:14, 1052:5
**limited** [6] - 1034:17, 1054:13, 1121:15, 1121:16, 1190:3, 1224:15
**limits** [1] - 1219:7
**Line** [1] - 1223:10
**line** [12] - 1032:12, 1074:7, 1076:14, 1078:6, 1078:8, 1173:23, 1174:6, 1174:7, 1177:18, 1280:5, 1280:14, 1280:16
**lines** [1] - 1197:15
**list** [3] - 1161:5, 1162:13, 1235:3
**literally** [1] - 1095:10

**literature** [4] - 1128:17, 1129:5, 1155:3, 1168:20
**litigation** [2] - 1052:12, 1054:14
**live** [1] - 1265:4
**living** [3] - 1059:22, 1172:22, 1265:5
**local** [1] - 1257:2
**location** [2] - 1061:19, 1269:6
**locked** [3] - 1293:19, 1293:22, 1293:23
**long-acting** [5] - 1224:21, 1225:2, 1225:11, 1225:18, 1225:21
**long-term** [2] - 1202:14, 1225:4
**longest** [1] - 1107:17
**look** [51] - 1032:9, 1032:13, 1036:16, 1041:13, 1055:2, 1067:6, 1071:17, 1076:13, 1078:6, 1083:2, 1083:4, 1083:18, 1105:18, 1106:12, 1106:23, 1128:16, 1129:22, 1131:22, 1131:24, 1133:11, 1133:13, 1133:16, 1136:24, 1138:1, 1156:1, 1156:6, 1163:11, 1172:11, 1173:3, 1176:7, 1186:5, 1186:10, 1186:13, 1186:15, 1186:18, 1186:21, 1192:17, 1192:21, 1196:3, 1198:3, 1210:1, 1222:3, 1224:9, 1227:13, 1231:19, 1231:23, 1237:5, 1244:5, 1278:7, 1278:8, 1290:14
**looked** [22] - 1033:25, 1034:8, 1035:15, 1041:3, 1041:4, 1045:14, 1155:3, 1155:4, 1159:20, 1183:4, 1186:12, 1186:24, 1197:11, 1197:14, 1206:24, 1222:5, 1235:18, 1235:24, 1240:6, 1278:10, 1278:11, 1278:21
**looking** [13] - 1038:3, 1065:15, 1134:19, 1134:22, 1136:7, 1157:23, 1192:18, 1192:22, 1192:25, 1230:20, 1231:4, 1244:16
**looks** [2] - 1292:14, 1294:16
**loosen** [1] - 1095:13
**Lorcet** [1] - 1160:1
**Lortab** [4] - 1062:9, 1111:20, 1158:17, 1160:1
**losing** [1] - 1200:2
**loss** [2] - 1136:4, 1199:21
**lost** [14] - 1037:23, 1042:18, 1042:20, 1073:22, 1074:5, 1074:6, 1074:7, 1074:11, 1074:12, 1090:24, 1136:20, 1154:2, 1154:5, 1156:19
**lotto** [3] - 1125:1, 1125:4
**loudly** [1] - 1031:8
**Louisiana** [20] - 1055:20, 1057:12, 1057:18, 1086:2, 1097:21, 1101:22, 1112:22, 1147:15, 1261:17, 1278:3, 1278:4, 1278:12, 1278:22, 1284:18, 1284:20, 1288:9, 1290:6, 1292:7, 1293:18
**love** [1] - 1091:1
**low** [10] - 1129:13, 1129:14, 1129:15, 1129:17, 1138:4, 1139:10, 1161:2, 1183:9, 1244:4, 1244:8
**lower** [3] - 1089:25, 1094:16, 1259:1
**lowered** [1] - 1251:9
**lumbar** [2] - 1089:24, 1089:25
**lunch** [2] - 1163:22, 1164:22
**Lupus** [19] - 1074:19, 1074:24,

1074:24, 1075:3, 1075:9, 1076:18, 1076:20, 1078:9, 1078:14, 1078:18, 1078:19, 1092:7, 1092:18, 1162:7, 1162:16, 1162:21, 1163:1, 1210:14
**LVN** [1] - 1103:7

# M

**ma'am** [71] - 1112:18, 1186:3, 1186:9, 1186:12, 1187:10, 1187:20, 1188:2, 1188:5, 1189:2, 1189:4, 1189:12, 1189:24, 1190:6, 1190:11, 1190:15, 1190:22, 1191:10, 1191:15, 1191:18, 1191:21, 1191:23, 1191:25, 1192:8, 1192:24, 1194:22, 1194:25, 1195:12, 1195:16, 1195:24, 1196:2, 1196:5, 1196:11, 1196:14, 1196:17, 1197:5, 1197:8, 1199:11, 1199:18, 1199:20, 1201:3, 1202:7, 1202:11, 1204:18, 1205:4, 1206:13, 1210:12, 1211:3, 1211:6, 1211:8, 1211:18, 1212:2, 1212:17, 1212:20, 1212:24, 1213:9, 1214:4, 1214:8, 1214:12, 1215:2, 1215:18, 1215:21, 1216:9, 1216:21, 1217:23, 1221:8, 1225:20, 1228:20, 1229:11, 1230:19, 1238:9, 1238:17
**mad** [1] - 1074:10
**magnify** [3] - 1134:11, 1171:6, 1175:23
**mail** [2] - 1237:12, 1255:7, 1278:12, 1284:6, 1291:17
**maintain** [4] - 1244:20, 1245:3, 1261:22, 1266:12
**maintained** [1] - 1198:16
**maintaining** [1] - 1244:14
**major** [1] - 1117:7
**majority** [5] - 1119:17, 1141:2, 1182:9, 1182:18, 1286:2
**makeup** [1] - 1128:5
**maladaptive** [4] - 1171:5, 1174:20, 1175:21, 1175:23
**Malik** [2] - 1063:6, 1063:7
**malpractice** [1] - 1188:1
**man** [1] - 1188:6
**manage** [5] - 1126:3, 1153:16, 1153:18, 1154:7, 1210:13
**managed** [2] - 1064:1, 1162:22
**management** [55] - 1052:10, 1054:1, 1079:14, 1096:15, 1097:7, 1117:20, 1117:21, 1118:14, 1118:20, 1119:4, 1119:14, 1120:1, 1123:4, 1124:10, 1126:2, 1126:15, 1126:20, 1131:18, 1133:8, 1136:7, 1139:24, 1155:3, 1169:8, 1172:10, 1172:23, 1179:20, 1187:1, 1187:8, 1187:17, 1190:21, 1190:24, 1191:12, 1199:13, 1199:22, 1202:10, 1204:13, 1204:24, 1210:4, 1218:12, 1221:15, 1221:16, 1221:17, 1222:12, 1224:10, 1233:3, 1243:14, 1245:1, 1245:14, 1245:15, 1251:21, 1273:3, 1273:14
**Management** [1] - 1118:11

**managing** [4] - 1073:8, 1126:15, 1210:9, 1210:10
**manmade** [2] - 1127:13, 1127:23
**Mann** [13] - 1060:24, 1061:5, 1062:3, 1077:24, 1091:13, 1092:3, 1092:6, 1102:22, 1103:4, 1106:1, 1107:25, 1281:15
**manufactured** [1] - 1220:19
**map** [2] - 1167:10, 1233:25
**maps** [1] - 1167:7
**March** [5] - 1064:25, 1066:3, 1080:14, 1080:18, 1178:5
**Marian** [2] - 1082:12, 1082:25
**marijuana** [2] - 1146:5, 1146:9, 1146:13, 1146:15, 1146:19, 1146:23, 1146:25, 1147:2, 1147:8, 1220:7, 1245:17, 1245:21
**mark** [3] - 1163:18, 1248:7
**marked** [1] - 1082:22
**marketplace** [1] - 1033:17
**marks** [2] - 1045:13, 1154:15
**Mary** [1] - 1220:5
**mass** [1] - 1140:2
**massage** [14] - 1061:7, 1091:5, 1095:5, 1102:8, 1102:18, 1112:11, 1141:14, 1141:18, 1142:1, 1142:3, 1142:6, 1142:7, 1252:6, 1252:11
**Mathern** [4] - 1246:25, 1247:8, 1247:21, 1249:19
**MATHERN** [1] - 1247:10
**matter** [15] - 1031:2, 1035:24, 1039:4, 1040:7, 1042:6, 1048:6, 1049:14, 1051:19, 1053:17, 1070:21, 1147:15, 1212:15, 1225:23, 1271:24, 1295:5
**matters** [1] - 1264:4
**maximizing** [1] - 1050:9
**maximum** [3] - 1261:24, 1291:5, 1291:7
**McDonald** [7] - 1149:11, 1149:14, 1229:1, 1246:12, 1246:14, 1247:21, 1249:18
**MD** [5] - 1052:16, 1052:18, 1052:22, 1055:4, 1076:14
**mean** [24] - 1033:3, 1034:18, 1038:1, 1038:16, 1041:9, 1045:8, 1045:16, 1048:25, 1054:8, 1100:13, 1107:16, 1111:19, 1122:16, 1127:22, 1137:14, 1139:19, 1148:9, 1191:6, 1192:10, 1206:19, 1232:4, 1234:18, 1239:2, 1239:3
**mean.** [1] - 1058:5, 1111:17
**meaning** [2] - 1039:10, 1099:18, 1187:22
**meaningful** [4] - 1145:22, 1182:16, 1184:23, 1215:20
**means** [16] - 1042:10, 1045:15, 1118:12, 1118:13, 1120:22, 1135:17, 1143:20, 1148:2, 1160:23, 1164:6, 1164:10, 1170:14, 1189:25, 1190:1, 1244:1, 1244:2
**meant** [2] - 1164:4, 1187:23, 1266:11
**measure** [6] - 1046:13, 1046:14, 1046:16, 1077:13, 1136:6, 1142:17

**mechanics** [1] - 1142:17
**mechanisms** [5] - 1133:3, 1171:5, 1174:20, 1175:21, 1175:23
**Medicaid** [6] - 1217:13, 1217:18, 1217:20, 1217:21, 1217:25, 1218:6
**medical** [92] - 1034:18, 1036:22, 1043:13, 1051:17, 1051:18, 1053:25, 1060:24, 1061:5, 1073:25, 1074:16, 1078:4, 1088:12, 1100:3, 1100:10, 1103:13, 1108:18, 1116:16, 1116:20, 1116:22, 1117:9, 1119:15, 1120:12, 1121:1, 1122:11, 1122:13, 1131:9, 1133:11, 1134:18, 1137:23, 1138:21, 1139:5, 1139:6, 1139:9, 1140:22, 1141:13, 1142:24, 1144:9, 1144:21, 1145:6, 1145:8, 1145:25, 1146:2, 1150:7, 1150:10, 1150:19, 1150:23, 1154:17, 1156:13, 1157:7, 1168:7, 1168:13, 1180:18, 1180:19, 1180:20, 1180:21, 1181:20, 1182:4, 1183:17, 1183:25, 1184:9, 1184:23, 1185:2, 1185:5, 1185:9, 1188:1, 1188:21, 1197:7, 1197:12, 1208:2, 1213:10, 1214:2, 1220:5, 1220:9, 1223:4, 1226:7, 1228:3, 1230:11, 1235:6, 1235:14, 1244:14, 1245:25, 1246:23, 1247:4, 1247:18, 1250:25, 1251:1, 1252:4, 1261:14, 1262:4, 1262:5, 1276:3
**Medical** [33] - 1046:24, 1116:23, 1117:23, 1123:25, 1187:7, 1187:16, 1191:22, 1192:6, 1193:6, 1193:10, 1194:4, 1202:21, 1203:5, 1207:18, 1208:1, 1208:4, 1208:6, 1209:22, 1210:16, 1211:16, 1211:21, 1212:4, 1213:19, 1213:21, 1221:7, 1225:19, 1226:11, 1228:2, 1230:24, 1234:7, 1235:1, 1240:17, 1251:20
**medically** [2] - 1251:25, 1252:1
**Medicare** [4] - 1217:10, 1217:16, 1217:18, 1217:19
**medicate** [2] - 1166:9, 1176:23
**medication** [57] - 1046:23, 1047:22, 1066:10, 1075:5, 1075:16, 1075:24, 1077:1, 1078:16, 1079:9, 1081:6, 1081:13, 1087:9, 1087:10, 1087:16, 1088:1, 1092:25, 1093:22, 1097:15, 1097:17, 1098:23, 1099:6, 1100:1, 1106:6, 1106:24, 1111:16, 1111:18, 1122:5, 1126:3, 1129:4, 1137:1, 1162:9, 1165:1, 1178:3, 1204:23, 1205:15, 1210:4, 1212:15, 1218:14, 1221:15, 1225:11, 1231:2, 1237:20, 1239:7, 1247:25, 1248:4, 1248:10, 1248:18, 1281:25, 1283:15, 1283:18, 1288:18, 1288:19, 1289:3, 1289:4
**medications** [29] - 1062:15, 1062:17, 1062:18, 1062:21, 1062:25, 1063:9, 1065:10, 1068:9, 1076:15, 1080:24, 1080:25, 1081:2, 1094:7, 1094:8, 1097:11, 1127:8, 1132:1, 1133:11, 1182:12, 1208:20, 1208:22, 1208:25, 1209:17, 1226:4, 1231:14, 1236:4,

1247:17, 1250:12, 1278:4
**medicine** [39] - 1032:1, 1046:15, 1052:24, 1053:2, 1053:12, 1081:2, 1117:15, 1118:4, 1121:9, 1121:11, 1121:14, 1137:22, 1140:13, 1149:24, 1149:25, 1157:3, 1183:4, 1183:20, 1184:6, 1184:7, 1184:8, 1190:13, 1190:17, 1190:18, 1190:20, 1190:25, 1192:11, 1202:20, 1219:17, 1220:1, 1225:9, 1225:23, 1237:5, 1240:12, 1251:19, 1273:5, 1273:7
**Medicine** [2] - 1121:10, 1121:13
**medicines** [5] - 1089:4, 1127:16, 1137:5, 1155:25, 1274:22
**meds** [3] - 1136:20, 1209:2, 1209:3
**meet** [3] - 1041:10, 1088:16, 1262:10
**meeting** [4] - 1062:7, 1086:11, 1091:13, 1110:8
**meetings** [2] - 1110:16, 1220:6
**member** [10] - 1119:18, 1120:12, 1120:16, 1122:19, 1152:12, 1152:13, 1152:21, 1153:5, 1221:21, 1238:15
**members** [7] - 1093:7, 1093:8, 1093:11, 1182:4, 1203:24, 1221:19, 1224:19
**Memorial** [1] - 1270:4
**memory** [2] - 1049:6, 1049:7
**men** [1] - 1033:11
**men's** [1] - 1056:9
**mental** [3] - 1133:1, 1177:9, 1218:1
**mention** [2] - 1172:20, 1221:9
**mentioned** [21] - 1035:20, 1088:6, 1092:20, 1147:17, 1149:18, 1166:19, 1170:20, 1171:16, 1172:18, 1174:18, 1186:1, 1210:25, 1224:21, 1227:25, 1236:19, 1238:18, 1243:25, 1258:5, 1274:25, 1275:5, 1280:25
**mentioning** [1] - 1046:22
**met** [9] - 1066:7, 1082:4, 1086:17, 1088:19, 1092:2, 1188:19, 1276:22, 1276:24, 1277:22
**Methern** [1] - 1247:8
**method** [1] - 1182:11
**microphone** [2] - 1254:5, 1254:14
**mid** [2] - 1060:12, 1129:4
**middle** [2] - 1067:7, 1207:6
**might** [25] - 1031:6, 1033:12, 1034:8, 1042:21, 1066:22, 1079:8, 1081:12, 1113:20, 1132:3, 1132:13, 1132:14, 1145:10, 1161:7, 1162:20, 1176:22, 1192:10, 1196:12, 1200:3, 1200:23, 1207:13, 1216:19, 1216:20, 1233:16, 1233:19, 1241:6
**mild** [3] - 1143:6, 1176:14, 1176:17
**miles** [1] - 1182:25
**military** [1] - 1122:6
**mill** [4] - 1032:3, 1032:7, 1032:10, 1184:16
**milligram** [3] - 1067:4, 1069:3, 1094:15
**milligrams** [9] - 1039:11, 1062:9, 1065:20, 1065:22, 1066:5, 1067:15,

**million** [3] - 1125:1, 1125:4, 1125:7
**million-dollar** [2] - 1125:1, 1125:4
**mind** [10] - 1070:12, 1098:8, 1098:12, 1098:22, 1192:18, 1203:5, 1232:17, 1250:23, 1251:11, 1274:17
**mindset** [1] - 1192:22
**mine** [1] - 1083:4
**minimal** [2] - 1183:9, 1245:7
**minimally** [2] - 1110:15, 1245:13
**minimize** [1] - 1201:18
**minimum** [18] - 1193:14, 1202:25, 1203:4, 1203:6, 1208:6, 1208:9, 1213:24, 1214:1, 1226:22, 1243:12, 1244:11, 1244:12, 1245:3, 1245:8, 1245:22, 1246:3, 1246:8, 1246:9
**minor** [1] - 1128:8
**minus** [3] - 1170:18, 1171:22
**minute** [8] - 1056:8, 1097:25, 1103:3, 1119:22, 1121:19, 1147:17, 1187:4, 1219:12
**minutes** [19] - 1037:15, 1056:17, 1084:2, 1088:15, 1091:18, 1091:23, 1107:18, 1107:25, 1108:5, 1108:12, 1108:13, 1114:14, 1114:21, 1131:13, 1241:14, 1254:25, 1257:11, 1292:18
**misanswered** [1] - 1217:17
**misdemeanor** [3] - 1059:12, 1059:15, 1060:1
**misdemeanors** [1] - 1058:24
**mispronounced** [1] - 1120:22
**misreading** [1] - 1118:1
**missing** [1] - 1037:18
**misstatement** [2] - 1104:15, 1104:22
**misuse** [2] - 1112:1, 1126:12
**misused** [1] - 1155:14
**misusing** [3] - 1079:9, 1081:12, 1250:7
**mitigate** [2] - 1145:21, 1166:10
**Mobic** [3] - 1094:8, 1158:21, 1159:2
**modalities** [1] - 1174:17
**model** [2] - 1169:13, 1169:17
**moderate** [3] - 1170:15, 1176:14, 1176:17
**moment** [5] - 1185:17, 1222:14, 1234:25, 1240:9, 1272:17
**Monday** [5] - 1048:2, 1256:19, 1258:2, 1260:18, 1285:20
**monetary** [1] - 1121:7
**money** [14] - 1073:23, 1099:17, 1099:18, 1099:19, 1125:10, 1125:13, 1184:11, 1195:17, 1287:23, 1291:17, 1291:18, 1291:21
**monitoring** [5] - 1184:4, 1187:3, 1236:20, 1236:25, 1237:2
**month** [21] - 1060:2, 1064:25, 1105:17, 1155:13, 1228:8, 1228:9, 1229:23, 1230:1, 1230:2, 1230:4, 1246:17, 1270:25, 1271:10, 1278:5, 1280:3, 1288:9
**monthly** [1] - 1151:3
**months** [30] - 1077:14, 1101:19, 1101:24, 1104:9, 1104:23, 1131:8,

1151:5, 1151:9, 1151:18, 1151:23, 1173:8, 1173:11, 1173:20, 1214:25, 1215:3, 1228:8, 1228:11, 1228:12, 1228:16, 1228:17, 1228:18, 1228:23, 1229:9, 1229:12, 1229:22, 1280:4, 1287:24, 1288:6, 1288:11

**mood** [6] - 1103:16, 1105:19, 1148:7, 1148:14, 1148:19, 1211:9

**moral** [2] - 1058:25, 1059:17

**morning** [11] - 1056:21, 1056:23, 1077:5, 1086:7, 1088:19, 1096:24, 1096:25, 1115:10, 1116:4, 1116:5, 1292:18

**most** [19] - 1037:9, 1047:7, 1085:13, 1089:16, 1090:3, 1090:4, 1129:15, 1144:21, 1169:5, 1174:20, 1186:23, 1199:12, 1214:6, 1228:23, 1261:16, 1273:22, 1281:5, 1285:24, 1286:19

**mostly** [2] - 1058:11, 1091:15

**motion** [20] - 1140:24, 1141:1, 1141:2, 1141:4, 1141:5, 1141:8, 1141:16, 1141:19, 1141:21, 1141:23, 1142:1, 1142:4, 1142:8, 1142:15, 1142:17, 1142:22, 1145:16, 1151:16, 1201:23, 1202:1

**motivation** [2] - 1175:25, 1176:8

**motor** [2] - 1130:24, 1197:22

**Motrin** [1] - 1094:1

**mouth** [1] - 1044:3

**move** [7] - 1071:7, 1073:1, 1155:22, 1178:11, 1254:15, 1258:3, 1269:12

**moved** [1] - 1065:21

**moving** [1] - 1174:23

**MR** [202] - 1031:10, 1031:17, 1031:25, 1032:4, 1032:8, 1032:15, 1032:23, 1033:1, 1033:5, 1033:8, 1033:20, 1033:24, 1034:4, 1035:17, 1035:19, 1035:25, 1036:6, 1036:9, 1037:4, 1038:8, 1038:10, 1038:21, 1038:23, 1039:5, 1039:12, 1039:14, 1039:20, 1040:1, 1040:9, 1040:11, 1041:6, 1041:12, 1041:16, 1042:12, 1042:19, 1044:20, 1044:24, 1047:6, 1047:10, 1047:15, 1047:19, 1047:21, 1048:11, 1048:18, 1048:21, 1049:2, 1049:8, 1049:20, 1049:23, 1050:2, 1050:14, 1050:24, 1051:3, 1054:7, 1054:22, 1055:13, 1055:16, 1055:19, 1055:24, 1056:4, 1056:8, 1056:13, 1056:16, 1057:4, 1057:7, 1059:3, 1059:9, 1059:10, 1059:14, 1059:16, 1059:19, 1063:15, 1063:17, 1068:3, 1068:5, 1069:9, 1069:12, 1071:9, 1072:7, 1072:11, 1072:18, 1073:3, 1073:11, 1073:13, 1073:18, 1076:2, 1076:4, 1076:7, 1082:19, 1082:22, 1083:1, 1084:20, 1094:19, 1096:18, 1096:20, 1096:23, 1098:15, 1098:18, 1098:25, 1099:3, 1103:22, 1103:23, 1104:3, 1104:5, 1104:14, 1104:17, 1104:18, 1104:20, 1104:21, 1105:4, 1106:3, 1108:14, 1108:15, 1111:3, 1111:9, 1112:15, 1112:21, 1112:25,

1113:5, 1113:9, 1113:14, 1113:18, 1113:22, 1113:25, 1114:4, 1114:5, 1114:6, 1114:10, 1114:15, 1114:18, 1115:2, 1115:14, 1115:20, 1115:23, 1116:3, 1163:20, 1164:1, 1164:3, 1164:20, 1164:21, 1177:23, 1178:13, 1178:15, 1178:20, 1180:1, 1180:3, 1185:11, 1188:10, 1188:12, 1194:13, 1241:11, 1241:14, 1241:16, 1241:20, 1241:23, 1241:24, 1242:4, 1242:9, 1242:11, 1242:17, 1242:25, 1243:2, 1250:18, 1250:20, 1252:13, 1252:18, 1252:22, 1253:8, 1253:11, 1253:15, 1253:18, 1254:11, 1260:4, 1260:5, 1262:20, 1263:10, 1263:13, 1263:15, 1263:21, 1264:1, 1268:16, 1268:22, 1268:23, 1271:21, 1272:3, 1272:5, 1272:7, 1292:16, 1293:2, 1293:4, 1293:10, 1293:14, 1293:16, 1293:21, 1293:25, 1294:3, 1294:6, 1294:9, 1294:12, 1294:19, 1294:21

**MRI** [4] - 1101:17, 1101:24, 1145:10, 1276:11

**MRIs** [3] - 1226:25, 1274:2, 1274:10

**MS** [58] - 1032:16, 1032:19, 1034:16, 1035:18, 1043:1, 1043:6, 1043:13, 1043:22, 1044:2, 1044:5, 1044:8, 1044:13, 1045:24, 1046:2, 1046:6, 1046:8, 1051:9, 1051:15, 1051:22, 1052:8, 1052:17, 1052:19, 1052:23, 1053:2, 1053:11, 1053:21, 1053:24, 1054:6, 1054:11, 1054:13, 1054:17, 1054:19, 1054:21, 1055:7, 1072:3, 1114:2, 1115:13, 1177:17, 1178:4, 1185:17, 1185:19, 1188:11, 1188:14, 1194:17, 1222:14, 1222:17, 1222:21, 1222:24, 1223:2, 1240:9, 1240:10, 1241:1, 1242:14, 1262:13, 1262:24, 1263:1, 1268:18, 1293:1

**multiple** [6] - 1093:11, 1137:15, 1137:17, 1162:7, 1166:23, 1280:1

**multisite** [7] - 1160:22, 1160:24, 1161:1, 1161:4, 1162:2, 1162:4, 1166:19

**muscle** [9] - 1095:11, 1095:14, 1174:24, 1176:2, 1201:20, 1201:22, 1201:24, 1201:25, 1203:10

**muscles** [7] - 1091:6, 1101:2, 1176:1, 1200:3, 1201:10, 1201:17, 1201:21

**must** [6] - 1187:12, 1187:13, 1187:22, 1187:23, 1220:7, 1251:19

## N

**name** [19] - 1070:21, 1113:21, 1116:8, 1116:11, 1119:7, 1123:19, 1149:11, 1162:15, 1204:24, 1229:2, 1246:12, 1247:5, 1247:7, 1254:18, 1277:19, 1288:19, 1288:21

**named** [2] - 1255:2, 1285:2

**names** [4] - 1180:9, 1186:7, 1239:18, 1275:16

**narcotic** [13] - 1140:9, 1150:5, 1172:4, 1173:13, 1173:25, 1180:12, 1247:17, 1247:25, 1255:7, 1266:9, 1280:2, 1281:1, 1289:17

**narcotics** [14] - 1110:3, 1110:8, 1111:21, 1111:25, 1146:20, 1147:3, 1150:4, 1150:18, 1157:5, 1171:19, 1173:15, 1176:19, 1223:21, 1283:23

**narrow** [1] - 1054:13

**narrowly** [1] - 1052:6

**nasty** [1] - 1125:10

**natural** [1] - 1127:22

**naturally** [1] - 1127:24

**nature** [10] - 1082:15, 1143:6, 1171:11, 1180:15, 1205:22, 1205:25, 1206:3, 1206:9, 1275:24, 1289:1

**navigating** [1] - 1232:3

**near** [2] - 1089:25, 1269:6

**necessarily** [7] - 1042:2, 1126:17, 1171:25, 1176:4, 1181:3, 1181:5, 1271:24

**necessary** [7] - 1036:25, 1066:9, 1132:19, 1138:15, 1152:7, 1170:24, 1282:2

**necessity** [12] - 1121:1, 1144:1, 1146:1, 1146:2, 1150:10, 1150:19, 1156:13, 1180:20, 1180:21, 1184:24, 1185:2, 1246:23

**neck** [8] - 1061:18, 1089:25, 1090:4, 1161:2, 1164:15, 1202:2, 1202:3, 1202:6

**need** [42] - 1031:2, 1031:4, 1031:21, 1036:19, 1037:9, 1042:14, 1043:6, 1047:9, 1047:10, 1047:15, 1048:25, 1049:6, 1051:6, 1089:5, 1106:5, 1113:6, 1115:18, 1115:20, 1122:1, 1122:4, 1124:25, 1132:6, 1140:7, 1155:19, 1155:22, 1171:10, 1173:21, 1179:9, 1212:11, 1219:2, 1241:12, 1241:24, 1243:3, 1243:5, 1243:16, 1244:4, 1260:1, 1268:18, 1283:15

**needed** [8] - 1065:11, 1068:13, 1093:25, 1097:14, 1136:2, 1139:17, 1272:14, 1279:11

**needing** [1] - 1070:25

**needle** [1] - 1045:13

**needles** [2] - 1218:22, 1218:24

**needs** [2] - 1181:24, 1228:5

**negative** [1] - 1124:21

**negatively** [1] - 1205:11

**negatives** [1] - 1139:25

**negligence** [2] - 1043:8, 1211:25

**negligent** [2] - 1045:17

**nerve** [6] - 1090:11, 1145:16, 1167:4, 1167:5, 1167:7, 1169:21

**nerves** [1] - 1218:17

**nervous** [2] - 1166:7, 1166:12

**neurological** [1] - 1132:15, 1145:16, 1149:20, 1150:8

**neuropathic** [1] - 1123:1

**never** [16] - 1051:5, 1051:7, 1079:16, 1080:21, 1101:13, 1101:14, 1101:18, 1106:22, 1108:2, 1110:4, 1110:25,

1168:16, 1171:14, 1188:15, 1188:19
**nevertheless** [2] - 1150:6, 1153:14
**new** [9] - 1072:2, 1131:21, 1137:25, 1155:13, 1179:9, 1193:17, 1230:21, 1262:9, 1292:14
**New** [2] - 1264:18, 1264:20
**newer** [1] - 1237:21
**news** [1] - 1057:1
**next** [22] - 1048:2, 1050:6, 1053:10, 1055:17, 1063:12, 1064:23, 1064:25, 1066:7, 1066:14, 1071:10, 1071:14, 1106:4, 1114:22, 1154:4, 1221:5, 1228:1, 1228:9, 1253:14, 1269:7, 1273:13, 1273:19
**nicotine** [1] - 1133:23
**nine** [1] - 1186:6
**nobody** [2] - 1084:15, 1200:18
**non** [1] - 1070:2
**noncancer** [1] - 1174:10
**none** [4] - 1041:5, 1043:25, 1169:18, 1184:8
**nonevidence** [1] - 1129:11
**nonevidenced** [1] - 1173:23
**nonnarcotic** [1] - 1094:3
**nonopioid** [1] - 1094:5
**nonopioids** [1] - 1094:10
**nonprofit** [1] - 1120:9
**nonresponsiveness** [1] - 1069:10
**nonspecific** [6] - 1143:6, 1167:21, 1168:2, 1168:15, 1168:22, 1176:15
**nontherapeutic** [2] - 1135:21, 1149:23, 1149:25, 1150:10, 1150:19, 1178:23, 1180:15, 1180:16, 1180:19, 1182:12
**nontherapeutically** [2] - 1145:24, 1184:4
**normal** [3] - 1086:9, 1172:15, 1177:3
**normalizes** [1] - 1135:20
**normally** [1] - 1092:2
**notes** [20] - 1038:13, 1040:5, 1047:24, 1060:7, 1067:6, 1076:14, 1107:7, 1107:14, 1151:21, 1163:25, 1182:4, 1204:19, 1204:21, 1204:22, 1216:13, 1227:3, 1227:6, 1231:2, 1252:4
**nothing** [14] - 1037:2, 1073:7, 1115:6, 1146:15, 1205:10, 1206:22, 1207:14, 1225:14, 1227:21, 1232:14, 1232:18, 1233:3, 1254:2, 1293:1
**notice** [7] - 1050:25, 1124:25, 1125:1, 1156:4, 1157:24, 1183:1, 1287:15
**noticed** [7] - 1154:15, 1182:6, 1197:11, 1199:8, 1206:25, 1243:5, 1270:21
**notwithstanding** [1] - 1084:1
**November** [1] - 1078:12
**Number** [18] - 1043:18, 1044:11, 1058:15, 1059:13, 1064:25, 1066:15, 1068:18, 1071:15, 1079:13, 1080:3, 1104:7, 1106:12, 1106:23, 1108:17, 1109:7, 1109:8, 1109:15, 1163:8
**number** [47] - 1045:1, 1046:22, 1064:5, 1066:4, 1067:15, 1068:2, 1068:8, 1069:3, 1069:4, 106₇:₁₀

1071:2, 1071:5, 1073:23, 1094:15, 1094:16, 1098:8, 1098:13, 1103:15, 1108:21, 1121:8, 1124:4, 1125:14, 1143:19, 1157:8, 1167:15, 1168:6, 1171:4, 1207:6, 1222:23, 1245:11, 1249:6, 1255:6, 1260:23, 1266:19, 1266:23, 1270:21, 1271:5, 1271:8, 1273:1, 1275:11, 1284:18, 1287:16, 1287:20, 1288:4, 1291:5, 1291:7
**numbered** [1] - 1230:16
**numbers** [8] - 1068:20, 1071:25, 1141:11, 1206:18, 1206:19, 1207:9, 1207:14, 1207:17
**numbness** [1] - 1138:7
**nurse** [6] - 1060:24, 1092:24, 1103:5, 1103:9, 1198:22
**Nursing** [2] - 1124:5, 1124:7
**nuts** [1] - 1212:3

## O

**o'clock** [3] - 1287:2, 1287:13, 1292:19
**O-w-e-n** [1] - 1116:12
**oath** [1] - 1248:13
**Oath** [2] - 1249:17, 1249:19
**object** [10] - 1059:3, 1069:9, 1076:2, 1076:4, 1095:13, 1104:15, 1104:21, 1177:17, 1194:13, 1262:13
**objected** [1] - 1242:3
**objection** [13] - 1059:14, 1068:3, 1098:15, 1098:25, 1111:3, 1115:11, 1188:10, 1188:12, 1242:13, 1263:1, 1263:17, 1268:17, 1268:19
**objections** [2] - 1055:5, 1112:23
**objective** [1] - 1171:2
**objectives** [1] - 1235:20
**obligation** [6] - 1248:25, 1248:3, 1248:12, 1249:20, 1250:1, 1250:2
**obligations** [1] - 1258:24
**observation** [5] - 1108:20, 1139:13, 1159:19, 1166:13, 1182:18
**observe** [4] - 1141:13, 1150:13, 1181:13, 1284:13
**observed** [3] - 1143:9, 1250:11, 1271:5
**obsessive** [2] - 1133:25
**obstruction** [1] - 1257:17
**obtain** [4] - 1097:11, 1182:21, 1291:10, 1292:1
**obtained** [2] - 1094:14, 1291:11
**obtaining** [1] - 1133:10
**obviously** [5] - 1035:11, 1043:3, 1084:15, 1164:9, 1224:2
**occasion** [4] - 1104:8, 1266:4, 1271:11, 1277:12
**occasional** [1] - 1151:16
**occasionally** [2] - 1145:15, 1192:14
**occasions** [1] - 1250:11
**occupational** [1] - 1170:8
**occur** [1] - 1127:24
**occurred** [1] - 1161:12
**October** [9] - 1071:15, 1071:22

1072:4, 1073:19, 1075:20, 1076:9, 1076:17, 1078:12
**of..** [1] - 1293:7
**offense** [4] - 1058:15, 1059:12, 1059:15, 1060:1
**offer** [4] - 1115:15, 1268:16, 1271:22
**offered** [3] - 1124:6, 1171:15, 1249:8
**offhand** [1] - 1051:4
**office** [63] - 1047:12, 1047:16, 1060:21, 1061:21, 1062:5, 1063:19, 1064:24, 1068:11, 1071:2, 1076:8, 1077:18, 1077:22, 1078:3, 1080:7, 1084:21, 1084:22, 1085:10, 1085:14, 1086:14, 1088:16, 1093:11, 1094:13, 1095:18, 1095:22, 1096:8, 1096:10, 1102:10, 1102:25, 1104:16, 1104:19, 1105:24, 1107:7, 1108:8, 1109:24, 1110:23, 1112:5, 1119:6, 1119:7, 1120:6, 1122:7, 1131:10, 1146:11, 1151:3, 1152:12, 1153:5, 1179:19, 1195:15, 1195:21, 1199:12, 1252:2, 1271:15, 1271:16, 1271:18, 1272:8, 1273:15, 1277:14, 1281:12, 1281:18, 1283:16, 1284:9, 1288:5, 1290:5, 1291:13
**officer** [1] - 1122:19
**offices** [3] - 1198:11, 1198:25, 1199:13
**official** [2] - 1122:7, 1122:10
**often** [16] - 1105:19, 1105:20, 1106:4, 1106:12, 1106:13, 1106:20, 1106:21, 1106:23, 1109:8, 1109:15, 1110:5, 1110:21, 1156:4, 1174:7, 1220:14, 1285:17
**Ogee** [2] - 1123:20, 1123:21
**old** [6] - 1133:21, 1167:19, 1193:17, 1274:3, 1276:9, 1276:16
**older** [2] - 1169:6, 1210:21
**OLLISON** [1] - 1032:23, 1113:14, 1114:10, 1241:23
**omissions** [1] - 1183:22
**once** [10] - 1108:25, 1112:6, 1112:13, 1114:6, 1130:20, 1151:4, 1151:9, 1278:16, 1290:5, 1291:15
**oncologist** [2] - 1075:25, 1077:12
**one** [131] - 1033:25, 1037:24, 1037:25, 1038:15, 1043:3, 1043:16, 1045:2, 1045:11, 1046:4, 1048:15, 1050:4, 1051:7, 1051:9, 1052:6, 1053:12, 1058:11, 1060:4, 1060:7, 1063:21, 1067:12, 1074:14, 1077:23, 1088:10, 1092:17, 1095:3, 1099:8, 1099:10, 1101:18, 1101:19, 1101:20, 1103:19, 1104:3, 1104:6, 1105:17, 1107:15, 1107:16, 1108:14, 1108:19, 1108:21, 1109:5, 1110:16, 1112:12, 1112:15, 1114:3, 1114:13, 1117:15, 1117:25, 1118:24, 1119:24, 1122:9, 1125:3, 1125:20, 1128:21, 1130:12, 1132:10, 1135:8, 1136:22, 1137:2, 1139:16, 1142:14, 1146:3, 1149:3, 1149:20, 1151:19, 1153:23, 1155:18, 1156:25, 1157:15, 1157:25, 1165:16, 1165:18,

1166:21, 1172:2, 1175:6, 1178:2,
1178:18, 1178:21, 1179:14, 1180:1,
1185:17, 1190:8, 1193:18, 1193:19,
1197:14, 1202:3, 1204:21, 1207:22,
1212:5, 1212:13, 1213:10, 1215:5,
1217:11, 1217:14, 1219:21, 1223:4,
1224:13, 1224:15, 1225:21, 1225:22,
1228:1, 1228:22, 1244:3, 1246:2,
1247:12, 1252:7, 1255:18, 1269:16,
1269:21, 1270:3, 1270:4, 1272:5,
1272:25, 1279:8, 1279:9, 1279:13,
1279:23, 1280:3, 1281:9, 1281:11,
1281:12, 1281:21, 1281:22, 1282:25,
1287:25, 1288:5, 1290:12, 1293:11

**one's** [1] - 1130:19

**one-year** [1] - 1117:25

**ones** [7] - 1048:23, 1049:10, 1094:3,
1131:5, 1139:21, 1186:1, 1202:20

**ongoing** [2] - 1182:1, 1198:16

**open** [1] - 1266:21

**opened** [1] - 1273:3

**opening** [1] - 1178:8

**operates** [1] - 1223:23

**operating** [1] - 1032:7

**opiates** [2] - 1127:6, 1224:24

**opine** [1] - 1217:6

**opinion** [43] - 1031:23, 1031:25,
1033:7, 1033:15, 1034:10, 1034:14,
1034:17, 1034:21, 1035:3, 1035:9,
1035:10, 1035:12, 1035:23, 1036:7,
1037:14, 1039:25, 1040:16, 1044:15,
1046:23, 1051:16, 1055:3, 1063:2,
1063:3, 1063:4, 1111:1, 1111:6,
1129:1, 1149:22, 1150:9, 1160:6,
1181:13, 1182:23, 1183:7, 1183:11,
1192:9, 1192:22, 1244:19, 1244:20,
1245:2, 1245:7, 1246:19, 1249:22,
1251:18

**opinions** [4] - 1033:12, 1131:25,
1192:16, 1220:4

**opioid** [28] - 1070:2, 1118:21, 1121:16,
1121:21, 1127:7, 1127:11, 1127:17,
1127:19, 1127:20, 1153:18, 1153:19,
1159:3, 1162:8, 1162:24, 1163:6,
1176:25, 1189:17, 1190:4, 1204:12,
1212:4, 1212:6, 1212:14, 1213:16,
1225:2, 1225:10, 1225:21, 1239:22,
1247:16

**OPIOID** [1] - 1127:7

**opioid's** [1] - 1127:12

**opioids** [38] - 1127:5, 1127:7, 1127:10,
1127:13, 1127:14, 1128:25, 1129:5,
1129:7, 1129:8, 1131:1, 1131:3,
1158:12, 1158:14, 1163:3, 1163:15,
1163:17, 1166:21, 1174:6, 1176:21,
1180:12, 1180:24, 1191:1, 1191:2,
1191:4, 1192:6, 1198:1, 1202:14,
1205:11, 1212:25, 1213:4, 1222:9,
1223:9, 1223:11, 1224:22, 1224:24,
1233:16, 1274:20

**opium** [1] - 1127:11

**opoid** [1] - 1079:8

**opportunity** [1] - 1093:5

**oppose** [2] - 1054:23, 1258:8

**opposed** [3] - 1053:20, 1097:17,
1100:7

**opposing** [2] - 1042:23, 1253:5

**opposite** [1] - 1233:22

**opt** [2] - 1217:7, 1217:24

**opted** [4] - 1217:19, 1217:21, 1218:6,
1218:8

**opting** [3] - 1090:12, 1090:13, 1090:15

**option** [4] - 1216:19, 1216:20,
1237:10, 1281:6

**options** [2] - 1135:10, 1213:17

**order** [19] - 1036:11, 1036:25,
1037:20, 1038:25, 1041:17, 1068:2,
1131:18, 1138:14, 1140:15, 1166:11,
1199:3, 1227:25, 1237:11, 1261:22,
1262:9, 1282:18, 1291:17, 1291:18

**ordered** [1] - 1246:3

**orders** [3] - 1184:11, 1261:24, 1291:22

**organization** [3] - 1119:23, 1120:9,
1209:6

**original** [3] - 1256:3, 1256:6, 1258:4

**originally** [3] - 1134:16, 1255:2,
1280:10

**orthopedic** [3] - 1132:14, 1204:25,
1233:2

**Osman** [18] - 1070:20, 1086:12,
1086:17, 1087:3, 1087:15, 1088:10,
1091:21, 1092:23, 1096:7, 1102:3,
1102:13, 1106:1, 1107:23, 1108:24,
1109:2, 1112:8, 1112:9, 1294:4

**Osmon's** [1] - 1102:5

**otherwise** [4] - 1124:6, 1166:5,
1220:8, 1252:21

**ought** [1] - 1032:13

**ourselves** [1] - 1126:1

**outbreak** [4] - 1074:19, 1075:9,
1076:19, 1078:18

**outcome** [4] - 1155:3, 1156:10,
1156:12, 1179:5

**Outcome** [1] - 1119:23

**outcomes** [1] - 1169:2

**Outcomes** [1] - 1119:14

**outpatient** [1] - 1118:20

**outside** [27] - 1031:9, 1031:11,
1089:10, 1095:18, 1095:21, 1096:10,
1097:7, 1113:10, 1150:21, 1154:16,
1164:9, 1164:16, 1180:17, 1183:24,
1184:7, 1184:8, 1185:8, 1188:20,
1194:1, 1235:11, 1240:22, 1245:6,
1245:8, 1247:17, 1253:17, 1261:13,
1262:4

**overall** [4] - 1038:17, 1074:13, 1180:6,
1182:14

**overdose** [3] - 1177:11, 1177:16,
1181:9

**overruled** [5] - 1059:18, 1069:11,
1076:6, 1099:2, 1194:16

**overseeing** [1] - 1233:2

**overweight** [1] - 1200:1

**OWEN** [1] - 1115:24

**Owen** [24] - 1044:5, 1044:10, 1056:1,

1115:3, 1116:10, 1183:6, 1185:12,
1185:20, 1187:6, 1189:9, 1193:14,
1210:22, 1212:1, 1213:22, 1214:23,
1217:8, 1219:16, 1223:4, 1226:23,
1236:17, 1237:8, 1240:11, 1243:3,
1250:3

**owen** [2] - 1051:21, 1164:22

**Owen's** [2] - 1043:19, 1250:1

**Owens** [1] - 1054:9

**owens** [2] - 1054:10

**own** [10] - 1047:4, 1073:24, 1119:4,
1124:15, 1195:13, 1221:2, 1260:11,
1266:21, 1276:10, 1276:13

**owned** [6] - 1266:19, 1267:1, 1267:4,
1267:21, 1269:3, 1269:16

**oxycodone** [34] - 1039:23, 1127:18,
1127:19, 1128:2, 1128:6, 1150:5,
1153:13, 1154:1, 1157:5, 1157:25,
1158:9, 1158:18, 1159:11, 1159:12,
1159:25, 1162:25, 1163:9, 1181:4,
1248:17, 1250:6, 1261:3, 1261:12,
1261:18, 1261:23, 1261:25, 1262:9,
1262:11, 1270:22, 1271:2, 1271:9,
1274:16, 1290:15, 1290:16

## P

**p.m** [3] - 1164:2, 1241:8, 1294:22

**package** [2] - 1086:1, 1086:2

**Page** [9] - 1032:16, 1032:25, 1035:20,
1044:11, 1067:5, 1076:13, 1108:16

**page** [10] - 1035:16, 1040:2, 1067:7,
1080:16, 1141:20, 1145:10, 1222:22,
1223:3, 1223:4, 1229:21

**pages** [9] - 1031:18, 1032:5, 1036:16,
1036:18, 1038:15, 1039:20, 1259:21,
1263:16

**paid** [2] - 1099:22, 1120:11

**Pain** [17] - 1118:10, 1119:8, 1121:10,
1121:12, 1122:20, 1122:22, 1122:25,
1191:17, 1219:21, 1220:2, 1221:18,
1221:22, 1221:25, 1224:18, 1234:10,
1234:22

**pain** [279] - 1052:10, 1052:24, 1053:2,
1053:11, 1061:19, 1061:20, 1063:23,
1063:25, 1064:4, 1064:11, 1065:2,
1065:14, 1066:10, 1066:11, 1067:20,
1067:25, 1068:19, 1068:22, 1069:6,
1069:8, 1069:14, 1075:3, 1075:5,
1075:10, 1075:14, 1075:16, 1075:24,
1076:10, 1076:22, 1078:14, 1078:17,
1078:21, 1079:14, 1086:18, 1086:20,
1086:25, 1087:3, 1087:17, 1088:20,
1089:1, 1089:15, 1089:16, 1089:17,
1090:10, 1090:21, 1093:17, 1094:21,
1095:6, 1095:14, 1096:15, 1097:7,
1100:12, 1100:13, 1101:3, 1101:10,
1106:6, 1106:24, 1117:20, 1117:21,
1118:14, 1118:19, 1119:4, 1119:14,
1120:1, 1121:9, 1121:11, 1123:2,
1123:3, 1124:10, 1124:16, 1124:18,
1124:20, 1124:22, 1125:6, 1125:17,

1125:21, 1125:23, 1126:1, 1126:15,
1126:20, 1127:8, 1128:25, 1129:6,
1129:8, 1129:16, 1130:1, 1130:5,
1131:15, 1131:18, 1132:23, 1133:8,
1134:11, 1136:7, 1138:4, 1138:6,
1138:8, 1139:11, 1139:23, 1143:2,
1143:4, 1143:5, 1143:8, 1143:11,
1143:18, 1143:20, 1143:22, 1143:25,
1144:4, 1151:22, 1151:24, 1154:23,
1155:1, 1155:2, 1155:3, 1155:4,
1155:6, 1155:9, 1155:15, 1155:18,
1155:21, 1155:24, 1156:16, 1156:22,
1160:22, 1160:24, 1161:2, 1161:3,
1161:4, 1161:8, 1162:2, 1162:4,
1162:9, 1162:10, 1162:14, 1162:18,
1163:3, 1164:23, 1164:24, 1165:4,
1165:9, 1165:21, 1166:4, 1166:19,
1166:21, 1166:23, 1166:24, 1167:4,
1167:12, 1167:22, 1167:24, 1168:3,
1168:17, 1168:18, 1168:24, 1169:7,
1169:9, 1169:12, 1169:16, 1170:3,
1170:4, 1170:18, 1170:19, 1170:20,
1171:7, 1172:10, 1172:21, 1172:22,
1173:6, 1173:7, 1173:9, 1173:12,
1173:20, 1174:3, 1174:4, 1174:9,
1174:10, 1174:14, 1174:15, 1174:16,
1174:19, 1174:21, 1175:8, 1175:9,
1175:18, 1175:24, 1176:2, 1176:5,
1177:2, 1177:4, 1177:5, 1177:8,
1179:5, 1179:20, 1182:9, 1182:10,
1183:7, 1187:1, 1187:7, 1187:17,
1188:17, 1190:8, 1190:21, 1190:24,
1191:12, 1191:14, 1192:4, 1192:5,
1199:13, 1199:21, 1200:12, 1200:17,
1200:18, 1200:19, 1200:21, 1201:2,
1201:10, 1201:18, 1201:19, 1202:6,
1202:10, 1204:12, 1205:2, 1205:23,
1205:25, 1206:3, 1206:9, 1206:15,
1207:1, 1207:3, 1207:7, 1207:13,
1208:13, 1210:17, 1210:19, 1213:12,
1213:14, 1214:20, 1215:15, 1218:12,
1218:18, 1218:25, 1219:17, 1221:16,
1221:17, 1222:1, 1222:12, 1224:10,
1225:23, 1227:15, 1227:16, 1230:22,
1233:3, 1243:14, 1244:4, 1245:1,
1245:14, 1245:15, 1251:18, 1251:21,
1252:6, 1272:25, 1273:2, 1273:7,
1273:14, 1281:25, 1283:19
  **painful** [2] - 1074:21, 1134:7
  **panel** [5] - 1120:12, 1120:13, 1120:16,
1121:1, 1122:9
  **panels** [1] - 1220:15
  **pants** [1] - 1163:9
  **paper** [8] - 1038:19, 1111:8, 1209:7,
1209:8, 1231:11, 1231:13, 1234:18,
1290:18
  **papers** [6] - 1033:10, 1033:11,
1034:12, 1112:12, 1185:15, 1191:7
  **paperwork** [8] - 1034:2, 1034:19,
1060:23, 1100:23, 1196:12, 1196:16,
1209:6, 1222:11
  **Paradigm** [3] - 1119:14, 1119:23,
1119:24

  **Paragraph** [1] - 1244:24
  **paragraphs** [1] - 1263:13
  **paralegal** [1] - 1164:3
  **paralyzed** [1] - 1090:12
  **pardon** [2] - 1118:1, 1276:23
  **park** [1] - 1270:1
  **Parkway** [1] - 1114:9
  **part** [60] - 1032:4, 1034:20, 1041:9,
1045:5, 1045:11, 1048:17, 1069:10,
1081:13, 1115:15, 1115:19, 1119:15,
1121:23, 1129:25, 1130:9, 1134:18,
1137:10, 1138:16, 1140:12, 1141:20,
1178:11, 1191:10, 1191:16, 1192:19,
1207:18, 1207:20, 1207:22, 1208:4,
1208:18, 1208:19, 1208:24, 1209:3,
1209:21, 1209:23, 1211:14, 1212:15,
1217:21, 1226:6, 1230:24, 1231:1,
1237:9, 1246:7, 1246:9, 1255:25,
1256:23, 1256:25, 1258:13, 1258:23,
1259:6, 1260:8, 1260:25, 1261:6,
1264:11, 1264:12, 1265:5, 1266:3,
1266:8, 1271:21, 1279:21, 1283:8
  **partial** [1] - 1076:24
  **partially** [2] - 1181:16, 1191:10
  **participate** [3] - 1217:10, 1217:13,
1217:15
  **participated** [1] - 1217:19
  **participating** [2] - 1067:21, 1173:2
  **participation** [1] - 1120:10
  **particular** [8] - 1035:7, 1042:2,
1053:24, 1087:6, 1101:23, 1206:12,
1286:8, 1286:18
  **particularly** [3] - 1150:5, 1253:5,
1261:3
  **party** [1] - 1238:21
  **pass** [2] - 1096:18, 1241:1
  **past** [10] - 1064:1, 1079:14, 1118:13,
1122:24, 1134:4, 1169:14, 1208:13,
1209:1, 1232:15, 1254:21
  **pathological** [1] - 1169:13
  **pathology** [8] - 1125:21, 1143:1,
1143:5, 1171:21, 1176:9, 1176:12,
1176:14, 1176:18
  **patient** [175] - 1036:1, 1036:4,
1036:10, 1037:8, 1037:20, 1038:15,
1040:3, 1040:23, 1042:1, 1042:5,
1089:20, 1095:7, 1109:5, 1131:21,
1132:19, 1132:23, 1134:24, 1136:12,
1139:2, 1140:6, 1143:7, 1143:17,
1143:24, 1144:11, 1146:8, 1146:13,
1146:14, 1146:19, 1147:2, 1147:7,
1147:15, 1147:18, 1147:25, 1148:6,
1148:20, 1149:10, 1149:22, 1151:2,
1151:9, 1151:18, 1152:20, 1152:22,
1153:4, 1153:6, 1153:8, 1153:13,
1153:15, 1154:14, 1154:25, 1156:11,
1156:15, 1157:13, 1159:20, 1159:21,
1161:22, 1162:15, 1163:7, 1163:8,
1165:7, 1165:15, 1165:21, 1166:13,
1171:8, 1171:9, 1171:12, 1174:15,
1176:6, 1176:13, 1177:15, 1180:6,
1180:13, 1181:3, 1182:19, 1186:11,
1186:18, 1192:21, 1196:7, 1196:8,

1196:25, 1198:10, 1198:13, 1198:19,
1199:4, 1199:8, 1199:10, 1199:14,
1199:16, 1200:15, 1200:20, 1202:9,
1202:19, 1203:21, 1204:5, 1204:23,
1205:22, 1205:25, 1207:12, 1208:25,
1209:13, 1209:16, 1210:5, 1210:13,
1210:25, 1211:15, 1213:14, 1214:13,
1214:15, 1215:1, 1215:8, 1215:12,
1216:24, 1218:8, 1218:18, 1221:12,
1221:15, 1223:7, 1224:2, 1224:15,
1225:2, 1226:19, 1227:19, 1228:7,
1228:11, 1228:21, 1230:14, 1231:15,
1232:10, 1232:25, 1237:5, 1237:19,
1238:18, 1239:3, 1239:9, 1244:16,
1245:20, 1246:12, 1246:16, 1247:22,
1247:23, 1249:24, 1250:12, 1250:22,
1251:8, 1274:5, 1274:22, 1275:2,
1279:7, 1279:14, 1279:24, 1280:3,
1280:11, 1281:9, 1281:12, 1281:18,
1281:19, 1281:24, 1282:10, 1283:1,
1283:6, 1283:14, 1283:15, 1283:17,
1286:14, 1286:21, 1288:16, 1289:5,
1289:15, 1291:24, 1292:1, 1292:12
  **patient's** [7] - 1148:3, 1151:21,
1154:8, 1154:23, 1219:13, 1228:4,
1283:3
  **patients** [69] - 1033:21, 1034:3,
1035:13, 1037:1, 1037:13, 1045:11,
1053:13, 1085:20, 1086:6, 1088:15,
1089:22, 1091:11, 1095:8, 1140:18,
1140:19, 1149:8, 1151:1, 1157:8,
1161:9, 1161:10, 1165:16, 1166:15,
1167:15, 1174:8, 1177:13, 1180:9,
1182:20, 1183:2, 1184:11, 1189:6,
1197:23, 1201:7, 1204:11, 1206:25,
1208:16, 1208:19, 1210:8, 1212:23,
1222:7, 1224:5, 1226:14, 1234:4,
1237:22, 1238:25, 1239:14, 1247:23,
1247:24, 1271:8, 1271:14, 1273:20,
1273:21, 1273:22, 1273:23, 1274:1,
1274:7, 1274:9, 1274:16, 1276:4,
1278:3, 1278:4, 1279:3, 1284:14,
1287:7, 1287:22, 1288:9, 1291:13,
1291:17, 1293:17, 1294:5
  **patients'** [1] - 1036:5
  **pattern** [10] - 1182:6, 1228:16,
1229:17, 1229:24, 1232:12, 1246:13,
1246:14, 1246:16, 1246:19, 1247:2
  **patterns** [2] - 1230:8, 1234:2
  **pay** [4] - 1125:15, 1169:10, 1179:19,
1268:1
  **paying** [1] - 1097:13
  **payment** [4] - 1291:10, 1291:11,
1291:19, 1292:1
  **Peekskill** [2] - 1264:19, 1264:20
  **peer** [2] - 1121:9, 1121:11
  **peg** [11] - 1094:22, 1094:25, 1095:1,
1095:4, 1095:10, 1095:17, 1100:19,
1100:22, 1100:24, 1100:25, 1101:9
  **penalty** [1] - 1125:12
  **people** [35] - 1033:11, 1070:3, 1084:3,
1126:3, 1167:22, 1167:23, 1168:3,
1168:16, 1174:13, 1176:21, 1177:4,

1177:5, 1177:6, 1178:2, 1186:8, 1191:6, 1201:9, 1201:16, 1203:21, 1206:19, 1214:9, 1214:19, 1218:10, 1218:21, 1223:16, 1225:6, 1226:1, 1232:1, 1274:21, 1285:5, 1285:6, 1285:7, 1288:5, 1290:22, 1291:16

**people's** [1] - 1198:25
**per** [2] - 1219:7, 1291:4
**perceive** [1] - 1171:24
**perceived** [3] - 1175:18, 1176:10, 1176:16
**percent** [3] - 1140:3, 1169:12, 1288:22
**perception** [4] - 1134:11, 1171:6, 1172:14, 1175:24
**perform** [7] - 1046:16, 1183:19, 1194:24, 1202:18, 1243:17, 1243:18, 1243:19
**performed** [12] - 1052:15, 1131:23, 1131:24, 1145:17, 1145:18, 1146:4, 1146:5, 1147:19, 1147:21, 1203:17, 1204:2, 1211:18
**perhaps** [11] - 1033:10, 1046:25, 1047:22, 1093:24, 1132:18, 1133:12, 1158:18, 1162:25, 1202:6, 1247:13
**period** [27] - 1062:25, 1070:18, 1075:23, 1076:22, 1079:4, 1091:16, 1093:12, 1095:23, 1134:8, 1144:20, 1186:21, 1187:15, 1190:23, 1191:11, 1193:2, 1194:5, 1206:16, 1213:1, 1213:5, 1220:23, 1230:4, 1234:8, 1235:2, 1237:9, 1237:10, 1275:9
**periodic** [2] - 1228:2, 1228:3
**periodically** [1] - 1079:6
**periods** [1] - 1151:23
**perithyroid** [1] - 1162:5
**perjury** [1] - 1257:16
**permit** [6] - 1031:16, 1034:7, 1035:4, 1042:18, 1051:13, 1252:24
**permitted** [5] - 1048:7, 1261:1, 1278:22, 1280:4, 1280:18
**persist** [1] - 1258:2
**persists** [1] - 1173:7
**person** [35] - 1039:10, 1045:13, 1049:1, 1051:8, 1052:4, 1067:20, 1079:8, 1080:9, 1095:15, 1120:11, 1131:15, 1132:3, 1132:11, 1136:2, 1142:2, 1145:12, 1145:21, 1153:25, 1154:21, 1166:11, 1167:13, 1169:8, 1170:24, 1171:19, 1172:7, 1173:12, 1173:19, 1175:16, 1199:24, 1200:17, 1202:9, 1203:7, 1203:13, 1215:22
**person's** [3] - 1172:3, 1172:21, 1173:16
**personal** [1] - 1133:22
**personality** [1] - 1134:2
**persons** [5] - 1109:11, 1152:9, 1167:18, 1168:9, 1247:20
**perspective** [1] - 1053:1, 1088:25
**pertaining** [2] - 1244:6, 1260:12
**pertinent** [4] - 1131:22, 1145:6, 1145:8, 1184:1
**Ph.D** [2] - 1054:23, 1055:4
**pharmaceutical** [5] - 1133:7, 1170:5,

1170:11, 1170:12, 1170:16
**pharmacies** [7] - 1266:19, 1266:23, 1267:19, 1267:20, 1267:21, 1268:1, 1269:17
**Pharmacies** [2] - 1270:2, 1270:3
**pharmacist** [15] - 1254:22, 1260:18, 1265:17, 1265:20, 1266:3, 1266:12, 1270:7, 1270:11, 1270:14, 1274:23, 1282:12, 1285:23, 1285:24, 1286:9, 1292:6
**pharmacists** [1] - 1286:5
**Pharmacy** [13] - 1086:3, 1258:18, 1267:1, 1267:2, 1268:12, 1269:1, 1269:7, 1269:20, 1269:22, 1270:1, 1270:8, 1278:13
**pharmacy** [31] - 1145:10, 1208:23, 1224:15, 1237:6, 1264:5, 1265:13, 1265:14, 1265:21, 1266:13, 1266:20, 1266:21, 1267:22, 1267:23, 1268:4, 1268:13, 1268:25, 1270:10, 1272:14, 1279:4, 1279:8, 1279:11, 1279:15, 1279:24, 1282:11, 1283:6, 1284:3, 1285:18, 1285:23, 1286:10, 1290:6, 1290:8
**phase** [1] - 1134:3
**philosophy** [1] - 1054:23
**phone** [9] - 1238:21, 1272:18, 1284:8, 1286:23, 1289:21, 1289:23, 1289:25, 1290:22, 1292:12
**phonetic** [2] - 1123:20, 1123:21
**photocopies** [1] - 1157:19
**photograph** [2] - 1268:9, 1268:11
**photos** [1] - 1107:7
**phrase** [1] - 1203:4
**physical** [57] - 1066:22, 1066:24, 1067:3, 1067:12, 1067:21, 1067:24, 1091:4, 1091:10, 1102:13, 1102:18, 1124:18, 1125:23, 1126:21, 1127:1, 1127:3, 1130:2, 1132:4, 1132:6, 1132:8, 1132:13, 1133:12, 1134:20, 1138:14, 1138:17, 1138:22, 1140:7, 1140:8, 1140:14, 1141:15, 1142:10, 1142:13, 1142:16, 1142:21, 1143:8, 1144:2, 1144:10, 1145:14, 1145:15, 1149:19, 1150:7, 1151:9, 1151:13, 1161:23, 1170:8, 1172:24, 1173:4, 1176:5, 1184:2, 1202:13, 1202:18, 1202:22, 1203:17, 1210:17, 1210:19, 1211:11, 1235:6, 1252:9
**physically** [1] - 1179:10
**physician** [34] - 1120:24, 1128:15, 1128:16, 1136:23, 1149:25, 1166:1, 1181:22, 1181:23, 1183:19, 1187:17, 1187:18, 1187:21, 1196:7, 1199:9, 1210:9, 1211:14, 1220:16, 1224:2, 1231:19, 1231:22, 1233:11, 1233:25, 1239:8, 1250:23, 1274:5, 1274:10, 1276:19, 1276:20, 1279:25, 1280:3, 1280:6, 1280:9, 1281:12, 1282:7
**physician's** [1] - 1121:3
**physicians** [13] - 1053:3, 1120:5, 1121:2, 1140:12, 1145:12, 1189:9, 1202:17, 1233:14, 1234:20, 1251:18,

1279:6, 1280:25, 1281:8
**PIC** [1] - 1270:14
**pick** [4] - 1048:12, 1057:2, 1114:22, 1292:19
**picking** [1] - 1054:2
**picture** [1] - 1268:24
**piece** [6] - 1038:19, 1125:3, 1209:7, 1209:8, 1231:11, 1231:13
**Pilates** [1] - 1170:9
**pile** [2] - 1290:12, 1290:14
**pill** [7] - 1032:3, 1032:7, 1032:10, 1122:2, 1135:20, 1184:16, 1288:20
**pills** [7] - 1067:15, 1083:12, 1083:21, 1084:8, 1098:14, 1153:14, 1250:21
**pilots** [3] - 1122:12, 1122:13, 1122:18
**pinches** [1] - 1206:8
**pinching** [1] - 1169:20
**Pittsburgh** [2] - 1117:22, 1119:3
**place** [9] - 1065:13, 1076:16, 1078:23, 1144:25, 1187:1, 1187:8, 1273:14, 1273:15, 1283:2
**placed** [1] - 1135:9
**plan** [18] - 1042:10, 1042:20, 1046:22, 1064:22, 1065:12, 1068:9, 1078:23, 1078:25, 1079:8, 1081:11, 1130:9, 1149:21, 1209:4, 1214:3, 1214:7, 1216:6, 1216:12, 1221:4
**planned** [5] - 1039:16, 1115:15, 1216:16, 1281:16, 1282:5
**planning** [2] - 1044:18
**plans** [2] - 1050:5, 1218:11
**plant** [2] - 1127:11, 1127:12
**played** [1] - 1047:11
**playing** [1] - 1085:7
**Plaza** [1] - 1270:1
**plea** [7] - 1255:18, 1255:24, 1256:10, 1256:18, 1257:25, 1258:2, 1260:13
**pleasurable** [1] - 1173:2
**pled** [4] - 1258:1, 1260:9, 1261:10, 1261:22
**plus** [4] - 1125:12, 1143:18, 1170:17, 1171:22
**point** [26] - 1034:5, 1034:6, 1039:4, 1042:22, 1044:11, 1055:2, 1055:9, 1083:8, 1104:24, 1107:22, 1113:7, 1119:17, 1140:6, 1161:21, 1173:5, 1182:12, 1199:7, 1217:11, 1217:14, 1220:21, 1265:8, 1266:20, 1270:16, 1275:17, 1282:3, 1292:14
**pointed** [1] - 1038:23
**points** [5] - 1039:16, 1044:10, 1095:12, 1151:20, 1243:7
**policy** [5] - 1233:17, 1234:12, 1234:15, 1234:19, 1234:23
**polyps** [2] - 1088:6, 1088:7
**poor** [1] - 1169:2
**poppy** [2] - 1127:11, 1127:12
**popular** [4] - 1130:8, 1159:3, 1159:5, 1160:10
**population** [6] - 1174:21, 1177:2, 1177:3, 1216:24, 1217:25, 1218:8
**portion** [2] - 1032:12, 1084:21

**portions** [1] - 1038:12
**position** [6] - 1046:25, 1122:22, 1163:18, 1182:11, 1224:5, 1234:11
**positions** [1] - 1191:7
**positive** [4] - 1068:10, 1146:5, 1234:1, 1288:22
**positives** [1] - 1139:25
**possession** [4] - 1057:17, 1058:11, 1110:3, 1198:7
**possibilities** [1] - 1171:23
**possible** [12] - 1156:2, 1156:23, 1192:12, 1197:2, 1200:5, 1200:6, 1204:14, 1210:7, 1220:4, 1226:5, 1231:8, 1231:16
**possibly** [5] - 1121:7, 1171:18, 1203:16, 1203:25, 1289:8
**post** [4] - 1134:3, 1166:6, 1186:15, 1187:1
**post-traumatic** [1] - 1166:6
**postal** [3] - 1081:18, 1082:12, 1082:24
**potential** [5] - 1067:24, 1222:8, 1223:20, 1250:7, 1253:3
**potentially** [1] - 1253:2
**pounds** [2] - 1074:8, 1074:12
**powerful** [1] - 1239:22
**practical** [1] - 1118:17
**practice** [38] - 1039:25, 1040:20, 1047:4, 1051:18, 1052:11, 1053:25, 1055:6, 1118:4, 1118:23, 1137:22, 1149:24, 1149:25, 1150:22, 1154:17, 1160:6, 1180:17, 1180:18, 1183:3, 1183:25, 1185:9, 1188:20, 1189:3, 1192:11, 1196:8, 1197:1, 1206:12, 1218:25, 1220:18, 1220:22, 1222:1, 1247:18, 1251:18, 1252:6, 1252:11, 1261:13, 1262:5, 1273:1
**practices** [8] - 1123:2, 1197:3, 1197:6, 1197:7, 1197:9, 1198:19, 1240:12
**practicing** [19] - 1032:1, 1053:9, 1119:16, 1140:12, 1157:3, 1183:20, 1184:6, 1184:7, 1189:11, 1189:13, 1202:20, 1245:14, 1270:7, 1273:2, 1273:5, 1273:7, 1273:14, 1273:15, 1273:17
**practitioner** [3] - 1070:15, 1070:16, 1198:23
**practitioners** [2] - 1191:13
**precedes** [1] - 1196:12
**precise** [1] - 1141:8
**precursor** [1] - 1127:25
**predict** [3] - 1167:24, 1176:10, 1176:15
**predictive** [1] - 1126:12
**prefer** [1] - 1260:13
**pregnancy** [1] - 1139:22
**preliminary** [2] - 1088:11, 1139:17
**preparation** [1] - 1085:4
**prepared** [2] - 1055:3, 1142:4
**preparing** [1] - 1081:11
**prescribe** [12] - 1094:5, 1097:19, 1140:9, 1140:16, 1147:12, 1162:24, 1183:15, 1184:24, 1226:4, 1239:24, 1246:23, 1248:16

**prescribed** [40] - 1062:8, 1065:10, 1068:9, 1068:12, 1068:24, 1069:4, 1069:22, 1069:24, 1069:25, 1078:16, 1081:1, 1081:2, 1081:7, 1083:21, 1087:16, 1088:2, 1094:2, 1094:3, 1094:8, 1134:24, 1136:15, 1136:17, 1146:2, 1146:20, 1152:3, 1157:15, 1158:4, 1159:23, 1180:25, 1183:16, 1185:8, 1188:16, 1205:12, 1216:7, 1231:14, 1236:4, 1236:9, 1247:16, 1250:15
**prescribes** [1] - 1248:10
**prescribing** [27] - 1054:2, 1066:10, 1098:3, 1137:6, 1145:24, 1149:23, 1150:1, 1150:4, 1150:10, 1150:19, 1150:21, 1152:24, 1156:8, 1159:8, 1160:7, 1160:19, 1176:19, 1178:23, 1184:4, 1212:3, 1213:7, 1246:13, 1246:19, 1247:2, 1249:22, 1283:23
**prescription** [52] - 1064:18, 1068:23, 1072:12, 1081:12, 1092:25, 1093:24, 1097:22, 1153:3, 1153:7, 1153:10, 1153:15, 1154:1, 1154:13, 1154:16, 1157:14, 1157:16, 1157:18, 1158:24, 1165:22, 1173:25, 1176:18, 1187:3, 1188:21, 1212:22, 1236:16, 1236:19, 1236:24, 1237:2, 1246:16, 1248:6, 1249:23, 1249:24, 1249:25, 1279:9, 1279:23, 1280:5, 1280:9, 1280:11, 1280:12, 1280:15, 1281:19, 1282:9, 1282:11, 1282:25, 1283:5, 1283:12, 1290:9, 1290:10, 1290:14, 1290:16, 1290:17, 1291:18
**prescriptions** [79] - 1062:24, 1094:15, 1107:19, 1150:18, 1153:16, 1155:13, 1156:18, 1157:4, 1157:9, 1157:13, 1157:20, 1157:23, 1157:24, 1158:16, 1158:25, 1180:14, 1180:16, 1184:9, 1185:3, 1188:25, 1231:4, 1245:20, 1261:7, 1261:11, 1261:16, 1261:18, 1261:23, 1262:4, 1270:17, 1270:21, 1271:9, 1271:14, 1272:13, 1272:21, 1275:11, 1275:20, 1279:4, 1279:6, 1279:9, 1279:13, 1279:19, 1280:1, 1280:19, 1280:21, 1281:2, 1281:8, 1281:11, 1281:13, 1281:19, 1281:22, 1282:5, 1282:13, 1282:15, 1283:2, 1284:3, 1284:4, 1284:6, 1285:5, 1285:7, 1285:24, 1285:25, 1286:11, 1286:13, 1286:17, 1286:21, 1287:5, 1287:10, 1287:15, 1287:16, 1287:20, 1287:25, 1288:7, 1288:8, 1289:18, 1290:5, 1291:14, 1291:15
**presence** [11] - 1031:1, 1073:15, 1114:19, 1163:23, 1178:17, 1212:5, 1241:5, 1242:1, 1242:21, 1263:23, 1292:22
**present** [2] - 1055:11, 1138:13
**presented** [3] - 1034:12, 1034:19, 1055:10
**presenting** [3] - 1033:22, 1041:11, 1041:21
**presents** [1] - 1161:1

**president** [1] - 1122:24
**pressed** [1] - 1090:3
**pressure** [26] - 1070:7, 1070:8, 1070:14, 1070:17, 1070:24, 1071:1, 1088:9, 1088:10, 1095:12, 1135:19, 1135:20, 1135:22, 1198:25, 1199:4, 1199:8, 1252:2, 1252:3, 1288:17, 1288:18, 1288:20, 1289:2, 1289:5, 1289:15
**pretty** [10] - 1043:1, 1125:4, 1125:13, 1129:1, 1155:5, 1178:15, 1199:22, 1269:9, 1291:20, 1291:23
**preventative** [1] - 1077:13
**previous** [9] - 1131:22, 1133:10, 1135:7, 1138:2, 1138:22, 1145:6, 1145:8, 1145:11, 1156:18
**previously** [16] - 1060:9, 1062:12, 1065:7, 1065:16, 1065:21, 1068:21, 1069:3, 1072:19, 1075:18, 1081:23, 1123:5, 1134:23, 1137:4, 1145:12, 1242:8
**primarily** [2] - 1246:21, 1269:17
**primary** [6] - 1117:19, 1170:11, 1187:2, 1191:13, 1199:9, 1210:8
**prison** [1] - 1071:24
**private** [1] - 1112:15
**probability** [1] - 1182:15
**problem** [27] - 1035:11, 1043:2, 1110:22, 1126:25, 1137:9, 1139:23, 1153:11, 1161:8, 1162:5, 1162:14, 1168:10, 1168:14, 1168:19, 1175:12, 1177:10, 1202:2, 1204:8, 1218:18, 1226:6, 1243:18, 1243:20, 1244:1, 1244:3, 1244:4, 1292:10
**problems** [11] - 1050:4, 1064:11, 1109:16, 1120:8, 1133:1, 1138:9, 1162:6, 1169:5, 1244:6, 1281:24, 1289:16
**procedure** [1] - 1291:20
**procedures** [2] - 1170:6, 1218:12
**proceed** [13] - 1057:3, 1073:14, 1073:16, 1073:17, 1084:19, 1115:22, 1164:18, 1178:19, 1185:16, 1242:23, 1259:18, 1263:22, 1263:24
**proceedings** [1] - 1295:4
**proceeds** [1] - 1258:14
**process** [2] - 1138:19, 1149:5
**processes** [1] - 1175:15
**produce** [5] - 1156:9, 1156:12, 1161:8, 1182:16, 1200:12
**productive** [1] - 1175:11
**products** [2] - 1261:19, 1261:23
**profanity** [1] - 1099:11
**profession** [2] - 1055:8, 1116:16
**professional** [11] - 1043:14, 1044:5, 1150:22, 1154:17, 1160:6, 1180:17, 1183:24, 1247:17, 1249:22, 1261:13, 1277:5
**profile** [1] - 1184:16
**profit** [2] - 1120:9, 1120:10
**program** [15] - 1052:24, 1117:5, 1117:14, 1117:24, 1119:3, 1120:4, 1182:14, 1187:3, 1217:11, 1217:14,

1236:20, 1236:25, 1237:2
**pronounce** [1] - 1070:20
**pronouncing** [1] - 1167:1
**proper** [21] - 1038:2, 1130:3, 1132:18, 1140:8, 1144:14, 1145:2, 1147:6, 1150:14, 1150:16, 1150:17, 1152:19, 1153:2, 1153:3, 1153:6, 1153:17, 1169:24, 1211:20, 1244:14, 1244:21, 1246:20, 1251:1
**properly** [3] - 1149:7, 1157:3, 1282:16
**property** [1] - 1125:14
**prosecuted** [2] - 1083:23, 1257:16
**prosecutor** [2] - 1196:4, 1197:16
**prostitution** [5] - 1059:12, 1059:16, 1059:21, 1060:1, 1060:4
**prove** [7] - 1040:24, 1040:25, 1041:21, 1041:22, 1143:3, 1188:7, 1188:9
**proved** [1] - 1045:1
**proven** [2] - 1190:19, 1220:8
**provide** [12] - 1043:9, 1063:22, 1074:1, 1076:22, 1086:20, 1131:8, 1182:15, 1208:16, 1222:7, 1251:5, 1257:13, 1257:19
**provided** [14] - 1037:12, 1061:5, 1061:10, 1062:3, 1064:3, 1065:14, 1066:3, 1081:4, 1088:24, 1093:7, 1185:4, 1185:5, 1222:5
**provides** [1] - 1225:5
**providing** [3] - 1060:24, 1081:14, 1251:3
**provisions** [1] - 1224:13
**prudent** [2] - 1128:14, 1128:16
**psychiatrist** [3] - 1132:22, 1132:25, 1133:5
**psychological** [13] - 1148:17, 1162:10, 1162:11, 1166:15, 1170:22, 1170:24, 1171:3, 1171:10, 1177:4, 1177:5, 1177:7, 1210:18, 1210:21
**psychologically** [1] - 1179:10
**psychologist** [19] - 1052:10, 1052:16, 1052:17, 1052:21, 1052:23, 1053:1, 1053:8, 1053:11, 1054:4, 1054:24, 1132:19, 1132:21, 1132:23, 1132:25, 1133:1, 1133:9, 1171:13, 1175:14, 1219:25
**psychologist's** [1] - 1053:16
**psychologists** [1] - 1053:3
**psychosocial** [6] - 1172:20, 1172:25, 1173:4, 1174:17, 1174:18, 1210:19
**psychotherapy** [5] - 1121:21, 1121:23, 1129:17, 1166:11, 1170:10
**Public** [1] - 1237:11
**public** [2] - 1183:12, 1212:22
**publications** [1] - 1123:1
**published** [2] - 1234:13, 1234:15
**publishing** [1] - 1191:7
**pull** [3] - 1124:25, 1129:1, 1254:14
**pumps** [1] - 1218:14
**punch** [1] - 1158:12
**punishment** [1] - 1259:22
**purchased** [2] - 1267:8, 1267:9
**purpose** [18] - 1046:4, 1053:15,

1075:16, 1132:24, 1150:23, 1154:18, 1180:22, 1181:20, 1183:25, 1184:9, 1185:5, 1185:9, 1222:6, 1223:10, 1247:18, 1261:14, 1262:5
**purposes** [3] - 1082:23, 1132:22, 1274:25
**pursuant** [2] - 1256:9, 1259:20
**pursue** [1] - 1148:16
**push** [1] - 1095:10
**pushing** [2] - 1090:10, 1090:11
**put** [20] - 1050:24, 1064:17, 1065:13, 1083:15, 1083:17, 1086:21, 1124:24, 1144:6, 1148:1, 1157:12, 1195:14, 1218:22, 1221:19, 1234:11, 1234:23, 1242:14, 1279:10, 1280:10, 1281:22, 1290:12
**puts** [1] - 1202:9
**putting** [3] - 1052:6, 1091:5, 1234:19

## Q

**qualified** [3] - 1034:9, 1142:3, 1142:7
**qualify** [1] - 1259:9
**quality** [7] - 1124:23, 1143:8, 1173:17, 1215:5, 1215:11, 1223:11
**quantities** [1] - 1261:18
**quantity** [1] - 1236:9
**questioned** [1] - 1178:10
**questioning** [3] - 1034:15, 1091:24, 1177:18
**questionnaire** [1] - 1126:11
**questionnaires** [1] - 1171:4
**questions** [48] - 1033:6, 1035:1, 1036:21, 1038:5, 1038:18, 1039:1, 1048:9, 1049:14, 1057:9, 1073:5, 1079:16, 1080:20, 1082:16, 1088:12, 1097:2, 1099:4, 1102:16, 1112:16, 1131:13, 1138:5, 1138:12, 1138:14, 1138:18, 1154:20, 1164:24, 1165:25, 1178:24, 1185:11, 1194:14, 1235:1, 1243:11, 1245:11, 1248:2, 1252:13, 1255:1, 1260:12, 1263:19, 1273:1, 1273:24, 1274:12, 1277:6, 1277:7, 1278:23, 1282:1, 1282:4, 1282:6, 1283:19, 1286:25
**quick** [1] - 1043:2
**quickly** [3] - 1113:5, 1243:11, 1243:15
**quit** [2] - 1096:1, 1132:5
**quite** [9] - 1058:3, 1074:17, 1097:13, 1102:24, 1168:20, 1195:7, 1218:24, 1224:14, 1229:17

## R

**radar** [1] - 1144:6
**radiate** [1] - 1138:6
**radiating** [1] - 1138:8
**radiculopathy** [3] - 1167:1, 1167:2, 1169:22
**raise** [2] - 1065:3, 1253:24
**raised** [4] - 1075:8, 1076:18, 1251:10,

1251:12
**raises** [1] - 1251:11
**ran** [1] - 1243:10
**Randall's** [2] - 1269:7, 1269:8
**range** [22] - 1140:24, 1141:1, 1141:2, 1141:4, 1141:5, 1141:7, 1141:16, 1141:19, 1141:21, 1141:23, 1141:25, 1142:4, 1142:8, 1142:14, 1142:17, 1142:21, 1145:15, 1151:16, 1165:6, 1201:23, 1201:25, 1259:2
**rate** [9] - 1063:23, 1065:1, 1065:4, 1068:19, 1069:6, 1069:8, 1069:14, 1086:20, 1105:8
**rated** [3] - 1164:23, 1164:24, 1165:4
**rather** [1] - 1243:10
**rating** [1] - 1201:1
**rational** [1] - 1225:15
**rationale** [1] - 1225:18
**ray** [3] - 1101:25, 1145:10, 1276:11
**rays** [2] - 1226:25, 1274:2
**reach** [1] - 1035:15
**reaches** [1] - 1036:8
**reaching** [1] - 1134:14
**react** [3] - 1128:1, 1129:23, 1133:3
**reacting** [1] - 1283:18
**reaction** [2] - 1124:22, 1130:5
**read** [15] - 1034:11, 1035:8, 1035:24, 1037:12, 1039:22, 1078:7, 1080:21, 1112:12, 1181:25, 1185:25, 1226:19, 1260:14, 1263:4, 1292:8
**reading** [1] - 1262:18
**ready** [6] - 1031:14, 1057:2, 1164:18, 1164:19, 1241:15, 1242:24
**real** [7] - 1113:5, 1131:5, 1141:18, 1143:22, 1209:2, 1212:3, 1219:16
**realistic** [2] - 1175:3, 1182:15
**reality** [1] - 1083:25
**realize** [6] - 1050:19, 1201:6, 1210:16, 1216:24, 1217:4, 1218:10
**really** [21] - 1035:12, 1035:13, 1035:14, 1037:9, 1046:14, 1047:2, 1047:23, 1073:9, 1126:2, 1162:14, 1166:7, 1169:10, 1182:15, 1190:24, 1200:14, 1200:17, 1209:11, 1219:1, 1232:6, 1238:10, 1293:8
**reason** [11] - 1067:16, 1067:17, 1072:14, 1073:25, 1076:25, 1077:2, 1095:4, 1097:8, 1238:13, 1286:8, 1286:18
**reasonable** [8] - 1128:14, 1128:16, 1146:23, 1228:4, 1230:8, 1230:9, 1285:13, 1286:24
**reasons** [5] - 1047:22, 1097:10, 1097:25, 1161:3, 1161:5
**rebut** [2] - 1046:5, 1051:21
**rebuttal** [2] - 1051:8, 1252:20
**recalling** [1] - 1213:3
**receive** [7] - 1246:16, 1259:23, 1270:23, 1279:18, 1282:9, 1284:5, 1287:21
**received** [7] - 1060:2, 1061:7, 1208:21, 1237:6, 1287:5, 1290:5, 1292:12

**receives** [2] - 1196:18, 1227:18
**receiving** [8] - 1058:16, 1093:1, 1156:24, 1205:15, 1272:13, 1284:24, 1287:17, 1288:5
**recent** [2] - 1085:25, 1236:24
**recently** [8] - 1057:12, 1077:16, 1077:17, 1077:19, 1078:9, 1085:2, 1091:17, 1238:6
**receptors** [2] - 1127:8, 1127:9
**Recessed** [5] - 1056:19, 1114:23, 1164:2, 1241:8, 1294:22
**recognize** [4] - 1083:3, 1130:8, 1175:15, 1223:5
**recognized** [5] - 1130:10, 1212:5, 1212:13, 1213:10, 1213:15
**recognizing** [1] - 1178:8
**recollect** [1] - 1058:21
**recollection** [20] - 1058:12, 1058:22, 1058:24, 1059:11, 1059:20, 1060:11, 1061:16, 1063:13, 1063:19, 1064:8, 1079:11, 1079:21, 1079:25, 1080:6, 1089:17, 1091:12, 1092:6, 1092:9, 1092:11, 1094:23
**recommend** [2] - 1163:14, 1259:1
**recommended** [2] - 1169:1, 1249:10
**recommends** [1] - 1224:19
**record** [14] - 1036:24, 1037:8, 1077:4, 1115:16, 1135:15, 1139:7, 1157:15, 1157:16, 1181:20, 1208:23, 1236:14, 1242:5, 1242:18, 1295:4
**recorded** [1] - 1207:17
**records** [42] - 1034:20, 1037:10, 1037:11, 1077:3, 1079:2, 1131:22, 1132:2, 1133:11, 1134:18, 1135:7, 1138:1, 1138:21, 1138:23, 1138:25, 1140:13, 1140:25, 1143:5, 1144:14, 1144:21, 1145:6, 1145:8, 1145:11, 1161:20, 1161:22, 1181:22, 1181:24, 1184:1, 1197:7, 1197:12, 1206:24, 1208:2, 1222:3, 1222:5, 1226:7, 1226:18, 1230:20, 1235:3, 1235:14, 1237:19, 1244:14, 1274:8, 1274:9
**recover** [1] - 1048:7
**recovering** [1] - 1063:10
**red** [2] - 1040:18, 1040:19
**REDIRECT** [2] - 1096:22, 1243:1
**redirect** [3] - 1056:12, 1096:19, 1241:3
**reduce** [4] - 1040:22, 1066:9, 1095:6, 1101:3
**reduced** [11] - 1065:20, 1066:3, 1069:4, 1069:15, 1094:14, 1098:9, 1098:13, 1098:23, 1153:12, 1153:13, 1155:1
**reducing** [1] - 1215:15
**reduction** [4] - 1095:14, 1098:13, 1155:5, 1259:10
**reductions** [1] - 1259:3
**refer** [8] - 1046:11, 1101:17, 1101:25, 1102:2, 1132:19, 1132:23, 1152:25, 1170:24
**reference** [4] - 1046:9, 1128:12, 1190:20, 1249:13
**referral** [2] - 1273:21, 1273:22

**referred** [6] - 1147:20, 1166:15, 1171:12, 1240:18, 1248:21, 1249:14
**referring** [6] - 1223:3, 1234:24, 1276:19, 1276:20, 1279:2, 1279:3
**refers** [1] - 1203:6
**refill** [1] - 1135:13
**refilling** [1] - 1155:12
**refills** [1] - 1136:20
**reflect** [2] - 1077:3, 1235:14
**reflected** [5] - 1087:15, 1146:15, 1169:7, 1207:14, 1208:15
**reflecting** [1] - 1089:8
**reflection** [2] - 1143:22, 1143:23
**reflects** [2] - 1077:4, 1085:22
**refresh** [1] - 1049:7
**refreshing** [1] - 1049:6
**refute** [2] - 1046:6, 1046:25
**regard** [42] - 1049:14, 1139:4, 1139:13, 1140:17, 1140:24, 1141:3, 1141:25, 1142:20, 1142:24, 1143:1, 1144:24, 1151:7, 1152:9, 1162:2, 1162:23, 1171:17, 1174:16, 1174:19, 1176:6, 1180:11, 1180:13, 1181:12, 1181:14, 1182:3, 1182:5, 1183:7, 1184:10, 1220:12, 1222:6, 1233:16, 1233:24, 1244:10, 1247:15, 1249:18, 1252:4, 1267:1, 1276:2, 1281:15, 1283:22, 1284:17, 1286:17, 1292:6
**regarding** [17] - 1034:7, 1035:13, 1038:6, 1038:18, 1041:25, 1049:3, 1049:24, 1051:14, 1060:8, 1063:22, 1073:21, 1118:13, 1139:14, 1193:5, 1219:18, 1258:10, 1280:21
**regardless** [2] - 1065:12, 1251:4
**registered** [7] - 1102:24, 1103:4, 1254:22, 1260:21, 1265:16, 1265:19, 1270:7
**registration** [7] - 1189:16, 1189:23, 1249:2, 1260:22, 1261:1
**regular** [1] - 1078:21
**regularly** [1] - 1095:18
**regulate** [3] - 1130:18, 1131:6, 1137:4
**regulating** [1] - 1289:5
**regulation** [1] - 1278:8
**regulations** [5] - 1251:19, 1251:23, 1258:10, 1278:8, 1292:8
**Regulations** [1] - 1278:14
**regulatory** [1] - 1046:12
**rehabilitation** [2] - 1170:15, 1249:15
**Rehabilitation** [1] - 1119:8
**rehabilitative** [2] - 1170:5, 1170:7
**reimbursement** [1] - 1217:22
**reissue** [1] - 1153:9
**rejected** [1] - 1186:13
**relate** [3] - 1076:8, 1078:3, 1078:13
**related** [11] - 1060:24, 1065:1, 1065:4, 1065:16, 1066:11, 1069:14, 1077:18, 1167:22, 1174:14, 1175:20, 1230:22
**relates** [6] - 1049:20, 1051:11, 1051:23, 1052:11, 1075:3, 1137:23
**relating** [2] - 1068:14, 1187:16
**relationship** [3] - 1196:7, 1196:9,

1211:14
**relationships** [1] - 1211:1
**relative** [1] - 1183:8
**release** [2] - 1096:4, 1101:3
**released** [2] - 1112:21, 1112:24
**releasing** [2] - 1090:14, 1249:23
**relevance** [2] - 1111:3, 1177:18
**relevant** [8] - 1034:22, 1037:21, 1038:16, 1038:17, 1046:20, 1047:4, 1049:12, 1061:5
**reliability** [1] - 1172:3
**reliable** [5] - 1141:12, 1143:19, 1145:22, 1168:24, 1184:22
**reliably** [1] - 1246:22
**relieving** [2] - 1281:25, 1283:19
**relooking** [1] - 1129:21
**rely** [5] - 1033:14, 1080:10, 1081:14, 1144:3, 1214:11
**remain** [2] - 1253:1, 1253:11
**remained** [1] - 1155:10
**remains** [1] - 1155:12
**remember** [84] - 1039:17, 1039:20, 1048:8, 1049:6, 1049:9, 1063:21, 1066:2, 1066:16, 1069:23, 1070:22, 1090:13, 1091:1, 1094:25, 1120:17, 1124:4, 1164:24, 1165:18, 1179:13, 1180:9, 1186:7, 1186:14, 1186:17, 1191:14, 1205:2, 1205:3, 1205:10, 1207:1, 1207:4, 1207:6, 1208:11, 1209:7, 1209:9, 1209:11, 1210:22, 1215:8, 1216:5, 1219:14, 1224:11, 1224:13, 1226:9, 1229:2, 1229:15, 1229:20, 1229:21, 1229:23, 1230:5, 1230:6, 1230:22, 1231:7, 1231:9, 1231:10, 1231:13, 1231:16, 1231:20, 1236:20, 1238:1, 1238:2, 1239:18, 1239:20, 1239:24, 1240:1, 1247:7, 1248:8, 1258:11, 1259:3, 1260:19, 1261:3, 1261:14, 1261:25, 1262:6, 1263:11, 1264:6, 1266:17, 1269:14, 1285:12, 1288:8, 1288:21, 1289:13, 1289:19, 1289:23, 1289:24, 1291:9, 1292:20
**remission** [4] - 1060:15, 1075:19, 1077:6, 1077:8
**remodeling** [5] - 1066:18, 1066:25, 1067:8, 1067:10, 1067:22
**remodelling** [2] - 1066:20, 1067:11
**remolding** [1] - 1066:19
**remote** [1] - 1059:15
**renew** [1] - 1265:23
**renewed** [1] - 1265:21
**repeated** [1] - 1219:2
**repeatedly** [1] - 1099:5
**repetitively** [1] - 1166:4
**rephrase** [2] - 1146:11, 1281:7
**replaced** [1] - 1159:13
**report** [11] - 1031:15, 1031:21, 1032:13, 1032:17, 1033:10, 1043:19, 1043:25, 1127:2, 1143:24, 1144:4, 1171:2
**reported** [14] - 1064:9, 1064:24, 1066:11, 1068:20, 1143:17, 1144:11,

1152:13, 1162:16, 1162:17, 1163:7,
1176:13, 1182:9, 1216:7, 1239:21
**REPORTER'S** [1] - 1295:1
**reporting** [6] - 1068:10, 1080:9,
1094:21, 1125:21, 1126:11, 1136:19
**reports** [4] - 1143:5, 1170:20, 1235:17,
1237:15
**represent** [3] - 1148:14, 1183:11,
1230:9
**represented** [3] - 1032:25, 1226:20
**represents** [1] - 1200:21
**request** [4] - 1135:13, 1179:14,
1257:21, 1258:8
**requested** [2] - 1031:23, 1075:11
**requesting** [3] - 1075:10, 1075:15,
1076:10
**requests** [2] - 1220:16, 1284:18
**require** [7] - 1193:6, 1193:10, 1193:13,
1193:21, 1202:22, 1220:10
**required** [12] - 1152:7, 1187:22,
1194:7, 1194:8, 1234:7, 1234:9,
1243:22, 1245:13, 1246:10, 1246:11,
1266:12, 1266:15
**requirements** [2] - 1245:7, 1245:9
**requires** [10] - 1067:23, 1141:10,
1192:4, 1207:19, 1209:22, 1210:16,
1214:13, 1216:6, 1226:12, 1230:25
**reserve** [1] - 1055:9
**reside** [1] - 1116:14
**residency** [5] - 1117:11, 1117:12,
1117:14, 1117:16, 1119:3
**resort** [2] - 1173:24, 1174:2
**resource** [1] - 1133:9
**respect** [3] - 1115:21, 1138:3, 1138:23
**respectfully** [1] - 1039:14
**respiratory** [1] - 1223:12
**respond** [2] - 1233:12, 1233:14
**responded** [1] - 1089:6
**responding** [2] - 1099:4, 1219:1
**responds** [1] - 1155:24
**response** [3] - 1057:9, 1136:6, 1172:4
**responsibilities** [2] - 1183:19, 1214:15
**responsibility** [2] - 1160:10, 1282:14
**responsive** [1] - 1076:3
**rest** [3] - 1130:25, 1169:25, 1198:3
**restate** [2] - 1048:9, 1105:2
**restore** [2] - 1172:14, 1173:16
**restructuring** [1] - 1129:22
**result** [15] - 1062:7, 1064:16, 1064:18,
1065:19, 1066:2, 1066:21, 1069:13,
1069:22, 1075:14, 1076:19, 1078:18,
1078:22, 1099:25, 1161:16, 1264:5
**results** [2] - 1140:3, 1235:15
**return** [2] - 1088:12, 1112:22
**reversibly** [1] - 1169:23
**review** [25] - 1086:22, 1093:6,
1120:13, 1131:9, 1134:18, 1138:24,
1140:13, 1140:17, 1142:20, 1159:19,
1161:9, 1166:13, 1168:6, 1171:8,
1180:4, 1181:22, 1184:10, 1184:14,
1188:15, 1223:5, 1228:2, 1228:3,
1239:11, 1247:22, 1251:5

**reviewed** [28] - 1036:10, 1037:11,
1037:19, 1138:25, 1139:14, 1140:22,
1141:14, 1144:21, 1150:13, 1151:1,
1157:7, 1159:21, 1161:21, 1165:15,
1179:19, 1180:24, 1181:7, 1182:19,
1183:18, 1185:22, 1207:12, 1216:3,
1226:15, 1228:15, 1236:17, 1249:4,
1250:12
**reviewer** [2] - 1121:9, 1121:11
**reviewing** [5] - 1148:20, 1149:10,
1167:14, 1176:11, 1248:20
**revisit** [2] - 1047:11, 1230:17
**Rexall** [1] - 1269:20
**rheumatological** [1] - 1162:6
**rheumatologist** [1] - 1210:13
**Rheumatology** [1] - 1163:14
**rheumatology** [1] - 1162:20
**Rhoda** [25] - 1060:24, 1091:13,
1092:3, 1092:18, 1102:22, 1106:1,
1107:25, 1271:19, 1272:2, 1272:9,
1277:18, 1277:19, 1277:21, 1277:22,
1277:24, 1278:1, 1278:23, 1279:12,
1281:15, 1282:20, 1282:22, 1284:2,
1284:12, 1285:1, 1285:11
**Rhoda's** [1] - 1277:19
**rich** [1] - 1173:18
**Richard** [4] - 1131:10, 1255:2, 1261:7,
1270:17
**RICHARDSON** [1] - 1057:5
**Richardson** [16] - 1057:8, 1059:25,
1067:6, 1069:13, 1078:10, 1082:24,
1083:2, 1096:24, 1148:21, 1148:24,
1155:8, 1156:15, 1156:22, 1162:15,
1250:14, 1251:8
**rid** [1] - 1201:18
**right-hand** [2] - 1230:17, 1280:13
**risk** [39] - 1051:12, 1052:11, 1052:12,
1053:12, 1054:1, 1054:14, 1062:14,
1126:12, 1126:14, 1126:15, 1126:16,
1126:17, 1129:2, 1129:3, 1129:10,
1129:13, 1129:14, 1129:17, 1133:16,
1133:18, 1133:20, 1133:21, 1145:17,
1148:4, 1148:5, 1148:15, 1166:3,
1166:8, 1172:12, 1173:23, 1176:20,
1176:21, 1177:8, 1178:25, 1181:9,
1217:25, 1235:23, 1250:7
**risks** [2] - 1222:8, 1223:9
**Rittmaster** [11] - 1061:7, 1062:4,
1088:17, 1088:20, 1091:14, 1091:19,
1092:23, 1096:7, 1102:16, 1102:17,
1107:24
**RMR** [1] - 1295:7
**RN** [1] - 1102:24
**Road** [3] - 1269:5, 1269:7, 1269:8
**road** [2] - 1157:17, 1181:24
**Robinson** [1] - 1220:6
**Rock** [2] - 1116:15, 1119:4
**Roland** [11] - 1061:7, 1088:17,
1088:20, 1091:14, 1091:19, 1092:23,
1096:7, 1102:3, 1102:16, 1106:1,
1107:23
**role** [4] - 1043:13, 1051:11, 1052:10,

**roles** [2] - 1051:22, 1052:1
**room** [8] - 1056:9, 1085:18, 1085:20,
1086:7, 1088:12, 1088:14, 1203:14,
1203:18
**Rouge** [1] - 1055:22
**Round** [1] - 1119:4
**round** [1] - 1116:15
**route** [1] - 1198:20
**routed** [1] - 1201:7
**routine** [3] - 1086:14, 1087:23,
1093:19
**routinely** [3] - 1061:24, 1091:9,
1093:21
**row** [3] - 1228:8, 1228:12, 1279:7
**roxi** [1] - 1098:23
**Roxicodone** [20] - 1062:8, 1064:19,
1065:20, 1066:4, 1067:4, 1067:8,
1067:15, 1069:3, 1069:16, 1073:23,
1094:15, 1097:22, 1098:1, 1098:4,
1098:14, 1111:20, 1153:13, 1158:17,
1160:1, 1250:16
**rule** [28] - 1046:24, 1187:7, 1187:11,
1187:16, 1190:21, 1192:6, 1193:12,
1193:14, 1193:15, 1193:17, 1193:20,
1193:21, 1194:4, 1194:8, 1202:22,
1203:5, 1208:1, 1208:5, 1208:11,
1211:21, 1211:23, 1213:19, 1213:21,
1214:2, 1225:19, 1235:2, 1240:19
**Rule** [15] - 1203:2, 1204:4, 1243:21,
1244:24, 1244:25, 1245:1, 1245:3,
1245:22, 1246:4, 1246:8, 1246:10,
1251:21, 1253:2, 1253:12, 1271:22
**rules** [1] - 1228:2
**rulings** [1] - 1055:10
**ruminating** [1] - 1175:2
**run** [5] - 1042:15, 1046:17, 1242:13,
1276:10
**running** [3] - 1052:25, 1136:25, 1275:1
**runs** [2] - 1052:24, 1167:5

## S

**sacroiliac** [1] - 1219:6
**safeguard** [2] - 1120:3, 1120:5
**safeguards** [1] - 1119:19
**safer** [2] - 1129:9, 1135:11
**safety** [1] - 1234:5
**Safety** [1] - 1237:11
**Samantha** [10] - 1039:17, 1042:7,
1045:12, 1238:19, 1247:13, 1248:12,
1248:20, 1249:7, 1249:18, 1249:23
**San** [1] - 1269:2
**Sanchez** [2] - 1295:3, 1295:7
**sat** [2] - 1085:17, 1092:12
**satisfied** [1] - 1284:8
**save** [2] - 1287:23
**saved** [1] - 1238:15
**Savillion** [1] - 1294:4
**saw** [52] - 1032:2, 1033:18, 1037:22,
1061:13, 1061:16, 1066:14, 1070:6,
1070:18, 1071:2, 1071:6, 1071:10,
1079:5, 1084:21, 1090:17, 1092:10,

1097:8, 1104:23, 1107:21, 1108:4, 1143:4, 1143:6, 1143:17, 1146:13, 1147:17, 1147:23, 1149:20, 1152:20, 1157:7, 1171:14, 1180:7, 1182:3, 1184:10, 1204:15, 1208:15, 1208:18, 1209:12, 1216:3, 1216:10, 1216:14, 1217:6, 1222:12, 1236:13, 1236:14, 1237:21, 1237:22, 1239:12, 1246:1, 1246:2, 1280:3, 1287:4, 1287:5

**scale** [4] - 1089:1, 1155:15, 1199:16, 1206:11

**scales** [4] - 1091:1, 1091:2, 1206:15

**schedule** [1] - 1252:24

**Schedule** [4] - 1150:5, 1150:18, 1157:4, 1261:2

**Scheduled** [1] - 1261:1

**schemes** [1] - 1120:6

**schizophrenia** [1] - 1134:2

**Schneider** [1] - 1123:10

**school** [5] - 1116:21, 1116:22, 1117:2, 1117:9, 1265:3

**School** [2] - 1116:23, 1258:17

**sciatica** [1] - 1169:21

**Science** [2] - 1117:10, 1121:10

**scientists** [1] - 1033:12

**sclerosis** [1] - 1162:7

**scope** [4] - 1183:24, 1184:7, 1184:8, 1185:8

**score** [3] - 1148:1, 1148:12, 1155:9

**scored** [4] - 1148:1, 1148:24, 1149:14, 1206:12

**screen** [5] - 1103:25, 1104:2, 1111:16, 1139:22, 1171:4

**screening** [1] - 1111:25

**script** [2] - 1284:24, 1284:25

**scripts** [5] - 1262:10, 1271:2, 1271:5, 1285:18, 1288:5

**search** [1] - 1264:5

**seat** [3] - 1115:9, 1164:17, 1254:4

**seated** [3] - 1114:25, 1164:8, 1242:22

**second** [31] - 1053:20, 1063:2, 1063:3, 1063:15, 1063:20, 1064:8, 1066:8, 1074:7, 1076:14, 1099:10, 1104:3, 1108:14, 1112:15, 1119:25, 1121:18, 1122:14, 1126:5, 1151:19, 1177:19, 1178:18, 1180:1, 1182:12, 1193:10, 1217:18, 1228:1, 1241:10, 1251:9, 1256:7, 1262:15, 1280:5, 1280:11

**secondly** [1] - 1048:16

**section** [7] - 1032:2, 1047:11, 1179:20, 1208:1, 1228:1, 1255:21, 1261:21

**Section** [1] - 1255:21

**sedatives** [1] - 1158:11

**see** [88] - 1032:11, 1033:9, 1033:13, 1037:2, 1037:19, 1040:20, 1044:12, 1047:2, 1068:19, 1075:21, 1079:7, 1080:20, 1081:11, 1083:2, 1083:4, 1083:17, 1091:6, 1092:4, 1093:11, 1096:8, 1097:5, 1097:10, 1100:4, 1101:14, 1105:17, 1108:6, 1108:22, 1108:24, 1113:25, 1131:23, 1132:2, 1132:23, 1138:11, 1141:11, 1142:20,

1143:13, 1144:5, 1144:8, 1144:13, 1150:16, 1150:25, 1151:4, 1151:8, 1151:12, 1154:14, 1158:3, 1158:16, 1158:23, 1159:22, 1161:10, 1161:20, 1164:17, 1166:14, 1167:14, 1168:18, 1169:8, 1169:10, 1181:6, 1183:3, 1186:3, 1189:6, 1198:22, 1200:14, 1202:13, 1202:18, 1203:14, 1204:11, 1207:13, 1208:19, 1208:22, 1208:24, 1209:4, 1216:13, 1223:10, 1228:11, 1231:2, 1235:17, 1237:5, 1247:5, 1247:8, 1249:4, 1252:19, 1268:18, 1274:21, 1281:17, 1281:24, 1284:14, 1294:8

**seeing** [20] - 1040:3, 1057:13, 1075:4, 1097:21, 1098:3, 1104:10, 1104:22, 1105:5, 1111:12, 1146:19, 1147:3, 1147:19, 1151:2, 1161:13, 1186:17, 1228:7, 1231:7, 1239:20, 1271:8, 1278:2

**seeking** [2] - 1037:17, 1096:15

**seem** [1] - 1277:4

**sees** [1] - 1045:13

**seize** [1] - 1125:14

**seized** [1] - 1086:1

**seldom** [7] - 1106:25, 1109:9, 1109:17, 1110:10, 1110:12, 1110:23, 1148:25

**selected** [1] - 1185:22

**self** [14] - 1079:15, 1080:9, 1126:11, 1130:18, 1130:23, 1131:6, 1131:7, 1136:24, 1137:4, 1137:5, 1144:4, 1166:9, 1171:2, 1176:23

**sell** [4] - 1083:21, 1084:11, 1097:11, 1220:18

**selling** [5] - 1071:23, 1072:5, 1072:25, 1097:15, 1118:23

**semi** [3] - 1127:13, 1127:19, 1127:21

**semi-synthetic** [2] - 1127:13, 1127:19

**send** [9] - 1132:14, 1140:1, 1248:19, 1276:10, 1279:24, 1281:6, 1281:8, 1283:5, 1284:7

**sending** [1] - 1184:11

**sensation** [1] - 1124:18

**sense** [3] - 1144:6, 1175:3, 1293:5

**sensitive** [2] - 1050:3, 1164:10

**sent** [3] - 1086:3, 1291:14, 1291:15

**sentence** [6] - 1058:7, 1058:16, 1060:2, 1119:22, 1259:1, 1259:22

**sentencing** [2] - 1258:7, 1258:9

**separate** [3] - 1177:4, 1207:25, 1255:18

**September** [7] - 1047:13, 1081:22, 1084:22, 1186:16, 1230:3, 1264:6, 1280:16

**series** [3] - 1036:20, 1131:9, 1154:20

**serious** [1] - 1168:16

**seriously** [1] - 1037:1

**serve** [1] - 1123:9

**served** [3] - 1057:15, 1123:15, 1123:24

**service** [1] - 1267:24

**session** [1] - 1115:10

1196:9, 1198:9, 1233:6, 1243:12, 1244:11, 1244:12

**several** [11] - 1044:9, 1070:18, 1085:8, 1086:5, 1104:22, 1120:18, 1120:21, 1127:9, 1143:17, 1228:11, 1263:16

**severe** [11] - 1125:21, 1125:22, 1125:23, 1131:15, 1143:5, 1162:11, 1174:9, 1176:10, 1182:9, 1182:10

**sex** [1] - 1188:25

**sexual** [2] - 1165:17, 1166:3

**sexually** [1] - 1166:4

**shall** [2] - 1187:13, 1187:23

**sheet** [9] - 1104:6, 1196:24, 1198:16, 1208:24, 1216:10, 1231:5, 1231:7, 1231:8, 1231:9

**sheets** [1] - 1182:7

**shelf** [1] - 1290:15

**shifting** [1] - 1292:14

**shin** [1] - 1143:21

**ship** [7] - 1278:3, 1278:12, 1278:22, 1282:10, 1285:6, 1291:19, 1292:9

**shipments** [1] - 1262:9

**shipped** [4] - 1284:19, 1290:6, 1291:12

**shipping** [5] - 1284:14, 1290:19, 1291:2, 1291:5, 1292:7

**shooting** [3] - 1042:1, 1152:22, 1238:22

**shoplifting** [2] - 1058:10, 1059:7

**shopping** [3] - 1137:10, 1137:13, 1137:15

**short** [8] - 1164:15, 1224:21, 1224:25, 1225:18, 1225:21, 1230:5, 1237:3, 1277:4

**short-acting** [3] - 1224:21, 1224:25, 1225:21

**short-term** [1] - 1230:5

**shorter** [1] - 1225:22

**shortly** [5] - 1265:16, 1266:20, 1284:12, 1285:14, 1285:15

**show** [15] - 1040:11, 1040:13, 1049:12, 1072:20, 1079:2, 1103:19, 1104:1, 1108:16, 1113:19, 1143:2, 1146:25, 1268:8, 1268:10, 1268:24, 1271:24

**showed** [5] - 1100:4, 1103:15, 1107:25, 1132:4, 1163:9

**showing** [2] - 1148:23, 1152:10

**shown** [1] - 1146:23

**shows** [3] - 1040:14, 1072:21, 1198:10

**SI** [1] - 1219:5

**side** [5] - 1053:3, 1090:11, 1226:1, 1269:17

**sidebar** [4] - 1071:19, 1113:3, 1177:21, 1262:17

**sideways** [1] - 1200:8

**sign** [4] - 1107:19, 1137:6, 1198:11, 1198:16

**sign-in** [1] - 1198:16

**signature** [2] - 1079:23, 1080:15

**significance** [3] - 1124:23, 1181:18, 1182:6

**significant** [7] - 1165:9, 1165:11, 1177:11, 1192:4, 1192:5, 1247:3, 1290:1
**signs** [1] - 1149:3
**similar** [6] - 1095:5, 1128:15, 1129:25, 1166:6, 1221:18, 1259:2
**simple** [1] - 1129:19
**simply** [6] - 1036:6, 1050:10, 1153:16, 1155:12, 1271:24, 1289:2
**single** [4] - 1048:16, 1049:24, 1060:7, 1202:18
**sister** [1] - 1039:22
**sit** [2] - 1112:3, 1172:25
**sites** [2] - 1166:22, 1166:24
**sits** [1] - 1120:24
**situation** [17] - 1032:12, 1132:16, 1137:8, 1153:22, 1165:19, 1166:2, 1174:5, 1175:3, 1188:15, 1188:19, 1200:4, 1201:6, 1212:25, 1215:4, 1239:6, 1250:6
**situations** [2] - 1214:6, 1251:4
**six** [15] - 1060:2, 1062:23, 1062:24, 1074:7, 1074:8, 1074:12, 1087:4, 1089:1, 1101:19, 1101:24, 1219:5, 1269:16, 1290:13, 1290:14, 1290:17
**six-month** [1] - 1060:2
**six-year** [1] - 1062:24
**skeleton** [1] - 1107:8
**skill** [1] - 1142:18
**skills** [5] - 1036:22, 1122:4, 1129:24, 1133:4
**skip** [2] - 1228:8, 1228:12
**sky** [2] - 1175:1
**sleep** [1] - 1211:7
**slowly** [2] - 1128:20, 1214:19
**small** [5] - 1084:21, 1207:20, 1209:23, 1244:3, 1267:18
**smaller** [1] - 1091:3
**smarter** [2] - 1128:18, 1128:20
**smiley** [1] - 1206:18
**so-called** [2] - 1107:7, 1159:15
**so..** [1] - 1293:15
**SOAPP** [15] - 1108:19, 1126:9, 1126:11, 1133:19, 1145:18, 1146:21, 1147:18, 1147:23, 1148:6, 1148:10, 1148:24, 1149:15, 1149:21, 1155:9, 1155:14
**SOAPPs** [1] - 1111:23
**social** [1] - 1211:4
**society** [1] - 1222:1
**Society** [9] - 1122:20, 1122:23, 1122:25, 1191:17, 1221:19, 1221:22, 1221:25, 1224:18, 1234:22
**Society's** [2] - 1220:2, 1234:10
**sold** [9] - 1083:12, 1084:8, 1084:12, 1119:11, 1195:10, 1267:5, 1267:6, 1267:13, 1267:18
**sole** [1] - 1122:5
**solemnly** [2] - 1115:5, 1253:25
**solved** [1] - 1050:4
**Soma** [5] - 1062:9, 1158:19, 1159:2, 1159:17, 1160:2

**Somas** [1] - 1111:20
**someone** [4] - 1120:24, 1170:19, 1277:15, 1284:9
**sometime** [3] - 1060:12, 1081:20, 1289:7
**sometimes** [16] - 1041:18, 1106:6, 1109:2, 1109:12, 1110:12, 1121:20, 1158:21, 1189:9, 1196:15, 1197:25, 1225:6, 1225:7, 1225:9, 1228:7, 1232:3, 1287:13
**somewhat** [1] - 1050:19
**somewhere** [1] - 1264:22
**son** [4] - 1071:24, 1089:11, 1096:6, 1101:6
**song** [1] - 1130:19
**sorry** [40] - 1038:10, 1054:11, 1058:17, 1065:25, 1068:7, 1072:3, 1076:1, 1082:18, 1083:16, 1093:3, 1097:2, 1100:21, 1104:17, 1105:6, 1111:11, 1121:15, 1121:16, 1123:8, 1123:15, 1126:15, 1145:7, 1151:1, 1155:16, 1156:20, 1175:22, 1179:13, 1185:12, 1212:10, 1250:3, 1250:15, 1250:18, 1255:21, 1267:7, 1267:9, 1268:8, 1277:14, 1287:18, 1284:19, 1293:21
**sort** [2] - 1093:18, 1252:5
**sounds** [1] - 1129:25
**sources** [1] - 1137:1
**South** [1] - 1059:22
**Southern** [2] - 1257:2, 1258:18
**Southwest** [2] - 1117:3, 1122:18
**Spady** [4] - 1063:5, 1063:6, 1063:7, 1101:23
**spanned** [2] - 1186:18, 1186:21
**sparse** [1] - 1181:16
**spasms** [1] - 1176:2
**speaking** [4] - 1033:4, 1044:9, 1070:22, 1254:5
**special** [5] - 1117:17, 1167:4, 1167:6, 1260:22, 1276:17
**specialists** [2] - 1132:9, 1218:12
**specialized** [1] - 1117:20
**specialty** [1] - 1117:19
**specific** [5] - 1037:15, 1041:24, 1051:10, 1169:22, 1232:11
**specifically** [6] - 1036:14, 1037:18, 1151:17, 1247:20, 1279:21, 1284:17
**specifics** [2] - 1041:2, 1213:3
**spectrometry** [1] - 1140:2
**spectrum** [1] - 1233:9
**speculation** [1] - 1069:9
**speculative** [1] - 1050:19
**Speculative** [1] - 1068:3
**spell** [4] - 1116:11, 1123:22, 1254:18, 1288:24
**spend** [3] - 1108:11, 1115:18, 1241:18
**spending** [1] - 1042:11
**spends** [1] - 1108:13
**spent** [10] - 1048:2, 1091:18, 1091:23, 1107:23, 1107:24, 1107:25, 1108:3, 1108:5, 1238:14
**spinal** [1] - 1119:25

**spine** [5] - 1089:24, 1167:5, 1200:9, 1213:12, 1218:15
**spiny** [1] - 1200:8
**split** [1] - 1052:1
**spoken** [1] - 1286:24
**spondylitis** [1] - 1162:6
**spot** [1] - 1163:19
**spots** [1] - 1101:2
**spread** [2] - 1166:21, 1166:23
**spring** [2] - 1098:9, 1288:12
**squarely** [1] - 1039:15
**staff** [30] - 1063:21, 1064:9, 1065:1, 1065:17, 1066:12, 1066:18, 1068:15, 1068:20, 1069:15, 1074:15, 1075:8, 1075:12, 1075:21, 1076:18, 1081:5, 1081:10, 1093:6, 1093:8, 1093:12, 1181:15, 1182:4, 1196:15, 1203:24, 1224:6, 1230:21, 1238:15, 1251:25, 1252:1, 1252:2, 1291:25
**staffs** [1] - 1120:6
**Stamp** [1] - 1223:3
**stand** [4] - 1047:9, 1115:4, 1173:1, 1178:9
**standard** [79] - 1037:2, 1037:17, 1042:3, 1042:6, 1043:7, 1045:7, 1045:18, 1046:9, 1046:10, 1046:13, 1046:20, 1051:14, 1051:16, 1054:5, 1120:25, 1126:14, 1126:16, 1128:12, 1128:13, 1128:14, 1128:19, 1128:22, 1144:15, 1144:19, 1144:25, 1145:2, 1145:3, 1153:3, 1153:6, 1153:9, 1153:17, 1154:10, 1154:11, 1157:1, 1157:20, 1179:23, 1183:8, 1183:9, 1184:15, 1193:3, 1193:5, 1193:13, 1193:14, 1193:22, 1193:24, 1202:25, 1203:2, 1203:4, 1203:6, 1208:7, 1208:9, 1211:17, 1211:23, 1211:25, 1213:24, 1226:13, 1233:6, 1234:9, 1234:21, 1240:14, 1240:23, 1243:11, 1243:20, 1243:21, 1244:8, 1244:11, 1244:12, 1244:13, 1244:20, 1244:21, 1245:13, 1245:22, 1246:5, 1246:9, 1246:20, 1251:2, 1263:3, 1263:5, 1263:8
**standards** [7] - 1041:10, 1243:12, 1244:10, 1245:3, 1245:21, 1246:3, 1246:8
**standing** [1] - 1053:10
**standpoint** [1] - 1170:7
**start** [14] - 1031:22, 1048:2, 1094:22, 1119:13, 1124:12, 1127:21, 1130:20, 1131:15, 1137:5, 1151:2, 1243:9, 1278:2, 1294:17
**started** [25] - 1031:3, 1056:5, 1056:6, 1056:18, 1071:21, 1071:23, 1072:5, 1098:3, 1098:5, 1104:10, 1105:5, 1111:12, 1119:4, 1120:17, 1129:2, 1129:4, 1129:9, 1159:15, 1256:21, 1270:23, 1271:8, 1271:13, 1287:12, 1290:23, 1290:24
**starting** [1] - 1269:4
**state** [14] - 1046:12, 1116:8, 1124:9, 1161:24, 1166:5, 1192:17, 1193:15,

1202:25, 1208:7, 1254:18, 1254:22, 1261:17, 1264:18, 1284:20
**State** [10] - 1117:3, 1117:4, 1187:6, 1202:21, 1209:22, 1210:16, 1224:14, 1280:21, 1284:17
**statement** [6] - 1215:12, 1220:3, 1240:11, 1257:17, 1263:12, 1275:22
**statements** [6] - 1257:15, 1271:23, 1272:1, 1272:2, 1272:4
**States** [13] - 1115:2, 1253:15, 1255:11, 1255:17, 1255:22, 1256:1, 1256:24, 1257:19, 1257:23, 1257:24, 1258:7, 1258:25, 1259:8
**station** [1] - 1124:25
**step** [5] - 1112:18, 1163:24, 1245:8, 1252:15, 1292:23
**stepped** [3] - 1193:25, 1235:11, 1245:6
**steps** [1] - 1199:16
**steroid** [1] - 1170:1
**Steven** [1] - 1123:10
**still** [23] - 1064:10, 1064:11, 1077:9, 1078:15, 1087:25, 1090:22, 1113:16, 1119:16, 1125:5, 1137:18, 1148:25, 1155:18, 1173:12, 1173:20, 1215:19, 1240:23, 1270:7, 1284:1, 1288:11, 1293:17, 1294:12
**stimulate** [1] - 1218:17
**stimulators** [1] - 1218:17
**stolen** [1] - 1136:20
**stop** [2] - 1152:24, 1174:23
**stopped** [5] - 1057:2, 1060:20, 1096:5, 1189:18, 1213:7
**Store** [1] - 1269:8
**straight** [1] - 1202:5
**straighten** [1] - 1206:7
**strategies** [1] - 1129:24
**street** [4] - 1116:13, 1160:14, 1160:20, 1274:20
**Street** [1] - 1059:23
**strength** [1] - 1130:11
**strengthen** [2] - 1200:3, 1200:4
**stress** [2] - 1133:4, 1134:3
**stressed** [1] - 1125:13
**stressor** [3] - 1125:18, 1134:9, 1134:10
**stressors** [1] - 1122:2
**stretching** [13] - 1072:1, 1182:5, 1182:7, 1182:8, 1182:13, 1201:7, 1201:9, 1201:16, 1201:20, 1202:4, 1202:9, 1203:8, 1231:8
**strict** [1] - 1190:19
**strikes** [1] - 1050:12
**strips** [1] - 1220:19
**strong** [2] - 1124:21, 1155:5
**stronger** [1] - 1201:16
**structurally** [1] - 1128:7
**structure** [1] - 1201:17
**structured** [1] - 1122:3
**stuck** [3] - 1031:3, 1055:22, 1227:12
**studied** [3] - 1190:19, 1193:1, 1265:13
**studies** [2] - 1265:14, 1266:21

**study** [3] - 1191:8, 1265:12, 1266:4
**stuff** [2] - 1036:13, 1198:1
**sub** [1] - 1117:19
**subject** [4] - 1048:6, 1165:17, 1225:23, 1292:14
**subjective** [5] - 1127:2, 1138:16, 1144:4, 1146:21, 1155:9
**subjectively** [1] - 1140:6
**submit** [2] - 1044:18, 1044:19
**Suboxone** [11] - 1121:19, 1121:20, 1121:24, 1121:25, 1154:6, 1154:9, 1189:22, 1190:3, 1248:17, 1248:22, 1249:2, 1249:9, 1249:11
**subsequent** [1] - 1258:4
**subsequently** [1] - 1134:17
**subspecialize** [1] - 1117:21
**substance** [10] - 1124:14, 1133:23, 1152:11, 1212:14, 1213:11, 1219:23, 1220:8, 1275:20, 1280:22, 1285:25
**substances** [21] - 1126:13, 1134:23, 1135:6, 1135:9, 1135:10, 1137:16, 1145:13, 1147:13, 1152:3, 1176:24, 1182:10, 1182:21, 1183:24, 1184:24, 1185:4, 1185:8, 1219:24, 1260:23, 1261:2, 1275:10, 1280:2
**substantial** [2] - 1074:5, 1259:11
**substantially** [1] - 1068:20
**substituted** [2] - 1159:11, 1187:13
**succeeding** [2] - 1078:11, 1096:8
**suffer** [1] - 1067:25
**suffering** [18] - 1067:20, 1069:20, 1070:3, 1089:16, 1097:6, 1125:19, 1125:23, 1125:25, 1126:2, 1126:3, 1126:6, 1143:7, 1143:23, 1155:20, 1162:16, 1170:21, 1176:4
**sufficient** [4] - 1141:4, 1142:7, 1261:23, 1283:22
**sufficiently** [1] - 1142:4
**suggest** [6] - 1124:16, 1146:16, 1149:2, 1152:5, 1156:17, 1179:7
**suggested** [5] - 1070:16, 1077:12, 1101:18, 1166:20, 1249:10
**suicide** [7] - 1177:3, 1177:7, 1177:9, 1177:10, 1177:14, 1177:25, 1178:11
**suicides** [1] - 1176:25
**summary** [7] - 1032:14, 1032:21, 1033:1, 1033:18, 1035:21, 1037:5, 1043:19
**summer** [3] - 1094:20, 1117:25
**summers** [1] - 1063:4
**Sunday** [1] - 1186:3
**superficial** [1] - 1139:10
**supply** [3] - 1137:18, 1261:22, 1262:10
**support** [7] - 1053:19, 1053:25, 1144:8, 1144:11, 1176:12, 1176:18, 1201:17
**supporting** [1] - 1182:11
**supposed** [9] - 1106:24, 1111:16, 1140:1, 1208:12, 1210:1, 1216:12, 1216:15, 1232:20, 1235:20
**surely** [4] - 1197:11, 1206:24, 1207:18, 1226:19

**surgeon** [1] - 1233:2
**surgery** [13] - 1090:12, 1090:13, 1090:15, 1090:17, 1090:19, 1096:15, 1097:7, 1168:25, 1169:24, 1169:25, 1170:6, 1170:14, 1216:19
**surgically** [1] - 1169:22
**surprise** [2] - 1091:18, 1091:21
**surprised** [1] - 1277:4
**surprisingly** [1] - 1155:25
**suspect** [2] - 1137:24, 1141:7
**suspicious** [1] - 1241:21
**sustain** [7] - 1055:5, 1059:5, 1068:4, 1098:17, 1111:4, 1188:13, 1263:18
**sustained** [1] - 1078:22
**swear** [2] - 1115:5, 1253:25
**swimming** [1] - 1170:9
**swing** [1] - 1148:19
**swings** [4] - 1103:17, 1105:19, 1148:7, 1148:14
**swore** [1] - 1253:21
**sworn** [2] - 1115:25, 1254:8
**symptom** [2] - 1143:13, 1155:19
**symptomatic** [1] - 1168:1
**symptoms** [5] - 1127:2, 1134:15, 1138:20, 1154:7
**synthetic** [7] - 1127:13, 1127:19, 1127:20, 1127:21, 1128:3, 1128:4
**system** [1] - 1166:12
**systematically** [1] - 1161:6

# T

**T's** [1] - 1125:12
**table** [2] - 1091:5, 1092:12
**tablets** [2] - 1062:9, 1073:24
**talks** [6] - 1040:2, 1208:1, 1214:2, 1224:2, 1240:12, 1243:14
**tape** [2] - 1107:25, 1108:5
**taught** [1] - 1033:17
**teach** [1] - 1175:11
**tease** [1] - 1149:6
**technician** [1] - 1290:8
**telephone** [12] - 1271:11, 1276:24, 1277:13, 1281:23, 1282:23, 1283:7, 1283:10, 1285:8, 1285:10, 1287:7, 1288:13, 1289:8
**temper** [2] - 1109:9, 1109:12
**temperature** [5] - 1164:4, 1164:6, 1164:7, 1164:9, 1164:11
**ten** [5] - 1077:14, 1087:10, 1143:18, 1155:10, 1241:14
**tends** [1] - 1044:8
**tension** [1] - 1106:12
**term** [14] - 1045:17, 1111:24, 1127:5, 1136:9, 1136:11, 1160:14, 1166:25, 1183:1, 1200:11, 1202:14, 1223:19, 1225:4, 1230:5, 1243:25
**terminate** [1] - 1153:7
**terms** [20] - 1034:8, 1049:16, 1050:8, 1091:16, 1099:16, 1118:17, 1124:13, 1137:22, 1141:5, 1144:9, 1160:23, 1169:4, 1190:12, 1196:15, 1210:24,

1225:4, 1249:25, 1293:6, 1293:7
   **test** [63] - 1079:6, 1079:7, 1080:1, 1080:7, 1080:9, 1080:10, 1080:11, 1080:18, 1081:8, 1081:16, 1101:12, 1108:19, 1118:13, 1135:14, 1136:11, 1136:14, 1136:18, 1136:19, 1139:17, 1139:20, 1139:21, 1139:23, 1140:2, 1141:16, 1141:23, 1142:4, 1142:8, 1142:15, 1142:22, 1143:3, 1146:4, 1146:7, 1146:10, 1146:14, 1146:15, 1146:21, 1146:22, 1146:24, 1147:1, 1147:21, 1147:23, 1148:24, 1148:25, 1149:20, 1179:14, 1179:15, 1220:14, 1234:3, 1234:5, 1245:18, 1246:2, 1274:18, 1274:19, 1274:20, 1274:24, 1275:7, 1276:2, 1276:4, 1276:12
   **testified** [26] - 1044:6, 1044:22, 1057:16, 1059:6, 1060:17, 1061:17, 1062:11, 1071:21, 1072:8, 1072:14, 1072:17, 1075:19, 1077:5, 1093:16, 1093:19, 1115:25, 1123:5, 1214:5, 1219:13, 1224:24, 1229:18, 1242:10, 1246:1, 1247:21, 1254:8, 1275:17
   **testify** [8] - 1044:15, 1045:4, 1045:6, 1051:14, 1052:4, 1255:11, 1256:2, 1257:5
   **testifying** [8] - 1043:23, 1045:4, 1051:16, 1051:17, 1053:19, 1081:17, 1224:22, 1236:20
   **testimony** [35] - 1039:17, 1044:6, 1053:23, 1054:12, 1054:23, 1060:8, 1062:20, 1067:9, 1074:10, 1084:1, 1085:4, 1094:4, 1097:20, 1099:15, 1115:5, 1123:25, 1124:6, 1124:12, 1124:14, 1128:11, 1168:4, 1186:2, 1190:14, 1219:14, 1221:9, 1236:23, 1238:22, 1247:15, 1253:25, 1255:12, 1255:13, 1259:18, 1271:22, 1282:18, 1294:14
   **testing** [28] - 1049:18, 1140:15, 1146:3, 1179:11, 1184:5, 1193:9, 1193:11, 1194:6, 1194:8, 1194:19, 1194:20, 1194:24, 1195:1, 1195:4, 1195:10, 1196:1, 1219:12, 1220:3, 1220:10, 1220:18, 1231:18, 1233:24, 1234:11, 1234:14, 1234:19, 1234:23, 1245:12, 1246:7
   **tests** [11] - 1079:14, 1081:4, 1139:14, 1150:8, 1193:22, 1195:7, 1245:25, 1276:5, 1276:10, 1276:13, 1276:15
   **Texas** [82] - 1046:24, 1116:15, 1116:22, 1117:3, 1117:4, 1117:10, 1119:8, 1120:13, 1120:19, 1122:20, 1122:22, 1122:25, 1123:12, 1123:25, 1124:5, 1124:7, 1124:9, 1147:8, 1147:12, 1179:20, 1187:7, 1187:16, 1190:21, 1191:17, 1192:6, 1193:5, 1193:10, 1194:4, 1202:21, 1203:5, 1204:4, 1207:18, 1208:1, 1208:4, 1208:6, 1211:16, 1211:21, 1212:4, 1213:19, 1213:21, 1219:19, 1219:21, 1220:2, 1221:6, 1221:18, 1221:22, 1221:24, 1224:14, 1224:18, 1225:19,

1226:11, 1228:2, 1230:24, 1234:7, 1234:10, 1234:22, 1235:1, 1236:19, 1236:24, 1237:2, 1237:11, 1240:17, 1243:13, 1244:9, 1245:1, 1251:19, 1251:21, 1254:22, 1257:3, 1258:18, 1260:19, 1264:23, 1265:5, 1265:6, 1265:7, 1270:14, 1278:13, 1280:21, 1292:6
   **THC** [7] - 1219:13, 1219:18, 1220:13, 1220:14, 1234:1, 1245:17, 1245:23
   **THE** [229] - 1031:2, 1031:13, 1031:20, 1032:2, 1032:6, 1032:11, 1032:18, 1032:20, 1032:24, 1033:3, 1033:6, 1033:9, 1033:21, 1034:1, 1034:5, 1034:17, 1035:22, 1036:3, 1036:7, 1036:12, 1037:6, 1038:9, 1038:12, 1038:22, 1039:2, 1039:6, 1039:13, 1039:19, 1039:24, 1040:4, 1040:8, 1040:10, 1040:13, 1041:8, 1041:15, 1041:19, 1042:13, 1042:23, 1043:5, 1043:12, 1043:20, 1043:25, 1044:4, 1044:7, 1044:12, 1044:17, 1044:21, 1045:3, 1045:25, 1046:3, 1046:7, 1047:5, 1047:8, 1047:14, 1047:18, 1047:20, 1047:24, 1048:17, 1048:19, 1048:24, 1049:5, 1049:15, 1049:22, 1049:25, 1050:3, 1050:22, 1051:1, 1051:5, 1051:13, 1051:20, 1051:25, 1052:14, 1052:18, 1052:20, 1052:25, 1053:5, 1053:17, 1053:22, 1054:3, 1054:10, 1054:12, 1054:15, 1054:18, 1054:20, 1055:1, 1055:8, 1055:15, 1055:17, 1055:22, 1056:2, 1056:5, 1056:10, 1056:14, 1056:17, 1056:21, 1056:24, 1057:1, 1059:5, 1059:18, 1063:16, 1068:4, 1069:11, 1071:7, 1071:8, 1071:16, 1071:20, 1072:4, 1072:9, 1072:14, 1072:23, 1073:7, 1073:12, 1073:14, 1073:17, 1076:6, 1082:21, 1084:18, 1094:17, 1096:19, 1096:21, 1098:17, 1099:2, 1103:21, 1103:25, 1105:1, 1106:2, 1111:4, 1111:6, 1111:7, 1111:8, 1112:18, 1112:20, 1112:23, 1113:1, 1113:4, 1113:6, 1113:12, 1113:15, 1113:20, 1113:24, 1114:3, 1114:8, 1114:12, 1114:16, 1114:20, 1114:25, 1115:4, 1115:8, 1115:9, 1115:17, 1115:21, 1163:18, 1163:21, 1163:24, 1164:6, 1177:19, 1177:22, 1177:25, 1178:6, 1178:14, 1178:18, 1180:2, 1185:14, 1188:13, 1194:16, 1222:16, 1222:19, 1222:22, 1223:1, 1241:2, 1241:6, 1241:9, 1241:12, 1241:15, 1241:17, 1241:21, 1242:3, 1242:7, 1242:10, 1242:12, 1242:19, 1242:22, 1250:17, 1252:15, 1252:19, 1253:1, 1253:9, 1253:13, 1253:17, 1253:19, 1253:20, 1253:21, 1253:23, 1253:24, 1254:3, 1254:4, 1259:25, 1260:2, 1260:3, 1262:15, 1262:18, 1262:21, 1262:25, 1263:4, 1263:11, 1263:14, 1263:16, 1263:22, 1263:24, 1268:17, 1268:20,

1272:1, 1272:4, 1272:6, 1292:13, 1292:17, 1292:23, 1293:3, 1293:8, 1293:11, 1293:15, 1293:19, 1293:23, 1294:2, 1294:5, 1294:8, 1294:10, 1294:15, 1294:20
   **theft** [4] - 1057:11, 1058:18, 1058:20, 1059:6
   **themselves** [6] - 1152:11, 1154:3, 1171:24, 1172:21, 1201:18, 1283:16
   **therapeutic** [30] - 1135:15, 1135:16, 1135:17, 1135:21, 1136:3, 1136:6, 1142:18, 1145:23, 1145:25, 1147:11, 1150:1, 1152:1, 1152:2, 1155:21, 1156:5, 1156:7, 1156:9, 1156:17, 1156:24, 1165:1, 1165:8, 1179:8, 1181:11, 1184:23, 1235:15, 1246:21, 1251:4, 1251:5, 1251:14
   **therapist** [23] - 1102:7, 1102:8, 1102:14, 1102:18, 1102:19, 1112:11, 1141:14, 1141:15, 1141:25, 1142:1, 1142:3, 1142:6, 1142:7, 1142:10, 1142:13, 1142:16, 1142:21, 1252:6, 1252:9, 1252:11, 1294:9
   **therapists** [2] - 1107:15, 1107:16
   **therapy** [28] - 1061:7, 1061:10, 1091:4, 1091:6, 1091:10, 1095:5, 1096:9, 1102:2, 1129:18, 1129:20, 1129:21, 1130:4, 1130:7, 1132:4, 1132:6, 1132:8, 1132:14, 1132:17, 1133:2, 1133:12, 1133:13, 1141:15, 1141:18, 1156:2, 1170:8, 1170:10, 1225:5
   **thereafter** [3] - 1265:16, 1284:12, 1289:7
   **therefore** [5] - 1062:14, 1067:3, 1184:23, 1185:2, 1246:22
   **they's** [1] - 1161:2
   **they've** [1] - 1126:8, 1131:24, 1135:10, 1154:2, 1154:5, 1192:10, 1201:5, 1209:17, 1213:13, 1226:17, 1233:22, 1291:14
   **thin** [1] - 1091:3
   **thinking** [6] - 1051:4, 1148:13, 1168:4, 1170:18, 1175:12, 1238:2
   **thinks** [1] - 1044:16
   **third** [8] - 1078:6, 1078:8, 1122:14, 1130:22, 1238:21, 1247:12, 1280:5, 1280:15
   **Third** [1] - 1059:23
   **third-party** [1] - 1238:21
   **thoughts** [1] - 1175:2
   **thousands** [1] - 1036:16
   **threat** [1] - 1183:12
   **threatening** [1] - 1223:18
   **three** [44] - 1048:3, 1049:14, 1050:18, 1107:18, 1108:12, 1117:16, 1117:24, 1128:22, 1132:5, 1139:11, 1151:5, 1151:9, 1151:18, 1159:22, 1170:4, 1173:8, 1173:11, 1173:20, 1177:2, 1180:5, 1215:25, 1228:8, 1228:12, 1228:16, 1228:18, 1228:23, 1229:9, 1230:4, 1250:10, 1279:6, 1279:13, 1280:4, 1280:18, 1281:8, 1281:11, 1281:13, 1286:7, 1287:24, 1288:5,

1288:6, 1294:1

**three-month** [1] - 1230:4

**threshold** [1] - 1134:14

**throat** [1] - 1244:5

**throughout** [2] - 1167:23, 1181:6

**thumbing** [2] - 1061:24, 1092:21

**thyroid** [1] - 1162:4

**ticket** [1] - 1125:2

**tight** [5] - 1091:6, 1095:11, 1101:2, 1166:7, 1201:10

**tighten** [1] - 1176:1

**timeframe** [4] - 1045:21, 1193:19, 1195:6, 1219:8

**timing** [2] - 1050:16, 1237:23

**tingling** [2] - 1090:20, 1206:5

**tissue's** [1] - 1173:7

**Title** [1] - 1255:21

**title** [1] - 1119:6

**titled** [1] - 1223:7

**today** [18] - 1036:11, 1067:9, 1078:15, 1091:3, 1109:21, 1124:24, 1128:23, 1144:19, 1144:25, 1159:19, 1171:17, 1172:20, 1252:24, 1255:1, 1255:10, 1255:13, 1257:7

**today's** [3] - 1192:17, 1192:22, 1280:13

**toe** [10] - 1124:19, 1124:20, 1124:22, 1125:5, 1125:6, 1125:15, 1125:16, 1125:17

**together** [8] - 1133:8, 1158:4, 1158:24, 1197:9, 1211:5, 1226:4, 1228:22, 1255:5

**tolerance** [2] - 1131:1, 1233:17

**tomorrow** [2] - 1292:18, 1293:9

**tonight** [1] - 1125:2

**took** [9] - 1062:21, 1065:10, 1076:16, 1081:6, 1088:10, 1187:1, 1187:8, 1217:4, 1230:2

**tool** [14] - 1063:25, 1126:8, 1126:14, 1126:16, 1126:17, 1145:18, 1147:20, 1147:24, 1148:25, 1160:23, 1237:4, 1245:13, 1274:24

**tools** [10] - 1052:12, 1053:15, 1111:23, 1126:18, 1129:3, 1144:18, 1151:20, 1154:22, 1172:3, 1182:3

**top** [6] - 1032:16, 1080:15, 1123:23, 1202:5, 1230:17, 1280:12

**topic** [4] - 1085:25, 1124:10, 1224:23, 1236:21

**topics** [3] - 1085:23, 1086:5, 1123:3

**tops** [1] - 1107:18

**total** [4] - 1049:14, 1148:12, 1186:5, 1280:4

**totally** [2] - 1128:3, 1142:2

**towards** [2] - 1129:2, 1129:4

**track** [4] - 1198:13, 1199:3, 1199:19, 1248:7

**tracked** [3] - 1213:4, 1221:24, 1231:9

**tracks** [1] - 1196:25

**trading** [4] - 1184:17, 1184:18, 1188:25

**traffic** [2] - 1031:4

**tragic** [2] - 1172:8, 1172:9

**trail** [1] - 1042:16

**trained** [6] - 1102:7, 1102:13, 1102:18, 1142:1, 1142:2, 1142:16

**training** [8] - 1102:21, 1103:13, 1116:17, 1117:25, 1121:24, 1142:13, 1266:3, 1266:8

**trains** [1] - 1175:16

**tranquilizer** [2] - 1158:7, 1159:16

**tranquilizers** [1] - 1223:21

**transcript** [1] - 1295:4

**trauma** [5] - 1124:20, 1125:6, 1125:16, 1161:18, 1161:19

**traumatic** [3] - 1134:3, 1134:4, 1166:6

**traveled** [1] - 1182:20

**treading** [2] - 1072:2, 1073:10

**treat** [17] - 1037:20, 1074:24, 1106:6, 1118:19, 1129:6, 1133:7, 1144:4, 1145:21, 1163:15, 1170:13, 1190:4, 1191:13, 1204:12, 1205:2, 1219:23, 1248:17, 1249:8

**treated** [11] - 1033:12, 1037:21, 1037:24, 1037:25, 1110:22, 1121:21, 1145:12, 1189:17, 1197:19, 1197:22, 1249:11

**treating** [12] - 1037:1, 1075:3, 1121:22, 1129:8, 1131:15, 1132:10, 1190:2, 1190:8, 1204:23, 1218:4, 1245:14

**treatise** [1] - 1034:23

**treatises** [6] - 1033:10, 1034:11, 1034:22, 1035:2, 1035:6

**treatment** [82] - 1040:17, 1042:3, 1042:4, 1045:11, 1046:21, 1064:22, 1065:12, 1068:9, 1078:23, 1078:25, 1079:8, 1081:11, 1095:6, 1101:10, 1121:19, 1121:20, 1121:24, 1122:5, 1128:18, 1128:25, 1129:11, 1129:13, 1129:14, 1129:15, 1129:17, 1130:9, 1131:14, 1131:19, 1131:20, 1133:14, 1135:2, 1135:18, 1136:3, 1140:16, 1146:1, 1147:6, 1147:24, 1148:4, 1148:11, 1149:21, 1152:6, 1153:1, 1154:9, 1155:11, 1156:9, 1156:12, 1163:12, 1163:13, 1166:16, 1169:24, 1170:3, 1170:4, 1170:11, 1171:1, 1173:16, 1173:23, 1173:24, 1174:2, 1174:6, 1174:8, 1181:25, 1182:13, 1183:7, 1183:23, 1201:5, 1204:16, 1209:3, 1213:17, 1214:3, 1214:7, 1214:18, 1216:6, 1216:12, 1221:4, 1221:6, 1227:19, 1234:6, 1235:20, 1239:13, 1248:18, 1248:22

**treatments** [27] - 1075:15, 1094:23, 1094:25, 1126:25, 1129:10, 1131:23, 1132:1, 1138:9, 1138:10, 1138:22, 1170:8, 1171:15, 1173:22, 1184:22, 1190:13, 1197:25, 1208:13, 1216:16, 1216:19, 1218:2, 1226:8, 1226:15, 1226:17, 1227:7, 1236:2, 1243:23, 1244:6

**treats** [2] - 1133:1, 1210:5

**trend** [6] - 1150:12, 1151:5, 1157:24,

1158:3, 1180:23, 1181:6

**trial** [4] - 1050:15, 1123:10, 1123:16, 1256:21

**trials** [2] - 1123:8, 1123:9

**tried** [3] - 1132:1, 1135:10

**trip** [1] - 1287:25

**trips** [1] - 1287:24

**trouble** [4] - 1134:10, 1288:17, 1289:5, 1293:24

**true** [14] - 1067:14, 1067:19, 1074:5, 1096:12, 1176:8, 1187:6, 1190:23, 1195:7, 1197:1, 1217:12, 1237:8, 1238:24, 1240:22, 1293:10

**truly** [2] - 1135:8, 1135:14

**truth** [7] - 1115:6, 1115:7, 1254:1, 1254:2, 1271:24

**truthful** [9] - 1049:3, 1081:25, 1082:3, 1083:25, 1084:5, 1107:2, 1109:19, 1257:13, 1277:10

**truthfully** [1] - 1255:12, 1257:6, 1277:8

**try** [12] - 1042:22, 1095:13, 1129:3, 1137:8, 1149:6, 1161:7, 1162:21, 1164:12, 1166:10, 1172:3, 1225:9, 1293:5

**trying** [21] - 1041:12, 1041:21, 1041:22, 1045:21, 1052:3, 1053:5, 1077:11, 1081:11, 1120:6, 1122:3, 1136:4, 1136:6, 1156:10, 1156:11, 1162:12, 1163:25, 1172:6, 1178:7, 1191:7, 1205:1, 1263:11

**Tuesday** [1] - 1050:6

**turn** [3] - 1164:8, 1164:16, 1202:3

**turned** [2] - 1058:10, 1194:1

**turning** [2] - 1164:4, 1164:7

**turpitude** [2] - 1058:25, 1059:17

**tweak** [3] - 1064:21, 1068:24, 1093:22

**twice** [3] - 1112:6, 1112:13, 1267:2

**Twillman** [1] - 1052:9

**twisted** [1] - 1200:8

**two** [52] - 1040:3, 1042:21, 1043:18, 1048:3, 1048:14, 1049:14, 1050:18, 1051:7, 1051:13, 1052:6, 1053:22, 1057:10, 1058:16, 1084:2, 1089:24, 1095:25, 1096:1, 1096:4, 1098:20, 1099:7, 1101:15, 1107:18, 1108:5, 1119:22, 1119:24, 1121:1, 1132:5, 1139:21, 1148:12, 1153:4, 1155:20, 1178:21, 1180:5, 1192:19, 1197:14, 1204:21, 1219:7, 1228:12, 1228:22, 1229:12, 1229:22, 1268:13, 1268:15, 1270:2, 1270:3, 1274:3, 1274:4, 1276:6, 1276:16, 1283:2

**two-part** [1] - 1192:19

**two-years** [1] - 1276:16

**type** [16] - 1093:24, 1129:14, 1134:9, 1134:10, 1141:14, 1161:18, 1161:19, 1165:24, 1166:15, 1167:16, 1170:11, 1171:13, 1267:22, 1267:23, 1276:2, 1290:8

**types** [5] - 1129:13, 1158:23, 1170:12, 1170:17, 1187:18

**typewritten** [1] - 1216:13

**typical** [6] - 1087:12, 1089:18, 1108:7, 1108:8, 1133:9, 1142:6
**typically** [4] - 1133:5, 1155:1, 1214:24, 1281:8
**typo** [1] - 1223:14
**typos** [1] - 1223:16

## U

**UDT** [2] - 1275:7, 1275:9
**ugly** [1] - 1051:19
**ultimate** [2] - 1044:21, 1259:22
**ultimately** [4] - 1053:14, 1191:24, 1203:13, 1203:14
**umpire** [1] - 1050:11
**unable** [1] - 1294:13
**uncle** [1] - 1265:2
**unclear** [1] - 1141:24
**uncommon** [1] - 1167:18
**undated** [1] - 1083:8
**under** [31] - 1078:21, 1079:8, 1099:16, 1141:17, 1147:7, 1165:22, 1204:4, 1244:11, 1244:12, 1245:1, 1245:3, 1245:22, 1246:8, 1248:12, 1249:19, 1251:1, 1251:2, 1251:20, 1251:21, 1253:1, 1253:11, 1255:21, 1257:16, 1258:1, 1258:9, 1258:25, 1260:22, 1271:22, 1278:13, 1280:20, 1282:13
**undercover** [1] - 1081:21
**undergo** [5] - 1067:20, 1075:13, 1075:22, 1076:9, 1076:21
**undergoing** [2] - 1077:9, 1078:20
**undergraduate** [1] - 1117:1
**underlying** [2] - 1210:1, 1210:6
**understood** [5] - 1062:14, 1067:1, 1081:10, 1095:4, 1162:24
**underway** [1] - 1114:13
**unemployed** [1] - 1172:8
**unfortunately** [2] - 1085:12, 1144:3
**unit** [1] - 1164:10
**United** [14] - 1115:2, 1122:17, 1253:15, 1255:11, 1255:17, 1255:22, 1256:1, 1256:24, 1257:19, 1257:23, 1257:24, 1258:7, 1258:25, 1259:8
**units** [9] - 1046:22, 1098:4, 1181:2, 1181:4, 1249:25, 1250:15, 1250:21, 1251:16, 1262:11
**University** [11] - 1116:22, 1117:3, 1117:4, 1117:10, 1117:22, 1119:3, 1258:17, 1258:18, 1265:9, 1265:13
**unless** [4] - 1039:9, 1178:9, 1200:14, 1219:24
**unlicensed** [2] - 1252:6, 1252:9
**unnecessary** [1] - 1048:6
**unreasonable** [1] - 1181:6
**unrecognized** [1] - 1177:9
**unstable** [3] - 1171:22, 1176:22, 1177:6
**untrained** [2] - 1252:1
**unusual** [2] - 1225:14, 1227:21
**unusually** [1] - 1182:20
**up** [66] - 1031:2, 1031:4, 1031:5,

1036:1, 1042:1, 1048:12, 1052:1, 1054:2, 1057:2, 1065:3, 1065:21, 1066:8, 1073:1, 1098:7, 1109:3, 1113:19, 1114:22, 1115:17, 1121:5, 1125:5, 1132:5, 1143:21, 1146:23, 1146:25, 1151:7, 1151:24, 1154:23, 1155:1, 1155:6, 1161:4, 1164:5, 1164:7, 1164:8, 1171:15, 1176:1, 1177:23, 1178:8, 1178:14, 1179:5, 1189:13, 1189:15, 1193:1, 1196:10, 1196:19, 1198:10, 1202:5, 1206:7, 1238:22, 1250:21, 1251:16, 1259:23, 1260:3, 1264:3, 1264:18, 1266:21, 1273:4, 1278:8, 1278:10, 1278:11, 1278:21, 1292:19, 1293:19, 1293:22, 1293:23
**up-to-date** [1] - 1193:1
**upstairs** [4] - 1061:13, 1091:13, 1092:4, 1164:11
**Urban** [3] - 1270:1, 1270:2, 1270:3
**urinalysis** [5] - 1274:12, 1274:15, 1274:18, 1274:19, 1275:3
**urine** [26] - 1081:16, 1101:12, 1101:16, 1135:13, 1136:14, 1139:14, 1139:16, 1139:20, 1139:21, 1139:22, 1146:3, 1146:4, 1146:7, 1146:22, 1179:11, 1179:15, 1184:5, 1193:22, 1219:13, 1234:13, 1234:19, 1245:24, 1246:6, 1246:7, 1275:6
**uses** [2] - 1096:6, 1101:6
**utilize** [1] - 1281:5
**utilized** [1] - 1144:19

## V

**V-E-R-E-L-A-N** [1] - 1288:25
**vaguely** [2] - 1063:14, 1240:1
**valid** [1] - 1169:10
**Valium** [5] - 1158:2, 1158:18, 1159:13, 1159:16, 1160:4
**variable** [1] - 1163:4
**variations** [1] - 1228:21
**varied** [2] - 1207:9, 1229:17
**various** [4] - 1060:23, 1063:25, 1171:6, 1191:19
**vast** [3] - 1141:1, 1170:12, 1182:9
**vehicle** [2] - 1130:24, 1197:22
**vehicles** [2] - 1268:14, 1268:15
**vendor** [1] - 1195:9
**verbal** [1] - 1143:10
**verbally** [1] - 1044:2
**Verelan** [2] - 1288:23, 1288:25
**verified** [1] - 1274:8
**verify** [3] - 1135:8, 1161:21, 1161:23
**versa** [2] - 1155:6, 1200:24
**version** [3] - 1159:6, 1159:10, 1210:21, 1237:24
**versus** [5] - 1054:1, 1131:3, 1134:16, 1224:24, 1224:25
**vice** [2] - 1155:6, 1200:23
**victim** [1] - 1175:9
**victimization** [1] - 1175:7

**video** [9] - 1047:11, 1081:22, 1084:25, 1085:8, 1085:22, 1092:10, 1092:18, 1107:21
**videos** [1] - 1091:17
**view** [2] - 1038:17, 1142:24
**vigilance** [1] - 1134:3
**village** [1] - 1264:18
**violating** [1] - 1120:25
**violation** [5] - 1046:24, 1121:4, 1121:5, 1250:1, 1250:5
**visit** [44] - 1047:12, 1047:16, 1060:21, 1063:12, 1063:20, 1064:9, 1066:16, 1067:16, 1069:15, 1070:9, 1071:11, 1071:14, 1072:7, 1073:21, 1074:6, 1074:16, 1076:9, 1076:17, 1077:22, 1078:11, 1078:12, 1084:21, 1087:12, 1089:20, 1093:19, 1094:13, 1099:19, 1104:19, 1107:17, 1108:8, 1181:21, 1199:3, 1207:9, 1214:22, 1215:9, 1229:5, 1229:7, 1229:10, 1281:12, 1281:18, 1288:6
**visited** [2] - 1063:19, 1274:5
**visits** [19] - 1061:25, 1070:18, 1071:2, 1071:6, 1072:5, 1086:14, 1087:23, 1093:13, 1093:15, 1094:14, 1096:8, 1103:6, 1151:7, 1214:25, 1228:16, 1228:22, 1229:3, 1229:22, 1230:16
**vitae** [2] - 1115:12, 1115:19
**vitals** [2] - 1091:24, 1093:17
**vocational** [1] - 1103:9
**volume** [1] - 1262:10
**voluntarily** [1] - 1257:9
**volunteered** [1] - 1290:23
**Voss** [3] - 1269:5, 1269:7, 1269:8

## W

**waiting** [8] - 1085:17, 1085:20, 1086:7, 1088:12, 1088:14, 1108:23, 1203:14, 1252:19
**walk** [5] - 1092:3, 1173:1, 1201:4, 1202:5, 1214:10
**walked** [1] - 1202:8
**walking** [2] - 1213:14, 1273:21
**wants** [4] - 1164:3, 1208:6, 1215:12, 1251:10
**warmup** [2] - 1201:13, 1201:15
**warning** [1] - 1137:6
**warrant** [1] - 1264:5
**watch** [1] - 1234:5
**water** [4] - 1212:11, 1243:3, 1260:1
**Wayne** [1] - 1229:20
**ways** [15] - 1045:1, 1122:1, 1129:8, 1132:10, 1144:19, 1148:12, 1153:18, 1153:21, 1153:24, 1170:18, 1175:11, 1188:8, 1190:2, 1227:15, 1233:14
**weakness** [1] - 1138:7
**website** [1] - 1120:5
**Wednesday** [1] - 1294:18
**week** [2] - 1071:17, 1071:21
**weekend** [3] - 1033:25, 1055:21, 1056:24

**weekly** [1] - 1285:18
**weeks** [7] - 1095:25, 1096:1, 1096:4, 1125:15, 1131:8, 1285:10, 1288:11
**weigh** [1] - 1199:13
**weight** [17] - 1066:1, 1069:7, 1069:8, 1073:22, 1074:5, 1074:6, 1074:11, 1074:13, 1088:11, 1090:23, 1090:24, 1135:24, 1136:1, 1136:4, 1199:21, 1200:2
**welfare** [1] - 1183:12
**west** [1] - 1269:17
**western** [1] - 1130:18
**wet** [1] - 1164:9
**whack** [3] - 1124:19, 1125:5, 1125:15
**whacking** [1] - 1124:22
**Wheeler** [2] - 1075:25, 1077:12
**whereabouts** [1] - 1139:13
**white** [1] - 1234:17
**whole** [7] - 1112:6, 1112:13, 1115:6, 1125:7, 1170:12, 1171:23, 1254:1
**wholesaler** [1] - 1261:25
**Wichita** [2] - 1123:14, 1123:15
**willful** [6] - 1044:10, 1044:19, 1045:2, 1045:4, 1045:10, 1045:20
**willfully** [1] - 1262:2
**Williams** [7] - 1082:12, 1082:25, 1083:8, 1083:14, 1083:20, 1084:1, 1084:17
**win** [1] - 1125:9
**wind** [1] - 1166:12
**wings** [2] - 1200:9, 1200:10
**winning** [1] - 1125:7
**wise** [1] - 1243:17
**wisely** [1] - 1050:9
**wish** [1] - 1091:3
**wishes** [1] - 1043:10
**withdraw** [1] - 1157:2
**withdrawal** [2] - 1154:7, 1248:18
**withdrawals** [2] - 1153:17, 1153:19
**withheld** [1] - 1082:6
**witness** [47] - 1031:8, 1031:15, 1042:11, 1042:16, 1042:17, 1045:25, 1047:9, 1048:3, 1048:4, 1049:3, 1050:20, 1051:21, 1052:9, 1053:24, 1054:16, 1054:19, 1054:20, 1055:17, 1055:18, 1056:7, 1056:11, 1069:10, 1076:2, 1076:5, 1082:19, 1096:18, 1112:23, 1113:8, 1114:22, 1115:1, 1123:6, 1123:9, 1123:16, 1178:9, 1222:17, 1241:1, 1241:13, 1241:15, 1241:19, 1242:19, 1252:3, 1252:16, 1253:14, 1257:6, 1262:14, 1293:13
**WITNESS** [9] - 1071:8, 1111:6, 1111:8, 1112:20, 1115:8, 1253:20, 1253:23, 1254:3, 1260:2
**witnesses** [15] - 1035:5, 1035:6, 1036:15, 1051:1, 1051:14, 1052:3, 1052:6, 1053:22, 1055:20, 1113:19, 1114:13, 1253:6, 1293:9, 1294:1, 1294:11
**woke** [1] - 1143:21
**word** [6] - 1035:20, 1100:25, 1113:4,

1130:13, 1213:19, 1230:6
**words** [16] - 1036:23, 1045:8, 1072:16, 1081:3, 1099:11, 1124:15, 1131:17, 1136:25, 1187:12, 1190:9, 1192:3, 1210:8, 1211:19, 1245:5, 1253:4, 1288:3
**Workers'** [3] - 1120:14, 1120:20, 1197:19
**works** [2] - 1158:7, 1225:6
**world** [1] - 1219:17
**worse** [6] - 1088:23, 1092:7, 1092:19, 1169:15, 1176:2, 1247:24
**worst** [3] - 1064:5, 1143:18, 1207:3
**Worth** [4] - 1123:17, 1265:2, 1265:7, 1265:8
**wound** [1] - 1166:7
**wounds** [1] - 1039:21
**wrap** [1] - 1177:23
**write** [23] - 1097:21, 1101:23, 1107:19, 1150:17, 1153:7, 1209:18, 1212:22, 1245:20, 1279:6, 1279:13, 1279:22, 1279:23, 1279:25, 1280:4, 1280:7, 1280:14, 1280:16, 1280:18, 1281:18, 1282:25, 1283:2, 1283:11
**writes** [1] - 1035:7
**writing** [8] - 1080:4, 1090:7, 1097:23, 1100:5, 1155:13, 1231:14, 1262:3
**written** [17] - 1033:10, 1033:12, 1082:16, 1140:5, 1143:10, 1154:16, 1205:16, 1209:4, 1235:23, 1259:20, 1261:7, 1261:12, 1261:24, 1262:11, 1270:21, 1281:13, 1288:1
**wrote** [7] - 1071:24, 1100:7, 1100:9, 1157:17, 1208:25, 1234:17, 1280:9

**X**

**X-ray** [3] - 1101:25, 1145:10, 1276:11
**X-rays** [2] - 1226:25, 1274:2
**Xanax** [4] - 1069:24, 1158:3, 1159:12, 1159:17

**Y**

**y'all** [7] - 1031:3, 1031:7, 1031:16, 1086:17, 1088:5, 1090:23, 1292:19
**year** [19] - 1062:24, 1116:24, 1117:5, 1117:15, 1117:24, 1117:25, 1120:17, 1123:17, 1189:17, 1219:7, 1265:12, 1265:14, 1265:20, 1265:24, 1266:17, 1267:14, 1269:12, 1277:12, 1277:25
**years** [33] - 1047:25, 1058:17, 1062:23, 1101:14, 1101:15, 1117:16, 1118:22, 1120:16, 1120:18, 1120:21, 1128:23, 1130:6, 1133:21, 1139:11, 1144:22, 1161:12, 1167:8, 1167:19, 1167:23, 1168:8, 1168:21, 1172:9, 1215:25, 1266:12, 1267:5, 1269:18, 1274:3, 1274:4, 1276:6, 1276:7, 1276:12, 1276:16
**yesterday** [1] - 1031:18

**yoga** [1] - 1170:9
**York** [2] - 1264:18, 1264:20
**you-all** [1] - 1042:15
**yourself** [4] - 1048:6, 1217:10, 1217:13, 1286:2

**Z**

**zero** [2] - 1083:18, 1233:17